FILED DEC 17 '04 14:49 USBCRI

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| In re:<br><br>LOUIS A. GENCARELLI, SR.,<br><br>Debtor. | Bk. No. 04-10682<br>(Chapter 11) |

**APPELLANT'S AMENDED DESIGNATION OF THE RECORD AND STATEMENT OF THE ISSUES ON APPEAL**

Claimants, 1800 Smith Street Associates, LP and 1500 Mineral Spring Associates, LP, by and through their General Partner, Jason's Realty Corp. (collectively, the "Creditors"), pursuant to Federal Rule of Bankruptcy Procedure 8006, hereby submit a designation of the items to be included in the record on appeal and a statement of the issues presented on appeal.

A. The Record on Appeal shall include the following:

1. Motion of Louis A. Gencarelli, Sr. ("Gencarelli") to Limit the Allowance of Claims filed by Claimants, 1500 Mineral Spring Associates, L.P. and 1800 Smith Street Associates, L.P., together with the Memorandum and Exhibits filed in support thereof, dated August 12, 2004;

2. Objection of Creditors to Gencarelli's Motion to Limit the Allowance of Claims of Claimants, 1500 Mineral Spring Associates, L.P. and 1800 Smith Street Associates, together with the Memorandum and Exhibits filed in support thereof, dated and filed August 26, 2004;

3. Motion of Gencarelli for Expedited Hearing Upon his Motion to Limit the Allowance of Claims Filed by Claimants, 1500 Mineral Spring Associates, L.P. and 1800 Smith Street Associates, L.P., dated August 30, 2004; and



3

4. Order entered on November 22, 2004 by the U.S. Bankruptcy Court for the District of Rhode Island granting Gencarelli's Motion to Limit the Allowance of Claims of the Claimants, 1500 Mineral Spring Associates, L.P., and 1800 Smith Street Associates, L.P., together with the appended transcript of the hearing held before the Bankruptcy Court on September 22, 2004.

B. <u>The Issues on Appeal are as follows:</u>

1. Whether the Bankruptcy Court erred in granting Gencarelli's Motion to Limit the Allowance of Claims filed by the Creditors under 11 U.S.C. §502(b)(6).

2. Whether, under the circumstances of this case, the Bankruptcy Court abused its discretion by failing and refusing to apply its equitable power under 11 U.S.C. §105 to prevent Gencarelli from abusing the bankruptcy process in order to avoid paying in full the Judgments entered in favor of the Creditors by the Rhode Island Superior Court.

Respectfully submitted,

1500 MINERAL SPRING ASSOCIATES, LP, and 1800 SMITH STREET ASSOCIATES, LP, by and through their General Partner JASON'S REALTY CORP.

By their Attorneys,

Denean M. Russo

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: December 17, 2004

**CERTIFICATION**

I hereby certify that on this 17th day of December, 2004, a true copy of the within Amended Designation was sent via first class mail, postage pre-paid, to the following:

Allan M. Shine, Esq.
Attorney Diane Finkle
WINOGRAD, SHINE & ZACKS, P.C.
123 Dyer Street
Providence, RI 02903

William G. Madsen, Esq.
Madsen Prestley Parenteau
44 Capitol Avenue, Suite 201
Hartford, CT 06106

Joseph Ferrucci, Esq.
Ferrucci Russo P.C.
55 Pine Street
Providence, RI 02903

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Horton's
874 Sinclair Road
Oakville, Ontario CANADA L6K 1Y1

James R. Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903

Transamerica Life Co.
P.O. Box 740559
Atlanta, GA 30374

Leonard J. DePasquale, Esq.
Assistant United States Trustee
10 Dorrance Street
Suite 910
Providence, RI 02903

Department of the Treasury
Internal Revenue Service
Insolvency Unit, 4th Floor
380 Westminster Street
Providence, RI 02903

Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107

Michelle B. Daugherty

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\BANKRUPTCY PLEADINGS\Amended Designation of Record and Issues for Appeal-Gencarelli's Motion to Cap Claims 121604.doc

UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

IN RE: LOUIS A. GENCARELLI, SR.

B.K. NO. 04-10682

Hearing Date: September 22, 2004

ORIGINAL

COPY

(TAPED HEARING COMMENCED)

JUDGE: The matter of Louis Gencarelli. Debtor's motion to limit the allowance of claims and the objection of claimant.

MR. FERRUCCI: Good morning, Your Honor. Joseph Ferrucci on behalf of Louis Gencarelli.

Your Honor, before you this morning is the debtor's motion to limit allowance of claims filed by 1500 Mineral Spring Avenue Associates, L.P. and 1800 Smith Street Associates, L.P.

We are seeking today the Court's order to limit the allowance of those claims based upon the cap imposed pursuant to 11 U.S.C. §502(b)(6) for pre-petition breaches of certain commercial real estate leases.

We note that, at least from the debtor's perspective, we intend to rely upon the pleadings that have been filed in this proceeding and the attachments thereto. We believe the Court has the authority as a matter of judicial notice to look at the pleadings that have been filed in both the District Court as well as the State Court Superior Court action. Again, many of those pleadings have been attached to both the movant's as well as the

respondent's papers.

By way of background, Your Honor, as outlined in our motion, the claimants are -- still are and at the time in 1999 were owners of land located in North Providence, Rhode Island at 1500 Mineral Spring Avenue and 1800 Smith Street. Those pieces of property were undeveloped at the time.

And in or about November of 1999, Gencarelli individually entered into two documents entitled Absolute Triple Net Leases for the purpose of attempting to develop those two locations as Bess Eaton restaurants and coffee restaurants.

In the 1500 lease, Your Honor, I'll refer to it as the 1500 lease, the minimum base rent was $3,500 per month and was to commence on March 1, 2000. And the 1800 lease, the minimum monthly rent was $3,000 per month commencing on March 1, 2000 as well.

On or about February 29, 2000, Your Honor, the debtor served notice, written notice, on the landlords purporting to exercise the debtor's right to terminate those leases.

On or about March 28, 2000, the landlord claimants here filed two separate actions in the

State District Court, in the Sixth Division District Court, seeking damages and possession of the lease property pursuant to Section 9 of the Landlord -- Commercial Landlord Tenant Act as enacted in Rhode Island, Rhode Island General Laws 34-18.1-1.

On or about June 13, 2000, Your Honor, the District Court entered a judgment in favor of the landlords in connection with the complaints.

The judgment for damages, Your Honor, that was rendered by the District Court was appealed in the form of a declaratory judgment action that was filed by counsel to Mr. Gencarelli at the time. The debtor at that time did not contest, nor did he appeal, the landlord's legal claim to possession of the real estate, Your Honor. It is also notable that the debtor did not pay any rent during this period of time as well.

On or about March 26, 2004, Your Honor, the Superior Court rendered a Decision, Justice Indeglia, on the above-referenced appeal. And Your Honor may be familiar with that in that we were here a couple months ago explaining to the Court the timing of that Decision and ultimately a consent was given for relief to allow the Decision to become a

final judgment of the Superior Court.

And then on March 1, 2004, Your Honor, the instant proceedings were filed herein.

Your Honor, the argument of the debtor is a very straightforward argument. The debtor's argument is that Section 502(b)(6), which this Court I know is keenly familiar with based upon Your Honor's years on the bench, is very, very clear. It's a statutory clarity, Your Honor, and there are not many sometimes in the Code.

But 502(b)(6) provides in pertinent part that the claim of the landlord shall be limited to the greater of one year or as the case may be 15%, not to exceed three years, of the remaining term of the lease, or in this case the leases.

In addition to that amount, Your Honor, the Code provides that pre-petition a calculation has to be done as to what damages under the lease were as of the earlier of the petition date or the date on which the lessor repossessed or the tenant surrendered the premises.

In the instant case, Your Honor, the position of the debtor is that these are commercial leases. The claimants have filed an objection and

have placed great weight on the fact that there may have been or there were arguments below or in the State Court proceedings that these were argued to be not leases, that they were contracts.

There are a number of arguments, however, Your Honor, that can be articulated in the alternative respectfully and it's done every day in Court. However, Your Honor doesn't need to go there because ultimately Judge Indeglia decided that issue in the State Court, and made a number of findings of fact in connection with his Decision.

And that's the Decision just again for the record that's dated March 26, 2004, Your Honor. And in that Decision, Judge Indeglia states that the matter before the Court is on the plaintiff's actions for rent and associated expenses on two leases with lessee defendant.

And then as you continue through the Opinion, and the Opinion is fraught with references to leases, Your Honor. There are findings of fact and conclusions of law on page 18 of that Decision, Judge.

JUDGE: Is there a specific ruling by the Superior Court that these in fact were leases or

were -- was the word leases being used loosely?

MR. FERRUCCI: No, I don't think so, Your Honor. I believe there was a ruling, and I think if you look at paragraph one of the findings of fact, that's page 18 of the Decision, it specifically says that on November 1, 1999, each of the plaintiffs, MSA and SSA, entered into a Commercial Absolute Triple Net Bonded Land Lease with defendant Gencarelli, collectively referred to as the leases.

Both leases are for a five year period commencing on March 1, 2000 with the option of renewal. I think that's a finding of fact and it maybe, if you continue on, Your Honor, back toward the page 20, the Court goes on in its findings to provide, "The plaintiffs have satisfied the Court by a preponderance of evidence that they are entitled to rent due under the two leases."

And then in its conclusory paragraph, says, "Accordingly, the Court finds for the plaintiffs and orders defendant to pay the minimum base rent on both leases. Defendant is also ordered to pay the additional rent."

And the last sentence prior to the directive to counsel to prepare an order, it says,

"Plaintiffs are entitled to recover from defendant reasonable attorneys' fees and expenses incurred as a result of defendant's default under the leases."

So regardless of what was argued below, Your Honor, the Court -- the judicial findings that these were leases and that these leases were breached and as a result damages flowed from that breach, and the Court outlined what those State law damages are in its Decision.

There are other indications, Your Honor, that leads to the conclusion that it was the claimant's position that these were in fact leases. If you take a look at the documents themselves, they are entitled Absolute Triple Net Leases.

The complaint that was filed at the District Court level by the claimants, Count I specifically seeks a judgment for possession under 34-18.19, which Your Honor knows is the Commercial Landlord Tenant Statute in Rhode Island. And it also sought damages under the terms of leases for rent.

And then the District Court judgment eventually was entered by the District Court on June 18 of 2000, Your Honor. So there is -- the record

below is certainly fraught with banter back and forth, but the bottom line, Your Honor, is that the District -- that the Superior Court made a conclusive finding that this was a lease.

Mr. Sisto makes basically three arguments, Judge. The first argument he makes is that 502 should not apply because somehow Mr. Gencarelli should be estopped from taking a position different than his counsel took below. Well, we've begun to argue that, Your Honor, begun to respond to that in the sense that the Court has already determined below this was a breach of a lease.

So arguments aside, and again respectfully, I think every lawyer in this room has argued matters in the alternative. In fact, the declaratory judgment complaint itself has a provision, the last provision of the Count for lease, says, "In the event the Court determines that this is a lease," then X, Y and Z should be done by the Court.

So it's typical that there are going to be arguments in the alternative, Your Honor, but the argument, the first argument of Mr. Sisto is that because of those arguments below, somehow 502(b)(6)

does not apply and that in fact, those findings below would somehow change the result in this proceeding.

Well, in fact, the judicial findings below were consistent with the fact that this was a lease. And as a result, those findings are binding on this Court and, therefore, should be looked to in light of the 502(b)(6) cap.

I note that in connection with that argument, there's not one case that's cited for the proposition. There's a finding below that we're dealing with a lease that somehow 502(b)(6) shouldn't apply if you made an alternative argument below.

The next argument that Sisto makes, Your Honor, is that Section 105 of the Code should somehow be applied to, for lack of a better expression, Your Honor, equitably override the plain language of Section 502(b)(6).

There are a number of cases, Your Honor, and I have copies for the Court to review, but the Courts have in general under the Code, and specifically in the instance of 502(b)(6), rejected these arguments and have consistently held that when

a statute's language is clear on its face, the sole function of the Court is to enforce the statute in accordance with its terms.

The Courts have noted that there is a difference between filling a gap in a statute, Your Honor, and when Congress is silent as opposed to a situation when we're asking the Court to rewrite a specific statutory mandate.

You will hear an argument, I'm sure, Your Honor, that this case is different because creditors are being paid in full. That's a consideration that has no meaning here, Judge, has no basis for disregarding the plain language of 502(b)(6).

In fact, we've been able -- our research recently has been able to find at least two cases that will say that in fact there is a solvent estate or that all creditors are being paid in full has no bearing on the plain language of the statute.

The language of the statute is clear. Legislature could have very easily, Your Honor, added a provision that said, "But in no event shall a statute apply in situations where all creditors are paid in full." It doesn't say that. It's clear on its face, Judge.

One of those cases, Judge, *In Re: Farley,* which is cited at 146 Bankruptcy Reporter 739, it's a Northern District of Illinois case (1992), the Court rejected an argument that the cap should not apply when all other creditors are being paid in full and the only beneficiary is the debtor.

Under the plain language the cap applies according to the Court, and nothing in Section 502 suggests that an exception exists where all creditors are being paid in full. Congress presumptively weighed those factors when it enacted the statute, Your Honor.

There are a number of other cases, Your Honor, that we can cite for the Court. Again, in looking at that argument by Mr. Sisto, there is not one case cited by Mr. Sisto in support of the proposition that Section 105 should somehow override equitably Section 502(b)(6).

Finally, Your Honor, and maybe most germane for today, is Mr. Sisto's argument that assuming arguendo that the cap applies, the bankruptcy petition date should be the date used to calculate Mr. Sisto's or claimant's damages.

With respect to that, Your Honor, we had

submitted in our papers two alternate dates. One date was the date that Mr. Sisto's client, Mr. Wieck's client filed the complaint in the District Court action, which was March 28, 2000.

The other date that we submitted respectfully as a date from which you measure it you will is the date the judgment was entered in the District Court action.

Since our pleadings, Your Honor, it's come to our attention that there has been entered in the District Court action a stipulation that is signed by attorneys for Mr. Sisto or attorneys for the claimants herein and at the time attorney for the debtor whereby the stipulation that was entered provides by agreement of the parties and is hereby acknowledged and understood that defendant Louis A. Gencarelli, Sr. does not have and is not entitled to possession of the demised premises.

Respectfully, Your Honor, this is a judicial acknowledgment that in effect Mr. Gencarelli was not in possession of the property as of April 19, 2000. This stipulation was a part of a motion that was filed with the Court that became part of the Court record. And in a nut shell, Your

Honor, puts to rest any issue relative to possession or repossession if you will by the landlord.

And I think it's critical, Your Honor, because a large part of Mr. Wieck's papers deal with the issue of res judicata and the fact that Mr. Gencarelli failed to argue below possession. Well, the simple fact, Your Honor, is that Mr. Gencarelli was not contesting possession below. He was not.

The District Court complaints that were filed by Mr. Sisto sought possession, and the Judgment was entered in June of 2000. The Judgment admittedly doesn't refer to possession, presumptively because the parties stipulated to it a month and a half or so earlier.

Secondly, Your Honor, under Rhode Island Law, and Your Honor is probably aware of this, on appeal a debtor would have to pay rent in order to be entitled to possession. No rent was ever paid, Judge.

And finally, Your Honor, we did reference the stipulation and the stipulation is clear on its face. It speaks for itself.

Again, to clarify the res judicata arguments, therefore, that had been cited by Mr.

Wieck I think are just ineffable under the circumstances.

Be that as it may, if there's any indication in that argument that this Court does not have the ability to look behind the State Court Judgment, and I'll anticipate an argument that Mr. Wieck might say this is a judgment, Judge, not to do with the lease.

Well, the Courts are clear on that issue as well that res judicata does not apply and does not preclude this Court from looking behind the Judgment to determine what the actual claim being asserted by the claimant is in order to apply the statutory cap.

And in connection with that, Your Honor, we would refer Your Honor to *In Re: Richard Turner*, which is cited 209 Bankruptcy Reporter 177, District of Massachusetts case (1997).

Again, respectfully, the cases that are cited in the objection deal with res judicata as a general concept. I found no case cited in the objection which deals with this issue as it relates to the 502(b)(6).

So in sum, Your Honor, I think what we

have is an argument by Mr. Sisto and the claimant that this is as a matter of equity this Court should look behind 502(b)(6), and as a matter of fairness come to a different result.

And respectfully, Your Honor, there has been no legal support cited for that. In fact, the legal support that we found is to the contrary and that this Court, as well as other Courts who have considered this issue, this Court should not look to the equities. The statute is plain and clear on its face and as a result the cap applies, Your Honor.

With respect to the calculation of damages, Your Honor, it is the position of the debtor, we've set forth the amounts that we believe are equal to the cap in our pleadings.

I will though clarify for the record one item, and that is we agree that the annual rent or the one-year rent would be the -- of the one-year versus 15%, the one-year would apply. And under the 1500 lease it would be $47,662.17. And of the 1800 lease it would be $40,098.32.

Our calculation, Your Honor, of the pre-petition rent, it should be paid from the date the lease commenced until the date that possession was

taken if you will by the landlord. That date based upon the stipulation would be April 19, March 1, 2000 to April 19 of 2000, it's 50 days. And we calculate rent, taxes, and insurance which would be properly paid -- should be properly paid under the rent.

For that period of time to be under the 1500 lease $6,409.09, and under the 1800 lease, $5,362.69. When you add those figures, Your Honor, we come to a number of $99,531, plus or minus some change, which we believe is the cap that should be applied here, and that we're asking this Court to find today as the maximum amount of Mr. Wieck's client's claim.

And in connection with that, Your Honor, we request that Your Honor impose, and the debtor is prepared to obviously continue to do this, to maintain an escrow in that amount for that claim.

And I'll state for the record that this is the last of all these claims where there's any dispute as to what at least what the escrow should be.

With that, Your Honor, I would just reserve right to respond to comments by Mr. Wieck.

If Your Honor has any questions, I'll be happy to answer.

JUDGE: Okay. Not right now. Any other arguments from -- okay, yeah.

(Off the record.)

MR. WIECK: Your Honor, Robert Wieck on behalf of the claimants, 1800 Smith Street Associates and 1500 Mineral Spring Associates.

As Mr. Ferrucci has eluded to, my arguments are essentially threefold and they are the arguments which I set forth in my papers, but would certainly appreciate the opportunity to elaborate upon here now.

The first argument that we make in our papers, and I reiterate here, is that of course we all know that 502(b)(6) and the effect of the cap that is effective in 502(b)(6) is only applicable as it relates to damages for the termination of a lease of real property.

The first argument that I make is that this is the first time, this is the first time that this debtor, Mr. Gencarelli, has ever taken the position that these documents, these agreements, are in fact leases for real property.

Now, Mr. Ferrucci correctly points out that ever since I filed the original complaint in the District Court, March of 2000, I have been saying, "These are leases; these are leases; these are leases." And I filed a T&E action in the District Court based upon the fact that I claimed that these were leases of real property.

Three specific times that issue became meaningful. Mr. Ferrucci makes reference to your familiarity with the T&E action in the State Court procedure. I assume Your Honor is also familiar with the appeal process from the T&E action.

Appellants, landlords have special appeal rights from appealing from T&E action. I tried to enforce those appeal rights three times, three times. The first time under the T&E statute when a tenant appeals, the tenant is obligated to post a bond as a condition of the appeal.

Now, Mr. Ferrucci misspoke just one regard. I'm sure it wasn't intentionally. Mr. Gencarelli did in fact appeal the T&E actions. I filed the T&E complaint in District Court. I got a judgment in District Court. Mr. Gencarelli appealed those T&E actions to the Superior Court. Those are

de novo appeals.

Mr. Gencarelli also filed separately a DG action in the Superior Court, asking the Superior Court prior to the District Court actions going forward, to assume jurisdiction over the case because these are not leases.

Mr. Gencarelli did everything that he could to get out of the District Court by filing a DJ action in the Superior Court saying, "These aren't leases. I never took possession. I don't belong in the District Court."

Now, after we went forward in the District Court and I prevailed, and Mr. Gencarelli appealed those actions and then we consolidated the two appeals with his DJ action. Now, the significance of that is Mr. Gencarelli did not post a bond.

I obtained a monetary judgment in the District Court action. He did not post a bond. I said, "Great, easy." I filed a motion to dismiss the appeal based upon the fact that he didn't post a bond. Result, "Wieck, you lose. We're not satisfied that these are leases. We're not satisfied that the T&E action applies. We're not going to require him to post a bond." Strike one.

Second thing I did under the T&E action, you're entitled to an expedited trial. You are supposed to go to the head of the list if you are appealing a T&E action. You're supposed to be first. I filed a motion to expedite the trial. Strike two. "Wieck, you lose again."

These aren't really T&E actions. They're not really leases. Now, when I say this, that's the argument that Mr. Gencarelli offered to the Superior Court. And in both cases, he prevailed in those arguments. He prevailed. Third strike.

T&E action requires you to post bond during the pendency of the appeal. Mr. Ferrucci correctly points out no rent was paid during the pendency of the appeal.

I filed a third action. Third motion, dismiss the appeal, failure to post -- to pay rent; therefore, dismiss the appeal. Strike three.

Three times that issue was brought to the Superior Court. Three times I lost. Three times Mr. Gencarelli prevailed on the basic notion of these were not leases involving possession of real estate.

Now, Mr. Ferrucci takes Mr. Justice

Indeglia's Decision and of course he cites the fact that there are leases and there's rent due. The mere fact of the fact that he refers to the leases, the documents themselves are called leases.

And I think Your Honor actually hit the nail on the head, if you simply substitute the word contracts every place Judge Indeglia says leases, the Decision has exactly the same effect.

I would defy anyone to examine that Decision to determine whether there was any finding of fact or any conclusion of law that even came close to addressing the issue of whether these were executory contracts versus leases for commercial real estate. Wasn't addressed. Wasn't important at that level. Judge Indeglia didn't address it.

The first -- I think the first issue that this Court has to determine is whether 502(b)(6) does apply.

Now, I'm sure that the argument sounds like the rose by any other name is a rose. But the fact of the matter is here is that Mr. Gencarelli never took possession of these properties. Never took possession of the properties. Never was a tenant in possession.

And he utilized that argument several times in arguing to the Superior Court that because he never took possession, because these were not leases in the sense that the tenant actually took possession, various aspects of the T&E action didn't apply.

Now, of course, he took those positions when it was to his advantage to take those positions. Now, for the first time, because he sees an advantage under 502(b)(6), he then says, "Never mind what I've been saying for the last four years. These are leases and Judge Indeglia said they were leases."

I think this Court frankly has to make its own independent decision with respect to that particular point. And it's not at all precluded by doing that as a result of Judge Indeglia's Decision.

Judge Indeglia's Decision is exactly the same whether he concludes they were leases that were terminated or executory contracts that were terminated. The result is the same and the damages are the same.

The second argument that I advance is assuming arguendo that the cap does apply, we have a

far different view with respect to how the cap applies and what the debtor is advancing. And that far different view frankly hinges on the debtor's interpretation of what surrender of possession means and the legal connotation of that.

Mr. Ferrucci cites to the stipulation that he suggested he found after his papers were filed, that stipulation was an exhibit to my papers. It's not something that we hid. It's consistent with Mr. Gencarelli's position from the beginning that he never took possession. He stipulated that he never had possession. He thought that was going to inure to his benefit and advantage, and in fact, it did because that was part of his argument each time I sought the advantage of the T&E action.

But under 502(b)(6), it's not -- it's not the concept of physical possession. Surrender of possession under 502(b)(6) must be construed under Rhode Island law. And we've cited you the cases under Rhode Island law.

Surrender of possession means where the landlord has accepted the possession of the premises without the right to obtain rent. It's the whole legal concept of rent reserved.

502(b)(6) didn't -- and we cited the cases with respect to that -- doesn't change the law with respect to a pre-petition rent as it relates to the concept of surrender and possession and the acceptance of possession.

As we cited, the lease specifically provides that when the landlord accepts possession of the property, he does not waive his right for rent reserve. It's the whole concept of the landlord's obligation of mitigating damages, obtaining a substitute tenant, attempting to relate to premises.

The mere fact that the tenant simply turns possession back to the landlord does not eliminate or alleviate the tenant's obligation to pay rent.

Now, what we cited in the papers are that issue was conclusively determined by Judge Indeglia because if in fact, if in fact possession of the premises, possession meaning landlord loses right to rent reserve, if that in fact occurred, that would have been a defense in the underlying action. That would have been a defense to any liability that Mr. Gencarelli had on a going forward basis.

That was not advanced. It was not found.

And as a result when Judge Indeglia finds that Mr. Gencarelli is in fact obligated for the rent for the period of time following his purported termination, he's already conclusively determined that particular point.

So Mr. Ferrucci and the debtor's pointing to the transfer of physical possession is frankly a red herring under 502(b)(6). The concept is when has possession -- when has surrender of possession occurred, meaning under State law, and that's a State law issue, surrender of possession means when the landlord no longer has the right for rent reserve.

Now, I will stipulate and my papers indicate that 502(b)(6) does apply at least to one element of my pre-petition damage. And that is I recognize that it limits the recovery to rent. Rent, not legal fees, not interest.

And in our papers we set forth a calculation as we see it under 502(b) that produces a 262,202.82 in one respect, and 205,935.56. But that is, as I said, it's based upon the effective clock beginning to tick as of the petition date because not any point in time prior to petition date

did landlord accept the surrender of the premises or surrender of possession so as to lose the legal right for rent reserve.

The final argument, Your Honor, I make is under 105. And Mr. Ferrucci is correct. I have not found a case. I have not found a case to cite to you in support of my 105 argument. And I would stipulate that I think the reason why I have not found a case is that perhaps there's never been quite a case like this one.

We had a situation here, as Your Honor well knows, that there were joint filings by Mr. Gencarelli and by Bess Eaton. Those joint filings were made presumably to permit the -- essentially the assets of Bess Eaton, and because Mr. Gencarelli owns some of those assets himself, to effectuate a sale of those assets.

Cases were never substantively consolidated. In fact, I'm not sure that the cases were ever administratively consolidated. But certainly all of us were told you don't really have to worry about all of those things. In fact, we're all told that you don't really have to worry about whether or not we belong in bankruptcy to begin in.

Everybody will be paid. Plenty of cash. Plenty of assets. Plenty to go around. All of the lawyers stood up, congratulated themselves appropriately so. Put the deal together quickly. Got a very fine result. Plenty of cash. Everybody's getting paid. Even unsecured creditors getting paid interest.

Last piece of paper that I saw the debtor filed wanted to expedite this hearing because he's sitting on $8 million that he's got to give to Mr. Gencarelli, subject to the legal fees. But there's a huge, huge pot of money that's going back to Mr. Gencarelli.

Everybody gets paid except my client, except my client. And not only does my client not get paid is that Mr. Gencarelli wants his cake and eat it too. I'm still litigating in the Supreme Court.

What Mr. Gencarelli has done before you, Your Honor, he wants to hedge his bet. He wants you to tell him that his worst case in the Supreme Court is the cap that he's asked you to impose, 50, $60,000.

At the same time, he wants to litigate

with me in the Supreme Court. Why? Because if the cap applies, my client can no longer recover his legal fees. Mr. Gencarelli is allowed to pay his lawyers. In fact, one of the creditors who have been paid in full has been Mr. Gencarelli's lawyers. Mr. Gencarelli's lawyers who have been paid fighting my client's claim.

And if the cap applies, my client cannot recover his legal fees either pre-petition or post-petition. I still must fight Mr. Gencarelli in the Supreme Court without the ability to recover those fees.

Interest. 502 applies notwithstanding the fact that all of their unsecured creditors have been paid. Notwithstanding the fact that Mr. Gencarelli will put $8 million in his pocket. My client's claim is capped. We take the statutory 12% interest provided by Rhode Island law. We just wash that away.

Now, we have cited to you the cases which show the legislative intent of 502(b)(6). The intent being we don't want a disproportionately large claim of landlord to render some prejudice to the estate. A disproportionate large claim to

landlords that would prevent or prohibit other creditors from being paid. That clearly is not happening here.

What is happening here is nothing more than a huge windfall for Mr. Gencarelli, where just by virtue of this filing, one creditor, my client who's been pursuing a claim for four years, is denied his statutory rights for interest; is denied his contractual rights to recover legal fees; and denied his contractual rights to recover rent when there is no other purpose being served by that particular cap.

And I would submit to you that under 105 that is the classic case where 105 should be exercised to prevent that abuse from occurring.

Can I give you a case which is on all fours with the present case? No. Now, that means one of two things to me. It means that what I'm telling you is flat out wrong. And I'm sure Mr. Ferrucci will tell you that what I'm telling you is flat out wrong.

Or the other thing it would suggest to me is that there's never quite been a case just like this one. And as a result, no Court prior to this

Court's determination, would have to do the fact kind of analysis that I'm suggesting to you that would be applicable under 105.

So for those reasons, Your Honor, I'd say that the cap doesn't apply because we're not talking about a lease. We're talking about damages from an executory contract, so says the debtor himself. And if the cap would apply, it's the numbers that we set forth.

And if all else fails, I would ask you to invoke your equity powers under 105 to prevent this result from occurring.

JUDGE: Because the debtor has argued diametrically opposed to what he's talking to now as far as the lease contract issue, what do you say about Mr. Ferrucci's argument that -- what do you think trumps what here?

Do you say that there is no res judicata influence at all here by Judge Indeglia's rulings and his Decision, or do you think that inconsistent or alternative arguments can rise above, you know, a Court decision.

MR. WIECK: I'll respond to that. As a matter of fact, I think the issue of whether this is

or is not a lease has in fact been conclusively determined and that's been conclusively determined that it is not a lease.

Why? Because all of those decisions I made reference to earlier, the denial of the motion for expedited relief, the denial of the bond pending appeal, and the denial of the rent, all of those are interlocutory order. I have no appeal rights to those until the end of the case.

So all of those interlocutory decisions are actually subsumed in Judge Indeglia's Decision. Now, the only way that you could come to the conclusion that the issue of was this a lease, and that's what we're talking about. We're talking about the issue specifically. Is it a lease of real property or was it an executory contract? That's what we're talking about.

And I would submit to you there is nothing in Judge Indeglia's Decision that even comes close to addressing lease versus executory contract. Because I did not appeal that Decision. I did not appeal it either as an appellant or a cross-appeal.

I believe -- I'm answering this question as candidly as I can. I believe that I've already

given up that issue of whether bond should be posted, whether I should have gotten an expedited appeal, whether the rent on appeal. I've given up those issues. Those have been conclusively adjudicated against my interest.

So the only way that you can truly find res judicata that would work against me is that you believe that Judge Indeglia's Decision actually addressed the question lease versus executory contract. And I would submit to you that just by looking at his words, that's not the answer to the question because he was simply referring to the name of the document.

I don't deny the fact the documents were called leases. They were called leases. But I would submit to you there is nothing that you could find in there that would address that question.

Why? Because by the time I got to trial, it was immaterial. I had lost. I didn't get the expedited trial. I didn't get the rent during pendency of the appeal. And I didn't get the bond. So I had lost those things. It was no longer important. And that was not an issue that he specifically addressed.

So if the answer to your question is is res judicata effected here? Yes. But I would say it's contrary to what Mr. Ferrucci says. I think it's already been conclusively adjudicated. That wasn't a lease of personal property involving possession. I lost those issues.

JUDGE: And you think that there's -- are you arguing that in the Judge Indeglia's ruling that, and in his Decision overall, that there's any room or basis for viewing it as though he treated these transactions as contracts rather than leases?

MR. WIECK: I'm telling -- what my argument, Your Honor, is, you can't tell. You can't read his Decision in any way to find anything in there where he made a specific reference or a specific finding or a specific conclusion where it's either "A" or "B".

Executory contracts that were breached. Leases that were terminated. He never addressed that. Nobody put that issue before him. I didn't think it was important at the time. I'm sure Joe Cavanaugh didn't think it was important at the time. And I'm sure he didn't think it was important at the time. Why? Because those -- that water was already

over the dam. That was done.

So I'm not suggesting to you that you should read that and find that he found that they weren't leases, but executory contracts. I'm not suggesting that. I'm suggesting you can't find anything in there where he specifically addressed that point.

And if you look at the trail of the case and the prior Decisions, which become final as a result of this, the only Decisions that were made actually were adverse to the point of it being a lease in the three that I've identified for you.

So that's my response on that. I'm not suggesting you can read that where he said they're executory contracts are not leases. What I'm saying is you can't read it to address that point whatsoever.

JUDGE: Thanks. Anything further?

MR. FERRUCCI: Very quickly, Your Honor.

You file eviction actions, Your Honor, in the District Court to evict tenants consistent with leases. And that was the genesis of this proceeding, Your Honor.

With respect to the language that Justice

Indeglia uses -- I think the word was, you know, loosely back and forth -- throughout the Decision, Your Honor, it's evident if you read it closely that the Judge was very careful to use the word lease when he intended it and use the word agreement or amendment when he intended it.

And look no further than paragraph two of the Findings of Fact and Conclusions of Law wherein the Court determined that there was an amendment to the lease to include an agreement that if the lessee encountered delays in the process of obtaining permits, the lease commencement date for minimum base rent would be extended accordingly.

So from our perspective, there's absolutely no doubt that what Judge Indeglia was dealing with here was a breach of a lease. He concluded that. I mean, I don't think you can get any clearer than paragraph one of the Decision. Both leases are for five-year period.

And particularly, Your Honor, you know, if you take a look at again the basis that was ultimately why the Court concluded that it did, it was based on the fact that the Complaints that were filed below were based upon trespass and ejectman

pursuant to the Commercial Landlord Tenants Act.

And I think most telling is the fact that even the claims submitted by the claimants here, the attachment outlines the damages in terms of rent due, in additional rent due.

So for those reasons, Judge, we've been very detailed in our first presentation to the Court. The fact is that these were leases. The old expression, if it looks like a duck, quacks like a duck, walks like a duck, it's a duck.

Judge Indeglia decided that, and just as easily for Mr. Wieck to say that Gencarelli was arguing that these were not leases, he was arguing the alternative. And he won.

Thank you, Judge.

JUDGE: I'm tempted to take this under advisement and look at things more carefully than we do when we're on the bench, or at least less of a rush. But I do think it would serve no purpose than recognize -- I'll start right out by again, I said this before, removing anything that might sound like suspense for anybody concerned.

I'm going to find for the debtor's motion to limit the allowance of claims for the reasons

argued by Mr. Ferrucci. Basically his written argument and his oral arguments here are basically adopted and incorporated by reference into this bench ruling.

As to basically all the points, including the damages calculation and the effective dates, Mr. Wieck has certainly argued forcefully and it's very, how can I say, not easy to dismiss a forceful argument. But when you consider the substance of it, it just doesn't cut it.

I looked at the Superior Court Decision by Judge Indeglia and although he maybe did not use the words of art that Mr. Wieck argues are missing as far as addressing the lease versus the contract issue, I think anybody would be hard-pressed to look at this Decision and say that Judge Indeglia was not referring to and basing his rulings on the fact that he was dealing with leases. It just can't come out any other way.

The Section 105 argument, I must say I've been, I'll say it bluntly, I've been suckered into thinking that Section 105 is a cure for many, many problems and cases that the Court feels shouldn't come out this way.

And frankly, I'm really tired of hearing the word of Appellate Courts telling me that I don't have a roving commission to do equity. I hate those words. They're ugly words.

But as I say, I have, especially in the early days of Section 105 before Appellate Courts had really made their positions clear on this and made it easier frankly for the Bankruptcy Courts to obey those teachings, but I can't knowingly -- you know, I've made mistakes many times and made incorrect rulings. But not knowingly, okay. That's my defense.

So for all the reasons that have been argued, I'm not going to repeat them. As I say, Mr. Wieck has put his client's best foot forward in a very eloquent way, in a forceful way, but he's not a magician and he can't change these are the facts and these are the results here.

And I realize that losing on arguments is three strikes that he referred to probably are frustrating as when you get to this point in a case. I really don't think there is anything the Court can do about this. Whether it would like to or should is another question. It's not relevant, and I

refuse to I guess even think about it.

So Mr. Ferrucci, you can draft an order.

MR. FERRUCCI: Thank you, Your Honor.

JUDGE: And your objections, Mr. Wieck, are all noted.

MR. WIECK: Thank you.

(TAPED HEARING CONCLUDED)

C E R T I F I C A T E

I, Renee Cockerill, hereby certify that the foregoing is a true, accurate, and complete transcription of a cassette tape as presented to me for the above-entitled hearing.

RENEE COCKERILL
AUDIO CASSETTE TRANSCRIBER

IN RE: LOUIS A. GENCARELLI, SR.
September 22, 2004

6 WED-42802 0103-1 pdfdoc 04-10682
The Federal Center
380 Westminster Street
Providence, RI 02903

000006 6 5 AV 1.161 02903 1 1 4757-3-6

Richard L. Gemma
101 Dyer Street Fourth Floor
Providence, RI 02903-3908

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

FILED DEC 17 '04 14:49 USBCRI

| | |
|---|---|
| In re:<br><br>LOUIS A. GENCARELLI, SR.,<br><br>Debtor. | Bk. No. 04-10682<br>(Chapter 11) |

**AMENDED APPELLANT'S ELECTION FORM**

Claimants, 1800 Smith Street Associates, LP and 1500 Mineral Spring Associates, LP, by and through their General Partner, Jason's Realty Corp. (collectively, the "Creditors") have filed a Notice of Appeal from the Order and Judgment entered by the U.S. Bankruptcy Court for the District of Rhode Island on November 22, 2004, which overruled the Creditors' Objection to, and granted Debtor Louis A. Gencarelli, Sr.'s Motion to, Limit the Allowance of Claims of the Creditors pursuant to 11 U.S.C. §506(b).

The Creditors hereby elect to opt out of the Bankruptcy Appellate Panel for the First Circuit and request that this appeal be heard by the United States District Court for the District of Rhode Island.

COUNSEL FOR APPELLANTS:

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700

COUNSEL FOR APPELLEE:

Joseph P. Ferrucci, Esq. #4231
Ferrucci Russo, PC
55 Pine Street
Providence, Rhode Island 02903
(401) 455-1000

BY: Denean M. Russo
Attorney Denean M. Russo #5043

Dated: December 17, 2004

## CERTIFICATION

I hereby certify that on this 17th day of December, 2004, a true copy of the within Amended Election Form was sent via first class mail, postage pre-paid, to the following:

Allan M. Shine, Esq.
Attorney Diane Finkle
WINOGRAD, SHINE & ZACKS, P.C.
123 Dyer Street
Providence, RI 02903

William G. Madsen, Esq.
Madsen Prestley Parenteau
44 Capitol Avenue, Suite 201
Hartford, CT 06106

Joseph Ferrucci, Esq.
Ferrucci Russo P.C.
55 Pine Street
Providence, RI 02903

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Horton's
874 Sinclair Road
Oakville, Ontario CANADA L6K 1Y1

James R. Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903

Transamerica Life Co.
P.O. Box 740559
Atlanta, GA 30374

Leonard J. DePasquale, Esq.
Assistant United States Trustee
10 Dorrance Street
Suite 910
Providence, RI 02903

Department of the Treasury
Internal Revenue Service
Insolvency Unit, 4th Floor
380 Westminster Street
Providence, RI 02903

Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107

Michelle B. Daugherty

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\BANKRUPTCY PLEADINGS\Amended Appeal Election Form-Gencarelli's Motion to Cap Claims 121504.doc

RECEIVED
AUG 13 2004
MacADAMS & WIECK INCORPORATED

(1)

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **In Re:** | : | |
| | : | |
| **Louis A. Gencarelli, Sr.** | : | **Chapter 11** |
| | : | **Case No. 04-10682** |
| **Debtor** | : | |
| **Bess Eaton Donut Flour Company Incorporated** | : | |
| **d/b/a Bess Eaton Coffee and Bake Shop** | : | **B.K. NO.: 04-10630** |
| **d/b/a Bess Eaton Coffee Shop** | : | **Chapter 11** |
| **Debtor** | : | |

**DEBTOR, LOUIS A. GENCARELLI, SR.'S MOTION TO LIMIT THE ALLOWANCE OF CLAIMS FILED BY CLAIMANTS, 1500 MINERAL SPRING ASSOCIATES, L.P. AND 1800 SMITH STREET ASSOCIATES, L.P.**

Debtor, Louis A. Gencarelli, Sr. hereby moves this Court, pursuant 11 U.S.C. § 502(b)(6), for an order limiting the allowance of claims filed by Claimants, 1500 Mineral Spring Associates, L.P. and 1800 Smith Street Associates, L.P.

The grounds for the instant motion are set forth in the accompanying Memorandum of Law.

Respectfully Submitted:
LOUIS A. GENCARELLI, SR.

By his attorneys,

FERRUCCI RUSSO, P.C.
Joseph P. Ferrucci, Esq.
R.I. Bar No.: 4231
55 Pine Street, 4th Floor
Providence, RI 02903
Tel: (401) 455-1000
Fax: (401) 455-7778
Dated: 8/12/04

## CERTIFICATION

I hereby certify that on the 13th day of August, 2004, I forwarded a true copy of the within Motion and Memorandum of Law by regular mail, postage prepaid to the parties set forth on the attached list.

**Please take notice:** That within ten (10) days after service (twenty (20) days for U.S. Government Officers and Agencies thereof), any party against whom a "Pleading" is filed, or any other party to the action who objects to the relief sought therein, shall serve and file an Objection to that Pleading. If no Objection is filed to a Pleading within the time prescribed herein, the Pleading will be deemed unopposed and will be granted, unless (1) the requested relief is prohibited by law; or (2) the requested relief is against public policy; or (3) in the opinion of the Court, the interests of justice requires *Sua Sponte* denial of the unopposed Motion.

**In re: LOUIS A. GENCARELLI, SR.**
**BK NO.: 04-10682**

**Service List**

Allan M. Shine, Esq.
Winograd Shine & Zacks
123 Dyer Street
Providence, RI 02903
(counsel to Bess Eaton)

Diane Finkle, Esq.
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903
(Counsel to Bess Eaton)

Harold B. Murphy, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors Committee)

Charles Bennett, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors Committee)

Scott Spear, Esq.
Blish & Cavanagh
30 Exchange Terrace
Providence, RI 02903
(Special Counsel to Bess Eaton)

William J. Delaney, Esq.
Tillinghast Licht Perkins Smith & Cohen LLP
10 Weybosset Street, Suite 1000
Providence, RI 02903
(Counsel to RDW Group)

Leonard De Pasquale, Esq.
United States Trustee
Suite 910
10 Dorrance Street
Providence, RI 02903

Douglas Rainville
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(CFO, COO of Bess Eaton)

Thomas O. Bean, Esq.
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(Counsel to Perkins Paper Co.)

Richard Kremen, Esq.
Piper Rudnick, LLP
6225 Smith Avenue
Baltimore, MD 21209-3600
(Counsel to Sara Lee)

Leland Goldberg
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(Interim CEO Bess Eaton)

William M. Dolan, III, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, RI 02903
(Counsel to Washington Trust Co.)

Brian J. Lamoureux, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, RI 02903
(Counsel to The Washington Trust Co.)

Richard S. Mittleman, Esq.
Cameron & Mittleman, LLP
56 Exchange Terrace
Providence, RI 02903
(Counsel to First Union Trade Bank)

Edward J. Bertozzi, Jr., Esq.
Edwards & Angell, LLP
2800 Financial Plaza
Providence, RI 02903
(Counsel to Tim Hortons (New England), Inc.)

Edwin Smith, Esq.
Mary DeNevi, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
(Counsel to Tim Horton (New England), Inc.)

James R. Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903
(Counsel to UPS Capital Business Credit f/k/a First International Bank d/b/a First International Capital)

Richard Nadeau, Jr., Esq.
Nadeau & Simmons, P.C.
56 Pine Street
Providence, RI 02903
(Counsel to UPS Capital Business Credit f/k/a First International Bank d/b/a First International Capital)

Max Wistow, Esq.
Wistow & Barylick
61 Weybosset Street
Providence, RI 02903
(Counsel to George Cioe)

Theodore Orson, Esq.
55 Dorrance Street
Providence, RI 02903
(Counsel to George Cioe)

David S. Berman, Esq.
Riemer & Braunstein LLP
Three Center Plaza
Boston, MA 02108
(Counsel to Eastern Bank)

John P. McCoy, Esq.
Carroll, Kelly & Murphy
One Turks Head , Suite 400
Providence, RI 02903
(Counsel to Narragansett Electric and New England Gas)

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Hortons
874 Sinclair Road
Oakville,Ontario CANADA L6K 2Y1
(Counsel to Tim Hortons)

Robert E. Glass, Esq.
Lang Michener, LLP
BCE Place
181 Bay Street, Suite 2500
Toronto, Ontario CANADA M5J 2T7

Charles Soloveitzik, Esq.
Two Elm Street, P.O. Box 414
Westerly, RI 02891
(Counsel to H. Douglas Randall III and Lorraine Randall)

Robert D. Wieck, Esq.
McAdams & Wieck
101 Dyer Street
Providence, RI 02903
(counsel to 1500 Mineral Spring Associates, et al)

Michael P. Lynch, Esq.
117 High Street,
P.O. Box 761
Westerly, RI 02891
(Counsel to Angelo A. Gencarelli, III and Frances G. Kirchon)

William A. Nardone, Esq.
Orsinger & Nardone
53 High Street
Westerly, RI 02891
(Counsel to Chelsea Groton Savings Bank)

Mark A. McSally, Esq.
Kelly, Kelleher, Reilly & Simpson
28 Caswell Street
Narragansett, RI 02882
(Counsel to Narragansett Pier Assoc.)

Cheryl Asquino, Esq.
Narragansett Bay Commission
One Service Road
Providence, RI 02903

Richard L. Gemma, Esq.
MacAdams & Wieck Incorporated
101 Dyer Street, 4th Floor
Providence, RI 02903
(Counsel to Sovereign Bank, Network Capital Alliance Division)

Patrick McBride, Esq.
Moss Codilis, L.L.P.
P.O. Box 1469
Scottsbluff, NE 69363-1469
(Counsel to Aurora Loan Service, Inc.)

C. George Kanabis, Esq.
Kanabis & Houlse
320 State Street
P.O. Box 2022
New London, CT 06320
(Counsel to Christ Matsas & Despina Matsas)

Benjamin M. Scungio, Esq.
Brennan, Recupero, Cascione, Scungio & McAllister, LLP
362 Broadway
Providence, RI 02909
(Counsel to Randolph Savings Bank)

Linda T. Taverni, Esq.
Deily, Mooney & Glastetter, LLP
8 Thurlow Terrace
Albany, NY 12203-1006
(Counsel to ChrylerDaimler Services North America LLC, successor by merger to Mercedes Benz Credit Corporation)

Mark B. Morse, Esq.
420 Angell Street
Providence, RI 02903
(Counsel to Salem Town Center, LLC)

David H. Sholes, Esq.
1375 Warwick Avenue
Warwick, RI 02888
(Counsel to Michael Caito)

**In re: BESS EATON DONUT FLOUR COMPANY INCORPORATED**
**d/b/a BESS EATON COFFEE AND BAKE SHOP**
**d/b/a BESS EATON COFFEE SHOP**
**BK NO.: 04-10630**

**SERVICE LIST**

Allan M. Shine, Esq.
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903
(Counsel to Bess Eaton

Leonard De Pasquale
United States Trustee
10 Dorrance Street, Suite 910
Providence, RI 029903

Diane Finkle, Esq.
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903
(Counsel to Debtor)

Douglas Rainville
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(CFO, COO Bess Eaton)

Harold B. Murphy, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors' Committee)

Joseph P. Ferrucci, Esq.
Ferrucci Russo, P.C.
55 Pine Street, 4th Floor
Providence, RI 02903
(Counsel to Louis A. Gencarelli, Sr.)

D. Ethan Jeffrey, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors' Committee)

Richard Kremen, Esq.
Piper Rudnick, LLP
6225 Smith Avenue
Baltimore, MD 21209-3600
(Counsel to Sarah Lee)

Scott Spear, Esq.
Blish & Cavanagh
30 Exchange Terrace
Providence, RI 02903
(Special Counsel to Bess Eaton)

Thomas O. Bean, Esq.
Nutter McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(Counsel to Perkins Paper)

James Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903
(Counsel to U.P.S. Capital Corp.)

Louis A. Gencarelli, Sr.
2 Kidds Way
Watch Hill, RI 02891

Leland Goldberg
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(Interim CEO Bess Eaton)

John P. McCoy, Esq.
Carroll, Kelly & Murphy
One Turks Head Place, Suite 400
Providence, RI 02903
(Counsel to Narragansett Electric)

Alfred Lane, Esq., Exec. Vice Pres.
Development and General Counsel
Tim Hortons
874 Sinclair Road
Oakville, Ontario CANADA L6K 2Y1
(Counsel to Tim Hortons)

William Dolan, Esq.
Brian Lamoureux, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, RI 02903

Robert E. Glass, Esq.
Lang Michener LLP
BCE Place
181 Bay Street, Suite 2500
Toronto, Ontario CANADA M5J 2T7
(Counsel to Tim Hortons)

Jim Petras
Sara Lee Coffee & Tea
935 National Parkway, Ste. 93510
Schaumberg, IL 60173
(Chairman, Creditors Committee)

Edwin Smith, Esq.
Mary DeNevi, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
(Counsel to Tim Hortons)

Max Wistow, Esq.
Wistow & Barylick
61 Weybosset Street
Providence, RI 02903

Theodore Orson, Esq.
55 Dorrance Street, Suite 400
Providence, RI 02903

Edward J. Bertozzi, Esq.
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903
(Counsel to Tim Hortons)

William J. Delaney, Esq.
Tillinghast, Licht, Perkins, Smith & Cohen, LLP
10 Weybosset Street
Providence, RI 02903
(Counsel to RDW Group)

David S. Berman, Esq.
Riemer & Braunstein, LLP
Three Center Plaza
Boston, MA 02108
(Counsel to Eastern Bank)

Patricia Antonelli, Esq.
180 South Main Street
Providence, RI 02903
(Counsel to Copper Beech Properties & Moogie LLC)

William A. Nardone, Esq.
Orsinger & Nardone
53 High Street
Westerly, RI 02891
(Counsel to Chelsea Groton Savings Bank)

Mark A. McSally, Esq.
Kelly, Kelleher, Reilly & Simpson
28 Caswell Street
Narrangansett, RI 02882
(Counsel to Narragansett Pier Assoc.)

Mark B. Morse, Esq.
420 Angell Street
Providence, RI 02903
(counsel to SalemTown Center, LLC)

Richard S. Mittleman, Esq.
Cameron & Mittleman
56 Exchange Terrace
Providence, RI 02903

Michael P. Lynch, Esq.
117 High Street
P.O. Box 761
Westerly, RI 02891

Tony Corleto
Corleto & Associates
107 Mill Plain Road
Danbury, CT 06811

Richard Pascal
O'Brien, Shafner, Stuart, Kelly & Morris
138 Main Street
P.O. Box 310
Norwich, CT 06360

Robert D. Wieck, Esq.
MacAdams & Wieck
101 Dyer Street
Providence, RI 02903

David H. Sholes, Esq.
1375 Warwick Avenue
Warwick, RI 02888
(Counsel to Michael Caito)

Carl Lisa, Esq.
Lisa & Sousa, Ltd.
5 Benefit Street
Providence, RI 02903

Matthew J. McGowan, Esq.
Salter, McGowan, Sylvia & Leonard
321 South Main Street
Providence, RI 02903

Cheryl Asquino, Esq.
Narragansett Bay Commission
One Service Road
Providence, RI 02905

Richard L. Gemma, Esq.
MacAdams & Wieck Incorporated
101 Dyer Street, 4th Floor
Providence, RI 02903
(Counsel to Sovereign Bank, Network Capital Alliance Division)

Benjamin M. Scungio, Esq.
Brennan, Recupero, Cascione, Scungio & McAllister, LLP
362 Broadway
Providence, RI 02909
(Counsel to Randolph Savings Bank)

C. George Kanabis, Esq.
Kanabis & Houle
320 State Street
P.O. Box 2022
New London, CT 06320
(Counsel to Christ Matsas & Despina Matsas)

Lynda L. Laing, Esq.
222 Richmond Street, Suite 208
Providence, RI 02903
(Counsel to Volvo North America LLC)

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **In Re:** | : | |
| | : | |
| **Louis A. Gencarelli, Sr.** | : | **Chapter 11** |
| | : | **Case No. 04-10682** |
| **Debtor** | : | |
| **Bess Eaton Donut Flour Company Incorporated** | : | |
| **d/b/a Bess Eaton Coffee and Bake Shop** | : | **B.K. NO.: 04-10630** |
| **d/b/a Bess Eaton Coffee Shop** | : | **Chapter 11** |
| **Debtor** | : | |

**DEBTOR, LOUIS A. GENCARELLI, SR.'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO LIMIT THE ALLOWANCE OF CLAIMS FILED BY CLAIMANTS, 1500 MINERAL SPRING ASSOCIATES, L.P. AND 1800 SMITH STREET ASSOCIATES, L.P.**

Debtor, Louis A. Gencarelli, Sr. ( "Debtor") submits this memorandum of law in support of his motion to limit the allowance of the claims for damages resulting from the termination of leases of real property filed by Claimants, 1500 Mineral Spring Associates, L.P. and 1800 Smith Street Associates, L.P. (collectively referenced herein as "Landlords").

Debtor submits the instant motion pursuant to the provisions of 11 U.S.C. § 502(b)(6) (hereinafter, "§ 502(b)(6)").

**Factual Background**

In or about November of 1999, Landlords owned undeveloped, real property located in North Providence, Rhode Island at 1500 Mineral Spring Avenue and 1800 Smith Street, respectively.

On or about November 1, 1999, Landlords leased said properties (collectively, the "Leased Properties") to Debtor for the purported development of Bess Eaton locations. *See* "1500 Lease" and "1800 Lease" attached hereto collectively as Exhibit A.

The 1500 Lease provided for a minimum base rent of $3,500.00 per month commencing on March 1, 2000. The 1800 Lease provided for a minimum base rent of $3,000.00 per month commencing on March 1, 2000. The 1500 and 1800 Leases, respectively, also provided for additional rent defined therein as taxes and insurance costs/expenses. *See* Landlords' calculation of rent appended to the relevant Proofs of Claim attached hereto for the convenience of the Court as Exhibit B.

On February 29, 2000, Debtor served written notice on Landlords purporting to exercise Debtor's right to terminate the 1500 Lease and 1800 Lease.

On or about March 28, 2000, Landlords commenced two separate actions against Debtor in Rhode Island District Court, Sixth Division (the "District Court") seeking damages and possession of the Leased Properties pursuant to Section 9 of the Rhode Island Commercial Landlord and Tenant Act, R.I. Gen. Laws § 34-18.1-1 *et seq.* (the "Landlord-Tenant Act"). *See* Complaints attached hereto collectively as Exhibit C.

On June 13, 2000, the District Court entered Judgment in favor of Landlords. *See* Judgments attached hereto collectively as Exhibit D.

The Judgment for damages rendered by the District Court was appealed to Rhode Island Superior Court in and for the County of Providence (the "Superior Court"). Debtor did not contest, nor appeal Landlords' legal claims to possession. In addition, Debtor did not pay any rent pending said appeal to Superior Court. Accordingly, on June 13, 2000, legal possession of the Leased Properties was finally and irrevocably secured by Landlords pursuant to the Landlord-Tenant Act.

On March 26, 2004, the Superior Court rendered a decision (the "Decision") on the above-referenced appeal which is attached hereto as Exhibit E.[1]

On March 1, 2004, Debtor filed a petition pursuant to Chapter 11 of the United States Bankruptcy Code. Thus, this Court must determine the amount of Landlords' claims to be allowed pursuant to § 502(b)(6).

**Argument**

It is beyond dispute that Landlords' claims are those of a lessor seeking damages resulting from the termination of a lease of real property. *See* Exhibits B and C. The actions initially commenced by Landlords were specifically advanced pursuant to Section 9 of the Landlord-Tenant Act, which is entitled "Delinquency in Rent – Repossession and Ejectment – Judgment". *See* R.I. Gen. Laws § 34-18.1-9. *See also* Exhibit C at ¶¶ 3, respectively (citing to R.I. Gen. Laws § 34-18.1-9). Furthermore, Landlords' proofs of claim are clearly for damages resulting from a termination of a lease of real property. *See* Exhibit B.

Thus, a determination as to the allowance of Landlords' claims for damages resulting from the termination of the Leases is determined pursuant to § 502(b)(6), which sets a "cap" on such damages. *See In re Peters,* 1004 WL 1291125 (Bankr. E.D. Pa. May 7, 2004); *Solow v. PPI Enterprises (U.S.), Inc. et al.*, 324 F.3d 197, 207 (3d Cir. 2003); *In re Smith*, 249 B.R. 328 (June D. Ga. 2000).

Section 502(b)(6) provides, in pertinent part, as follows:

> **Allowance of claims or interests**
>
> * * *
>
> (b) except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after

---

[1] It should be noted that the written decision of the Superior Court was issued post bankruptcy filing.

> notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that –
>
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds –
>
> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of:
>
> (i) the date of the filing of the petition; and
>
> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>
> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

11 U.S.C. § 502(b)(6).

Under § 502(b)(6), Landlords are entitled to rent reserved in an amount equal to the greater of (1) one lease year, or (2) 15% of rent reserved, not to exceed three years of the remaining lease term. The cap operates from the earlier of the petition filing date, or "the date on which [the] . . . lessor repossessed or the lessee surrendered, the leased property". *See* U.S.C. § 502(b)(6)(A)(i-ii). In addition, Landlords retain a claim for any unpaid rent due under the 1500 and 1800 Leases prior to the earlier of the above-referenced dates.

In short, it is well-established that Landlords' claims for damages are determined by Rhode Island law and the terms of the 1500 and 1800 Leases, and then limited by the statutory mandates of § 502(b)(6). *See In re Smith*, 249 B.R. 328 (June D. Ga. 2000). *In re Gantos, Inc.*, 176 B.R. 793, 795 (Bankr, W.D. Mich. 1995); *In re Iron-Oak Supply Corp.*, 169 B.R. 414 (Bankr, E.D.Cal. 1994); *In re Financial News Network, Inc.* 149 B.R. 348, 350-51 (Bankr. S.D.N.Y. 1993); *In re Q-Masters, Inc.*, 135 B.R. 157, 159 (Bankr. S.D.Fla. 1991). *See also Fifth*

*Avenue Jewelers*, 203 B.R. at 382. *In re Fulton,* 148 B.R. 838, 843 (Bankr. S.D.Tex. 1992); *In re Thompson*, 116 B.R. 610, 612 (Bankr. S.D.Ohio 1990).

In this instance, the Decision has established Landlords' claim for damages in accordance with Rhode Island law and the terms of the 1500 and 1800 Leases. *See* Exhibit E. However, those charges recoverable under Rhode Island law and the terms of the respective leases are not allowed as part of the bankruptcy claim to the extent that such charges exceed the § 502(b)(6) cap. Therefore, this Court must now "look behind" the Decision and undertake the necessary calculations to limit Landlords' claims to the extent that each claim exceeds the § 502(b)(6) cap. *See In Re Richard A. Turner, Co., Inc.*, 209 B.R. 177 (D. Mass. 1997) ("the court may look behind a [state court] judgment to determine allowable amount of lessor's claim for damages under § 502(b)(6)"); *Kohn v. Leavitt-Berner Tanning Corp.*, 157 B.R. 523 (N.D.N.Y. 1993); *In re Fulton,* 148 B.R. 838, 843 (Bankr. S.D.Tex. 1992) (the doctrine of *res judicata* does not prevent the Bankruptcy Court from undertaking a § 502(b)(6) analysis); *Weeks v. Kinslow*, 28 B.R. 958 (W.D.Okla. 1983) (compromise between "fresh start" for debtor and accrued rent claim of landlord); *In re Bus Stop, Inc.*, 3 B.R. 26 (S.D.Fla. 1980). *See also Oldden v. Tonto Realty Corporation,* 143 F.2d 916 (2d. Cir. 1944), (the limitations on the claim of a landlord for damages resulting from termination of a lease of real property are mandatory).

In order to carry out the mandate of § 502(b)(6), this Court will need to determine the earlier of the following dates: (1) the date of the filing of the petition; (2) the date upon which Landlords **"repossessed"** the Leased Properties; or (3) the date upon which Debtor **"surrendered"** the Leased Properties. Debtor submits that the ***earliest*** of those dates is **March 28, 2000**, when Landlord "accepted" Debtor's February 29, 2000 "surrender" of possession by filing actions pursuant to R.I. Gen. Laws § 34-18.1-9, specifically seeking legal

possession of the Leased Properties. *See* Exhibit C, Complaints at ¶¶ 3 and 3, respectively. Debtor further submits that the ***latest*** trigger date pursuant to § 502(b)(6)(A)(ii), is **June 13, 2000**, the date on which Landlords "repossessed" the Leased Properties by securing Judgments pursuant to Landlords' legal actions for possession in accord with Rhode Island General Laws § 34-18.1-9. *See* District Court Judgments attached hereto as Exhibit D. The District Court Judgments became absolutely final on June 13, 2000, when Debtor elected not to contest or appeal legal possession. Furthermore, the District Court Judgments became final as a matter of law retroactive to June 13, 2000, when Debtor elected not to pay the stipulated rent pending appeal to Superior Court. *See* R.I. Gen. Laws §34-18.1-16.

Debtor submits that the Court will arrive at one of the above-referenced trigger dates regardless of whether the Court undertakes a "surrender" or a "repossession" analysis.

The term "surrender" under Rhode Island law involves the surrender of a leased premises by the tenant and the acceptance thereof by the landlord. *See Bove v. Transcom Electronics, Inc.*, 116 R.I. 210, 353 A.2d 613 (R.I. 1976); *Ciambelli v. Porter*, 55 R.I. 14, 177 A. 145 (R.I. 1935); *Smith v. Hunt*, 32 R.I. 326, 79 A. 826 (R.I. 1911); *White v. Berry*, 24 R.I. 74, 52 A. 682 (R.I. 1902). In order to determine if there has been a surrender and acceptance thereof, the Court looks to the acts and deeds of the party. *Id.* With regard to a § 502(b)(6) analysis of "surrender", the Court must look to the acts and deeds of the parties to determine when the Debtor "surrendered" possession of the Leased Properties and whether the Landlord undertook acts and deeds which "accepted" such a surrender of possession as a matter of law.

In this instance, the Superior Court found that the Debtor provided written correspondence dated February 29, 2000, allegedly terminating and voiding the 1500 and 1800 Leases. *See* Decision at p. 19, ¶ 6. Said notice was a surrender of the Leased Properties by

Debtor. "Acceptance" of Debtor's surrender under Rhode Island law is embodied within Landlords' filing of complaints pursuant to the Landlord-Tenant Act seeking legal possession of the Leased Premises. Landlords commenced such actions on March 28, 2000. *See* Exhibit C. Therefore, there was a surrender and acceptance by the acts and deeds of the parties as of March 28, 2000, when Landlords commenced actions to secure legal possession of the Leased Properties and to pursue Landlords' claims for breach of the 1500 and 1800 Lease terms and conditions.[2] *See White v. Berry,* 52 RI at 683.

In turn, if this Court were to undertake a "repossession" analysis, pursuant to the clear and unambiguous language of § 502(b)(6)(A)(ii), the date of "repossession" as a matter of Rhode Island landlord-tenant law is June 13, 2000, the date on which Landlords secured the District Court Judgments. *See* Exhibit D (District Court Judgments); Exhibit C at ¶¶ 3 and 3, respectively.

Accordingly, § 502(b)(6) operates as a cap on the allowance of Landlords' claims utilizing a trigger date of either **March 28, 2000**, or at the very latest, **June 13, 2000**.

Applying the § 502(b)(6) cap on Landlords' claims utilizing a trigger date of March 28, 2000 results in the following calculations:

1. <u>The greater of one Lease year, or 15% of the reserved rent (not to exceed three years of the remaining Lease term)</u>

   a. 1500 Lease -- $47,662.17 (one Lease year)
   b. 1800 Lease -- $40,098.32 (one Lease year)

2. <u>Unpaid rent due prior to March 28, 2000</u>

   a. 1500 Lease -- $4,347.85

---

[2] While Landlords' legal actions are the most compelling basis for concluding the operative date for calculating unpaid rent due, it must be noted that other indicia of "surrender" and "acceptance" exist such as, among other things, Landlords payment of taxes, maintenance of the property, payment of insurance, marketing through its own brokers, etc., which took place upon Debtor's surrender in February of 2000.

b. 1800 Lease -- $3,566.57

3. For a total of: **$95,674.91**[3]

Applying the § 502(b)(6) cap utilizing a trigger date of June 13, 2000 is as follows:

1. The greater of one Lease year or 15% of the reserved rent (not to exceed three years of the remaining Lease term)

   a. 1500 Lease -- $47,662.17 (one Lease year)
   b. 1800 Lease -- $40,098.32 (one Lease year)

2. Unpaid rent due prior to June 13, 2000

   a. 1500 Lease -- $14,847.85
   b. 1800 Lease -- $12,566.87

3. For a total of **$115,175.21**

The figures utilized in the above-referenced calculations cannot be disputed by Landlords as such figures were taken directly from the exhibits attached to Landlords' Proofs of Claim. *See* Landlords' calculations attached hereto as Exhibit B.

The only remaining items to be addressed in Landlords' Proofs of Claim are those claims for demolition costs ($7,500.00), attorneys' fees and interest. These sums are clearly **not** allowed in applying the § 502(b)(6) cap, because such claims are not rent. *See In re Smith*, at 340 (interest and attorneys' fees are disallowed under the language of § 502(b)(6)(B), simply because they are not unpaid rent).

## Conclusion

Applying the plain language of § 502(b)(6), Landlords' respective claims of $314,059.78 for the 1500 Lease and $257,288.02 for the 1800 Lease (plus any other amounts contained in such claims) are "capped" at $95,674.91. This cap applies no matter what damage amount may be awarded to Landlords in the state court proceedings, whether on appeal, on remand or

[3] Debtor has combined a total sum for the claims due to the common ownership of Claimants and ease of analysis.

otherwise. Therefore, once this Court determines that the cap applies to limit the amount of Landlords' allowed claims, the reserve to satisfy that claim should equal the cap amount and no more.

Respectively submitted,
LOUIS A. GENCARELLI, SR.

By his attorneys,

FERRUCCI RUSSO, P.C.
Joseph P. Ferrucci, Esq.
R.I. Bar No.: 4231
55 Pine Street, 4th Floor
Providence, RI 02903
Tel: (401) 455-1000
Fax: (401) 455-7778
Dated: 8/12/04

**CERTIFICATION**

I hereby certify that on the 13th day of August, 2004, I forwarded a true copy of the within objection by regular mail, postage prepaid to the parties set forth on the attached list.

**Please take notice:** That within ten (10) days after service (twenty (20) days for U.S. Government Officers and Agencies thereof), any party against whom a "Pleading" is filed, or any other party to the action who objects to the relief sought therein, shall serve and file an Objection to that Pleading. If no Objection is filed to a Pleading within the time prescribed herein, the Pleading will be deemed unopposed and will be granted, unless (1) the requested relief is prohibited by law; or (2) the requested relief is against public policy; or (3) in the opinion of the Court, the interests of justice requires *Sua Sponte* denial of the unopposed Motion.

**In re: LOUIS A. GENCARELLI, SR.**
**BK NO.: 04-10682**

**Service List**

Allan M. Shine, Esq.
Winograd Shine & Zacks
123 Dyer Street
Providence, RI 02903
(counsel to Bess Eaton)

Leonard De Pasquale, Esq.
United States Trustee
Suite 910
10 Dorrance Street
Providence, RI 02903

Diane Finkle, Esq.
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903
(Counsel to Bess Eaton)

Douglas Rainville
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(CFO, COO of Bess Eaton)

Harold B. Murphy, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors Committee)

Thomas O. Bean, Esq.
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(Counsel to Perkins Paper Co.)

Charles Bennett, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors Committee)

Richard Kremen, Esq.
Piper Rudnick, LLP
6225 Smith Avenue
Baltimore, MD 21209-3600
(Counsel to Sara Lee)

Scott Spear, Esq.
Blish & Cavanagh
30 Exchange Terrace
Providence, RI 02903
(Special Counsel to Bess Eaton)

Leland Goldberg
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(Interim CEO Bess Eaton)

William J. Delaney, Esq.
Tillinghast Licht Perkins Smith & Cohen LLP
10 Weybosset Street, Suite 1000
Providence, RI 02903
(Counsel to RDW Group)

William M. Dolan, III, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, RI 02903
(Counsel to Washington Trust Co.)

Brian J. Lamoureux, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, RI 02903
(Counsel to The Washington Trust Co.)

Richard S. Mittleman, Esq.
Cameron & Mittleman, LLP
56 Exchange Terrace
Providence, RI 02903
(Counsel to First Union Trade Bank)

Edward J. Bertozzi, Jr., Esq.
Edwards & Angell, LLP
2800 Financial Plaza
Providence, RI 02903
(Counsel to Tim Hortons (New England), Inc.)

Edwin Smith, Esq.
Mary DeNevi, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
(Counsel to Tim Horton (New England), Inc.)

James R. Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903
(Counsel to UPS Capital Business Credit f/k/a First International Bank d/b/a First International Capital)

Richard Nadeau, Jr., Esq.
Nadeau & Simmons, P.C.
56 Pine Street
Providence, RI 02903
(Counsel to UPS Capital Business Credit f/k/a First International Bank d/b/a First International Capital)

Max Wistow, Esq.
Wistow & Barylick
61 Weybosset Street
Providence, RI 02903
(Counsel to George Cioe)

Theodore Orson, Esq.
55 Dorrance Street
Providence, RI 02903
(Counsel to George Cioe)

David S. Berman, Esq.
Riemer & Braunstein LLP
Three Center Plaza
Boston, MA 02108
(Counsel to Eastern Bank)

John P. McCoy, Esq.
Carroll, Kelly & Murphy
One Turks Head , Suite 400
Providence, RI 02903
(Counsel to Narragansett Electric and New England Gas)

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Hortons
874 Sinclair Road
Oakville,Ontario CANADA L6K 2Y1
(Counsel to Tim Hortons)

Robert E. Glass, Esq.
Lang Michener, LLP
BCE Place
181 Bay Street, Suite 2500
Toronto, Ontario CANADA M5J 2T7

Charles Soloveitzik, Esq.
Two Elm Street, P.O. Box 414
Westerly, RI 02891
(Counsel to H. Douglas Randall III and Lorraine Randall)

Robert D. Wieck, Esq.
McAdams & Wieck
101 Dyer Street
Providence, RI 02903
(counsel to 1500 Mineral Spring Associates, et al)

Michael P. Lynch, Esq.
117 High Street,
P.O. Box 761
Westerly, RI 02891
(Counsel to Angelo A. Gencarelli, III and Frances G. Kirchon)

William A. Nardone, Esq.
Orsinger & Nardone
53 High Street
Westerly, RI 02891
(Counsel to Chelsea Groton Savings Bank)

Mark A. McSally, Esq.
Kelly, Kelleher, Reilly & Simpson
28 Caswell Street
Narragansett, RI 02882
(Counsel to Narragansett Pier Assoc.)

Cheryl Asquino, Esq.
Narragansett Bay Commission
One Service Road
Providence, RI 02903

Richard L. Gemma, Esq.
MacAdams & Wieck Incorporated
101 Dyer Street, 4th Floor
Providence, RI 02903
(Counsel to Sovereign Bank, Network Capital Alliance Division)

Patrick McBride, Esq.
Moss Codilis, L.L.P.
P.O. Box 1469
Scottsbluff, NE 69363-1469
(Counsel to Aurora Loan Service, Inc.)

C. George Kanabis, Esq.
Kanabis & Houlse
320 State Street
P.O. Box 2022
New London, CT 06320
(Counsel to Christ Matsas & Despina Matsas)

Benjamin M. Scungio, Esq.
Brennan, Recupero, Cascione, Scungio & McAllister, LLP
362 Broadway
Providence, RI 02909
(Counsel to Randolph Savings Bank)

Linda T. Taverni, Esq.
Deily, Mooney & Glastetter, LLP
8 Thurlow Terrace
Albany, NY 12203-1006
(Counsel to ChrylerDaimler Services North America LLC, successor by merger to Mercedes Benz Credit Corporation)

Mark B. Morse, Esq.
420 Angell Street
Providence, RI 02903
(Counsel to Salem Town Center, LLC)

David H. Sholes, Esq.
1375 Warwick Avenue
Warwick, RI 02888
(Counsel to Michael Caito)

**In re: BESS EATON DONUT FLOUR COMPANY INCORPORATED**
**d/b/a BESS EATON COFFEE AND BAKE SHOP**
**d/b/a BESS EATON COFFEE SHOP**
**BK NO.: 04-10630**

**SERVICE LIST**

Allan M. Shine, Esq.
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903
(Counsel to Bess Eaton

Diane Finkle, Esq.
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903
(Counsel to Debtor)

Harold B. Murphy, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors' Committee)

D. Ethan Jeffrey, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors' Committee)

Scott Spear, Esq.
Blish & Cavanagh
30 Exchange Terrace
Providence, RI 02903
(Special Counsel to Bess Eaton)

James Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903
(Counsel to U.P.S. Capital Corp.)

Leonard De Pasquale
United States Trustee
10 Dorrance Street, Suite 910
Providence, RI 029903

Douglas Rainville
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(CFO, COO Bess Eaton)

Joseph P. Ferrucci, Esq.
Ferrucci Russo, P.C.
55 Pine Street, 4th Floor
Providence, RI 02903
(Counsel to Louis A. Gencarelli, Sr.)

Richard Kremen, Esq.
Piper Rudnick, LLP
6225 Smith Avenue
Baltimore, MD 21209-3600
(Counsel to Sarah Lee)

Thomas O. Bean, Esq.
Nutter McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(Counsel to Perkins Paper)

Louis A. Gencarelli, Sr.
2 Kidds Way
Watch Hill, RI 02891

Leland Goldberg
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(Interim CEO Bess Eaton)

Alfred Lane, Esq., Exec. Vice Pres.
Development and General Counsel
Tim Hortons
874 Sinclair Road
Oakville, Ontario CANADA L6K 2Y1
(Counsel to Tim Hortons)

Robert E. Glass, Esq.
Lang Michener LLP
BCE Place
181 Bay Street, Suite 2500
Toronto, Ontario CANADA M5J 2T7
(Counsel to Tim Hortons)

Edwin Smith, Esq.
Mary DeNevi, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
(Counsel to Tim Hortons)

Theodore Orson, Esq.
55 Dorrance Street, Suite 400
Providence, RI 02903

William J. Delaney, Esq.
Tillinghast, Licht, Perkins, Smith & Cohen, LLP
10 Weybosset Street
Providence, RI 02903
(Counsel to RDW Group)

Patricia Antonelli, Esq.
180 South Main Street
Providence, RI 02903
(Counsel to Copper Beech Properties & Moogie LLC)

John P. McCoy, Esq.
Carroll, Kelly & Murphy
One Turks Head Place, Suite 400
Providence, RI 02903
(Counsel to Narragansett Electric)

William Dolan, Esq.
Brian Lamoureux, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, RI 02903

Jim Petras
Sara Lee Coffee & Tea
935 National Parkway, Ste. 93510
Schaumberg, IL 60173
(Chairman, Creditors Committee)

Max Wistow, Esq.
Wistow & Barylick
61 Weybosset Street
Providence, RI 02903

Edward J. Bertozzi, Esq.
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903
(Counsel to Tim Hortons)

David S. Berman, Esq.
Riemer & Braunstein, LLP
Three Center Plaza
Boston, MA 02108
(Counsel to Eastern Bank)

William A. Nardone, Esq.
Orsinger & Nardone
53 High Street
Westerly, RI 02891
(Counsel to Chelsea Groton Savings Bank)

Mark A. McSally, Esq.
Kelly, Kelleher, Reilly & Simpson
28 Caswell Street
Narragansett, RI 02882
(Counsel to Narragansett Pier Assoc.)

Mark B. Morse, Esq.
420 Angell Street
Providence, RI 02903
(counsel to SalemTown Center, LLC)

Richard S. Mittleman, Esq.
Cameron & Mittleman
56 Exchange Terrace
Providence, RI 02903

Michael P. Lynch, Esq.
117 High Street
P.O. Box 761
Westerly, RI 02891

Tony Corleto
Corleto & Associates
107 Mill Plain Road
Danbury, CT 06811

Richard Pascal
O'Brien, Shafner, Stuart, Kelly & Morris
138 Main Street
P.O. Box 310
Norwich, CT 06360

Robert D. Wieck, Esq.
MacAdams & Wieck
101 Dyer Street
Providence, RI 02903

David H. Sholes, Esq.
1375 Warwick Avenue
Warwick, RI 02888
(Counsel to Michael Caito)

Carl Lisa, Esq.
Lisa & Sousa, Ltd.
5 Benefit Street
Providence, RI 02903

Matthew J. McGowan, Esq.
Salter, McGowan, Sylvia & Leonard
321 South Main Street
Providence, RI 02903

Cheryl Asquino, Esq.
Narragansett Bay Commission
One Service Road
Providence, RI 02905

Richard L. Gemma, Esq.
MacAdams & Wieck Incorporated
101 Dyer Street, 4th Floor
Providence, RI 02903
(Counsel to Sovereign Bank, Network Capital Alliance Division)

Benjamin M. Scungio, Esq.
Brennan, Recupero, Cascione, Scungio & McAllister, LLP
362 Broadway
Providence, RI 02909
(Counsel to Randolph Savings Bank)

C. George Kanabis, Esq.
Kanabis & Houle
320 State Street
P.O. Box 2022
New London, CT 06320
(Counsel to Christ Matsas & Despina Matsas)

Lynda L. Laing, Esq.
222 Richmond Street, Suite 208
Providence, RI 02903
(Counsel to Volvo North America LLC)

# ABSOLUTE TRIPLE NET

# BONDED LAND LEASE

THIS INDENTURE, made as of the 1st day of November by and between 1800 Smith Associates, LP with an address of 20 Westminster Street Providence, Rhode Island 02903 (hereinafter referred to as Lessor) and LOUIS A. GENCARELLI, SR., with a mailing address of 79 Tom Harvey Road, Westerly, Rhode Island 02891 (hereinafter referred to as Lessee).

WITNESSETH:

That in consideration of the rents, terms and conditions herein reserved and contained on the part of the Lessee to be paid, performed and observed, Lessor does hereby lease and demise to Lessee that land situated in the Town of North Providence, and the State of Rhode Island, located on 1800 Smith Street, as more particularly described in Exhibit "A", attached hereto and made a part hereof (hereinafter called the "Demised Premises");

TO HAVE AND TO HOLD the same for an initial term of twenty (20) years commencing on the Commencement Date, as hereinafter defined, yielding and paying therefore, Minimum Base Rent and Additional Rent as follows:

SUMMARY OF PAYMENTS

Minimum Base Rent: Commencing as of the Base Rent Commencement Date and continuing through the last day of the sixtieth (60th) month, Lessee agrees to pay to Lessor an annual minimum Base Rent of Thirty-Six Thousand and 00/100 ($36,000.00) Dollars payable in advance in equal successive monthly installments of Three-Thousand and 00/100 ($3,000.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of sixty-first (61st) month and continuing through, the last day of the second five year period, Lessee agrees to pay to Lessor an annual minimum Base Rent of Thirty-Nine Thousand Six Hundred and 00/100 ($39,600.00) Dollars payable in advance in equal successive monthly installments of Three Thousand Three Hundred and 00/100 ($3,300.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of the one hundred twenty-first (121st) month and continuing through the last day of the third five year period. Lessee agrees to pay to Lessor an annual minimum Base Rent of Forty-Three Thousand Five Hundred Sixty and 00/100 ($43,560.00) Dollars payable in advance in equal successive monthly installments of Three Thousand Six Hundred Thirty and 00/100 ($3,630.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of the one hundred eighty-first (181st) month and continuing through the last day of the fourth five year period. Lessee agrees to pay to Lessor an annual minimum Base Rent of Forty-Seven Thousand, Nine Hundred Sixteen and 00/100 ($47,916.00) Dollars payable in advance in equal successive monthly installments of Three Thousand Nine Hundred Ninety Three and 00/100 ($3,993.00) Dollars each on the first day of every calendar month during said period.

EXHIBIT

A

For any partial month at the beginning or end of the Term, Lessee shall pay a proportional share of the amount that would be due for a full month. In addition to the Base Rent, Lessee shall pay all Additional Rent and Rental Adjustments provided herein. All payments shall be made to Lessor at Lessor's address or such other place as Lessor may designate in writing, without prior demand and without deduction or offset.

Additional Rent: Commencing as of the Additional Rent Commencement Date, Lessee shall pay, when due, any and all costs and expenses directly attributable to the use, operation, maintenance, and repair of the Premises, including but not limited to, real estate taxes and all other assessments against the land as set forth in Paragraphs 8 and 9, and/or structure(s); personal property taxes; insurance; and all utilities, including but not limited to water, sewer, gas, phone, and electrical. This Additional Rent shall be paid during the full term of the lease and through all extension periods thereof. Additional Rent payments shall be assessed and paid monthly.

This Lease is made on the following terms and conditions:

1. Construction of Building:

a. This Lease is executed with the understanding and agreement that Lessee may construct buildings, fixtures and improvements on the Demised Premises. Lessee shall rough grade the site at its own expense. It is understood and agreed that Lessee will erect on the Demised Premises a free-standing retail coffee shop and bakery building as more particularly described in Exhibit B, attached hereto and made part hereof (hereinafter called the "Building").

Prior to commencement of construction, Lessee shall present to Lessor certificates of insurance evidencing to the reasonable satisfaction of Lessor that Lessee has procured "builder's risk" insurance, so-called pursuant to a prepaid premium insuring Lessor and Lessee and Lessor's lender (when financing is obtained) as an additional insured for construction of the Improvements on the Property in such amounts reasonable for the construction contemplated hereby, and comprehensive public liability insurance insuring Lessor and Lessee as an additional insured against loss from and liability for damages on account of loss or injuries suffered by any person within or upon the Property. Such coverage and protection to be not less than a combined single limit of Two Million Dollars ($2,000,000.00).

In connection with any such construction and continuing thereafter Lessor shall cooperate with and if required join with Lessee in applying for such permits and approvals, including, but not limited to, any zoning changes, variances, whether for use or dimensional or set back requirements, zoning exceptions, curb cuts and sewer, water and other utility tie-ins or connections, and building permits, as are required for the construction and the operation of a retail coffee shop and bakery with drive-thru capability and 24 hour operation. Any applications for permits (including demolition), approvals or variances shall be at Lessee's sole cost and expense.

Lessor shall not be responsible for any portion of such costs, including filing fees, attorney fees or any other costs associated with such applications. The Lessee shall arrange for sufficient financing to pay for any construction which Lessee undertakes on the Demised Premise.

It shall be a condition precedent to the Lessee's performance of any obligation Lessee may have as Lessee hereunder that: (a) all the permits and approvals be obtained necessary to construct a drive-thru coffee shop and bakery specifically including the drive-thru capability, the signage and exterior menu, except the condition to operate for 24 hours a day, (b) that Lessor obtain at its expense and deliver to Lessee an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's Lender, (which satisfaction shall not be unreasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of this lease; (c) that Lessor provide a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within sixty (60) days after execution of this lease; (d) that all representations and warranties of Lessor herein are and continue to be true and accurate, (e) that Lessee obtain financing to construct the Building in an amount equal to eighty (80%) percent of all construction costs with financing at commercially acceptable terms and rates within one hundred twenty (120) days after execution of this lease, (f) that Lessee obtain title insurance in a form sufficient to enable Lessee to obtain financing through the grant of a leasehold mortgage to construct and operate the proposed drive-thru coffee and bakery shop.

b. The Minimum Base Rent Commencement Date shall be one hundred twenty (120) days after execution of the lease or upon Lessee opening for business, whichever is sooner. If the Lessee is unable to satisfy the above contingencies in which event this payment obligation shall cease, and this lease shall become null and void.

c. The Additional Rent Commencement Date shall be November 1,1999 and shall be paid from said date through the duration of the lease. If the Lessee is unable to satisfy the above contingencies within the 120 days after execution of this lease this payment obligation shall cease and this lease becomes null and void.

d. The Commencement Date of this Lease shall be November 1, 1999.

2. Quiet Enjoyment: So long as the Lessee keeps and performs all of his covenants and conditions under this Lease and is not in default, he shall have quiet, undisturbed and continued possession of the Demised Premises free from all claims against Lessor and all persons claiming under, by or through Lessor.

3. Use and Occupancy: The Demised Premises may be used and occupied by Lessee for a retail store and/or restaurant including, but not limited to the operation of a retail store for the sale of bakery products, with drive thru capability, including, but not limited to, the sale of donuts, muffins and bagels and other pastries or bakery items of any kind, and for the sale of coffee, tea and other non-alcoholic beverages, and to provide tables, chairs and counters for patrons to sit while eating and drinking; or any other lawful purpose which (a) notwithstanding the foregoing

provisions of this document, Lessee shall not have the right to use the Demised Premises for any use which directly competes with any business located on property owned by Lessor that is contiguous to or adjacent to the Demised Property, without Lessor's prior written consent, which consent shall not be unreasonably withheld or delayed and; (5) Lessee shall promptly observe and comply with all present and future laws, ordinances, requirements, orders, directives, rules, and regulations of federal, state, and municipal governments and all other government authorities applicable to the Premises with regards to Lessee's use thereof.

Lessee shall not cause any portion of the Demised Premises to be used for any banking purpose, whether commercial banking, retail banking, mortgage banking, insurance brokerage, insurance sales and/or securities brokerage.

Lessor shall not, during the term of this Lease or any renewal thereof, without Lessee's consent in writing conduct any business, lease or cause to be leased, any space which exclusively sells or serves pastry items, and/or donuts and/or muffins and/or bagels, and/or coffee or tea, or which is otherwise in substantial competition with the Lessee on or contiguous to or adjacent to the Demised Premises. Substantial competition shall mean stores with a similar format to Lessee including Dunkin Donuts, Honeydew Donuts, Starbucks, Café LaFrance and the like.

4. **Alteration and Improvements:** Lessee covenants that at the end of the initial term of twenty (20) years or any Extended Term, Lessee will at no cost to Lessor peaceably deliver up to Lessor or Lessor's heirs, executors, administrators, successors and assigns the Demised Premises. All buildings, erections, improvements, or fixtures, which are placed on the Demised Premises, not including Lessee's personal property and trade fixtures, shall remain as the property of the Lessor. Lessee, may at its own expense, remove the façade or other features of the building (without placing the structure in jeopardy) to eliminate the appearance of a Bess Eaton store. All alterations to the façade, or other features must be replaced, at Lessees sole cost and expense, with like kind materials and workmanship.

5. **Assignment of Lease:** Lessee shall not assign this Lease nor sublet the Demised Premises or any part thereof without the written consent of the Lessor, which consent shall not be unreasonably withheld. Notwithstanding anything to the contrary contained in this Lease, Lessee may assign or sublet the Lease to Bess Eaton Donut Flour Co., Inc. or a member of Lessee's immediate family so long as Louis A. Gencarelli, Sr., guarantees the Lease. As a condition of any assignment or sub-let, Lessee shall personally guarantee the obligations of any assignee or sub-lessee if Lessor so demands. Except where consented to by Lessor, which consent shall not be unreasonably withheld, any sublease hereunder shall incorporate by reference the obligations of Lessee hereunder.

6. **Default:** In the event that any Rent, including Additional Rent, shall be in arrears and unpaid for five (5) days or more after receipt of notice from the Lessor that the same is unpaid provided, however, Lessor shall not be required to provide notice more than twice in any twelve month period for any particular monetary payment constituting Base Rent and Additional Rent, or if, after notice from Lessor of a default in the performance of any other covenant or condition herein contained and to be

kept by Lessee, Lessee shall not have cured such default within the space of thirty (30) days after the receipt of such notice or if said default cannot be cured within such time, if Lessee shall not have commenced curing such default or shall thereafter fail diligently to proceed with and complete curing the same, or if Lessee shall at any time vacate the Demised Premises and not sublet the Premises as herein provided or make a general assignment for the benefit of his creditors or apply for relief under any bankruptcy or insolvency laws, or if Lessee shall be adjudicated a bankrupt, it shall be lawful for Lessor thereupon, or at any time thereafter, at Lessor's option, and with or without process of law, to exercise all rights and remedies at law or in equity, and to terminate this Lease and to enter upon the Premises and to expel Lessee and those claiming under Lessee without being guilty of any manner including but not limited to trespass, and thenceforth peacefully and quietly hold and enjoy the Premises as if this Lease has not been made; without prejudice, however, to any right to sue for and recover any Rent, Additional Rent, and other sums then and thereafter due under this Lease, or to any claim for damages or right of action or remedy for the preceding breach of covenant, agreement or condition herein contained which Lessor might otherwise have or use, plus reasonable attorneys' fees incurred by Lessor in enforcing its remedies hereunder.

In the event of default, this Lease shall not, except at the option of the Lessor, continue for the benefit of any attaching creditor, assignee for the benefit of creditors, permanent receiver, or trustee in bankruptcy. This Lease is a "shopping center lease", so-called, pursuant to the Bankruptcy Code. Upon default, Lessor's and Lessee's rights, remedies, and benefits under this Lease are not cumulative and shall not be exclusive of any other rights, remedies, and benefits allowed by law or equity.

7. Governmental Orders: Lessee shall comply with all requirements of the municipal or other governmental authorities relating to the operation of the business of Lessee at Demised Premises (with the right, however, to contest by appropriate legal proceedings at his sole cost, expense and risk and requirements which Lessee may regard as unlawful or improper), provided that Lessor is not at risk of forfeiture of the Demised Property.

8. Taxes: From the Additional Rent Commencement Date hereof until termination of the Lease hereunder, Lessee shall pay as Additional Rent, all real estate and personal property taxes and other assessments whether general or special assessments on the Demised Premises and the improvements thereon. Lessee shall be obligated to pay only those installments of such taxes or assessments which are payable during the term hereof. Except as otherwise specifically stated above, nothing in this Lease shall be construed to require Lessee to pay any franchise, estate, inheritance, succession, capital levy, business tax or transfer tax of Lessor arising out of or connected with this Lease or Lessor's right in said premises, or any income, excess profit, or revenue tax or any other tax or import charged or levied upon the rentals payable by Lessee pursuant to this Lease, except any alternative method of taxing the use and occupancy of Lessee which replaces, substitutes and/or supplements real estate and/or personal property taxes as currently assessed and referred to. Lessee may contest and review by legal proceedings, instituted and conducted by him at his own expense, taxes, assessment, water rates, sewer charges or other charges imposed against the Demised Premises or improvements thereon. Notwithstanding anything to the contrary

contained herein, Lessee shall be required to pay any taxes which he is contesting in good faith but not any interest, penalty, charge or assessment arising from Lessor's failure to pay taxes or assessments when due or otherwise arising from Lessor's misfeasance, nonfeasance or malfeasance. Lessee shall indemnify and hold harmless Lessor from and against any cost or expenses associated with any such contest.

Lessee shall furnish to Lessor evidence of the payment of the Taxes and Assessments within ten (10) days following the date upon which payment is due. In the event Lessee does not timely pay such taxes and assessments of any nature, Lessor shall be permitted to pay the same on behalf of Lessee and such payments shall constitute Additional Rent payable to Lessor by Lessee. Upon written demand from Lessor, together with evidence of Lessor's payments of such taxes and assessments, Lessee shall promptly reimburse Lessor for such payment together with interest actually charged.

9. Utilities: Lessee shall pay the cost of all water, sewer, electricity, heating and other utilities including the cost of use and maintenance and/or replacements in connection with the Demised Premises and/or any buildings it constructs on the Demised Premises from the Commencement date thereof and during the term hereof.

10. Mortgages:

a. Subordination: Lessee will, upon request of Lessor, execute such document or documents as may be reasonably required to subordinate its leasehold to any subsequent mortgage made by Lessor on the Demised Premises (after Lessee has completed construction upon the premises - which Lessor and Lessee acknowledge will require bank financing), provided that the mortgagee agrees to recognize the validity of this Lease, and so long as the Lessee is not in default of this Lease and performs its obligations under this Lease, not to disaffirm this Lease, to assume the Lessor's obligation under this Lease, and not to disturb Lessee's possession or use of the Demised Premises in accordance with this Lease, and executes and delivers to Lessee such document or documents as may be reasonably required to effect and evidence such agreements by the mortgagee. If this Lease remains in full force and effect after the foreclosure of a mortgage upon the Demised Premises, Lessee agrees to recognize the mortgagee or the purchaser in foreclosure as Lessor under this lease and to execute such document or documents as may be reasonably required to evidence such attornment.

b. Leasehold Mortgages: Lessee shall have the right to mortgage his interest in this Lease under a "Leasehold Mortgage" or to make a "Collateral Assignment" of this Lease or of any of Lessee's rights hereunder as security for a loan to Lessee, but any such Mortgage or Assignment shall in all respects and at all times be subject to the provisions of this Lease. Any Leasehold Mortgage or Collateral Assignment by Lessee shall always be subordinate to Lessor's fee interest and to any present or future mortgage by Lessor. Lessee shall not obtain any mortgage and/or financing by Lessee for Lessee's construction, alterations, improvements or for any other purpose that involves a lien or encumbrance of Lessor's interest in the Demised Premises.

11. Condemnation:

a. Eminent domain; Cancellation. If, at any time during the continuance of this Lease, all or any portion of the Demised Premises or the improvement of any building located thereon is taken, appropriated or condemned by reason of eminent domain, the Lessor and Lessee shall divide the proceeds and awards in the condemnation proceedings, abate the rent, and make other adjustments in a just and equitable manner under the circumstances. If the parties cannot agree on a just and equitable decision, annual abatement of rent, or other adjustments within 30 days after the award has been made, the disputed matters shall, by appropriate proceedings, be submitted to a court having jurisdiction of the subject matter for its decision and determination. If legal title to the entire premises is wholly taken by condemnation, the Lease shall be canceled.

b. Apportionment. The deprivation of the Lessee's use of the buildings and improvements shall, together with the remaining term of the Lease, be an item of damage in determining the Lessee's portion of the condemnation award and the value of the land together with the remaining term of the Lease shall be an item of damage in determining Lessors award. It is the general intent of this Section that, upon condemnation, the parties shall share in their awards to the extent that their respective interests are depreciated, damaged, or destroyed by the exercise of the right of eminent domain. If the condemnation is total, the condemnation award shall be allocated so that the then value of the property, as if it were unimproved property, is allocated to the Lessor after giving due consideration to the number of years then remaining on the term of this Lease, and the then value of the building or buildings thereon is allocated between the Lessor and Lessee after giving due consideration to the number of years then remaining on the term of this Lease and the condition of the buildings at the time of condemnation. Notwithstanding anything to the contrary contained herein, Lessee shall be entitled to a separate award from the condemning authority for moving expenses, loss business and good will, and for its trade fixtures and equipment.

12. Expenses, Improvements and Replacements: It is the intention of the Lessor and Lessee that the Base Rent and Additional Rent herein specified shall be absolute and triple net, with no costs or services to the Lessor, in each year during the term and any extensions thereof of the Lease. Nothing in this Lease shall be deemed to require the Lessee to pay or discharge any liens or mortgages which are placed on the Demised Premises as a result of Lessor's action or inaction.

13. Renewal Options & Holdover Tenancy: Rent during the Renewal Option period shall be negotiated by the Lessor and the Lessee at least one (1) year prior to the expiration of the initial term. If the Lessee holds over after the termination of this Lease (including any renewal or option period), then the tenancy shall be from month-to-month in the absence of any written agreement to the contrary. Either party may terminate such month-to-month tenancy upon thirty (30) days written notice to the other party. Rent and Additional Rent obligations during such holdover period shall continue at a rate one and a half times (1½) the Rent obligation for

the last month of the Lease term.

14. Indemnity and Insurance: Lessee will indemnify and hold harmless the Lessor from any liability by reason of personal injury or death to any person or persons or loss or damage to property on or about the Demised Premises. Lessee will carry ALL RISK fire, casualty, real estate, personal property, liability, general liability, public liability and loss of rent insurance in an amount reasonably satisfactory to the Lessor. Insurance policy shall be approved by Lessor, which approval shall not be unreasonably withheld or delayed, and name Lessor as additional insured, in the minimum amount of Two Million Dollars ($2,000,000) for injury to or death of any one person, and Two Million Dollars ($2,000,000) for injury to or death of any number of persons arising out of a single occurrence and Five Hundred Thousand ($500,000) Dollars for damage to property and will pay all premiums for said policies promptly when due and otherwise keep said policies in good standing. Lessee will provide Lessor with certificates thereof, will put the same into effect as of the date of Lease Commencement and will maintain all such policies or renewals thereof in effect during the Term and extended Terms of this Lease as well as during any period(s) in which Lessee occupies the Demised Premises.

Notwithstanding the foregoing, the Lessee shall not be required to indemnify or hold the Lessor harmless for any death or injury to any person or damage to any property due to the negligence of the Lessor, its agents, employees or contractors.

15. Damage or Destruction: Lessee shall, to the extent obtainable, keep all buildings and improvements placed on the Demised Premises insured for 100% of actual replacement cost against Loss or damage by fire and all such other risks and hazards as are insurable under present and future standard forms of fire and extended coverage insurance policies. In the event of any fire or other casualty insured against by Lessee's policies Lessor shall, at Lessee's request, assign to Lessee all of its rights, title and interest in any insurance proceeds, subject to Lessee's full replacement of the building and improvements. If the building or improvements on the Demised Premises shall be damaged or destroyed by casualty or fire, Lessee elects not to replace the building to original condition, Lessee shall not have the right to request any rights, title and/or interest in any insurance proceeds and Lessee shall have the option to terminate this Lease following such fire or casualty. Rent and additional rent shall abate during any period of untenantability caused by any damage to the buildings and/or improvements on the Demised Premises.

16. Signs: The Lessee shall have the right to place signs on the Demised Premises, including signs on the exterior of the building and on the curb area of the Demised Premises, provided that such signs comply with applicable State and Municipal regulations or are permitted by special use permit or variance.

17. First Refusal Purchase Option: Lessor shall not sell, or grant options with respect to or otherwise dispose of the Demised Premises or any part thereof to any direct or indirect competitor of Bess Eaton Donut Flour Co., Inc. unless Lessor shall first notify Lessee in writing stating the terms and conditions under which Lessor is willing to sell, or grant options with respect to or otherwise dispose of the Demised Premises and giving Lessee the Refusal Purchase Option to purchase said property

pursuant to such terms and conditions as set forth in the then existing offer to purchase acceptable to the Lessor. If this first refusal purchase option is not exercised by Lessee within five (5) business days after such notice is received, Lessor may sell, and/or grant said property to another party pursuant to such terms and conditions. Notwithstanding anything to the contrary contained in this Lease, the Lessee's right of first Refusal Purchase Option contained herein does not apply to and is waived by Lessee and thus null and void with respect to transfers, assignments, sales, leases, inheritance, devise, grant, and/or bequests to relatives of the Lessor, his assignees, respective successors, heirs, kindred, and descendants, but Lessee's First Refusal Purchase Option shall thereafter remain in full force and effect. Notice of Lessee's Option shall be contained in all transfer documents.

18. **Notice:** All notices required to be given under this Lease or as provided by law shall be effective on receipt and shall be addressed to the Lessor or Lessee at the following addresses, until written notice is received that a different address is to be used, and such notices must be sent by certified mail, return receipt requested:

| | |
|---|---|
| To Lessor: | 1300 Smith Associates, LP<br>c/o SAF Management, LLC.<br>20 Westminster Street<br>Providence, Rhode Island 02903 |
| With a copy to: | The Discovery Group, LLC.<br>c/o Jason A. Sisti<br>P.O. Box 8801<br>Boston, Massachusetts 02114 |
| To Lessee: | Louis R. Gencarelli, Sr.<br>13 Tom Harvey Road<br>Westerly, Rhode Island 02891 |
| With a copy to: | Scott T. Spear, Esq.<br>BLISH & CAVANAGH<br>30 Exchange Terrace<br>Providence, RI 02903 |

19. **Captions:** The captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease nor the intent of an provision thereof.

20. **Binding:** The obligation of each party hereto shall be binding upon such party and upon the respective successors and assigns of the parties, as the case may be.

21. **Counterparts:** This Lease may be executed in any number of counterparts, each of which shall be an original and the counterparts shall constitute but one and the same instrument.

22. **Modifications:** This Lease may not be modified, altered, terminated or discharged orally, but only by an agreement, in writing, signed by the parties hereto.

23. Brokers: The parties recognize Sandra Salvadore of Metropolitan Commercial Property, Ltd. as the sole agent for the Lessor. The parties acknowledge there are no other brokers involved in this transaction other than Sandra Salvadore of Metropolitan Commercial Property Ltd. and the Lessee shall indemnify and hold the Lessor harmless from and against any and all claim or demand by any broker, or any person who claims to have dealt with the indemnifying party.

24. The submission by Lessee of this document for examination does not constitute an offer and this document shall become effective and binding only upon execution and delivery hereof by both Lessor and Lessee.

25. Lessor hereby represents and warrants to Lessee as follows:

a. Lessor is the owner of the Demised Premises in fee simple absolute.

b. There are no restrictions, encumbrances, covenants, easements, exclusive use provisions in other Lessor's leases or other agreements, laws or other ordinances or regulations which will prevent Lessee from occupying the Premises for the purposes provided herein or otherwise conflict with any provision of this Lease, to the best of its knowledge.

c. Lessor has full right and authority to enter into this Lease and no joinder or approval of any other person or entity is required with respect to Lessor's right and authority to enter into this Lease.

d. To the best of its knowledge there is no oil or hazardous waste, material or substance on the Demised Premises as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency, and there are no violations of any federal or state law or municipal ordinance, order, or requirements of any governmental body or authority affecting all or any portion of the Demised Premises. Lessor, its successors or assigns agrees to indemnify and hold harmless the Lessee, its successors and assigns from any and all loss, cost, or damage, including attorneys' fees and court costs, which the Lessee, its successors or assigns, may sustain, suffer or incur as a result of any storage, disposal, release, escape, threat of release, presence on or transport to the Demised Premises of any oil or hazardous waste, material or substance as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency prior to the execution of this Lease or which results from the fault, act, omission, negligence or misconduct of Lessor, its agents, employees, and contractors or any predecessor in title.

Lessor will save Lessee harmless, and will exonerate, defend, and indemnify Lessee from and against any and all claims, liabilities or penalties (including attorney fees) asserted by or on behalf of any person, firm, corporation or public authority: (1) On account of or based upon any injury to persons or loss of or damage to property sustained or occurring on the Demised Premises on account or based upon the act, omission, fault, negligence, or misconduct of Lessor, its agents, employees, contractors or invitees to the full extent of any injury or damage not attributable to Lessee; (2) On account of or resulting from the failure of Lessor to perform and discharge any

of its covenants and obligations under this Lease; and

Lessee, its successors or assigns agrees to indemnify and hold harmless the Lessor, its successors and assigns from any and all loss, cost, or damage, including attorneys' fees and court costs, which the Lessor, its successors or assigns, may sustain, suffer or incur as a result of any storage, disposal, release, escape, threat of release, presence on or transport to the Demised Premises of any oil or hazardous waste, material or substance as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency during the term of this Lease or which results from the fault, act, omission, negligence or misconduct of Lessee, its agents, employees, contractors, invitees, and/or licensees, to the full extent of any injury or damage not attributable to Lessor.

Lessee will save Lessor harmless, and will exonerate, defend, and indemnify Lessor from and against any and all claims, liabilities or penalties (including attorney fees) asserted by or on behalf of any person, firm, corporation or public authority on account or based upon any injury to persons or loss of or damage to property sustained or occurring on the Demised Premises on account or based upon the act, omission, fault, negligence, or misconduct of Lessee, its agents, employees, contractors or invitees to the full extent of any injury or damage not attributable to Lessor.

26. Environmental Audits

a. Owner Conducts Initial Audit (Initial Environmental Audit): On or before the delivery date, Lessor shall, at its sole cost and expense, provide tenant a Phase I environmental assessment of the Premises, together with additional reports and testing from an environmental consultant selected by the Lessor.

b. Lessee Conducts Update (Environmental Update): After lessees vacates the premises in accordance with the terms and conditions of this lease, but no later than 30 days after the expiration or sooner termination of this lease, Lessee shall, at its sole cost and expense, provide Landlord with a Phase I environmental assessment of the Premises, together with such additional reports and testing, including a Phase II environmental assessment if reasonably necessary in Landlord's sole discretion using the consultant who initially prepared the initial Environmental Audit or, if that consultant is not available, another licensed environmental consultant reasonably acceptable to Landlord, to determine the environmental status of the premises as of the date of that Environmental Update.

c. Lessee's Further Environmental Obligations: Lessee's obligations under this Section (including, without limitation, its redemption and indemnification obligations) shall be limited to any Hazardous Waste and/or contamination generated, stored, or disposed of by Lessee, it's agents, employees, contractors, invitees, licensees, and/or any other parties during the term or extended term of this lease, contrary to the provisions of this Lease which are revealed by the Environmental Update (or any inspection by the Landlord prior to Lessee's delivery of the Premises to Landlord), but which were not revealed by the Initial

Environmental Audit. This clause shall survive the expiration or sooner termination of the Lease."

27. Lessor and Lessee agree that upon the request of the other, they will execute a memorandum of lease or short form lease for recording purposes which shall contain a Summary of the lease terms and right of first Refusal Purchase Option contained herein.

28. The Lessee shall not allow a lien and/or claim of any kind to be filed, including but not limited to liens and/or claims to be filed against the Lessor's interest in the Demised Premises, except for leasehold mortgages necessary to finance construction during the continuance of this Lease. If such lien and/or claim is filed, the Lessee shall cause the Demised Premises to be released from the lien and/or claim within 60 days after the Lessor is given written notice that a claim has been filed, or within 60 days after the Lessor is given written notice of the claim and transmits written notice of its receipt to the Lessee, whichever 60-day period expires earlier. The Lessee will cause such release either by paying to the court the amount necessary to relieve and release the Demised Premises from the lien, or in any other manner which, as a matter of law, will result, within the 60-day period, in releasing the Lessor and its title from the claim.

29. Force majeure: If the Lessor or Lessee is delayed, hindered, or prevented from performing any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive government laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war, or other reason beyond its control, then performance of the act shall be excused for the period of the delay. In the event of a delay, the Commencement Date of the Rent payment obligations and Additional Rent payment obligations shall not be so extended. In that event, the period for the performance of the act shall be extended for a period equivalent to the period of the delay, provided that such extension shall not extend the term of this Lease.

30. Estoppel - Certificates: Either party shall, without charge, at any time and from time to time hereafter, within ten days after the others' written request of the other, certify by instrument duly executed and acknowledged to any mortgagee or purchaser or proposed mortgagee or proposed purchaser, or any other person, firm, or corporation specified in the request as to:

a. Whether this Lease has been supplemented or amended, and, if so, the substance and manner of the supplement or amendment;

b. The validity and force and effect of this Lease, in accordance with its tenor as then constituted;

c. The existance of any default thereunder;

d. The existence of all offsets, counterclaims, or defenses thereto on the part of the other party:

e. The commencement and expiration dates of the term of this Lease; and

f. All other matters that may reasonably be so requested.

Any such certificate may be relied upon by the party who requested it and any other person, firm, or corporation to whom it may be exhibited or delivered, and the contents of the certificate shall be binding on the party executing it.

31. Waivers: The failure of either party hereto to insist in any one or more instances upon the strict and literal performance of any of the agreements, terms, or conditions of this Agreement and Lease, shall not be construed as a waiver for the future of such term, condition, or agreement.

32. Covenants Running with Land; Binding Effect: All covenants, conditions, and obligations contained herein or implied by law are covenants running with the land and shall attach and bind and inure to the benefit of the Lessor and Lessee and their respective heirs, legal representatives, successors, and assigns, except as otherwise provided herein. All covenants, conditions, and obligations contained herein or implied by law shall expire at the date of termination of this lease, except as otherwise provided herein.

33. Upon signing of this document, Lessor and Lessee acknowledge their willful, full, complete and total acceptance of the terms and conditions herein. Lessor and Lessee acknowledge that this agreement is a full, complete and total integration of the parties intent and that all previous warranties, guarantees, representations, (both oral and written), memorandums, letters, including but not limited to facsimiles and electronic mail, are null and void for the all purposes, including, but not limited to parol evidence. Lessor and Lessee acknowledge this agreement, exhibits, appendixes and all other contents attached to herein are a willful, final and complete binding commitment and representation between the Lessor and Lessee.

IN WITNESS WHEREOF, Lessor and Lessee have caused these presents and a duplicate of the same tenor to be executed on the day and year above written.

| | |
|---|---|
| Witness: | Lessor: |
| [signature] | [signature] |
| | 2300 Smith Associates, LP |
| Witness: | Lessee: |
| [signature] | [signature] |
| | Louis A. Gencarelli, Sr. |

STATE OF RI
COUNTY OF Providence

In Providence, on the 18th day of Nov, before me personally appeared [illegible] in his capacity as of [illegible] to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him so executed to be his free act and deed and the free act and deed of said entity.

Notary Public
My Commission Expires: 3/30/02

STATE OF RI
COUNTY OF Washington

In Westerly, on the 5th day of November, before me personally appeared Louis A. Gencarelli, Sr., to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him so executed to be his free act and deed and the free act and deed of said entity.

Notary Public
My Commission Expires: 2-13-02

EXHIBIT A
"Demised Premises Site Plan and Description"

EXHIBIT 3

"Building, Structure, Sign Specifications"

EXHIBIT C
"Cross Easement Site Plan and Description"

# ABSOLUTE TRIPLE NET BONDED LAND LEASE

THIS INDENTURE, made as of the 1st day of November, 1999 by and between 1500 Mineral Spring Associates, LP with an address of 20 Westminster Street Providence, Rhode Island 02903 (hereinafter referred to as Lessor) and LOUIS A. GENCARELLI, SR., with a mailing address of 79 Tom Harvey Road, Westerly, Rhode Island 02891 (hereinafter referred to as Lessee).

WITNESSETH:

That in consideration of the rents, terms and conditions herein reserved and contained on the part of the Lessee to be paid, performed and observed, Lessor does hereby lease and demise to Lessee that land situated in the Town of North Providence, and the State of Rhode Island, located on 1500 Mineral Spring Avenue, as more particularly described in Exhibit "A", attached hereto and made a part hereof (hereinafter called the "Demised Premises");

TO HAVE AND TO HOLD the same for an initial term of twenty (20) years commencing on the Commencement Date, as hereinafter defined, yielding and paying therefore, Minimum Base Rent and Additional Rent as follows:

SUMMARY OF PAYMENTS

Minimum Base Rent: Commencing as of the Base Rent Commencement Date and continuing through the last day of the sixtieth (60th) month, Lessee agrees to pay to Lessor an annual minimum Base Rent of Forty Two Thousand and 00/100 ($42,000.00) Dollars payable in advance in equal successive monthly installments of Three-Thousand and 00/100 ($3,500.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of sixty-first (61st) month and continuing through, the last day of the second five year period, Lessee agrees to pay to Lessor an annual minimum Base Rent of Forty Six Thousand Two Hundred and 00/100 ($46,200.00) Dollars payable in advance in equal successive monthly installments of Three Thousand Three Hundred and 50/100 ($3,850.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of the one hundred twenty-first (121st) month and continuing through the last day of the third five year period. Lessee agrees to pay to Lessor an annual minimum Base Rent of Fifty Thousand Eight Hundred Twenty and 00/100 ($50,820.00) Dollars payable in advance in equal successive monthly installments of Four Thousand Two Hundred Thirty Five and 00/100 ($4,235.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of the one hundred eighty-first (181st) month and continuing through the last day of the fourth five year period. Lessee agrees to pay to Lessor an annual minimum Base Rent of Fifty Five Thousand, Nine Hundred Two and 00/100 ($55,902.00) Dollars payable in advance in equal successive monthly installments of Four Thousand Six Hundred Fifty Eight and 50/100 ($4,658.50) Dollars each on the first day of every calendar month during said period.

For any partial month at the beginning or end of the Term, Lessee shall pay a proportional share of the amount that would be due for a full month. In addition to the Base Rent, Lessee shall pay all Additional Rent and Rental Adjustments provided herein. All payments shall be made to Lessor at Lessor's address or such other place as Lessor may designate in writing, without prior demand and without deduction or offset.

Additional Rent: Commencing as of the Additional Rent Commencement Date, Lessee shall pay, when due, any and all costs and expenses directly attributable to the use, operation, maintenance, and repair of the Premises, including but not limited to, real estate taxes and all other assessments against the land as set forth in Paragraphs 8 and 9, and/or structure(s); personal property taxes; insurance; and all utilities, including but not limited to water, sewer, gas, phone, and electrical. This Additional Rent shall be paid during the full term of the lease and through all extension periods thereof. Additional Rent payments shall be assessed and paid monthly.

This Lease is made on the following terms and conditions:

1. Construction of Building:

a. This Lease is executed with the understanding and agreement that Lessor, at Lessor's expense, will demolish and remove all existing structures, buildings and improvements on the Demised Premises so the Lessee may construct buildings, fixtures and improvements on the Demised Premises. Lessee shall reimburse Lessor $7,800 for said costs. Lessee shall rough grade the site at its own expense. It is understood and agreed that Lessee will erect on the Demised Premises a free-standing retail coffee shop and bakery building as more particularly described in Exhibit B, attached hereto and made part hereof (hereinafter called the "Building").

Prior to commencement of construction, Lessee shall present to Lessor certificates of insurance evidencing to the reasonable satisfaction of Lessor that Lessee has procured "builder's risk" insurance, so-called pursuant to a prepaid premium insuring Lessor and Lessee and Lessor's lender (when financing is obtained) as an additional insured for construction of the Improvements on the Property in such amounts reasonable for the construction contemplated hereby, and comprehensive public liability insurance insuring Lessor and Lessee as an additional insured against loss from and liability for damages on account of loss or injuries suffered by any person within or upon the Property. Such coverage and protection to be not less than a combined single limit of Two Million Dollars ($2,000,000.00).

In connection with any such construction and continuing thereafter Lessor shall cooperate with and if required join with Lessee in applying for such permits and approvals, including, but not limited to, any zoning changes, variances, whether for use or dimensional or set back requirements, zoning exceptions, curb cuts and sewer, water and other

utility tie-ins or connections, and building permits, as are required for the construction and the operation of a retail coffee shop and bakery with drive-thru capability and 24 hour operation. Any applications for permits (including demolition), approvals or variances shall be at Lessee's sole cost and expense. Lessor shall not be responsible for any portion of such costs, including filing fees, attorney fees or any other costs associated with such applications. The Lessee shall arrange for sufficient financing to pay for any construction which Lessee undertakes on the Demised Premise.

It shall be a condition precedent to the Lessee's performance of any obligation Lessee may have as Lessee hereunder that; (a) all the permits and approvals be obtained necessary to construct a drive-thru coffee shop and bakery specifically including the drive-thru capability, the signage and exterior menu, except the condition to operate for 24 hours a day, (b) that Lessor obtain at its expense and deliver to Lessee an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's Lender, (which satisfaction shall not be unreasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of this lease; (c) that Lessor provide a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within sixty (60) days after execution of this lease; (d) that all representations and warranties of Lessor herein are and continue to be true and accurate, (e) that Lessee obtain financing to construct the Building in an amount equal to eighty (80%) percent of all construction costs with financing at commercially acceptable terms and rates within one hundred twenty (120)days after execution of this lease, (f) that Lessee obtain title insurance in a form sufficient to enable Lessee to obtain financing through the grant of a leasehold mortgage to construct and operate the proposed drive-thru coffee and bakery shop.

b. The Minimum Base Rent Commencement Date shall be one hundred twenty (120) days after execution of the lease or upon Lessee opening for business, whichever is sooner. If the Lessee is unable to satisfy the above contingencies in which event this payment obligation shall cease, and this lease shall become null and void.

c. The Additional Rent Commencement Date shall be November 1,1999 and shall be paid from said date through the duration of the lease. If the Lessee is unable to satisfy the above contingencies within the 120 days after execution of this lease this payment obligation shall cease and this lease becomes null and void.

d. The Commencement Date of this Lease shall be November 1, 1999.

2. Quiet Enjoyment: So long as the Lessee keeps and performs all of his covenants and conditions under this Lease and is not in default, he shall have quiet, undisturbed and continued possession of the Demised Premises free from all claims against Lessor and all persons

claiming under, by or through Lessor.

3. Use and Occupancy: The Demised Premises may be used and occupied by Lessee for a retail store and/or restaurant including, but not limited to the operation of a retail store for the sale of bakery products, with drive thru capability, including, but not limited to, the sale of donuts, muffins and bagels and other pastries or bakery items of any kind, and for the sale of coffee, tea and other non-alcoholic beverages, and to provide tables, chairs and counters for patrons to sit while eating and drinking; or any other lawful purpose which (a) notwithstanding the foregoing provisions of this document. Lessee shall not have the right to use the Demised Premises for any use which directly competes with any business located on property owned by Lessor that is contiguous to or adjacent to the Demised Property, without Lessor's prior written consent, which consent shall not be unreasonably withheld or delayed and; (b) Lessee shall promptly observe and comply with all present and future laws, ordinances, requirements, orders, directives, rules, and regulations of federal, state, and municipal governments and all other government authorities applicable to the Premises with regards to Lessee's use thereof.

Lessee shall not cause any portion of the Demised Premises to be used for any banking purpose, whether commercial banking, retail banking, mortgage banking, insurance brokerage, insurance sales and/or securities brokerage.

Lessor shall not, during the term of this Lease or any renewal thereof, without Lessee's consent in writing conduct any business, lease or cause to be leased, any space which exclusively sells or serves pastry items, and/or donuts and/or muffins and/or bagels, and/or coffee or tea, or which is otherwise in substantial competition with the Lessee on or contiguous to or adjacent to the Demised Premises. Substantial competition shall mean stores with a similar format to Lessee including Dunkin Donuts, Honeydew Donuts, Starbucks, Café LaFrance and the like.

4. Alteration and Improvements: Lessee covenants that at the end of the initial term of twenty (20) years or any Extended Term, Lessee will at no cost to Lessor peaceably deliver up to Lessor or Lessor's heirs, executors, administrators, successors and assigns the Demised Premises. All buildings, erections, improvements, or fixtures, which are placed on the Demised Premises, not including Lessee's personal property and trade fixtures, shall remain as the property of the Lessor. Lessee may at it's own expense remove the façade or features of the building (without placing the structure in jeopardy) to eliminate the appearance of a Bess Eaton store. All alterations to the facade or other features must be replaced, at Lessees sole cost and expense with like kind materials and workmanship.

5. Assignment of Lease: Lessee shall not assign this Lease nor sublet the Demised Premises or any part thereof without the written consent of the Lessor, which consent shall not be unreasonably withheld. Notwithstanding anything to the contrary contained in this Lease, Lessee may assign or sublet the Lease to Bess Eaton Donut Flour Co., Inc. or a member of Lessee's immediate family so long as Louis A. Gencarelli, Sr., guarantees the Lease. As a condition of any

assignment or sub-let, Lessee shall personally guarantee the obligations of any assignee or sub-lessee if Lessor so demands. Except where consented to by Lessor, which consent shall not be unreasonably withheld, any sublease hereunder shall incorporate by reference the obligations of Lessee hereunder.

6. Default: In the event that any Rent, including Additional Rent, shall be in arrears and unpaid for five (5) days or more after receipt of notice from the Lessor that the same is unpaid provided, however, Lessor shall not be required to provide notice more than twice in any twelve month period for any particular monetary payment constituting Base Rent and Additional Rent, or if, after notice from Lessor of a default in the performance of any other covenant or condition herein contained and to be kept by Lessee, Lessee shall not have cured such default within the space of thirty (30) days after the receipt of such notice or if said default cannot be cured within such time, if Lessee shall not have commenced curing such default or shall thereafter fail diligently to proceed with and complete curing the same, or if Lessee shall at any time vacate the Demised Premises and not sublet the Premises as herein provided or make a general assignment for the benefit of his creditors or apply for relief under any bankruptcy or insolvency laws, or if Lessee shall be adjudicated a bankrupt, it shall be lawful for Lessor thereupon, or at any time thereafter, at Lessor's option, and with or without process of law, to exercise all rights and remedies at law or in equity, and to terminate this Lease and to enter upon the Premises and to expel Lessee and those claiming under Lessee without being guilty of any manner including but not limited to trespass, and thenceforth peacefully and quietly hold and enjoy the Premises as if this Lease has not been made; without prejudice, however, to any right to sue for and recover any Rent, Additional Rent, and other sums then and thereafter due under this Lease, or to any claim for damages or right of action or remedy for the preceding breach of covenant, agreement or condition herein contained which Lessor might otherwise have or use, plus reasonable attorneys' fees incurred by Lessor in enforcing its remedies hereunder.

In the event of default, this Lease shall not, except at the option of the Lessor, continue for the benefit of any attaching creditor, assignee for the benefit of creditors, permanent receiver, or trustee in bankruptcy. This Lease is a "shopping center lease", so-called, pursuant to the Bankruptcy Code. Upon default, Lessor's and Lessee's rights, remedies, and benefits under this Lease are not cumulative and shall not be exclusive of any other rights, remedies, and benefits allowed by law or equity.

7. Governmental Orders: Lessee shall comply with all requirements of the municipal or other governmental authorities relating to the operation of the business of Lessee at Demised Premises (with the right, however, to contest by appropriate legal proceedings at his sole cost, expense and risk and requirements which Lessee may regard as unlawful or improper), provided that Lessor is not at risk of forfeiture of the Demised Property.

8. Taxes: From the Additional Rent Commencement Date hereof until termination of the Lease hereunder, Lessee shall pay as Additional

Rent, all real estate and personal property taxes and other assessments whether general or special assessments on the Demised Premises and the improvements thereon. Lessee shall be obligated to pay only those installments of such taxes or assessments which are payable during the term hereof. Except as otherwise specifically stated above, nothing in this Lease shall be construed to require Lessee to pay any franchise, estate, inheritance, succession, capital levy, business tax or transfer tax of Lessor arising out of or connected with this Lease or Lessor's right in said premises, or any income, excess profit, or revenue tax or any other tax or import charged or levied upon the rentals payable by Lessee pursuant to this Lease, except any alternative method of taxing the use and occupancy of Lessee which replaces, substitutes and/or supplements real estate and/or personal property taxes as currently assessed and referred to. Lessee may contest and review by legal proceedings, instituted and conducted by him at his own expense, taxes, assessment, water rates, sewer charges or other charges imposed against the Demised Premises or improvements thereon. Notwithstanding anything to the contrary contained herein, Lessee shall be required to pay any taxes which he is contesting in good faith but not any interest, penalty, charge or assessment arising from Lessor's failure to pay taxes or assessments when due or otherwise arising from Lessor's misfeasance, nonfeasance or malfeasance. Lessee shall indemnify and hold harmless Lessor from and against any cost or expenses associated with any such contest.

Lessee shall furnish to Lessor evidence of the payment of the Taxes and Assessments within ten (10) days following the date upon which payment is due. In the event Lessee does not timely pay such taxes and assessments of any nature, Lessor shall be permitted to pay the same on behalf of Lessee and such payments shall constitute Additional Rent payable to Lessor by Lessee. Upon written demand from Lessor, together with evidence of Lessor's payments of such taxes and assessments, Lessee shall promptly reimburse Lessor of such payment together with interest actually charged.

9. Utilities: Lessee shall pay the cost of all water, sewer, electricity, heating and other utilities including the cost of use and maintenance and/or replacements in connection with the Demised Premises and/or any buildings it constructs on the Demised Premises from the Commencement date hereof and during the term hereof.

10. Mortgages:

a. Subordination: Lessee will, upon request of Lessor, execute such document or documents as may be reasonably required to subordinate its leasehold to any subsequent mortgage made by Lessor on the Demised Premises (after Lessee has completed construction upon the premises - which Lessor and Lessee acknowledge will require bank financing), provided that the mortgagee agrees to recognize the validity of this Lease, and so long as the Lessee is not in default of this Lease and performs its obligations under this Lease, not to disaffirm this Lease, to assume the Lessor's obligation under this Lease, and not to disturb Lessee's possession or use of the Demised Premises in accordance with this Lease, and executes and delivers to Lessee such document or documents as may be reasonably required to

effect and evidence such agreements by the mortgagee. If this Lease remains in full force and effect after the foreclosure of a mortgage upon the Demised Premises, Lessee agrees to recognize the mortgagee or the purchaser in foreclosure as Lessor under this lease and to execute such document or documents as may be reasonably required to evidence such attornment.

b. **Leasehold Mortgages:** Lessee shall have the right to mortgage his interest in this Lease under a "Leasehold Mortgage" or to make a "Collateral Assignment" of this Lease or of any of Lessee's rights hereunder as security for a loan to Lessee, but any such Mortgage or Assignment shall in all respects and at all times be subject to the provisions of this Lease. Any Leasehold Mortgage or Collateral Assignment by Lessee shall always be subordinate to Lessor's fee interest and to any present or future mortgage by Lessor. Lessee shall not obtain any mortgage and/or financing by Lessee for Lessee's construction, alterations, improvements or for any other purpose that involves a lien or encumbrance of Lessor's interest in the Demised Premises.

11. **Condemnation:**

a. **Eminent domain; Cancellation:** If, at any time during the continuance of this Lease, all or any portion of the Demised Premises or the improvement of any building located thereon is taken, appropriated or condemned by reason of eminent domain, the Lessor and Lessee shall divide the proceeds and awards in the condemnation proceedings, abate the rent, and make other adjustments in a just and equitable manner under the circumstances. If the parties cannot agree on a just and equitable decision, annual abatement of rent, or other adjustments within 30 days after the award has been made, the disputed matters shall, by appropriate proceedings, be submitted to a court having jurisdiction of the subject matter for its decision and determination. If legal title to the entire premises is wholly taken by condemnation, the Lease shall be canceled.

c. **Apportionment.** The deprivation of the Lessee's use of the buildings and improvements shall, together with the remaining term of the Lease, be an item of damage in determining the Lessee's portion of the condemnation award and the value of the land together with the remaining term of the Lease shall be an item of damage in determining Lessors award. It is the general intent of this Section that, upon condemnation, the parties shall share in their awards to the extent that their respective interests are depreciated, damaged, or destroyed by the exercise of the right of eminent domain. If the condemnation is total, the condemnation award shall be allocated so that the then value of the property, as if it were unimproved property, is allocated to the Lessor after giving due consideration to the number of years then remaining on the term of this Lease, and the then value of the building or buildings thereon is allocated between the Lessor and Lessee after giving due consideration to the number of years then remaining on the term of this lease and the condition of the buildings at the time of condemnation.

Notwithstanding anything to the contrary contained herein, Lessee shall be entitled to a separate award from the condemning authority for moving expenses, loss business and good will, and for its trade fixtures and equipment.

12. **Expenses, Improvements and Replacements:** It is the intention of the Lessor and Lessee that the Base Rent and Additional Rent herein specified shall be absolute and triple net, with no costs or services to the Lessor, in each year during the term and any extensions thereof of the Lease. Nothing in this Lease shall be deemed to require the Lessee to pay or discharge any liens or mortgages which are placed on the Demised Premises as a result of Lessor's action or inaction.

13. **Renewal Options & Holdover Tenancy:** Rent during the Renewal Option period shall be negotiated by the Lessor and the Lessee at least one (1) year prior to the expiration of the initial term. If the Lessee holds over after the termination of this Lease (including any renewal or option period), then the tenancy shall be from month-to-month in the absence of any written agreement to the contrary. Either party may terminate such month-to-month tenancy upon thirty (30) days written notice to the other party. Rent and Additional Rent obligations during such holdover period shall continue at a rate one and a half times (1½) the Rent obligation for the last month of the Lease term.

14. **Indemnity and Insurance:** Lessee will indemnify and hold harmless the Lessor from any liability by reason of personal injury or death to any person or persons or loss or damage to property on or about the Demised Premises. Lessee will carry ALL RISK fire, casualty, real estate, personal property, liability, general liability, public liability and loss of rent insurance in an amount reasonably satisfactory to the Lessor. Insurance policy shall be approved by Lessor, which approval shall not be unreasonably withheld or delayed, and name Lessor as additional insured, in the minimum amount of Two Million Dollars ($2,000,000) for injury to or death of any one person, and Two Million Dollars ($2,000,000) for injury to or death of any number of persons arising out of a single occurrence and Five Hundred Thousand ($500,000) Dollars for damage to property and will pay all premiums for said policies promptly when due and otherwise keep said policies in good standing. Lessee will provide Lessor with certificates thereof, will put the same into effect as of the date of Lease Commencement and will maintain all such policies or renewals thereof in effect during the Term and extended Terms of this Lease as well as during any period(s) in which Lessee occupies the Demised Premises.

Notwithstanding the foregoing, the Lessee shall not be required to indemnify or hold the Lessor harmless for any death or injury to any person or damage to any property due to the negligence of the Lessor, its agents, employees or contractors.

15. **Damage or Destruction:** Lessee shall, to the extent obtainable, keep all buildings and improvements placed on the Demised Premises insured for 110% of actual replacement cost against loss or damage by fire and all such other risks and hazards as are insurable under

present and future standard forms of fire and extended coverage insurance policies. In the event of any fire or other casualty insured against by Lessee's policies Lessor shall, at Lessee's request, assign to Lessee all of its rights, title and interest in any insurance proceeds, subject to Lessee's full replacement of the building and improvements. If the building or improvements on the Demised Premises shall be damaged or destroyed by casualty or fire, Lessee elects not to replace the building to original condition, Lessee shall not have the right to request any rights, title and/or interest in any insurance proceeds and Lessee shall have the option to terminate this Lease following such fire or casualty. Rent and additional rent shall abate during any period of untenantability caused by any damage to the buildings and/or improvements on the Demised Premises.

16. **Signs:** The Lessee shall have the right to place signs on the Demised Premises, including signs on the exterior of the building and on the curb area of the Demised Premises, provided that such signs comply with applicable State and Municipal regulations or are permitted by special use permit or variance.

17. **First Refusal Purchase Option:** Lessor shall not sell, or grant options with respect to or otherwise dispose of the Demised Premises or any part thereof to any direct or indirect competitor of Bess Eaton Donut Flour Co., Inc. unless Lessor shall first notify Lessee in writing stating the terms and conditions under which Lessor is willing to sell, or grant options with respect to or otherwise dispose of the Demised Premises and giving Lessee the Refusal Purchase Option to purchase said property pursuant to such terms and conditions as set forth in the then existing offer to purchase acceptable to the Lessor. If this first refusal purchase option is not exercised by Lessee within five (5) business days after such notice is received, Lessor may sell, and/or grant said property to another party pursuant to such terms and conditions. Notwithstanding anything to the contrary contained in this Lease, the Lessee's right of first Refusal Purchase Option contained herein does not apply to and is waived by Lessee and thus null and void with respect to transfers, assignments, sales, leases, inheritance, devise, grant, and/or bequests to relatives of the Lessor, his assignees, respective successors, heirs, kindred, and descendents, but Lessee's First Refusal Purchase Option shall thereafter remain in full force and effect. Notice of Lessee's Option shall be contained in all transfer documents.

18. **Notice:** All notices required to be given under this Lease or as provided by law shall be effective on receipt and shall be addressed to the Lessor or Lessee at the following addresses, until written notice is received that a different address is to be used, and such notices must be sent by certified mail, return receipt requested:

To Lessor: 1500 Mineral Spring Associates, LP
c/o SAF Management, LLC.
20 Westminster Street
Providence, Rhode Island 02903

With a copy to: The Discovery Group, LLC.
c/o Jason R. Sisto
P.O. Box 8801
Boston, Massachusetts 02114

To Lessee: Louis A. Gencarelli, Sr.
79 Tom Harvey Road
Westerly, Rhode Island 02891

With a copy to: Scott T. Spear, Esq.
BLISH & CAVANAGH
30 Exchange Terrace
Providence, RI 02903

19. Captions: The captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease nor the intent of an provision thereof.

20. Binding: The obligation of each party hereto shall be binding upon such party and upon the respective successors and assigns of the parties, as the case may be.

21. Counterparts: This Lease may be executed in any number of counterparts, each of which shall be an original and the counterparts shall constitute but one and the same instrument.

22. Modifications: This Lease may not be modified, altered, terminated or discharged orally, but only by an agreement, in writing, signed by the parties hereto.

23. Brokers: The parties recognize Sandra Salvadore of Metropolitan Commercial Property, Ltd. as the sole agent for the Lessor. The parties acknowledge there are no other brokers involved in this transaction other than Sandra Salvadore of Metropolitan Commercial Property Ltd. and the Lessee shall indemnify and hold the Lessor harmless from and against any and all claim or demand by any broker, or any person who claims to have dealt with the indemnifying party.

24. The submission by Lessee of this document for examination does not constitute an offer and this document shall become effective and binding only upon execution and delivery hereof by both Lessor and Lessee.

25. Lessor hereby represents and warrants to Lessee as follows:

a. Lessor is the owner of the Demised Premises in fee simple absolute.

b. There are no restrictions, encumbrances, covenants, easements, exclusive use provisions in other Lessor's Leases or other agreements, laws or other ordinances or regulations which will prevent Lessee from occupying the Premises for the purposes provided herein or otherwise conflict with any provision of this Lease, to the best of its knowledge.

c. Lessor has full right and authority to enter into this Lease

and no joinder or approval of any other person or entity is required with respect to Lessor's right and authority to enter into this Lease.

d. To the best of its knowledge there is no oil or hazardous waste, material or substance on the Demised Premises as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency, and there are no violations of any federal or state law or municipal ordinance, order, or requirements of any governmental body or authority affecting all or any portion of the Demised Premises. Lessor, its successors or assigns agrees to indemnify and hold harmless the Lessee, its successors and assigns from any and all loss, cost, or damage, including attorneys' fees and court costs, which the Lessee, its successors or assigns, may sustain, suffer or incur as a result of any storage, disposal, release, escape, threat of release, presence on or transport to the Demised Premises of any oil or hazardous waste, material or substance as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency prior to the execution of this Lease or which results from the fault, act, omission, negligence or misconduct of Lessor, its agents, employees, and contractors or any predecessor in title.

Lessor will save Lessee harmless, and will exonerate, defend, and indemnify Lessee from and against any and all claims, liabilities or penalties (including attorney fees) asserted by or on behalf of any person, firm, corporation or public authority: (1) On account of or based upon any injury to persons or loss of or damage to property sustained or occurring on the Demised Premises on account or based upon the act, omission, fault, negligence, or misconduct of Lessor, its agents, employees, contractors or invitees to the full extent of any injury or damage not attributable to Lessee; (2) On account of or resulting from the failure of Lessor to perform and discharge any of its covenants and obligations under this Lease; and

Lessee, its successors or assigns agrees to indemnify and hold harmless the Lessor, its successors and assigns from any and all loss, cost, or damage, including attorneys' fees and court costs, which the Lessor, its successors or assigns, may sustain, suffer or incur as a result of any storage, disposal, release, escape, threat of release, presence on or transport to the Demised Premises of any oil or hazardous waste, material or substance as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency during the term of this Lease or which results from the fault, act, omission, negligence or misconduct of Lessee, its agents, employees, contractors, invitees, and/or licensees, to the full extent of any injury or damage not attributable to Lessor.

Lessee will save Lessor harmless, and will exonerate, defend, and indemnify Lessor from and against any and all claims,

liabilities or penalties (including attorney fees) asserted by or on behalf of any person, firm, corporation or public authority on account or based upon any injury to persons or loss of or damage to property sustained or occurring on the Demised Premises on account of based upon the act, omission, fault, negligence, or misconduct of Lessee, its agents, employees, contractors or invitees to the full extent of any injury or damage not attributable to Lessor.

26. Environmental Audit:

a. Owner Conducts Initial Audit (Initial Environmental Audit): On or before the delivery date, Lessor shall, at its sole cost and expense, provide tenant a Phase I environmental assessment of the Premises, together with additional reports and testing from an environmental consultant selected by the Lessor.

b. Lessee Conducts Update (Environmental Update): After lessee vacates the premises in accordance with the terms and conditions of this lease, but no later than 30 days after the expiration or sooner termination of this lease, Lessee shall, at its sole cost and expense, provide Landlord with a Phase I environmental assessment of the Premises, together with such additional reports and testing, including a Phase II environmental assessment if reasonably necessary in Landlord's sole discretion using the consultant who initially prepared the initial Environmental Audit or, if that consultant is not available, another licensed environmental consultant reasonably acceptable to Landlord, to determine the environmental status of the premises as of the date of that Environmental Update.

c. Lessee's Further Environmental Obligations: Lessee's obligations under this Section (including, without limitation, its redemption and indemnification obligations) shall be limited to any Hazardous Waste and/or contamination generated, stored, or disposed of by Lessee, it's agents, employees, contractors, invitees, licensees, and/or any other parties during the term or extended term of this Lease, contrary to the provisions of this Lease which are revealed by the Environmental Update (or any inspection by the Landlord prior to Lessee's delivery of the Premises to Landlord), but which were not revealed by the Initial Environmental Audit. This clause shall survive the expiration or sooner termination of the Lease."

27. Lessor and Lessee agree that upon the request of the other, they will execute a memorandum of lease or short form lease for recording purposes which shall contain a Summary of the lease terms and right of first Refusal Purchase Option contained herein.

28. The Lessee shall not allow a lien and/or claim of any kind to be filed, including but not limited to liens and/or claims to be filed against the Lessor's interest in the Demised Premises, except for leasehold mortgages necessary to finance construction during the

continuance of this Lease. If such lien and/or claim is filed, the Lessee shall cause the Demised Premises to be released from the lien and/or claim within 60 days after the Lessor is given written notice that a claim has been filed, or within 60 days after the Lessor is given written notice of the claim and transmits written notice of its receipt to the lessee, whichever 60-day period expires earlier. The Lessee will cause such release either by paying to the court the amount necessary to relieve and release the Demised Premises from the lien, or in any other manner which, as a matter of law, will result, within the 60-day period, in releasing the Lessor and its title from the claim.

29. **Force majeure:** If the Lessor or Lessee is delayed, hindered, or prevented from performing any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive government laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war, or other reason beyond its control, then performance of the act shall be excused for the period of the delay. In the event of a delay, the Commencement Date of the Rent payment obligations and Additional Rent payment obligations shall not be so extended. In that event, the period for the performance of the act shall be extended for a period equivalent to the period of the delay, provided that such extension shall not extend the term of this Lease.

30. **Estoppel - Certificates:** Either party shall, without charge, at any time and from time to time hereafter, within ten days after the others' written request of the other, certify by instrument duly executed and acknowledged to any mortgagee or purchaser or proposed mortgagee or proposed purchaser, or any other person, firm, or corporation specified in the request as to:

a. Whether this Lease has been supplemented or amended, and, if so, the substance and manner of the supplement or amendment;

b. The validity and force and effect of this Lease, in accordance with its tenor as then constituted;

c. The existence of any default thereunder;

d. The existence of all offsets, counterclaims, or defenses thereto on the part of the other party;

e. The commencement and expiration dates of the term of this Lease; and

f. All other matters that may reasonably be so requested.

Any such certificate may be relied upon by the party who requested it and any other person, firm, or corporation to whom it may be exhibited or delivered, and the contents of the certificate shall be binding on the party executing it.

31. **Waivers:** The failure of either party hereto to insist in any one or more instances upon the strict and literal performance of any of the agreements, terms, or conditions of this Agreement and Lease,

shall not be construed as a waiver for the future of such term, condition, or agreement.

32. **Covenants Running with Land; Binding Effect:** All covenants, conditions, and obligations contained herein or implied by law are covenants running with the land and shall attach and bind and inure to the benefit of the Lessor and Lessee and their respective heirs, legal representatives, successors, and assigns, except as otherwise provided herein. All covenants, conditions, and obligations contained herein or implied by law shall expire at the date of termination of this lease, except as otherwise provided herein.

33. Upon signing of this document, Lessor and Lessee acknowledge their willful, full, complete and total acceptance of the terms and conditions herein. Lessor and Lessee acknowledge that this agreement is a full, complete and total integration of the parties intent and that all previous warranties, guarantees, representations, (both oral and written), memorandums, letters, including but not limited to facsimiles and electronic mail, are null and void for the all purposes, including, but not limited to parol evidence. Lessor and Lessee acknowledge this agreement, exhibits, appendixes and all other contents attached to herein are a willful, final and complete binding commitment and representation between the Lessor and Lessee.

IN WITNESS WHEREOF, Lessor and Lessee have caused these presents and a duplicate of the same tenor to be executed on the day and year above written.

Witness: [signature]

Lessor: [signature]
1500 Mineral Spring Associates, LP

Witness: [signature]

Lessee: [signature]
Louis A. Gencarelli, Sr.

STATE OF Rhode Island
COUNTY OF Providence

In November, on the 10th day of 1999, before me personally appeared Jason Sisto, in his capacity as Vice President of Jason's Realty Corp to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him so executed to be his free act and deed and the free act and deed of said entity.

Notary Public

My Commission Expires: 3/20/02

STATE OF RI
COUNTY OF Washington

In Westerly, on the 5th day of November, before me personally appeared Louis A. Gencarelli, Sr., to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him so executed to be his free act and deed and the free act and deed of said entity.

Notary Public

My Commission Expires: 2-13-02

EXHIBIT A

"Demised Premises Site Plan and Description"

EXHIBIT B

"Building, Structure, Sign Specifications"

EXHIBIT C

"Cross Easement Site Plan and Description"

**B) <u>1800 SMITH STREET</u>**

1) Rent: $3,000/month for 50 months (3/1/00-4/1/04) TOTAL: $150,000

2) Additional Rent:

| | | | |
|---|---|---|---|
| Taxes: | 11/99 & 12/99 RE Taxes | (1/6 of $3,064.60) | $ 510.77 |
| | 2000 RE Taxes | (100% of $3,064.60) | $3,064.60 |
| | 2001 RE Taxes | (100% of $3,169.08) | $3,169.08 |
| | 2002 RE Taxes | (100% of $3,322.96) | $3,322.96 |
| | 2003 RE Taxes | (100% of $3,505.44) | $3,505.44 |
| | 2004 RE Taxes-estimate | (1/4 of $3,505.44) | $1,168.48 |
| | | TOTAL: | $14,741.33 |

| | | | | |
|---|---|---|---|---|
| Insurance: | 11/99 - 12/99 | | (1/6 of $334.79) | $ 55.80 |
| | 2000 | Jan-July | (7/12 of $334.79) | $ 195.29 |
| | | Aug-Dec | (5/12 of $652.47) | $ 271.86 |
| | 2001 | Jan-July | (7/12 of $652.47) | $ 380.61 |
| | | Aug-Dec | (5/12 of $476.00) | $ 198.33 |
| | 2002 | Jan-July | (7/12 of $476.00) | $ 277.67 |
| | | Aug-Dec | (5/12 of $ 45.00) | $ 18.75 |
| | 2003 | Jan-July | (7/12 of $ 45.00) | $ 26.25 |
| | | Aug-Dec | (5/12 of $150.98) | $ 62.91 |
| | 2004 | Jan-April | (1/3 of $150.98) | $ 50.33 |
| | | | TOTAL: | $1,537.81 |

Sub-Totals: Base Rent - $150,000.00
RE Taxes - $ 14,741.33
Insurance - $ 1,537.81
$166,279.14 Principal
$ 42,713.38 Pre-Judgment Interest (*See* attached)
**$208,992.52 JUDGMENT TOTAL FOR SMITH STREET**

**C) <u>LEGAL FEES & EXPENSES</u>**

| | | | |
|---|---|---|---|
| Fees & Expenses | (3/3/00 - 2/12/01) | Paid on 4/19/01 | $31,072.74 |
| Fees & Expenses | (2/13/01-12/31/03) | Paid on 2/3/04 | $44,861.87 |
| Fees Due | (1/1/04 - 3/31/04) | | $20,306.50 |
| Expenses Due | (1/1/04 - 3/31/04) | | $ 349.89 |
| | | **TOTAL:** | **$96,591.00** |
| | | **(½ = $48,295.50)** | |

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\Documents\Judgment Calulation 0304.doc

**1800 SMITH STREET**

| Date | Rent | R.E. Taxes | Insurance | Total Due | Pre-Judgment Interest (12%/year through 4/04) |
|---|---|---|---|---|---|
| 11/99 | ------ | 255.38 | 27.90 | = 283.28 | (54 mos.) 152.97 |
| 12/99 | ------ | 255.38 | 27.90 | = 283.28 | (53 mos.) 150.14 |
| 1/00 | ------ | 255.38 | 27.90 | = 283.28 | (52 mos.) 147.31 |
| 2/00 | ------ | 255.38 | 27.90 | = 283.28 | (51 mos.) 144.47 |
| 3/00 | 3,000 | 255.38 | 27.90 | = 3,283.28 | (50 mos.) 1,641.64 |
| 4/00 | 3,000 | 255.38 | 27.90 | = 3,283.28 | (49 mos.) 1,608.81 |
| 5/00 | 3,000 | 255.38 | 27.90 | – 3,283.28 | (48 mos.) 1,575.97 |
| 6/00 | 3,000 | 255.38 | 27.90 | = 3,283.28 | (47 mos.) 1,543.14 |
| 7/00 | 3,000 | 255.38 | 27.90 | = 3,283.28 | (46 mos.) 1,510.31 |
| 8/00 | 3,000 | 255.38 | 54.37 | = 3,309.75 | (45 mos.) 1,489.39 |
| 9/00 | 3,000 | 255.38 | 54.37 | = 3,309.75 | (44 mos.) 1,456.29 |
| 10/00 | 3,000 | 255.38 | 54.37 | = 3,309.75 | (43 mos.) 1,423.19 |
| 11/00 | 3,000 | 255.38 | 54.37 | = 3,309.75 | (42 mos.) 1,390.10 |
| 12/00 | 3,000 | 255.38 | 54.37 | = 3,309.75 | (41 mos.) 1,357.00 |
| 1/01 | 3,000 | 264.09 | 54.37 | = 3,318.46 | (40 mos.) 1,327.38 |
| 2/01 | 3,000 | 264.09 | 54.37 | = 3,318.46 | (39 mos.) 1,294.20 |
| 3/01 | 3,000 | 264.09 | 54.37 | = 3,318.46 | (38 mos.) 1,261.01 |
| 4/01 | 3,000 | 264.09 | 54.37 | = 3,318.46 | (37 mos.) 1,227.83 |
| 5/01 | 3,000 | 264.09 | 54.37 | = 3,318.46 | (36 mos.) 1,194.65 |
| 6/01 | 3,000 | 264.09 | 54.37 | = 3,318.46 | (35 mos.) 1,161.46 |
| 7/01 | 3,000 | 264.09 | 54.37 | = 3,318.46 | (34 mos.) 1,128.28 |
| 8/01 | 3,000 | 264.09 | 39.67 | = 3,303.76 | (33 mos.) 1,090.24 |
| 9/01 | 3,000 | 264.09 | 39.67 | = 3,303.76 | (32 mos.) 1,057.20 |
| 10/01 | 3,000 | 264.09 | 39.67 | = 3,303.76 | (31 mos.) 1,024.17 |
| 11/01 | 3,000 | 264.09 | 39.67 | = 3,303.76 | (30 mos.) 991.13 |
| 12/01 | 3,000 | 264.09 | 39.67 | = 3,303.76 | (29 mos.) 958.09 |
| 1/02 | 3,000 | 276.91 | 39.67 | = 3,316.58 | (28 mos.) 928.64 |
| 2/02 | 3,000 | 276.91 | 39.67 | = 3,316.58 | (27 mos.) 895.48 |
| 3/02 | 3,000 | 276.91 | 39.67 | – 3,316.58 | (26 mos.) 862.31 |
| 4/02 | 3,000 | 276.91 | 39.67 | = 3,316.58 | (25 mos.) 829.15 |
| 5/02 | 3,000 | 276.91 | 39.67 | = 3,316.58 | (24 mos.) 795.98 |
| 6/02 | 3,000 | 276.91 | 39.67 | = 3,316.58 | (23 mos.) 762.81 |
| 7/02 | 3,000 | 276.91 | 39.67 | = 3,316.58 | (22 mos.) 729.65 |
| 8/02 | 3,000 | 276.91 | 3.75 | = 3,280.66 | (21 mos.) 688.94 |
| 9/02 | 3,000 | 276.91 | 3.75 | = 3,280.66 | (20 mos.) 656.13 |
| 10/02 | 3,000 | 276.91 | 3.75 | = 3,280.66 | (19 mos.) 623.33 |
| 11/02 | 3,000 | 276.91 | 3.75 | = 3,280.66 | (18 mos.) 590.52 |
| 12/02 | 3,000 | 276.91 | 3.75 | = 3,280.66 | (17 mos.) 557.71 |
| 1/03 | 3,000 | 292.12 | 3.75 | = 3,295.87 | (16 mos.) 527.34 |
| 2/03 | 3,000 | 292.12 | 3.75 | = 3,295.87 | (15 mos.) 494.38 |
| 3/03 | 3,000 | 292.12 | 3.75 | = 3,295.87 | (14 mos.) 461.42 |
| 4/03 | 3,000 | 292.12 | 3.75 | = 3,295.87 | (13 mos.) 428.46 |

**1800 SMITH STREET**

| | | | | | | |
|---|---|---|---|---|---|---|
| 5/03 | 3,000 | 292.12 | 3.75 | = 3,295.87 | (12 mos.) | 395.50 |
| 6/03 | 3,000 | 292.12 | 3.75 | = 3,295.87 | (11 mos.) | 362.55 |
| 7/03 | 3,000 | 292.12 | 3.75 | = 3,295.87 | (10 mos.) | 329.59 |
| 8/03 | 3,000 | 292.12 | 12.58 | = 3,304.70 | (9 mos.) | 297.42 |
| 9/03 | 3,000 | 292.12 | 12.58 | = 3,304.70 | (8 mos.) | 264.38 |
| 10/03 | 3,000 | 292.12 | 12.58 | = 3,304.70 | (7 mos.) | 231.33 |
| 11/03 | 3,000 | 292.12 | 12.58 | = 3,304.70 | (6 mos.) | 198.28 |
| 12/03 | 3,000 | 292.12 | 12.58 | = 3,304.70 | (5 mos.) | 165.24 |
| 1/04 | 3,000 | 292.12 | 12.58 | = 3,304.70 | (4 mos.) | 132.19 |
| 2/04 | 3,000 | 292.12 | 12.58 | = 3,304.70 | (3 mos.) | 99.14 |
| 3/04 | 3,000 | 292.12 | 12.58 | = 3,304.70 | (2 mos.) | 66.09 |
| 4/04 | 3,000 | 292.12 | 12.58 | = 3,304.70 | (1 mo.) | 33.05 |

**TOTALS: $166,279.04 $42,713.38**

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\Documents\1800 Smith Street (interest calculation).doc

**EXHIBIT B**

1800 Smith Street Associates, LP

Contingent future rent and additional rent.

Annual

| | |
|---|---|
| (a) Rent | $36,000.00 |
| (b) Taxes | $ 3,505.44 |
| (c) Insurance | $ 150.98 |
| TOTAL | $39,656.42 |

Claimant believes it is likely that mitigation efforts will take another three (3) years, i.e. three years of Rent and Additional Rent will accrue until substitute tenant is found.

Contingent Rent Claim

$39,656.42 x 3 years = $118,969.26

ALSO: Interest and reasonable fees and expenses continue to accrue on claim.

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\BANKRUPTCY PLEADINGS\Exh B to Proof of Claim (1800).doc

# JUDGMENT CALCULATION

## A) 1500 MINERAL SPRING AVENUE

1) Rent: $3,500/month for 50 months (3/1/00-4/1/04) TOTAL: $175,000

2) Additional Rent:

| | | | | |
|---|---|---|---|---|
| Taxes: | 11/1/99 & 12/99 RE Taxes | | (1/6 of $4,230.72) | $ 705.12 |
| | 2000 | RE Taxes | (100% of $4,230.72) | $4,230.72 |
| | 2001 | RE Taxes | (100% of $1,533.96) | $1,533.96 |
| | 2002 | RE Taxes | (100% of $8,505.48) | $8,505.48 |
| | 2003 | RE Taxes | (100% of $8,972.60) | $8,972.60 |
| | 2004 | RE Taxes-estimate | (1/4 of $8,972.60) | $2,990.87 |
| | | | TOTAL: | $26,938.75 |

| | | | |
|---|---|---|---|
| Insurance: | 11/99 & 12/99 | (1/6 of $856.41) | $ 142.73 |
| | 2000 | Jan-July (7/12 of $856.41) | $ 499.57 |
| | | Aug-Dec (5/12 of $201.67) | $ 84.03 |
| | 2001 | Jan-July (7/12 of $201.67) | $ 117.64 |
| | | Aug-Dec (5/12 of $100.00) | $ 41.67 |
| | 2002 | Jan-July (7/12 of $100.00) | $ 58.33 |
| | | Aug-Dec (5/12 of $110.00) | $ 45.83 |
| | 2003 | Jan-July (7/12 of $110.00) | $ 64.17 |
| | | Aug-Dec (5/12 of $250.00) | $ 104.17 |
| | 2004 | Jan-April (1/3 of $250.00) | $ 83.33 |
| | | TOTAL: | $1,241.47 |

Sub-Totals:
Base Rent - $175,000.00
RE Taxes - $ 26,938.75
Insurance - $ 1,241.47
$203,180.22 Principal
$ 50,884.06 Pre-Judgment Interest (*See* attached)
**$254,064.28 TOTAL**

3) Demolition Expense Reimbursement: $ 7,800
Pre-Judgment Interest for 50 mos. (3/00-4/04) $ 3,900
**TOTAL: $11,700**

**JUDGMENT TOTAL FOR MINERAL SPRING AVENUE: $265,764.28**
**($254,064.28 + $11,700)**

**1500 MINERAL SPRING AVENUE**

| Date | Rent | R.E. Taxes | Insurance | Total Due | Pre-Judgment Interest (12%/year through 4/04) |
|---|---|---|---|---|---|
| 11/99 | ------ | 352.56 | 71.37 | = 423.93 | (54 mos.) 228.92 |
| 12/99 | ------ | 352.56 | 71.37 | = 423.93 | (53 mos.) 224.68 |
| 1/00 | ------ | 352.56 | 71.37 | = 423.93 | (52 mos.) 220.44 |
| 2/00 | ------ | 352.56 | 71.37 | = 423.93 | (51 mos.) 216.20 |
| 3/00 | 3,500 | 352.56 | 71.37 | = 3,923.93 | (50 mos.) 1,961.97 |
| 4/00 | 3,500 | 352.56 | 71.37 | = 3,923.93 | (49 mos.) 1,922.73 |
| 5/00 | 3,500 | 352.56 | 71.37 | = 3,923.93 | (48 mos.) 1,883.49 |
| 6/00 | 3,500 | 352.56 | 71.37 | = 3,923.93 | (47 mos.) 1,844.25 |
| 7/00 | 3,500 | 352.56 | 71.37 | = 3,923.93 | (46 mos.) 1,805.01 |
| 8/00 | 3,500 | 352.56 | 16.80 | = 3,869.36 | (45 mos.) 1,741.21 |
| 9/00 | 3,500 | 352.56 | 16.80 | = 3,869.36 | (44 mos.) 1,702.52 |
| 10/00 | 3,500 | 352.56 | 16.80 | = 3,869.36 | (43 mos.) 1,663.82 |
| 11/00 | 3,500 | 352.56 | 16.80 | = 3,869.36 | (42 mos.) 1,625.13 |
| 12/00 | 3,500 | 352.56 | 16.80 | = 3,869.36 | (41 mos.) 1,586.44 |
| 1/01 | 3,500 | 127.83 | 16.80 | = 3,644.63 | (40 mos.) 1,457.85 |
| 2/01 | 3,500 | 127.83 | 16.80 | = 3,644.63 | (39 mos.) 1,421.41 |
| 3/01 | 3,500 | 127.83 | 16.80 | = 3,644.63 | (38 mos.) 1,384.96 |
| 4/01 | 3,500 | 127.83 | 16.80 | = 3,644.63 | (37 mos.) 1,348.51 |
| 5/01 | 3,500 | 127.83 | 16.80 | = 3,644.63 | (36 mos.) 1,312.07 |
| 6/01 | 3,500 | 127.83 | 16.80 | = 3,644.63 | (35 mos.) 1,275.62 |
| 7/01 | 3,500 | 127.83 | 16.80 | = 3,644.63 | (34 mos.) 1,239.17 |
| 8/01 | 3,500 | 127.83 | 8.33 | = 3,636.16 | (33 mos.) 1,199.93 |
| 9/01 | 3,500 | 127.83 | 8.33 | = 3,636.16 | (32 mos.) 1,163.57 |
| 10/01 | 3,500 | 127.83 | 8.33 | = 3,636.16 | (31 mos.) 1,127.21 |
| 11/01 | 3,500 | 127.83 | 8.33 | = 3,636.16 | (30 mos.) 1,090.85 |
| 12/01 | 3,500 | 127.83 | 8.33 | = 3,636.16 | (29 mos.) 1,054.49 |
| 1/02 | 3,500 | 708.79 | 8.33 | = 4,217.12 | (28 mos.) 1,180.79 |
| 2/02 | 3,500 | 708.79 | 8.33 | = 4,217.12 | (27 mos.) 1,138.62 |
| 3/02 | 3,500 | 708.79 | 8.33 | = 4,217.12 | (26 mos.) 1,096.45 |
| 4/02 | 3,500 | 708.79 | 8.33 | = 4,217.12 | (25 mos.) 1,054.28 |
| 5/02 | 3,500 | 708.79 | 8.33 | = 4,217.12 | (24 mos.) 1,012.11 |
| 6/02 | 3,500 | 708.79 | 8.33 | = 4,217.12 | (23 mos.) 969.94 |
| 7/02 | 3,500 | 708.79 | 8.33 | = 4,217.12 | (22 mos.) 927.77 |
| 8/02 | 3,500 | 708.79 | 9.16 | = 4,217.95 | (21 mos.) 885.77 |
| 9/02 | 3,500 | 708.79 | 9.16 | = 4,217.95 | (20 mos.) 843.59 |
| 10/02 | 3,500 | 708.79 | 9.16 | = 4,217.95 | (19 mos.) 801.41 |
| 11/02 | 3,500 | 708.79 | 9.16 | = 4,217.95 | (18 mos.) 759.23 |
| 12/02 | 3,500 | 708.79 | 9.16 | = 4,217.95 | (17 mos.) 717.05 |
| 1/03 | 3,500 | 747.71 | 9.16 | = 4,256.87 | (16 mos.) 681.10 |
| 2/03 | 3,500 | 747.71 | 9.16 | = 4,256.87 | (15 mos.) 638.53 |
| 3/03 | 3,500 | 747.71 | 9.16 | = 4,256.87 | (14 mos.) 595.96 |
| 4/03 | 3,500 | 747.71 | 9.16 | = 4,256.87 | (13 mos.) 553.39 |

**1500 MINERAL SPRING AVENUE**

| | | | | | | |
|---|---|---|---|---|---|---|
| 5/03 | 3,500 | 747.71 | 9.16 | = 4,256.87 | (12 mos.) | 510.82 |
| 6/03 | 3,500 | 747.71 | 9.16 | = 4,256.87 | (11 mos.) | 468.26 |
| 7/03 | 3,500 | 747.71 | 9.16 | = 4,256.87 | (10 mos.) | 425.69 |
| 8/03 | 3,500 | 747.71 | 20.83 | = 4,268.54 | (9 mos.) | 384.17 |
| 9/03 | 3,500 | 747.71 | 20.83 | = 4,268.54 | (8 mos.) | 341.48 |
| 10/03 | 3,500 | 747.71 | 20.83 | = 4,268.54 | (7 mos.) | 298.80 |
| 11/03 | 3,500 | 747.71 | 20.83 | = 4,268.54 | (6 mos.) | 256.11 |
| 12/03 | 3,500 | 747.71 | 20.83 | = 4,268.54 | (5 mos.) | 213.43 |
| 1/04 | 3,500 | 747.71 | 20.83 | = 4,268.54 | (4 mos.) | 170.74 |
| 2/04 | 3,500 | 747.71 | 20.83 | = 4,268.54 | (3 mos.) | 128.06 |
| 3/04 | 3,500 | 747.71 | 20.83 | = 4,268.54 | (2 mos.) | 85.37 |
| 4/04 | 3,500 | 747.71 | 20.83 | = 4,268.54 | (1 mo.) | 42.69 |

**TOTALS: $203,179.92 $50,884.06**

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\Documents\1500 Mineral Spring (interest calculation).doc

# EXHIBIT B

1500 Mineral Spring Associates, LP

Contingent future rent and additional rent.

Annual

| | |
|---|---|
| (a) Rent | $42,000.00 |
| (b) Taxes | $ 8,972.60 |
| (c) Insurance | $ 250.00 |
| TOTAL | $51,222.60 |

Claimant believes it is likely that mitigation efforts will take another three (3) years, i.e. three years of Rent and Additional Rent will accrue until substitute tenant is found.

Contingent Rent Claim

$51,222.60 x 3 years = $153,667.80

ALSO: Interest and reasonable fees and expenses continue to accrue on claim.

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\BANKRUPTCY PLEADINGS\Exh B to Proof of Claim.doc

STATE OF RHODE ISLAND
PROVIDENCE, SC.

DISTRICT COURT
SIXTH DIVISION

1800 SMITH STREET ASSOCIATES, LP, :
by and through its General Partner :
JASON'S REALTY CORP., :
Plaintiff, :
:
v. : C.A. No. 00-3375
:
LOUIS A. GENCARELLI, SR., :
Defendant. :

## COMPLAINT

1. Plaintiff 1800 SMITH STREET ASSOCIATES, LP ("Smith Street") is a Rhode Island limited partnership with a principal place of business located at 20 Westminster Street, Providence, Rhode Island 02903. JASON'S REALTY CORP. is a Rhode Island corporation and is the General Partner of Smith Street.

2. Defendant Louis A. Gencarelli, Sr. ("Gencarelli") is, upon information and belief, a resident of the State of Rhode Island with an address at 79 Tom Harvey Road, Westerly, Rhode Island 02891.

3. This Court has subject matter jurisdiction over this matter pursuant to R.I.G.L. §34-18.1-9.

4. This Court has personal jurisdiction over Gencarelli in that, upon information and belief, he resides within the State of Rhode Island.

5. Venue is appropriate in this Court in that this matter is a trespass and ejectment action concerning commercial premises located within Providence County.

## FACTS COMMON TO ALL COUNTS

6. Plaintiff 1800 SMITH STREET ASSOCIATES, LP (the "Lessor") and Defendant Gencarelli (the "Lessee") entered into a commercial Absolute Triple Net Bonded Land Lease dated November 1, 1999 ("Lease") covering the "Demised Premises" located in North Providence, Rhode Island, as more fully described in the Lease attached hereto as *Exhibit A*.

EXHIBIT
tabbles'
C

7. Pursuant to the terms of the Lease, the Lessee is obligated to pay annual Minimum Base Rent in the amount of $36,000.00 to the Lessor in equal monthly installments of $3,000.00 on the first day of each month, commencing one hundred twenty (120) days after execution of the Lease.

8. Pursuant to the terms of the Lease, there were certain contingencies which were conditions **precedent** to the Lessee's obligation to pay the Minimum Base Rate to the Lessor. Those contingencies were required to be satisfied by the Lessee within one hundred twenty (120) days after execution of the Lease, or the Lease became null and void.

9. Pursuant to the terms of the Lease, the Lessee is obligated to pay monthly, commencing on November 1, 1999, any and all Additional Rent as specifically defined in the Lease.

10. Pursuant to the terms of the Lease, there were certain contingencies which were conditions **subsequent** to the Lessor's obligation to pay the Additional Rent to the Lessor. Those contingencies were required to be satisfied by the Lessee within one hundred twenty (120) days after execution of the Lease, or the Lease became null and void.

11. The contingencies which were required to be satisfied by the Lessee include, without limitation, (i) obtaining all necessary permits and approvals to construct a Bess Eaton drive-thru coffee shop and bakery; and (ii) obtaining financing to construct the building.

12. By correspondence dated February 9, 2000, a copy of which is attached hereto as *Exhibit B*, the Lessor forwarded an invoice to the Lessee requesting payment of the Additional Rent due and owing for the period from November 1, 1999 through February 29, 2000 in the amount of $1,133.14.

13. By correspondence dated February 29, 2000, the 121st day after execution of the Lease, the Lessor forwarded an invoice to the Lessee, requesting payment of the Minimum Base Rent now due and owing in the amount of $3,103.45. A copy of this February 29th correspondence is attached hereto as *Exhibit C*.

14. By correspondence dated February 29, 2000, a copy of which is attached hereto as *Exhibit D*, the Lessee notified the Lessor that the Lease "is now null and void" on the ground that he failed to satisfy the necessary contingencies within the 120-day time period set forth in the Lease. The Lessee's notice has no force or effect in that it was untimely received by the Lessor.

15. Based upon correspondence dated February 15, 2000 from Scott T. Spear, Esq., counsel for Bess Eaton Donut Flour Company, to Joseph Ferrucci, Esq., a copy of which is attached hereto as *Exhibit E*, the zoning application had still not been filed with the North Providence Planning Department as of that date. Upon information and belief, the Lessee did not take one step towards securing the necessary permits and approvals from North Providence until January of 2000, *i.e.* more than 60 days after execution of the Lease.

16. In failing to use his best efforts to timely (i) obtain all of the necessary permits and approvals to construct the drive-thru coffee shop and bakery, and (ii) obtain financing to construct the building, Lessee breached his implied duty of good faith and fair dealing.

17. The Lessee failed to pay Minimum Base Rent and Additional Rent to the Lessor at the times and in the manner provided for in the Lease, which constituted an event of default under the Lease.

18. As a result of the Lessee's default, pursuant to paragraph 6 of the Lease, the Lessor provided notice of default to the Lessee by correspondence dated March 17, 2000, via certified mail, return receipt requested (the "Notice"). The Notice advised the Lessee, *inter alia*, that he had five (5) days after receipt of the Notice to pay the Minimum Base Rent and Additional Rent due and in arrears. The Notice also set forth the sum owed by the Lessee to the Lessor pursuant to the terms of the Lease. A copy of the Notice and the Domestic Return Receipts are attached hereto as *Exhibit F*.

19. The Lessee failed and refused to pay to the Lessor the sum due and owing to the Lessor as demanded in the Notice.

COUNT I
(Trespass and Ejectment)

20. The Plaintiff Lessor hereby incorporates by reference the allegations set forth in paragraphs 1 through 19 above as if fully set forth and realleged herein.

21. As of the present date, the Lessee still remains in possession of the Demised Premises under the Lease.

22. The Lessee's continued possession of the Demised Premises as of this date is unlawful and constitutes a trespass.

WHEREFORE, Plaintiff Lessor respectfully requests that this Honorable Court:

a. enter judgment in its favor and against the Lessee for possession of the Demised Premises pursuant to R.I.G.L. §34-18.1-9;

b. enter judgment in its favor and against the Lessee for the sum representing all Minimum Base Rent and Additional Rent due and owing to the Lessor under the terms of the Lease;

c. award to the Lessor all reasonable attorneys' fees and costs incurred due to the Lessee's default under the Lease;

d. grant to the Lessor such other and further relief as this Court deems just and proper.

1800 SMITH STREET ASSOCIATES, LP,
by and through its General Partner
JASON'S REALTY CORP.

By its Attorneys,

[signature]

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: March 28, 2000

G:\Sisto, Bennie\Gencarelli, Louis A. SA\Pleadings\Complaint-1800 Smith 032800.doc

STATE OF RHODE ISLAND
PROVIDENCE, SC.

DISTRICT COURT
SIXTH DIVISION

1500 MINERAL SPRING ASSOCIATES, LP, by and through its General Partner JASON'S REALTY CORP.,
Plaintiff,

v. C.A. No. 00- 3376

LOUIS A. GENCARELLI, SR.,
Defendant.

**COMPLAINT**

1. Plaintiff 1500 MINERAL SPRING ASSOCIATES, LP ("Mineral Spring") is a Rhode Island limited partnership with a principal place of business located at 20 Westminster Street, Providence, Rhode Island 02903. JASON'S REALTY CORP. is a Rhode Island corporation and is the General Partner of Mineral Spring.

2. Defendant Louis A. Gencarelli, Sr. ("Gencarelli") is, upon information and belief, a resident of the State of Rhode Island with an address at 79 Tom Harvey Road, Westerly, Rhode Island 02891.

3. This Court has subject matter jurisdiction over this matter pursuant to R.I.G.L. §34-18.1-9.

4. This Court has personal jurisdiction over Gencarelli in that, upon information and belief, he resides within the State of Rhode Island.

5. Venue is appropriate in this Court in that this matter is a trespass and ejectment action concerning commercial premises located within Providence County.

FACTS COMMON TO ALL COUNTS

6. Plaintiff 1500 MINERAL SPRING ASSOCIATES, LP (the "Lessor") and Defendant Gencarelli (the "Lessee") entered into a commercial Absolute Triple Net Bonded Land Lease dated November 1, 1999 ("Lease") covering the "Demised Premises" located in North Providence, Rhode Island, as more fully described in the Lease attached hereto as *Exhibit A*.

7. Pursuant to the terms of the Lease, the Lessee is obligated to pay annual Minimum Base Rent in the amount of $42,000.00 to the Lessor in equal monthly installments of $3,500.00 on the first day of each month, commencing one hundred twenty (120) days after execution of the Lease.

8. Pursuant to the terms of the Lease, there were certain contingencies which were conditions **precedent** to the Lessee's obligation to pay the Minimum Base Rate to the Lessor. Those contingencies were required to be satisfied by the Lessee within one hundred twenty (120) days after execution of the Lease, or the Lease became null and void.

9. Pursuant to the terms of the Lease, the Lessee is obligated to pay monthly, commencing on November 1, 1999, any and all Additional Rent as specifically defined in the Lease.

10. Pursuant to the terms of the Lease, there were certain contingencies which were conditions **subsequent** to the Lessor's obligation to pay the Additional Rent to the Lessor. Those contingencies were required to be satisfied by the Lessee within one hundred twenty (120) days after execution of the Lease, or the Lease became null and void.

11. The contingencies which were required to be satisfied by the Lessee include, without limitation, (i) obtaining all necessary permits and approvals to construct a Bess Eaton drive-thru coffee shop and bakery; and (ii) obtaining financing to construct the building.

12. By correspondence dated February 9, 2000, a copy of which is attached hereto as *Exhibit B*, the Lessor forwarded an invoice to the Lessee requesting payment of the Additional Rent due and owing in the amount of $7,800.00.

13. By correspondence dated March 1, 2000, the 121st day after execution of the Lease, the Lessor forwarded an invoice to the Lessee, requesting payment of the Minimum Base Rent now due and owing in the amount of $3,500.00. A copy of this March 1st correspondence is attached hereto as *Exhibit C*.

14. By correspondence dated February 29, 2000, a copy of which is attached hereto as *Exhibit D*, the Lessee notified the Lessor that the Lease "is now null and void" on the ground that he failed to satisfy the necessary contingencies within the 120-day time period set forth in the Lease. The Lessee's notice has no force or effect in that it was untimely received by the Lessor.

15. Based upon correspondence dated February 15, 2000 from Scott T. Spear, Esq., counsel for Bess Eaton Donut Flour Company, to Joseph Ferrucci, Esq., a copy of which is attached hereto as *Exhibit E*, the zoning application had still not been filed with the North Providence Planning Department as of that date. Upon information and belief, the Lessee did not take one step towards securing the necessary permits and approvals from North Providence until January of 2000, *i.e.* more than 60 days after execution of the Lease.

16. In failing to use his best efforts to timely (i) obtain all of the necessary permits and approvals to construct the drive-thru coffee shop and bakery, and (ii) obtain financing to construct the building, Lessee breached his implied duty of good faith and fair dealing.

17. The Lessee failed to pay Minimum Base Rent and Additional Rent to the Lessor at the times and in the manner provided for in the Lease, which constituted an event of default under the Lease.

18. As a result of the Lessee's default, pursuant to paragraph 6 of the Lease, the Lessor provided notice of default to the Lessee by correspondence dated March 17, 2000, via certified mail, return receipt requested (the "Notice"). The Notice advised the Lessee, *inter alia*, that he had five (5) days after receipt of the Notice to pay the Minimum Base Rent and Additional Rent due and in arrears. The Notice also set forth the sum owed by the Lessee to the Lessor pursuant to the terms of the Lease. A copy of the Notice and the Domestic Return Receipts are attached hereto as *Exhibit F*.

19. The Lessee failed and refused to pay to the Lessor the sum due and owing to the Lessor as demanded in the Notice.

<u>COUNT I</u>
(Trespass and Ejectment)

20. The Plaintiff Lessor hereby incorporates by reference the allegations set forth in paragraphs 1 through 19 above as if fully set forth and realleged herein.

21. As of the present date, the Lessee still remains in possession of the Demised Premises under the Lease.

22. The Lessee's continued possession of the Demised Premises as of this date is unlawful and constitutes a trespass.

WHEREFORE, Plaintiff Lessor respectfully requests that this Honorable Court:

a. enter judgment in its favor and against the Lessee for possession of the Demised Premises pursuant to R.I.G.L. §34-18.1-9;



IC

b. enter judgment in its favor and against the Lessee for the sum representing all Minimum Base Rent and Additional Rent due and owing to the Lessor under the terms of the Lease;

c. award to the Lessor all reasonable attorneys' fees and costs incurred due to the Lessee's default under the Lease;

d. grant to the Lessor such other and further relief as this Court deems just and proper.

1500 MINERAL SPRING ASSOCIATES, LP, by and through its General Partner JASON'S REALTY CORP.

By its Attorneys,

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: March 28, 2000

G:\Sisto. Bennie\Gencarelli, Louis A. Sr\Pleadings\Complaint-1500 Mineral 032800.doc

STATE OF RHODE ISLAND
PROVIDENCE, SC.

DISTRICT COURT
SIXTH DIVISION

1800 SMITH STREET ASSOCIATES, LP, by and through its General Partner JASON'S REALTY CORP.,
Plaintiff,

v.

C.A. No. 00-3375

LOUIS A. GENCARELLI, SR.,
Defendant.

**JUDGMENT**

This action came on for trial before the Court, Judge Pirraglia presiding, and the issues having been tried and a decision having been duly rendered,

It is Ordered and Adjudged:

That the Plaintiff, 1800 SMITH STREET ASSOCIATES, LP, by and through its General Partner JASON'S REALTY CORP., recover of the Defendant, LOUIS A. GENCARELLI, SR., the sum of Eleven Thousand Three Hundred Sixty Nine Dollars and 73/100 ($11,369.73); plus Three Thousand Seven Hundred Fifty Dollars and 00/100 ($3,750.00) in attorney's fees, together with interest and costs associated with this action.

Dated at Providence, Rhode Island, this 15 day of June, 2000.

Judge

6/15/00
Clerk
CLERK

G:\Glass, Bernie\Gencarelli, Louis A. Sr\Pleadings\Judgment on 1800 Smith.doc

ALICE ... CLERK
2000 JUN 15 PM 1:16
DISTRICT COURT SIXTH DIVISION

EXHIBIT
D

STATE OF RHODE ISLAND
PROVIDENCE, SC.

DISTRICT COURT
SIXTH DIVISION

1500 MINERAL SPRING ASSOCIATES, LP, by and through its General Partner JASON'S REALTY CORP.,
Plaintiff,

v.

C.A. No. 00-2376

LOUIS A. GENCARELLI, SR.,
Defendant.

**JUDGMENT**

This action came on for trial before the Court, Judge Pirraglia presiding, and the issues having been tried and a decision having been duly rendered,

It is Ordered and Adjudged:

That the Plaintiff, 1500 MINERAL SPRING ASSOCIATES, LP, by and through its General Partner JASON'S REALTY CORP., recover of the Defendant, LOUIS A. GENCARELLI, SR., the sum of Eighteen Thousand Three Hundred Dollars and 00/100 ($18,300.00); plus Three Thousand Seven Hundred Fifty Dollars and 00/100 ($3,750.00) in attorney's fees, together with interest and costs associated with this action.

Dated at Providence, Rhode Island, this 15 day of June 2000.

Judge

ENTERED: Clerk
CLERK

G:\Silva, Bernie\Gencarelli, Louis A. SR\Pleadings\Judgment of ... .doc

**STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS**

**PROVIDENCE, SC.** **SUPERIOR COURT**

**1500 MINERAL SPRING ASSOCIATES, LP,**
**1800 SMITH STREET ASSOCIATES, LP,**
**AND JASON'S REALTY CORP.**

**PLAINTIFF**

**C.A. Nos: 00-1732, 00-3174, 00-3175**

***vs.***

**LOUIS A. GENCARELLI, SR.**

**DEFENDANT**

**DECISION**

**INDEGLIA, J.**: This matter is before the Court on Plaintiffs' actions for rent and associated expenses on two leases with lessee Defendant and on Defendant's Complaint for Declaratory Judgment seeking a declaration of rights and obligations of the parties under the leases.[1] Over several days in December 2003, this matter was tried before this Court sitting without a jury. The parties have submitted post trial briefs and made oral arguments in support of their respective positions.

**FACTS AND TRAVEL**

This dispute arises from two commercial leases that were executed as of November of 1999, between Plaintiffs 1500 Mineral Spring Associates, LP (hereinafter "MSA" or "Plaintiff"), and 1800 Smith Street Associates, LP (hereinafter "SSA" or



EXHIBIT
E

3-26-2004

"Plaintiff"), and Defendant Louis A. Gencarelli Sr. (hereinafter "Gencarelli", "Defendant", or "Lessee"). Bennie Sisto (hereinafter "Sisto", "Plaintiff", or "Lessor") is the President and majority stockholder of JASON'S REALTY CORP., the general partner of both MSA and SSA. At all times relevant hereto, Gencarelli had been President, CEO and Chairman of the Board of Bess Eaton Donut Flour Company.[2]

Negotiations between Sisto and Gencarelli began in 1998 when Sandra Salvadore (hereinafter "Salvadore"), the real estate broker for MSA and SSA, presented the subject properties to Tim Londregan (hereinafter "Londregan") of Londregan Real Estate, who then represented Bess Eaton. At that time, Londregan informed Salvadore that Bess Eaton was interested in both sites but could not act immediately. In February 1999, Salvadore once again contacted Londregan at which time Londregan proceeded to bring the subject properties to Gencarelli's attention. Gencarelli personally visited both sites with Salvadore, Sisto, Jason Sisto (Plaintiff's son) and Londregan.

In June 1999, Salvadore contacted Gencarelli and his attorney, Scott Spear, to discuss the properties, at which time Salvadore was informed that Gencarelli was now ready to proceed. Thereafter, the parties exchanged several draft letters with respect to each of the properties. In July of 1999, Salvadore forwarded site maps of both MSA and SSA to Bess Eaton. Peter Huff (hereinafter "Huff"), who was Bess Eaton's Director/Manager of Construction and Architectural Design at that time, was to review the identified Bess Eaton locations/sites and work with the contractors, engineers and attorneys that were necessary to complete the projects. On July 8, 1999, Huff prepared a

[1] The Plaintiffs actions are de novo appeals from the District Court which awarded judgment for Plaintiffs.
[2] It should be noted that in 2002, Defendant Gencarelli did not act as president of Bess Eaton. During 2002, the president of Bess Eaton was George Cioe. After 2002, Gencarelli resumed his position as president of Bess Eaton.

preliminary sketch/layout (not covering the entire parcel) of the proposed Bess Eaton donut shop on MSA and forwarded it to Salvadore and Gencarelli. On July 19, 1999, Huff prepared a preliminary sketch/layout (not covering the entire parcel) of the proposed Bess Eaton donut shop on SSA and forwarded it to Salvadore. From September 7, 1999, through the latter part of 1999, the parties negotiated and exchanged draft leases regarding the subject properties.

On November 1, 1999, Defendant entered into two five-year leases for MSA and SSA.[3] The Defendant intended to build and operate two Bess Eaton facilities on those sites, and both leases contained a number of identical conditions precedent that were to be satisfied by Defendant and by Plaintiff. The last paragraph of paragraph 1(a) in both leases, and paragraph 1(b) and 1(c) of both leases are identical, and provide as follows:

> "a. It shall be a condition precedent to the Lessee's [Gencarelli's] performance of any obligation Lessee may have as Lessee hereunder that: (a) all the permits and approvals be obtained necessary to construct a drive-thru coffee shop and bakery specifically including the drive-thru capability, the signage and exterior menu, except the condition to operate for 24 hours a day, (b) that Lessor obtain at its expense and deliver to Lessee an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's Lender, (which satisfaction shall not be unreasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of this lease; (c) that Lessor provide a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within (60) days after execution of this lease; (d) that all representations and warranties of Lessor herein are and continue to be true and accurate, (e) that Lessee obtain financing to construct the Building in an amount equal to eighty (80%) percent of all construction costs with financing at commercially acceptable terms and rates within one hundred twenty (120) days after execution

[3] The rent provisions in the leases state they are applicable for the "first five-year period, commencing on March 1, 2000."

of this lease, (f) that Lessee obtain title insurance in a form sufficient to enable Lessee to obtain financing through the grant of a leasehold mortgage to construct and operate the proposed drive-thru coffee and bakery shop.

b. The Minimum Base Rent Commencement Date shall be one hundred twenty (120) days after execution of the lease or upon Lessee opening for business, whichever is sooner. If the Lessee is unable to satisfy the above contingencies in which event this payment obligation shall cease, and this lease shall become null and void.

c. The Additional Rent Commencement Date shall be November 1, 1999 and shall be paid from said date through the duration of the lease. If the Lessee is unable to satisfy the above contingencies within the 120 days after execution of this lease this payment obligation shall cease and this lease becomes null and void."

Additionally, the first sentence of paragraph 1(a) of the 1500 Lease also provides:

"This lease is executed with the understanding and agreement that Lessor, at Lessor's expense, will demolish and remove all existing structures, buildings and improvements on the Demised Premises so the Lessee may construct buildings, fixtures and improvements on the Demised Premises. Lessee shall reimburse Lessor $7,800 for said costs."

The 1500 lease provided for a minimum base rent of $3,500.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000. The 1800 lease provided for a minimum base rent of $3,000.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000.

On November 4, 1999, two cover letters were delivered to MSA and SSA from Defendant, each stating the following:

"Upon final review of the Agreement [Leases], I gave consideration to the possibility that I may encounter delays in the process of obtaining permits. In the event that I experience delays, court contests or appeals, I will need

> your agreement to extend the lease commencement date accordingly. The extension would not include the additional rent commencement date."

In response, both MSA and SSA executed their respective cover letter acknowledging that:

> "The content of this letter is acceptable on behalf of [1800 Smith Street Associates, LP or 1500 Mineral Spring Associates, LP as appropriate] and shall be deemed an amendment to the above referenced Land Lease."

Between November 1, 1999 and February 29, 1999, the parties exchanged several letters and corresponded through their respective agents, primarily Huff and Salvadore. The most pertinent of those communications are discussed herein. On December 20, 1999, Salvadore informed Gencarelli that Garafalo had been hired to perform the environmental reports for both Smith Street and Mineral Spring Avenue. Gencarelli acknowledged his acceptance thereof by executing each letter agreement at the bottom after the following language: "The content of this letter is acceptable on behalf of Bess Eaton Coffee & Bake Shop and shall be deemed an amendment to the above referenced Absolute Triple Net Bonded Land Lease." Sisto testified that he believed that Gencarelli's acknowledgement on and acceptance of the December 20, 1999 letter agreements meant that he was not going to enforce the 60 day deadline for delivery of the environmental reports.

During the trial, Salvadore testified that in December 1999 or January 2000, she contacted Huff to inquire as to Gencarelli's commitment on the Mineral Spring Avenue site and Huff responded that they were totally committed and to move forward with whatever needed to be done to get the site ready. Additionally, Sisto testified that in December 1999, he also had a conversation with Huff wherein Huff told him that they

were going forward with the deal and that they did not want to utilize the existing structures on Mineral Spring. Sisto further testified that in reliance on the above-stated conversations with Huff, in January 2000, MSA demolished and removed the existing brick buildings/ structures from the Mineral Spring Avenue property, and re-graded the site for construction.

On February 14, 2000, Salvadore met with two engineers from Garofalo at the Mineral Spring Avenue site, who were performing the Phase I site evaluation. At this time, Garofalo recommended that a Phase II subsurface investigation be performed on Mineral Spring Avenue because it was discovered that a gas station previously located on another piece of property upgrade from the Mineral Spring Avenue site had a leaking underground storage tank. During the trial, Salvadore testified that she telephoned Huff to inform him of the Phase II evaluation being performed and to ask Huff whether he wanted a written copy of the completed Phase I report. According to Salvadore, Huff told her "no" and to just go ahead with the Phase II evaluation. On February 24, 2000, the Phase II evaluation was being conducted. Salvadore testified that while she was at the Smith Street site, she telephoned Huff to inform him that Phase II was being performed on both properties that day and Huff expressed his pleasure with the progress. Salvadore's recollection of her telephone conversations with Huff is consistent with Gencarelli's testimony during trial in which he stated that receiving the written environmental reports on Mineral Spring Avenue and Smith Street within the 60 day time period set forth in the leases was not important to him.

Also, in February of 2000, the parties resumed correspondence relating to the obtaining of the necessary permits and approvals. By correspondence dated February 16,

2000, corporate counsel for Gencarelli/Bess Eaton, Scott Spear, told Salvadore to contact Attorney Ferrucci, who was engaged by Gencarelli to provide legal services with respect to the permitting process, and work directly with him on the permitting aspects of the projects. On February 17, 2000, Salvadore advised Huff, Attorney Spear and Attorney Ferrucci that the North Providence Town Planning Board Director had reserved two spots for the Smith Street and Mineral Spring Avenue proposals on the Planning Board's February 22 meeting Agenda, and that Bess Eaton needed to submit "something" to him. In response, Huff put together informational packages for each site, which were ultimately submitted to the Planning Board at its February 22, 2000 meeting. The sketch contained in the Smith Street package was the same sketch that was previously prepared by Huff on July 19, 1999 during negotiations between the parties. Likewise, the sketch contained in the Mineral Spring Avenue package is the same sketch that was previously prepared by Huff on July 8, 1999, during negotiations.

At the Planning Board's February 22 meeting, Huff made his presentation regarding each of the projects. The Planning Board took no formal action at this time because there was not a quorum present at that meeting. The matters were continued to the next meeting of the Planning Board, to be held on March 13, 2000. During the trial, Gencarelli testified that he was informed that the Planning Board reacted favorably to the projects, even though they could not take action.

Shortly before the end of the 120-day period set forth in the leases, Sisto sent invoices to lessee for each property, reminding Gencarelli of the rent commencement date and charging rent on each lease as of February 29, 2000. On February 29, 2000, Termination Notices were sent from Gencarelli to SSA and MSA that purported to

exercise Gencarelli's right to terminate the 1500 lease and the 1800 lease. Gencarelli bases his right of termination on the fact that all conditions precedent referenced in the leases were not accomplished within the 120 day time frame set forth in the leases.

**PLAINTIFF'S ARGUMENT**

The Plaintiff-lessor contends that the letters exchanged between the parties constituted a modification to each of the leases, evidencing the parties' intent not to be bound by a strict adherence to the 120 day period set forth in paragraph 1 of the leases. Lessor argues that the amendments to the leases clearly demonstrate that time was not of the essence and therefore, the lessee was not justified in terminating the leases because all of the conditions in the leases were not performed within the original 120 day time period. Furthermore, lessor asserts that even if Defendant did not expressly waive all of the time provisions set forth in the leases, Defendant's behavior up until his letter terminating the leases, was indicative of someone who intended to be bound by the leases and was satisfied with the progress being made.

While lessor concedes that he sent a bill for the base rent due 121 days after execution of the leases, lessor asserts that the bill for rent was a separate act that was not dependent upon the 120 day time period set forth in the leases, as these time limits had already been waived by the parties. Lessor maintains that even if the 120 day time period was not expressly waived by the amendments to the leases, lessee's actions manifested an implicit waiver of the 120 day time constraint in the leases. Consequently, the bill sent by lessor with regard to the properties in question was an independent act that did not carry with it any meaning other than to notify the lessee that the due date for the

minimum base rent was upon them. Additionally, lessor posits that he would have been willing to adjust the due date for the minimum base rent had the lessee opted to engage in discussions with the lessor regarding this matter. It is lessor's contention that up until the point that lessee informed lessor that he was terminating the leases, negotiations between the parties were extremely amiable and making additional accommodations had never posed a problem.

Furthermore, lessor argues that lessee should be held responsible for the rent on the lease because he did not fulfill his duty to use good faith, diligence and best efforts to obtain the necessary approval and permits within the 120 day time period. Lessor maintains that the provision allotting the lessee 120 days to secure financing before either party could terminate the lease assumed that the lessee would make reasonable efforts to secure said financing. Thus, even if the 120 day time period had not been waived by the parties, lessor contends that lessee would still be obligated to pay the rent on the leases, as the lessee did not even attempt to fulfill the condition pertaining to the 120 day time constraint.

Finally, lessor maintains that lessee should bear the costs incurred as a result of the demolition of the structures on the Mineral Spring Avenue site. Lessor argues that he reasonably relied on the representations of lessee and Huff that lessee had every intention of going forward with the leases, irrespective of any time frames originally set forth in the leases.

**DEFENDANT'S ARGUMENT**

Conversely, Defendant-lessee argues that when the conditions precedent were not accomplished within the 120 day time period set forth in the leases, the lessee's obligations to pay rent automatically ceased, and both leases became null and void. It is lessee's contention that the 120 day time period allotted in the leases was a strict time limit within which all of the conditions precedent set forth in the leases needed to be performed. Lessee asserts that because he was unable to obtain financing within 120 days following execution of the leases, under the terms of the agreements, his obligations under the leases automatically ceased. While the lessee does not contest that he was obligated to make reasonable efforts to obtain financing within the 120 days, as per the agreements, he maintains that the lessor's failure to perform certain contingencies, namely providing environmental assessments and boundary surveys in a timely manner, prevented him from obtaining financing within 120 days of execution of the leases, the nonoccurrence of which voided the agreements.

Moreover, lessee maintains that the lessor's bill for the base rent on the 121st day after execution of the leases undermines the lessor's position that the 120 day time provision in the leases was waived or modified by the parties. Lessee contends that if the lessor truly believed that the parties were no longer bound by the 120 day time period then lessor would not have sent out a bill for the rent exactly 120 days after execution of the leases, as provided for in § § b and c of the leases. It is lessee's position that the lessor's partial adherence to the aforementioned provisions, subsequent to the passage of the 120 day time period set forth in the leases, is demonstrative of the fact that lessor

intended to be bound by these provisions, regardless of any amendments made to the 60 day time period allotted for environmental assessments and boundary surveys.

Furthermore, it is lessee's contention that he should not be held responsible for the costs incurred due to the demolition of the structures on Mineral Spring Avenue because lessor was aware that under the terms of the lease, lessee's obligations on the leases would only be triggered if all conditions precedent were accomplished within the 120 day time frame set forth in the leases.

## DISCUSSION

The Rhode Island Supreme Court has repeatedly held that contracts which include provisions relating to performance at a fixed time are to be given a reasonable construction by the court, with regard being given to the surrounding circumstances and the parties' manifested intent. Safeway System, Inc. v. Manuel Bros., Inc., 228 A.2d 851, 856 (R.I. 1967); Furlong v. Barnes, 8 R.I. 226 (R.I. 1865). "A contract is not to be construed like a railway time-table." Furlong, 8 R.I. at 229. Additionally, when construing a contract that includes a provision relating to time limits, the burden of proof falls upon the party contending that time is of the essence. Sal's Furniture Co. v. Peterson, 133 A.2d 770, 773 (R.I. 1957).

In the present case, lessee has not demonstrated to this Court that time was of the essence in the lease agreements at issue. Although the leases do give a specific time frame for the completion of certain conditions, there is no explicit language in the leases themselves suggesting that these time frames are material or essential to the agreements. Moreover, the amendments to the leases, in which the lessee himself requested leniency

if he needed additional time to obtain permits and approvals, further suggests that the parties did not view the time element to be strict in nature.

This Court rejects lessee's position that language stating that the leases shall become null and void if the terms of the leases are not satisfied possess equivalent or even stronger meaning than the phrase "time is of the essence" because they signify an automatic nullification of the leases if the conditions do not occur within the 120 day time frame. Most contracts contain language that the contract will become null and void if the parties do not act consistently with the terms of the lease. That in itself however, does not suggest that time is of the essence. "That the parties to a contract intended to make time of the essence may appear by express stipulation therein or it may be found in the nature or purpose of the contract or in the circumstances under which it was made. There must, however, be some evidence from which such intent can be ascertained, and the party contending that time is of the essence of the contract has the burden of proof thereon." Sal's Furniture Co., 133 A.2d at 773.

Moreover, lessee's argument completely ignores the fact that he implicitly waived all time limits in the leases by voluntarily continuing with the contracts long after the 60 day time limit had not been met. "'A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive." Fairbanks, Morse & Co. v. Nelson, 217 F. 218 (9th Cir. 1914). In the case of Welsh v. Dick, 84 A. 769 (Pa. 1912), the court declared: "The right to insist upon time as the essence of a contract may be waived as effectually by implication as by express agreement, and whether there has been an

implied waiver in any case depends upon whether the conduct of the party seeking to invoke the strict provision of the contract had been such as to lead the other party to believe he would not be held to it, but might, notwithstanding it, proceed to perform." Although, lessee attempts to distinguish the 60 day time limit from the 120 day time limit by arguing that the 120 day time limit was more absolute, the facts of this case do not indicate that lessee made any such representations to that effect at any time throughout the parties' transactions.

Furthermore, "it is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring out that happening." Bradford Dyeing Associates, Inc. v. J. Stog Tech GmbH., 765 A.2d 1226, 1237-38 (R.I. 2001)(citing United States v. Croft-Mullins Electric Co., 333 F.2d 772, 775 n. 4 (5th Cir. 1964)) (quoting Gulf, Mobile& Ohio Railroad Co. v. Illinois Central Railroad Co., 128 F. Supp. 311. 324 (N.D. Ala. 1954)). In the present case, lessee made no attempts to secure financing for the properties within 120 days after execution of the leases. This Court rejects lessee's argument that he was prevented from fulfilling this condition due to the lessor's failure to provide environmental assessment reports and boundary surveys in a timely manner. If it truly was lessee's intent to be lenient with regard to the 60 day time constraint while enforcing a strict 120 day time limit, then it was the lessee's responsibility to clarify this when he realized that the lessor was not going to provide the necessary documents which would allow lessee to secure financing within the 120 days initially allotted. Rather than

making lessor aware of the fact that "time was of the essence", a term absent from the lease itself, however, lessee's behavior suggested that the original time constraints in the leases were unimportant. It is clear to this Court, that lessee knew well in advance of the 120th day following execution of the leases, that financing would not be secured in the time allotted in the leases.

In a recent case with facts very similar to the facts before this Court, the Rhode Island Supreme Court affirmed the trial court's finding that where conditions are made part of a contract, it is assumed that the parties to the contract will utilize good faith and due diligence in order to accomplish those conditions. See Ray LaCroix v. David F. Walker, 819 A.2d 1244 (R.I. 2003). This is especially true where the conditions in a contract particularly benefit or shield one party, as it is mutually assumed that the party for whom the condition is intended to protect will be using his best efforts to accomplish those conditions. See Safeway System, Inc., 228 A.2d at 853. In LaCroix, the parties entered into a five-year lease for three units in a building with the express purpose of operating a gym in the space leased. LaCroix, 819 A.2d at 1245. The lease included an express condition precedent which made the terms of the lease contingent upon the lessee's being able to obtain a license to operate a gym in the leased facility. Id. When the lessee and his architect could not reach an agreement regarding the removal of unit partitions, however, the lessee never applied for a license to operate the gym. Id. The Supreme Court declared that it was reasonable for the trial justice to conclude that the lessee breached the contract by failing to take "all necessary steps" to obtain a license, where the term "all necessary steps" meant that lessee was required to "at a minimum, submit a floor plan and apply to Gold's Gym for a license." Id. at 1246-47.

Lessee attempts to distinguish the facts in LaCroix from the facts in this case by arguing that in this case the conditions lessee had to fulfill were contingent upon the lessor's completion of its conditions. This argument does not have merit since the lessee implicitly waived the time limit for completion of the environmental assessments and boundary surveys and continuously acted in a manner that would lead a reasonable person to believe that he was not concerned with when those acts were to be performed. Here, lessee not only gave no indication to lessor that the 120 day time frame was still in effect, lessee also turned down the opportunity to secure financing when it presented itself.[4] Thus, it is apparent to this Court that lessee failed to use his best efforts in order to achieve the conditions within the 120 day time frame he depends on for nullification of the leases.

Additionally, lessee testified at trial that he was displeased when he realized that under the terms of the leases he was obligated to begin paying rent on the properties themselves before he had obtained all of the necessary permits and approvals from the Town of North Providence to build the donut shops. There is little question that Defendant viewed the parties' failure to adhere to the original terms of the agreements as an opportunity to terminate the leases and escape from what he viewed to be two disadvantageous commitments. During Defendant's deposition, Defendant conceded that he did not realize when he entered into the leases that under their terms he would potentially have to begin paying rent on the properties before he had obtained permits for

[4] In January 2000, Salvadore, Gencarelli and his son, Paul Gencarelli, met with a representative of NE Realty Resources, Inc., a financing source, at Bess Eaton in Westerly. NE Realty ultimately proposed financing to Bess Eaton to fund several of its projects, including the Smith Street and Mineral Spring projects, which had been discussed at their meeting. By correspondence to NE Realty dated January 31, 2000, Gencarelli declined the financing proposal stating "we have already secured sufficient financing to complete our development objectives for the next twelve months." This correspondence between

the Bess Eaton facilities. However, Defendant's displeasure with the agreements he made, no matter how disadvantageous, did not absolve him of his duty to act in good faith and to use his best efforts to timely obtain the permits and approvals in order to satisfy the conditions in the leases. See Bradford Dyeing Associates, Inc., 765 A.2d at 1238.

Although lessee had numerous opportunities to inform the lessor of his intent to disengage himself from the leases if all conditions were not accomplished by the 120 day mark, lessee and Huff engaged in several acts that were directly contrary to that intent. As of February 16, 2000, lessee's legal counsel had not yet filed the pertinent applications with the Town of North Providence and it was only due to the initiative of lessor and his real estate agent that the projects were placed on the agenda for the February 22, 2000 meeting for the North Providence Planning Board. That meeting was held only seven days preceding the 120 day deadline, yet none of the actions taken by lessee or those acting on his behalf indicated that there was any intent on the part of lessee to terminate the leases if all the conditions in the leases were not satisfied by the 120 day mark. At no time before, during or after this meeting, did either Huff or Ferrucci approach Sisto and inform Sisto of any urgency in obtaining approval for the permits and applications because the 120 day deadline was approaching. Lessee's complete failure to notify lessor of his intent to act in accordance with the 120 day time frame set forth in the leases when it was clear that the parties were not acting under that assumption for quite some time, served as an implicit waiver of the 120 day deadline. A contract deadline

Gencarelli and NE Realty evidences the fact that Gencarelli was not in a rush to secure financing within the 120 day time frame and that he was aware that he would be able to secure financing for these two projects.

may be expressly or impliedly waived by acts, words or conduct inconsistent with the deadline. CBS, Inc. v. Merrick, 716 F.2d 1292, 1295 (9th Cir. 1983)

With respect to the demolition costs incurred by lessor from the work done on the Mineral Spring Avenue site, this Court finds that lessor reasonably relied on Huff's statements in December 1999, that Defendant intended to follow though on the leases and wanted the structures on the Mineral Spring Avenue property taken down. At no time did lessee or Huff inform lessor that lessee did not intend to pay the expenses incurred as a result of this demolition if all conditions precedent were not accomplished within the 120 day time frame. A plaintiff's reliance upon a vague promise can be viewed as reasonable and justified, if the plaintiff had sufficient reason to believe that the defendants' commitment to an oral contract modification had been made. See GBM Acquisitions, Inc. v. Susan Adams d/b/a The Waterfront Cafe, 823 A.2d 1121, 1124 (R.I. 2003)

In the present case, several conversations between the parties supported lessor's objectively reasonable belief that both the 60 day deadline and the 120 day deadline had been mutually waived by the parties. Consequently, lessor had no reason to suspect that lessee was planning to extricate himself from the leases if the 120 day time deadline was not met. Moreover, lessee's assertion that it was lessor's choice to demolish the buildings before the 120 day deadline completely ignores the fact that in order to conduct a comprehensive environmental assessment of the properties as they would be when delivered to lessee, all unwanted structures needed to be removed in advance of the 120 day time frame.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Accordingly, after careful review of all the evidence introduced, the testimony of the witnesses and memoranda submitted by the attorneys, the Court makes the following findings of fact and conclusions of law.

1. On November 1, 1999, each of the Plaintiffs, MSA and SSA, entered into a commercial Absolute Triple Net Bonded Land Lease with Defendant Gencarelli, collectively referred to as the Leases. Both leases are for a five-year period, commencing on March 1, 2000, with the option of renewal.
2. On November 4, 1999, the parties agreed via cover letters, to amend the leases to include an agreement that if lessee encountered delays in the process of obtaining permits, the lease commencement date for the minimum base rent would be extended accordingly. These amendments were made at the request of Defendant Gencaralli.
3. The 1500 Lease provided that Lessor, at Lessor's expense, would demolish all existing structures on the Demised Premises for the Lessee's benefit, and Lessee would reimburse Lessor $7,800 for said costs. See, *supra*, Facts and Travel.
4. Both leases contained specific conditions precedent to any performance obligation of Defendant Gencarelli as Lessee. See, *supra*, Facts and Travel.
5. The 1500 Lease provided for a Minimum Base Rent of $3,500.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000. The 1800 Lease provided for a Minimum Base Rent of $3,000.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000.

6. On February 29, 2000, written notices were sent from Gencarelli to SSA and MSA that purported to exercise Gencarelli's right to terminate the leases. In each of the Termination Notices, Gencarelli asserted that the alleged failure to satisfy the lease contingencies "automatically voids the lease."

7. Prior to receiving the Termination Notices, Sisto had Invoices sent to Gencarelli for both Smith Street and Mineral Spring Avenue to remind Gencarelli of the minimum base rent commencement date under the leases.

8. Defendant Gencarelli, through his actions and the actions of those acting on his behalf, implicitly waived the 60 day time limit for the production of environmental assessments and boundary surveys, and the 120 day time limit for the securing of financing.

9. The phrase "time is of the essence" is not present in the leases and Defendant's behavior suggested that the original time constraints in the leases were flexible.

10. Defendant knew, or should have known well in advance of the 120th day following execution of the leases, that financing would not be secured in the time allotted in the leases.

11. Defendant breached his implied duty to act in good faith, with due diligence, and to use his best efforts to fulfill his conditions within 120 days after execution of the leases.

12. Up until the time that he sent the termination notices, Defendant, and all those acting on his behalf, manifested an intent to carry through on the leases, regardless of any time provisions originally set forth in the leases.

13. Plaintiffs reasonably relied on Defendant's actions in demolishing the structures on the Mineral Spring Avenue property, in accordance with the 1500 Lease.

14. Plaintiffs have tried to mitigate damages by attempting to sell and/or lease the Mineral Spring Avenue property and the Smith Street property. Despite their marketing efforts, however, they have been unsuccessful in consummating a sale or lease thus far.

15. Plaintiffs have satisfied the Court by a preponderance of the evidence that they are entitled to rent due under the two leases and demolition costs associated with the Mineral Spring Avenue property.

Accordingly, the Court finds for the Plaintiffs and orders Defendant to pay the Minimum Base Rent on both leases for the period commencing on March 1, 2000 through the present date, $3,500 per month under the 1500 Lease and $3,000 per month under the 1800 Lease. Defendant is also ordered to pay the Additional Rent (i.e. taxes and insurance costs/expenses) on both leases for the period commencing on November 1, 1999 through the present date. Additionally, Defendant is hereby ordered to pay for the demolition costs associated with the 1500 Lease in the amount of $7,800. Plaintiffs are entitled to recover from Defendant reasonable attorneys' fees and expenses incurred as a result of Defendant's default under the Leases.

Counsel shall prepare an order consistent with this decision.

# ABSOLUTE TRIPLE NET
# BONDED LAND LEASE

THIS INDENTURE, made as of the 1st day of November by and between 1800 Smith Associates, LP with an address of 20 Westminster Street Providence, Rhode Island 02903 (hereinafter referred to as Lessor) and LOUIS A. GENCARELLI, SR., with a mailing address of 79 Tom Harvey Road, Westerly, Rhode Island 02891 (hereinafter referred to as Lessee).

## WITNESSETH:

That in consideration of the rents, terms and conditions herein reserved and contained on the part of the Lessee to be paid, performed and observed, Lessor does hereby lease and demise to Lessee that land situated in the Town of North Providence, and the State of Rhode Island, located on 1800 Smith Street, as more particularly described in Exhibit "A", attached hereto and made a part hereof (hereinafter called the "Demised Premises");

TO HAVE AND TO HOLD the same for an initial term of twenty (20) years commencing on the Commencement Date, as hereinafter defined, yielding and paying therefore, Minimum Base Rent and Additional Rent as follows:

## SUMMARY OF PAYMENTS

Minimum Base Rent: Commencing as of the Base Rent Commencement Date and continuing through the last day of the sixtieth (60th) month, Lessee agrees to pay to Lessor an annual minimum Base Rent of Thirty-Six Thousand and 00/100 ($36,000.00) Dollars payable in advance in equal successive monthly installments of Three-Thousand and 00/100 ($3,000.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of sixty-first (61st) month and continuing through, the last day of the second five year period, Lessee agrees to pay to Lessor an annual minimum Base Rent of Thirty-Nine Thousand Six Hundred and 00/100 ($39,600.00) Dollars payable in advance in equal successive monthly installments of Three Thousand Three Hundred and 00/100 ($3,300.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of the one hundred twenty-first (121st) month and continuing through the last day of the third five year period. Lessee agrees to pay to Lessor an annual minimum Base Rent of Forty-Three Thousand Five Hundred Sixty and 00/100 ($43,560.00) Dollars payable in advance in equal successive monthly installments of Three Thousand Six Hundred Thirty and 00/100 ($3,630.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of the one hundred eighty-first (181st) month and continuing through the last day of the fourth five year period. Lessee agrees to pay to Lessor an annual minimum Base Rent of Forty-Seven Thousand, Nine Hundred Sixteen and 00/100 ($47,916.00) Dollars payable in advance in equal successive monthly installments of Three Thousand Nine Hundred Ninety Three and 00/100 ($3,993.00) Dollars each on the first day of every calendar month during said period.

For any partial month at the beginning or end of the Term, Lessee shall pay a proportional share of the amount that would be due for a full month. In addition to the Base Rent, Lessee shall pay all Additional Rent and Rental Adjustments provided herein. All payments shall be made to Lessor at Lessor's address or such other place as Lessor may designate in writing, without prior demand and without deduction or offset.

Additional Rent: Commencing as of the Additional Rent Commencement Date, Lessee shall pay, when due, any and all costs and expenses directly attributable to the use, operation, maintenance, and repair of the Premises, including but not limited to, real estate taxes and all other assessments against the land as set forth in Paragraphs 8 and 9, and/or structure(s); personal property taxes; insurance; and all utilities, including but not limited to water, sewer, gas, phone, and electrical. This Additional Rent shall be paid during the full term of the lease and through all extension periods thereof. Additional Rent payments shall be assessed and paid monthly.

This Lease is made on the following terms and conditions:

1. Construction of Building:

a. This Lease is executed with the understanding and agreement that Lessee may construct buildings, fixtures and improvements on the Demised Premises. Lessee shall rough grade the site at its own expense. It is understood and agreed that Lessee will erect on the Demised Premises a free-standing retail coffee shop and bakery building as more particularly described in Exhibit B, attached hereto and made part hereof (hereinafter called the "Building").

Prior to commencement of construction, Lessee shall present to Lessor certificates of insurance evidencing to the reasonable satisfaction of Lessor that Lessee has procured "builder's risk" insurance, so-called pursuant to a prepaid premium insuring Lessor and Lessee and Lessor's lender (when financing is obtained) as an additional insured for construction of the Improvements on the Property in such amounts reasonable for the construction contemplated hereby, and comprehensive public liability insurance insuring Lessor and Lessee as an additional insured against loss from and liability for damages on account of loss or injuries suffered by any person within or upon the Property. Such coverage and protection to be not less than a combined single limit of Two Million Dollars ($2,000,000.00).

In connection with any such construction and continuing thereafter Lessor shall cooperate with and if required join with Lessee in applying for such permits and approvals, including, but not limited to, any zoning changes, variances, whether for use or dimensional or set back requirements, zoning exceptions, curb cuts and sewer, water and other utility tie-ins or connections, and building permits, as are required for the construction and the operation of a retail coffee shop and bakery with drive-thru capability and 24 hour operation. Any applications for permits (including demolition), approvals or variances shall be at Lessee's sole cost and expense.

Lessor shall not be responsible for any portion of such costs, including filing fees, attorney fees or any other costs associated with such applications. The Lessee shall arrange for sufficient financing to pay for any construction which Lessee undertakes on the Demised Premise.

It shall be a condition precedent to the Lessee's performance of any obligation Lessee may have as Lessee hereunder that; (a) all the permits and approvals be obtained necessary to construct a drive-thru coffee shop and bakery specifically including the drive-thru capability, the signage and exterior menu, except the condition to operate for 24 hours a day, (b) that Lessor obtain at its expense and deliver to Lessee an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's Lender, (which satisfaction shall not be unreasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of this lease; (c) that Lessor provide a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within sixty (60) days after execution of this lease; (d) that all representations and warranties of Lessor herein are and continue to be true and accurate, (e) that Lessee obtain financing to construct the Building in an amount equal to eighty (80%) percent of all construction costs with financing at commercially acceptable terms and rates within one hundred twenty (120)days after execution of this lease, (f) that Lessee obtain title insurance in a form sufficient to enable Lessee to obtain financing through the grant of a leasehold mortgage to construct and operate the proposed drive-thru coffee and bakery shop.

b. The Minimum Base Rent Commencement Date shall be one hundred twenty (120) days after execution of the lease or upon Lessee opening for business, whichever is sooner. If the Lessee is unable to satisfy the above contingencies in which event this payment obligation shall cease, and this lease shall become null and void.

c. The Additional Rent Commencement Date shall be November 1,1999 and shall be paid from said date through the duration of the lease. If the Lessee is unable to satisfy the above contingencies within the 120 days after execution of this lease this payment obligation shall cease and this lease becomes null and void.

d. The Commencement Date of this Lease shall be November 1, 1999.

2. Quiet Enjoyment: So long as the Lessee keeps and performs all of his covenants and conditions under this Lease and is not in default, he shall have quiet, undisturbed and continued possession of the Demised Premises free from all claims against Lessor and all persons claiming under, by or through Lessor.

3. Use and Occupancy: The Demised Premises may be used and occupied by Lessee for a retail store and/or restaurant including, but not limited to the operation of a retail store for the sale of bakery products, with drive thru capability, including, but not limited to, the sale of donuts, muffins and bagels and other pastries or bakery items of any kind, and for the sale of coffee, tea and other non-alcoholic beverages, and to provide tables, chairs and counters for patrons to sit while eating and drinking; or any other lawful purpose which (a) notwithstanding the foregoing

provisions of this document, Lessee shall not have the right to use the Demised Premises for any use which directly competes with any business located on property owned by Lessor that is contiguous to or adjacent to the Demised Property, without Lessor's prior written consent, which consent shall not be unreasonably withheld or delayed and; (b) Lessee shall promptly observe and comply with all present and future laws, ordinances, requirements, orders, directives, rules, and regulations of federal, state, and municipal governments and all other government authorities applicable to the Premises with regards to Lessee's-use thereof.

Lessee shall not cause any portion of the Demised Premises to be used for any banking purpose, whether commercial banking, retail banking, mortgage banking, insurance brokerage, insurance sales and/or securities brokerage.

Lessor shall not, during the term of this Lease or any renewal thereof, without Lessee's consent in writing conduct any business, lease or cause to be leased, any space which exclusively sells or serves pastry items, and/or donuts and/or muffins and/or bagels, and/or coffee or tea, or which is otherwise in substantial competition with the Lessee on or contiguous to or adjacent to the Demised Premises. Substantial competition shall mean stores with a similar format to Lessee including Dunkin Donuts, Honeydew Donuts, Starbucks, Café LaFrance and the like.

4. Alteration and Improvements: Lessee covenants that at the end of the initial term of twenty (20) years or any Extended Term, Lessee will at no cost to Lessor peaceably deliver up to Lessor or Lessor's heirs, executors, administrators, successors and assigns the Demised Premises. All buildings, erections, improvements, or fixtures, which are placed on the Demised Premises, not including Lessee's personal property and trade fixtures, shall remain as the property of the Lessor. Lessee, may at its own expense, remove the façade or other features of the building (without placing the structure in jeopardy) to eliminate the appearance of a Bess Eaton store. All alterations to the façade, or other features must be replaced, at Lessees sole cost and expense, with like kind materials and workmanship.

5. Assignment of Lease: Lessee shall not assign this Lease nor sublet the Demised Premises or any part thereof without the written consent of the Lessor, which consent shall not be unreasonably withheld. Notwithstanding anything to the contrary contained in this Lease, Lessee may assign or sublet the Lease to Bess Eaton Donut Flour Co., Inc. or a member of Lessee's immediate family so long as Louis A. Gencarelli, Sr., guarantees the Lease. As a condition of any assignment or sub-let, Lessee shall personally guarantee the obligations of any assignee or sub-lessee if Lessor so demands. Except where consented to by Lessor, which consent shall not be unreasonably withheld, any sublease hereunder shall incorporate by reference the obligations of Lessee hereunder.

6. Default: In the event that any Rent, including Additional Rent, shall be in arrears and unpaid for five (5) days or more after receipt of notice from the Lessor that the same is unpaid provided, however, Lessor shall not be required to provide notice more than twice in any twelve month period for any particular monetary payment constituting Base Rent and Additional Rent, or if, after notice from Lessor of a default in the performance of any other covenant or condition herein contained and to be

kept by Lessee, Lessee shall not have cured such default within the space of thirty (30) days after the receipt of such notice or if said default cannot be cured within such time, if Lessee shall not have commenced curing such default or shall thereafter fail diligently to proceed with and complete curing the same, or if Lessee shall at any time vacate the Demised Premises and not sublet the Premises as herein provided or make a general assignment for the benefit of his creditors or apply for relief under any bankruptcy or insolvency laws, or if Lessee shall be adjudicated a bankrupt, it shall be lawful for Lessor thereupon, or at any time thereafter, at Lessor's option, and with or without process of law, to exercise all rights and remedies at law or in equity, and to terminate this Lease and to enter upon the Premises and to expel Lessee and those claiming under Lessee without being guilty of any manner including but not limited to trespass, and thenceforth peacefully and quietly hold and enjoy the Premises as if this Lease has not been made; without prejudice, however, to any right to sue for and recover any Rent, Additional Rent, and other sums then and thereafter due under this Lease, or to any claim for damages or right of action or remedy for the preceding breach of covenant, agreement or condition herein contained which Lessor might otherwise have or use, plus reasonable attorneys' fees incurred by Lessor in enforcing its remedies hereunder.

In the event of default, this Lease shall not, except at the option of the Lessor, continue for the benefit of any attaching creditor, assignee for the benefit of creditors, permanent receiver, or trustee in bankruptcy. This Lease is a "shopping center lease", so-called, pursuant to the Bankruptcy Code. Upon default, Lessor's and Lessee's rights, remedies, and benefits under this Lease are not cumulative and shall not be exclusive of any other rights, remedies, and benefits allowed by law or equity.

7. Governmental Orders: Lessee shall comply with all requirements of the municipal or other governmental authorities relating to the operation of the business of Lessee at Demised Premises (with the right, however, to contest by appropriate legal proceedings at his sole cost, expense and risk and requirements which Lessee may regard as unlawful or improper), provided that Lessor is not at risk of forfeiture of the Demised Property.

8. Taxes: From the Additional Rent Commencement Date hereof until termination of the Lease hereunder, Lessee shall pay as Additional Rent, all real estate and personal property taxes and other assessments whether general or special assessments on the Demised Premises and the improvements thereon. Lessee shall be obligated to pay only those installments of such taxes or assessments which are payable during the term hereof. Except as otherwise specifically stated above, nothing in this Lease shall be construed to require Lessee to pay any franchise, estate, inheritance, succession, capital levy, business tax or transfer tax of Lessor arising out of or connected with this Lease or Lessor's right in said premises, or any income, excess profit, or revenue tax or any other tax or import charged or levied upon the rentals payable by Lessee pursuant to this Lease, except any alternative method of taxing the use and occupancy of Lessee which replaces, substitutes and/or supplements real estate and/or personal property taxes as currently assessed and referred to. Lessee may contest and review by legal proceedings, instituted and conducted by him at his own expense, taxes, assessment, water rates, sewer charges or other charges imposed against the Demised Premises or improvements thereon. Notwithstanding anything to the contrary

contained herein, Lessee shall be required to pay any taxes which he is contesting in good faith but not any interest, penalty, charge or assessment arising from Lessor's failure to pay taxes or assessments when due or otherwise arising from Lessor's misfeasance, nonfeasance or malfeasance. Lessee shall indemnify and hold harmless Lessor from and against any cost or expenses associated with any such contest.

Lessee shall furnish to Lessor evidence of the payment of the Taxes and Assessments within ten (10) days following the date upon which payment is due. In the event Lessee does not timely pay such taxes and assessments of any nature, Lessor shall be permitted to pay the same on behalf of Lessee and such payments shall constitute Additional Rent payable to Lessor by Lessee. Upon written demand from Lessor, together with evidence of Lessor's payments of such taxes and assessments, Lessee shall promptly reimburse Lessor or such payment together with interest actually charged.

9. Utilities: Lessee shall pay the cost of all water, sewer, electricity, heating and other utilities including the cost of use and maintenance and/or replacements in connection with the Demised Premises and/or any buildings it constructs on the Demised Premises from the Commencement date hereof and during the term hereof.

10. Mortgages:

a. Subordination: Lessee will, upon request of Lessor, execute such document or documents as may be reasonably required to subordinate its leasehold to any subsequent mortgage made by Lessor on the Demised Premises (after Lessee has completed construction upon the premises - which Lessor and Lessee acknowledge will require bank financing), provided that the mortgagee agrees to recognize the validity of this Lease, and so long as the Lessee is not in default of this Lease and performs its obligations under this Lease, not to disaffirm this Lease, to assume the Lessor's obligation under this Lease, and not to disturb Lessee's possession or use of the Demised Premises in accordance with this Lease, and executes and delivers to Lessee such document or documents as may be reasonably required to effect and evidence such agreements by the mortgagee. If this Lease remains in full force and effect after the foreclosure of a mortgage upon the Demised Premises, Lessee agrees to recognize the mortgagee or the purchaser in foreclosure as Lessor under this lease and to execute such document or documents as may be reasonably required to evidence such attornment.

b. Leasehold Mortgages: Lessee shall have the right to mortgage his interest in this Lease under a "Leasehold Mortgage" or to make a "Collateral Assignment" of this Lease or of any of Lessee's rights hereunder as security for a loan to Lessee, but any such Mortgage or Assignment shall in all respects and at all times be subject to the provisions of this Lease. Any Leasehold Mortgage or Collateral Assignment by Lessee shall always be subordinate to Lessor's fee interest and to any present or future mortgage by Lessor. Lessee shall not obtain any mortgage and/or financing by Lessee for Lessee's construction, alterations, improvements or for any other purpose that involves a lien or encumbrance of Lessor's interest in the Demised Premises.

11. Condemnation:

a. Eminent domain; Cancellation. If, at any time during the continuance of this Lease, all or any portion of the Demised Premises or the improvement of any building located thereon is taken, appropriated or condemned by reason of eminent domain, the Lessor and Lessee shall divide the proceeds and awards in the condemnation proceedings, abate the rent, and make other adjustments in a just and equitable manner under the circumstances. If the parties cannot agree on a just and equitable decision, annual abatement of rent, or other adjustments within 30 days after the award has been made, the disputed matters shall, by appropriate proceedings, be submitted to a court having jurisdiction of the subject matter for its decision and determination. If legal title to the entire premises is wholly taken by condemnation, the Lease shall be canceled.

b. Apportionment. The deprivation of the Lessee's use of the buildings and improvements shall, together with the remaining term of the Lease, be an item of damage in determining the Lessee's portion of the condemnation award and the value of the land together with the remaining term of the Lease shall be an item of damage in determining Lessors award. It is the general intent of this Section that, upon condemnation, the parties shall share in their awards to the extent that their respective interests are depreciated, damaged, or destroyed by the exercise of the right of eminent domain. If the condemnation is total, the condemnation award shall be allocated so that the then value of the property, as if it were unimproved property, is allocated to the Lessor after giving due consideration to the number of years then remaining on the term of this Lease, and the then value of the building or buildings thereon is allocated between the Lessor and Lessee after giving due consideration to the number of years then remaining on the term of this lease and the condition of the buildings at the time of condemnation. Notwithstanding anything to the contrary contained herein, Lessee shall be entitled to a separate award from the condemning authority for moving expenses, loss business and good will, and for its trade fixtures and equipment.

12. Expenses, Improvements and Replacements: It is the intention of the Lessor and Lessee that the Base Rent and Additional Rent herein specified shall be absolute and triple net, with no costs or services to the Lessor, in each year during the term and any extensions thereof of the Lease. Nothing in this Lease shall be deemed to require the Lessee to pay or discharge any liens or mortgages which are placed on the Demised Premises as a result of Lessor's action or inaction.

13. Renewal Options & Holdover Tenancy: Rent during the Renewal Option period shall be negotiated by the Lessor and the Lessee at least one (1) year prior to the expiration of the initial term. If the Lessee holds over after the termination of this Lease (including any renewal or option period), then the tenancy shall be from month-to-month in the absence of any written agreement to the contrary. Either party may terminate such month-to-month tenancy upon thirty (30) days written notice to the other party. Rent and Additional Rent obligations during such holdover period shall continue at a rate one and a half times (1½) the Rent obligation for

the last month of the Lease term.

14. **Indemnity and Insurance:** Lessee will indemnify and hold harmless the Lessor from any liability by reason of personal injury or death to any person or persons or loss or damage to property on or about the Demised Premises. Lessee will carry ALL RISK fire, casualty, real estate, personal property, liability, general liability, public liability and loss of rent insurance in an amount reasonably satisfactory to the Lessor. Insurance policy shall be approved by Lessor, which approval shall not be unreasonably withheld or delayed, and name Lessor as additional insured, in the minimum amount of Two Million Dollars ($2,000,000) for injury to or death of any one person, and Two Million Dollars ($2,000,000) for injury to or death of any number of persons arising out of a single occurrence and Five Hundred Thousand ($500,000) Dollars for damage to property and will pay all premiums for said policies promptly when due and otherwise keep said policies in good standing. Lessee will provide Lessor with certificates thereof, will put the same into effect as of the date of Lease Commencement and will maintain all such policies or renewals thereof in effect during the Term and extended Terms of this Lease as well as during any period(s) in which Lessee occupies the Demised Premises.

Notwithstanding the foregoing, the Lessee shall not be required to indemnify or hold the Lessor harmless for any death or injury to any person or damage to any property due to the negligence of the Lessor, its agents, employees or contractors.

15. Damage or Destruction: Lessee shall, to the extent obtainable, keep all buildings and improvements placed on the Demised Premises insured for 100% of actual replacement cost against loss or damage by fire and all such other risks and hazards as are insurable under present and future standard forms of fire and extended coverage insurance policies. In the event of any fire or other casualty insured against by Lessee's policies Lessor shall, at Lessee's request, assign to Lessee all of its rights, title and interest in any insurance proceeds, subject to Lessee's full replacement of the building and improvements. If the building or improvements on the Demised Premises shall be damaged or destroyed by casualty or fire, Lessee elects not to replace the building to original condition, Lessee shall not have the right to request any rights, title and/or interest in any insurance proceeds and Lessee shall have the option to terminate this Lease following such fire or casualty. Rent and additional rent shall abate during any period of untenantability caused by any damage to the buildings and/or improvements on the Demised Premises.

16. Signs: The Lessee shall have the right to place signs on the Demised Premises, including signs on the exterior of the building and on the curb area of the Demised Premises, provided that such signs comply with applicable State and Municipal regulations or are permitted by special use permit or variance.

17. **First Refusal Purchase Option:** Lessor shall not sell, or grant options with respect to or otherwise dispose of the Demised Premises or any part thereof to any direct or indirect competitor of Bess Eaton Donut Flour Co., Inc. unless Lessor shall first notify Lessee in writing stating the terms and conditions under which Lessor is willing to sell, or grant options with respect to or otherwise dispose of the Demised Premises and giving Lessee the Refusal Purchase Option to purchase said property

pursuant to such terms and conditions as set forth in the then existing offer to purchase acceptable to the Lessor. If this first refusal purchase option is not exercised by Lessee within five (5) business days after such notice is received, Lessor may sell, and/or grant said property to another party pursuant to such terms and conditions. Notwithstanding anything to the contrary contained in this Lease, the Lessee's right of first Refusal Purchase Option contained herein does not apply to and is waived by Lessee and thus null and void with respect to transfers, assignments, sales, leases, inheritance, devise, grant, and/or bequests to relatives of the Lessor, his assignees, respective successors, heirs, kindred, and descendents, but Lessee's First Refusal Purchase Option shall thereafter remain in full force and effect. Notice of Lessee's Option shall be contained in all transfer documents.

18. Notice: All notices required to be given under this Lease or as provided by law shall be effective on receipt and shall be addressed to the Lessor or Lessee at the following addresses, until written notice is received that a different address is to be used, and such notices must be sent by certified mail, return receipt requested:

| | |
|---|---|
| To Lessor: | 1800 Smith Associates, LP<br>c/o SAF Management, LLC.<br>20 Westminster Street<br>Providence, Rhode Island 02903 |
| With a copy to: | The Discovery Group, LLC.<br>c/o Jason A. Sisto<br>P.O. Box 8801<br>Boston, Massachusetts 02114 |
| To Lessee: | Louis A. Gencarelli, Sr.<br>79 Tom Harvey Road<br>Westerly, Rhode Island 02891 |
| With a copy to: | Scott T. Spear, Esq.<br>BLISH & CAVANAQH<br>30 Exchange Terrace<br>Providence, RI 02903 |

19. Captions: The captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease nor the intent of an provision thereof.

20. Binding: The obligation of each party hereto shall be binding upon such party and upon the respective successors and assigns of the parties, as the case may be.

21. Counterparts: This Lease may be executed in any number of counterparts, each of which shall be an original and the counterparts shall constitute but one and the same instrument.

22. Modifications: This Lease may not be modified, altered, terminated or discharged orally, but only by an agreement, in writing, signed by the parties hereto.

23. Brokers: The parties recognize Sandra Salvadore of Metropolitan Commercial Property, Ltd. as the sole agent for the Lessor. The parties acknowledge there are no other brokers involved in this transaction other than Sandra Salvadore of Metropolitan Commercial Property Ltd. and the Lessee shall indemnify and hold the Lessor harmless from and against any and all claim or demand by any broker, or any person who claims to have dealt with the indemnifying party.

24. The submission by Lessee of this document for examination does not constitute an offer and this document shall become effective and binding only upon execution and delivery hereof by both Lessor and Lessee.

25. Lessor hereby represents and warrants to Lessee as follows:

a. Lessor is the owner of the Demised Premises in fee simple absolute.

b. There are no restrictions, encumbrances, covenants, easements, exclusive use provisions in other Lessor's leases or other agreements, laws or other ordinances or regulations which will prevent Lessee from occupying the Premises for the purposes provided herein or otherwise conflict with any provision of this Lease, to the best of its knowledge.

c. Lessor has full right and authority to enter into this Lease and no joinder or approval of any other person or entity is required with respect to Lessor's right and authority to enter into this Lease.

d. To the best of its knowledge there is no oil or hazardous waste, material or substance on the Demised Premises as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency, and there are no violations of any federal or state law or municipal ordinance, order, or requirements of any governmental body or authority affecting all or any portion of the Demised Premises. Lessor, its successors or assigns agrees to indemnify and hold harmless the Lessee, its successors and assigns from any and all loss, cost, or damage, including attorneys' fees and court costs, which the Lessee, its successors or assigns, may sustain, suffer or incur as a result of any storage, disposal, release, escape, threat of release, presence on or transport to the Demised Premises of any oil or hazardous waste, material or substance as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency prior to the execution of this Lease or which results from the fault, act, omission, negligence or misconduct of Lessor, its agents, employees, and contractors or any predecessor in title.

Lessor will save Lessee harmless, and will exonerate, defend, and indemnify Lessee from and against any and all claims, liabilities or penalties (including attorney fees) asserted by or on behalf of any person, firm, corporation or public authority: (1) On account of or based upon any injury to persons or loss of or damage to property sustained or occurring on the Demised Premises on account or based upon the act, omission, fault, negligence, or misconduct of Lessor, its agents, employees, contractors or invitees to the full extent of any injury or damage not attributable to Lessee; (2) On account of or resulting from the failure of Lessor to perform and discharge any

of its covenants and obligations under this Lease; and

Lessee, its successors or assigns agrees to indemnify and hold harmless the Lessor, its successors and assigns from any and all loss, cost, or damage, including attorneys' fees and court costs, which the Lessor, its successors or assigns, may sustain, suffer or incur as a result of any storage, disposal, release, escape, threat of release, presence on or transport to the Demised Premises of any oil or hazardous waste, material or substance as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency during the term of this Lease or which results from the fault, act, omission, negligence or misconduct of Lessee, its agents, employees, contractors, invitees, and/or licensees, to the full extent of any injury or damage not attributable to Lessor.

Lessee will save Lessor harmless, and will exonerate, defend, and indemnify Lessor from and against any and all claims, liabilities or penalties (including attorney fees) asserted by or on behalf of any person, firm, corporation or public authority on account or based upon any injury to persons or loss of or damage to property sustained or occurring on the Demised Premises on account or based upon the act, omission, fault, negligence, or misconduct of Lessee, its agents, employees, contractors or invitees to the full extent of any injury or damage not attributable to Lessor.

26. Environmental Audit:

a. Owner Conducts Initial Audit (Initial Environmental Audit): On or before the delivery date, Lessor shall, at its sole cost and expense, provide tenant a Phase I environmental assessment of the Premises, together with additional reports and testing from an environmental consultant selected by the Lessor.

b. Lessee Conducts Update (Environmental Update): After lessee vacates the premises in accordance with the terms and conditions of this lease, but no later than 30 days after the expiration or sooner termination of this lease, Lessee shall, at its sole cost and expense, provide Landlord with a Phase I environmental assessment of the Premises, together with such additional reports and testing, including a Phase II environmental assessment if reasonably necessary in Landlord's sole discretion using the consultant who initially prepared the initial Environmental Audit or, if that consultant is not available, another licensed environmental consultant reasonably acceptable to Landlord, to determine the environmental status of the premises as of the date of that Environmental Update.

c. Lessee's Further Environmental Obligations: Lessee's obligations under this Section (including, without limitation, its redemption and indemnification obligations) shall be limited to any Hazardous Waste and/or contamination generated, stored, or disposed of by Lessee, it's agents, employees, contractors, invitees, licensees, and/or any other parties during the term or extended term of this lease, contrary to the provisions of this Lease which are revealed by the Environmental Update (or any inspection by the Landlord prior to Lessee's delivery of the Premises to Landlord), but which were not revealed by the Initial

Environmental Audit. This clause shall survive the expiration or sooner termination of the Lease."

27. Lessor and Lessee agree that upon the request of the other, they will execute a memorandum of lease or short form lease for recording purposes which shall contain a Summary of the lease terms and right of first Refusal Purchase Option contained herein.

28. The Lessee shall not allow a lien and/or claim of any kind to be filed, including but not limited to liens and/or claims to be filed against the Lessor's interest in the Demised Premises, except for leasehold mortgages necessary to finance construction during the continuance of this Lease. If such lien and/or claim is filed, the Lessee shall cause the Demised Premises to be released from the lien and/or claim within 60 days after the Lessor is given written notice that a claim has been filed, or within 60 days after the Lessor is given written notice of the claim and transmits written notice of its receipt to the Lessee, whichever 60-day period expires earlier. The Lessee will cause such release either by paying to the court the amount necessary to relieve and release the Demised Premises from the lien, or in any other manner which, as a matter of law, will result, within the 60-day period, in releasing the Lessor and its title from the claim.

29. Force majeure: If the Lessor or Lessee is delayed, hindered, or prevented from performing any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive government laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war, or other reason beyond its control, then performance of the act shall be excused for the period of the delay. In the event of a delay, the Commencement Date of the Rent payment obligations and Additional Rent payment obligations shall not be so extended. In that event, the period for the performance of the act shall be extended for a period equivalent to the period of the delay, provided that such extension shall not extend the term of this Lease.

30. Estoppel - Certificates: Either party shall, without charge, at any time and from time to time hereafter, within ten days after the others' written request of the other, certify by instrument duly executed and acknowledged to any mortgagee or purchaser or proposed mortgagee or proposed purchaser, or any other person, firm, or corporation specified in the request as to:

a. Whether this Lease has been supplemented or amended, and, if so, the substance and manner of the supplement or amendment;

b. The validity and force and effect of this Lease, in accordance with its tenor as then constituted;

c. The existence of any default thereunder;

d. The existence of all offsets, counterclaims, or defenses thereto on the part of the other party;

e. The commencement and expiration dates of the term of this Lease; and

f. All other matters that may reasonably be so requested.

Any such certificate may be relied upon by the party who requested it and any other person, firm, or corporation to whom it may be exhibited or delivered, and the contents of the certificate shall be binding on the party executing it.

31. Waivers: The failure of either party hereto to insist in any one or more instances upon the strict and literal performance of any of the agreements, terms, or conditions of this Agreement and Lease, shall not be construed as a waiver for the future of such term, condition, or agreement.

32. Covenants Running with Land; Binding Effect: All covenants, conditions, and obligations contained herein or implied by law are covenants running with the land and shall attach and bind and inure to the benefit of the Lessor and Lessee and their respective heirs, legal representatives, successors, and assigns, except as otherwise provided herein. All covenants, conditions, and obligations contained herein or implied by law shall expire at the date of termination of this lease, except as otherwise provided herein.

33. Upon signing of this document, Lessor and Lessee acknowledge their willful, full, complete and total acceptance of the terms and conditions herein. Lessor and Lessee acknowledge that this agreement is a full, complete and total integration of the parties intent and that all previous warranties, guarantees, representations, (both oral and written), memorandums, letters, including but not limited to facsimiles and electronic mail, are null and void for the all purposes, including, but not limited to parol evidence. Lessor and Lessee acknowledge this agreement, exhibits, appendixes and all other contents attached to herein are a willful, final and complete binding commitment and representation between the Lessor and Lessee.

IN WITNESS WHEREOF, Lessor and Lessee have caused these presents and a duplicate of the same tenor to be executed on the day and year above written.

| | |
|---|---|
| Witness: | Lessor: |
| [signature] | [signature] 1800 Smith Associates, LP |
| Witness: | Lessee: |
| [signature] | [signature] Louis A. Gencarelli, Sr. |

STATE OF RI
COUNTY OF Providence

In Providence, on the 10th day of Nov, before me personally appeared [illegible] in his capacity as of Vice Pres to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him so executed to be his free act and deed and the free act and deed of said entity.

[signature]
Notary Public
My Commission Expires: 3/20/02

STATE OF RI
COUNTY OF Washington

In Westerly, on the 5th day of November, before me personally appeared Louis A. Gencarelli, Sr., to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him so executed to be his free act and deed and the free act and deed of said entity.

[signature]
Notary Public
My Commission Expires: 2-13-02

EXHIBIT A

"Demised Premises Site Plan and Description"

EXHIBIT B

"Building, Structure, Sign Specifications"

EXHIBIT C

"Cross Easement Site Plan and Description"

Bess Eaton
Coffee & Bake Shop

November 4, 1999

Mr. Bennie Sisto
1800 Smith Associates, LP
c/o SAF Management, LLC
20 Westminster Street
Providence, RI 02903

Reference: 1800 Smith Street, North Providence, Rhode Island

Dear Mr. Sisto:

I am pleased to enclose an original executed Absolute Triple Net Bonded Land Lease for property at 1800 Smith Street, North Providence, Rhode Island.

This Land Lease is being provided to you with the understanding that it will be held in escrow until Exhibit A, Exhibit B and Exhibit C are agreed upon by the parties. Obviously, I cannot agree to lease property that has not yet been defined

Additionally, upon final review of the Agreement, I gave consideration to the possibility that I may encounter delays in the process of obtaining operating permits. In the event that I experience delays, court contests or appeals, I will need your agreement to extend the lease commencement date accordingly. The extension would not include the additional rent commencement date.

If the contents of this letter are acceptable to you, would you please acknowledge your acceptance by executing the enclosed copy of this letter where indicated and returning the same to me.

Yours truly,

Louis A. Gencarelli, Sr.

*The content of this letter is acceptable on behalf of 1800 Smith Associates, LP and shall be deemed an amendment to the above referenced Land Lease.*

*1800 Smith Associates, LP*

By: ______________________

Enclosure (1)

79 TOM HARVEY ROAD
WESTERLY, RI 02891

HEARING DATE: April 14, 2000

STATE OF RHODE ISLAND
PROVIDENCE, SC.

DISTRICT COURT
SIXTH DIVISION

1800 SMITH STREET ASSOCIATES, LP, by and through its General Partner JASON'S REALTY CORP.,
Plaintiffs,

v. C.A. No. 00-3375

LOUIS A. GENCARELLI, SR.,
Defendant.

MacADAMS & WIECK INCORPORATED
RECEIVED
APR 7 2000

## DEFENDANT'S MOTION TO STAY

### Introduction

Defendant, Louis A. Gencarelli, Sr., (hereinafter "Defendant"), hereby moves this Court for an order to stay further proceedings in this lawsuit until such time as the Providence County Superior Court renders a declaration of the rights and duties of the parties under the November 1, 1999 lease agreement, that forms the basis of this dispute. The Superior Court action was filed pursuant to R.I. Gen. Laws § 90-30-1, *et seq.*, which provides for exclusive jurisdiction to the Superior Court to declare the legal rights, duties and obligations of the parties to the aforesaid lease agreement.

### Travel of Case/Argument

The above-referenced case was filed by Plaintiffs, 1800 Smith Street Associates, LP and Jason's Realty Corp., on or about March 28, 2000. The action seeks to eject Defendant from the premises of 1800 Smith Street, which is owned by Plaintiffs. Plaintiffs further seek a judgment for future rent payments, which amount to $194,922, as well as any and all additional rents that may be due and owing. Plaintiffs also seek legal fees and

costs, and such other relief as this Court deems just and appropriate. *See*, Plaintiffs' complaint, *ad damnum* clause.

In the first instance, this Court lacks jurisdiction to render the monetary award sought by Plaintiffs. Second, Defendant denies that it has possession or control of the property in question. Defendant has no right to the premises of 1800 Smith Street. Thus, Plaintiffs have no claim for ejectment. Third, this Court's jurisdiction is preempted by that of the Superior Court, pursuant to the Declaratory Judgment Act. *See*, R.I. Gen. Laws § 9-30-1.

Ordinarily, a landlord can seek relief against a tenant in the District Court, pursuant to R.I. Gen. Laws § 34-18-1-1, *et. seq*. Such an action presumes the existence of a valid, commercial lease agreement. In the instant case, however, there is no valid lease agreement. The Defendant has filed a declaratory judgment action in Superior Court in order to determine the status of the contract, as well as any obligations owed by the parties. It is the ***exclusive*** jurisdiction of the Superior Court and Family Court to hear declaratory judgment actions:

> The superior or family court upon petition, following such procedure as the court by general or special rules may prescribe, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.

*See*, R.I. Gen. Laws § 90-30-1.

As set forth in the declaratory judgment action, the contract was to remain in escrow and not become legally effective until such time as the parties mutually agreed to the following definitions and conditions: (1) the "demised premises site plan and description," (2) the "building, structure, sign specifications," and (3) the "cross

easement site plan and description." The escrow provision was memorialized in an addendum to the lease agreement, executed by the parties on November 4, 1999. *See*, addendum attached hereto as Exhibit A. There is no dispute that the parties never agreed to the aforesaid definitions and conditions. Indeed, the lease agreement itself contains blank pages at the points where the definitions and conditions were to be set forth as Exhibits A through C of the agreement. *See*, Lease Agreement, attached hereto as Exhibit B. As expressly provided for by the addendum to the lease agreement, neither Plaintiffs nor Defendant have any contractual duties, obligations, or expectations, since the parties never agreed to the material definitions and conditions set forth above.

Furthermore, pursuant to 26(a) of the lease agreement, Plaintiffs were to conduct an environmental audit of the parcel of land to be leased by Defendant. Pursuant to Section 1(a) of the lease agreement, Plaintiff was required to obtain at its own expense and deliver to Lessee (Gencarelli) an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's lender, (which satisfaction shall not be reasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of the lease. Pursuant to Section 1(a) of the lease agreement, Plaintiff was required to provide Defendant with a "boundaries survey" which is satisfactory to Lessee, ...within sixty (60) days after execution of the lease. The facts will clearly establish that at no time have Plaintiffs provided Defendant with the environmental assessment report. The facts will also establish that Plaintiffs did not provide a boundary survey of the land within sixty (60) days of the execution. Consequently, even if the agreement were legally

binding, Plaintiffs' failure to satisfy conditions precedent preclude any right to recovery against Defendant.

In conclusion, it is the exclusive jurisdiction of the Superior Court to clarify the rights and obligations of the parties to the aforesaid lease agreement. The parties are entitled to a trial by jury as to any factual dispute regarding the lease agreement. Consequently, this action should be stayed pending a decision by the Providence County Superior Court. In the event that the Superior Court rules that a valid lease agreement exists between the parties, and that Plaintiffs have satisfied each of the conditions precedent, then the stay could be lifted and this Court could order appropriate relief to the parties.

LOUIS A. GENCARELLI, SR.,

By his Attorneys,

Scott T. Spear (RM)

Scott T. Spear #3189
Raymond A. Marcaccio #3569
BLISH & CAVANAGH
30 Exchange Terrace
Providence, RI 02903
Telephone: (401) 831-8900
Facsimile: (401) 751-7542

CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of April 2000, I caused a true copy of the within Motion to be mailed, postage prepaid to Robert D. Wieck, Esq., and Denean M. Russo, Esq., MacAdams & Wieck, Inc., 101 Dyer Street, Suite 400 Providence, RI 02903.

HEARING DATE: April 14, 2000

STATE OF RHODE ISLAND
PROVIDENCE, SC.

DISTRICT COURT
SIXTH DIVISION

MacADAMS & WIECK INCORPORATED
RECEIVED
APR 7 2000

1500 MINERAL SPRING ASSOCIATES, LP, by and through its General Partner JASON'S REALTY CORP.
Plaintiffs,

v. C.A. No. 00-3376

LOUIS A. GENCARELLI, SR.,
Defendant.

## DEFENDANT'S MOTION TO STAY

### Introduction

Defendant, Louis A. Gencarelli, Sr., (hereinafter "Defendant"), hereby moves this Court for an order to stay further proceedings in this lawsuit until such time as the Providence County Superior Court renders a declaration of the rights and duties of the parties under the November 1, 1999 lease agreement, that forms the basis of this dispute. The Superior Court action was filed pursuant to R.I. Gen. Laws § 90-30-1, *et seq.*, which provides for exclusive jurisdiction to the Superior Court to declare the legal rights, duties and obligations of the parties to the aforesaid lease agreement.

### Travel of Case/Argument

The above-referenced case was filed by Plaintiffs, 1500 Mineral Spring Associates, LP and Jason's Realty Corp., on or about March 28, 2000. The action seeks to eject Defendant from the premises of 1500 Mineral Spring Avenue, which is owned by Plaintiffs. Plaintiffs further seek a judgment for future rent payments, which amount to $194,922, as well as any and all additional rents that may be due and owing. Plaintiffs

also seek legal fees and costs, and such other relief as this Court deems just and appropriate. *See*, Plaintiffs' complaint, *ad damnum* clause.

In the first instance, this Court lacks jurisdiction to render the monetary award sought by Plaintiffs. Second, Defendant denies that it has possession or control of the property in question. Defendant has no right to the premises of 1500 Mineral Spring Avenue. Thus, Plaintiffs have no claim for ejectment. Third, this Court's jurisdiction is preempted by that of the Superior Court, pursuant to the Declaratory Judgment Act. *See*, R.I. Gen. Laws § 9-30-1.

Ordinarily, a landlord can seek relief against a tenant in the District Court, pursuant to R.I. Gen. Laws § 34-18-1-1, *et. seq*. Such an action presumes the existence of a valid, commercial lease agreement. In the instant case, however, there is no valid lease agreement. The Defendant has filed a declaratory judgment action in Superior Court in order to determine the status of the contract, as well as any obligations owed by the parties. It is the *exclusive* jurisdiction of the Superior Court and Family Court to hear declaratory judgment actions:

> The superior or family court upon petition, following such procedure as the court by general or special rules may prescribe, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.

*See*, R.I. Gen. Laws § 90-30-1.

As set forth in the declaratory judgment action, the contract was to remain in escrow and not become legally effective until such time as the parties mutually agreed to the following definitions and conditions: (1) the "demised premises site plan and description," (2) the "building, structure, sign specifications," and (3) the "cross

easement site plan and description." The escrow provision was memorialized in an addendum to the lease agreement, executed by the parties on November 4, 1999. *See*, addendum attached hereto as Exhibit A. There is no dispute that the parties never agreed to the aforesaid definitions and conditions. Indeed, the lease agreement itself contains blank pages at the points where the definitions and conditions were to be set forth as Exhibits A through C of the agreement. *See*, Lease Agreement, attached hereto as Exhibit B. As expressly provided for by the addendum to the lease agreement, neither Plaintiffs nor Defendant have any contractual duties, obligations, or expectations, since the parties never agreed to the material definitions and conditions set forth above.

Furthermore, pursuant to 26(a) of the lease agreement, Plaintiffs were to conduct an environmental audit of the parcel of land to be leased by Defendant. Pursuant to Section 1(a) of the lease agreement, Plaintiff was required to obtain at its own expense and deliver to Lessee (Gencarelli) an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's lender, (which satisfaction shall not be reasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of the lease. Pursuant to Section 1(a) of the lease agreement, Plaintiff was required to provide Defendant with a "boundaries survey" which is satisfactory to Lessee, ...within sixty (60) days after execution of the lease. The facts will clearly establish that at no time have Plaintiffs provided Defendant with the environmental assessment report. The facts will also establish that Plaintiffs did not provide a boundary survey of the land within sixty (60) days of the execution. Consequently, even if the agreement were legally

binding, Plaintiffs' failure to satisfy conditions precedent preclude any right to recovery against Defendant.

In conclusion, it is the exclusive jurisdiction of the Superior Court to clarify the rights and obligations of the parties to the aforesaid lease agreement. The parties are entitled to a trial by jury as to any factual dispute regarding the lease agreement. Consequently, this action should be stayed pending a decision by the Providence County Superior Court. In the event that the Superior Court rules that a valid lease agreement exists between the parties, and that Plaintiffs have satisfied each of the conditions precedent, then the stay could be lifted and this Court could order appropriate relief to the parties.

LOUIS A. GENCARELLI, SR.,

By his Attorneys,
Scott T. Spear (em)

Scott T. Spear #3189
Raymond A. Marcaccio #3569
BLISH & CAVANAGH
30 Exchange Terrace
Providence, RI 02903
Telephone: (401) 831-8900
Facsimile: (401) 751-7542

CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of April 2000, I caused a true copy of the within Motion to be mailed, postage prepaid to Robert D. Wieck, Esq., and Denean M. Russo, Esq., MacAdams & Wieck, Inc., 101 Dyer Street, Suite 400 Providence, RI 02903.

STATE OF RHODE ISLAND
PROVIDENCE, SC.

DISTRICT COURT
SIXTH DIVISION

1800 SMITH STREET ASSOCIATES, LP, :
by and through its General Partner :
JASON'S REALTY CORP., :
Plaintiff, :
:
v. : C.A. No. 00-3375
:
LOUIS A. GENCARELLI, SR., :
Defendant. :

**STIPULATION**

By agreement of the parties, it is hereby acknowledged and understood that Defendant Loius A. Gencarelli, Sr. does not have and is **not** entitled to possession of the "Demised Premises" located in North Providence, Rhode Island, as that term is more fully described in the commercial Absolute Triple Net Bonded Land Lease dated November 1, 1999 between the parties.

1800 SMITH STREET ASSOCIATES, LP,
by and through its General Partner
JASON'S REALTY CORP.

By its Attorneys,

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: April 19, 2000

LOUIS A. GENCARELLI, SR.

By his Attorneys,

Scott T. Spear, Esq. #3189
Raymond A. Marcaccio, Esq. #3569
Blish & Cavanagh
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900
(401) 751-7542 (facsimile)
Dated: April 19, 2000

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\Pleadings\Stipulation 041300.doc

STATE OF RHODE ISLAND
PROVIDENCE, SC.

DISTRICT COURT
SIXTH DIVISION

1500 MINERAL SPRING ASSOCIATES, LP, by and through its General Partner JASON'S REALTY CORP., Plaintiff,

v.

LOUIS A. GENCARELLI, SR., Defendant.

C.A. No. 00-3376

**STIPULATION**

By agreement of the parties, it is hereby acknowledged and understood that Defendant Loius A. Gencarelli, Sr. does not have and is **not** entitled to possession of the "Demised Premises" located in North Providence, Rhode Island, as that term is more fully described in the commercial Absolute Triple Net Bonded Land Lease dated November 1, 1999 between the parties.

1500 MINERAL SPRING ASSOCIATES, LP,
by and through its General Partner
JASON'S REALTY CORP.

By its Attorneys,

[signature]

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: April 19, 2000

LOUIS A. GENCARELLI, SR.

By his Attorneys,

[signature]

Scott T. Spear, Esq. #3189
Raymond A. Marcaccio, Esq. #3569
Blish & Cavanagh
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900
(401) 751-7542 (facsimile)
Dated: April 19, 2000

MacADAMS & WIECK INCORPORATED
RECEIVED
JUN 30 2000

HEARING DATE: JULY 12, 2000

STATE OF RHODE ISLAND
PROVIDENCE, SC.

SUPERIOR COURT

LOUIS A. GENCARELLI, SR.,
Plaintiff,

v.

C.A. No. 00-1732

1500 MINERAL SPRING ASSOCIATES, LP,
1800 SMITH STREET ASSOCIATES, LP,
and JASON'S REALTY CORP.,
Defendants.

## MOTION OF PLAINTIFF, LOUIS A. GENCARELLI, SR., TO CONSOLIDATE

Pursuant to Rule 42 of the Superior Court Rules of Civil Procedure, Plaintiff, Louis A. Gencarelli, Sr. (hereinafter "Gencarelli"), moves this Court for an order to consolidate this action with the following two cases: *1800 Smith Street Associates, LP., by and through its General Partner Jason's Realty Corp. v. Louis A. Gencarelli, Sr.*, C.A. No. 00-3174 and *1500 Mineral Spring Associates, LP., by and through its General Partner Jason's Realty Corp. v. Louis A. Gencarelli, Sr.*, C.A. No. 00-3175.

All three lawsuits relate to two executory contracts that were entered between Gencarelli and two entities, 1500 Mineral Spring Associates, and 1800 Smith Street Associates, which are minority partners of Jason's Realty Corporation. The latter is a corporate entity that is owned and/or controlled by Benjamin Sisto (hereinafter "Sisto").

Through the instant lawsuit, Gencarelli seeks a declaration by this Court, pursuant to R.I. Gen. Laws §9-30-1, *et seq.*, of the parties' rights and duties under the two contracts. In summary, the contracts are executory, requiring Sisto to perform certain

conditions before the agreements would ripen into a landlord/tenant relationship. Sisto failed to satisfy these conditions, thereby negating the obligation of Gencarelli to proceed with the tenancies.

In the other two cases, Sisto filed trespass and ejection actions against Gencarelli, in an effort to enforce the landlord/tenant relationships. The district court trial judge found in favor of Sisto and Gencarelli appealed the matters to the Superior Court.

All three cases arise from a common set of facts and will address identical issues of law. As a matter of judicial economy, and in order to avoid contradictory rulings arising from the same set of facts, these cases should be consolidated for discovery and trial.

LOUIS A. GENCARELLI, SR.,
By his Attorneys,

Scott T. Spear #3189
Raymond A. Marcaccio #3569
BLISH & CAVANAGH
30 Exchange Terrace
Providence, RI 02903
Telephone: (401) 831-8900
Facsimile: (401) 751-7542

Dated: June 28, 2000

## NOTICE OF HEARING

Please take notice that the foregoing Motion will be called for hearing before a Justice of this Court on Wednesday, July 12, 2000, at 9:30 a.m., or as soon thereafter as counsel may be heard.

CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of June, 2000, I caused a true copy of the within Motion to be mailed, postage prepaid to Robert D. Wieck, Esq., and Denean M. Russo, Esq., MacAdams & Wieck, Inc., 101 Dyer Street, Suite 400 Providence, RI 02903.

MCADAMS & WECK INCORPORATED
RECEIVED
SEP 7 2000

STATE OF RHODE ISLAND
PROVIDENCE, SC.

SUPERIOR COURT

| | | |
|---|---|---|
| LOUIS A. GENCARELLI, SR., Plaintiff, | : | |
| v. | : | C.A. No. 00-1732 |
| 1500 MINERAL SPRING ASSOCIATES, LP, et al. Defendants. | : | |

**MEMORANDUM OF LAW OF PLAINTIFF, LOUIS A. GENCARELLI, SR., IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Louis A. Gencarelli, Sr. (hereinafter "plaintiff" or "Gencarelli"), submits this memorandum of law in support of his motion for summary judgment.[1]

*INTRODUCTION*

This dispute arises from two contracts that were signed on November 1, 1999, between the Gencarelli, and the defendants, 1500 Mineral Springs Associates, LP and 1800 Smith Street Associates, LP. Jason's Realty Corporation served as general partner for both Mineral Spring Associates and Smith Street Associates. These corporate entities are controlled by Benjamin Sisto (hereinafter "defendants" or "Sisto"). The contracts are virtually identical and are attached hereto as Exhibits A and B (hereinafter "agreements"). An addendum was executed for each of the agreements on November 4, 1999, copies of which are attached as Exhibits C and D.

The agreements contemplated the leasing of two properties owned by Sisto at 1500 Mineral Spring Avenue and 1800 Smith Street, North Providence, Rhode Island.

[1] This lawsuit has been consolidated with *1800 Smith Street Associates, LP, et al. v. Louis A. Gencarelli, Sr.*, C.A. No. PC 00-3174 and *1500 Mineral Spring Associates, LP, et al. v. Louis A. Gencarelli, Sr.*, C.A. No. PC 00-3175, pursuant to an order entered by this Court on July 12, 2000. Each of these lawsuits arise from the same set of facts and involve identical issues of law.

Gencarelli intended to build and operate two Bess Eaton facilities on those sites. The agreements contained an initial, 120-day exploratory or due diligence period in which the parties were required and obligated to satisfy certain preconditions and/or contingencies. If all of the preconditions and/or contingencies were satisfied by the parties, then, on the 121st day, the contracts would ripen into a landlord/tenancy relationship with Sisto as the landlord, and Gencarelli as the tenant. If all of the preconditions and/or contingencies were not satisfied, the contracts would automatically terminate on the 120th day.

The agreements contained a number of identical conditions precedent, that were to be satisfied by Sisto before *any* obligation arose on behalf of Gencarelli. Sisto's obligations included: (a) the preparation and delivery of environmental assessment reports, and (b) the preparation and delivery of boundary surveys, for both properties. Sisto failed to satisfy each of these preconditions.

The addenda, executed on November 4, 1999, specified that the contracts *were to remain in escrow* until such time as the parties agreed to the language to be contained in three exhibits for the agreements. The parties never agreed to the language and information to be contained in the exhibits.

As set forth more fully below, Gencarelli had no obligation to perform under the contracts since Sisto failed to satisfy the preconditions set forth in the agreements. Further, the parties' failure to agree to the language to be contained in Exhibits A through C of the agreements rendered the agreements void *ab initio*, pursuant to the express language contained in the November 4, 1999 addenda.

## *STATEMENT OF UNDISPUTED FACTS*

On November 1, 1999, Gencarelli and Sisto entered into two agreements entitled, Absolute Triple Net Bonded Land Leases. *See*, Exhibits A and B. Addenda to the aforesaid agreements were executed by the parties on November 4, 1999. *See*, Exhibits C and D. Furthermore, pursuant to the addenda, the agreements were to remain in escrow until such time as the parties agreed to the following definitions and conditions to the lease agreements: (1) the "demised premises site plan and description," (2) the "building, structure, sign specifications," and (3) the "cross easement site plan and description." *See*, Exhibits C and D. The parties never agreed to these terms and conditions. *See,* Exhibit E, Affidavit of Gencarelli at ¶ 3.

Pursuant to Section 1(a) of the agreements, Sisto was required to have environmental assessment reports completed for both parcels of land to be leased by Gencarelli. The agreements stated that as a "condition precedent," Sisto was to "obtain at its own expense and deliver to Lessee [Gencarelli] an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's lender, (which satisfaction shall not be reasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of the Lease..." Gencarelli never received the written environmental assessment reports. *See,* Exhibit E, Affidavit of Gencarelli at ¶ 6.

Sisto was also contractually required to provide Gencarelli with "a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within sixty (60) days after execution" of the lease. *See*, Section 1(a) of Exhibits A and B. Sisto provided a hand drawn boundary survey of one of the properties

(1800 Smith Street). *See*, Affidavit of Gencarelli at ¶ 7. The survey was inadequate and unsatisfactory and Gencarelli requested that the survey be prepared in a computerized assisted drawing (CAD) format. *Id.* While Gencarelli's representatives repeatedly requested a CAD formatted survey, Sisto never complied. *Id.* Additionally, Sisto did not deliver a CAD formatted survey for the second property (1500 Mineral Springs Avenue) until February 16, 2000, which was one hundred and six (106) days after the agreements were executed -- well beyond the sixty (60) day time limit contained in the agreements. *Id.*, at ¶ 8.

On February 29, 2000, Gencarelli gave Sisto notice that the agreements had automatically terminated, a copy of which is attached hereto as Exhibit F.

*ARGUMENT*

*Standard for Granting Motion for Summary Judgment*

Pursuant to Rule 56(a) of the Superior Court Rules of Civil Procedure, where the pleadings and other submissions "show there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law," the court should grant summary judgment. *E.g., Holliston Mills, Inc. v. Citizens Trust Co.*, 604 A.2d 331, 334 (R.I. 1992). Summary judgment is a means of "curtailing litigation in its early stages if it is found that no genuine issue of material fact requires resolution." *E.g., Trend Precious Metals Co. v. Sammartino, Inc.*, 577 A.2d 986, 988 (R.I. 1990). The principles involved in granting summary judgment are the same when the underlying action is one for declaratory judgment. *Sjogren v. Metropolitan Property and Casualty Ins. Co.*, 703 A.2d

608, 610 (R.I. 1997); *Sisters of Mercy of Providence, Inc. v. Wilkie*, 668 A.2d 650, 652 (R.I. 1996).

This case is ripe for summary disposition since it involves the interpretation of express contract language and, as such, presents questions of law for the court to decide. *Beckwith v. Rhode Island School of Design*, 122 R.I. 93, 98-99, 404 A.2d 480, 483 (1979). "Only when disputed issues of fact concerning the terms of a contract exist, should a jury become involved with questions relating to the legal effect of a written instrument." *Id.* "[C]lear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions." *Elias v. Youngken*, 493 A.2d 158, 163 (R.I. 1985); *Durapin, Inc. v. American Products, Inc.*, 559 A.2d 1051, 1056 (R.I. 1989). Inasmuch as the express language contained in both the agreements and addenda provided that the agreements would not be binding in the absence of certain conditions which ultimately were not satisfied, this Court should grant summary judgment in favor of Gencarelli, as a matter of law.

*Sisto's Failure to Fulfill the Conditions Precedent Expressly Set Forth in the Agreements Discharges Gencarelli from His Obligation to Perform.*

The agreements unambiguously establish express conditions precedent to Gencarelli's performance of any obligation under the contract:

> [It] shall be a *condition precedent* to the Lessee's [Gencarelli's] performance of any obligation Lessee may have as Lessee hereunder that . . . (b) Lessor [Sisto] obtain at its own expense and deliver to Lessee an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's lender, (which satisfaction shall not be unreasonably withheld and/or delayed, from a licensed firm selected by Lessor within sixty

> (60) days after execution of this lease; (c) Lessor provide a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within sixty (60) days after execution of this lease; . . .

*See*, Section 1(a) of Exhibits A and B.

A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under the contract becomes due. Restatement (Second) of Contracts 2d, § 224 (1981). The failure to satisfy an express condition precedent to an agreement discharges the subsequent duty to perform. *Bradford Dyeing Ass'n, Inc. v. J. Stog Tec GMBH,* 1999 WL 360751 at *5 (R.I. Super. 1999) citing Restatement (Second) of Contracts §§ 225 and 261 (1981); *Oppenheimer & Co., Inc. v. Oppenheimer,* 86 N.Y. 2d 685, 690, 660 N.E. 2d 415,418 (1995) ["Express conditions must be literally performed."]; *Petricca Dev., LP v. Pioneer Dev. Co.,* 40 F. Supp. 2d 49, 54 (U.S.D.C. Mass. 1999) aff'd 214 F.3d 216 (1st Cir. 2000), ["Parties may establish any condition precedent they wish and 'if the condition is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced'."]; *Feinberg v. Berglewicz,* 32 Conn. App. 857, 862, 632 A.2d 709, 712 (1993) ["Because the condition was not satisfied, the contract was not binding."] *LaSalle Nat'l Bank v. Metropolitan Life Ins. Co.,* 18 F.3d 1371, 1374 (7th Cir. 1994) [Defendant was entitled to judgment as a matter of law after establishing that plaintiff failed to comply with the conditions precedent to a lease agreements.] As explained in Restatement (Second) of Contracts § 225 (1981):

> (1) Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused.

(2) Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur.

Indeed, the Rent Commencement Date was not to begin until the 120th day following the execution of the contracts. *See*, Exhibits A and B at p. 3.

*The Environmental Assessment Reports were not Prepared or Delivered to Gencarelli*

The environmental suitability of a property is a material issue in any real estate transaction, but even more so when the parties have freely contracted to make the term an express precondition. "Such an express condition has the sanctity of the promise itself and the will of the parties must be enforced." 5 Williston, Contracts §669, at 154 [3d ed.]; *Oppenheimer & Co., Inc. v. Oppenheimer,* 86 N.Y. 2d 685, 690, 660 N.E. 2d 415, 418 (1995). The environmental reports had to be satisfactory to both Gencarelli and his lender. *See*, Exhibits A and B, at Section 1(a). Sisto never provided the environmental assessment reports to Gencarelli. Thus, neither Gencarelli, nor his lender, had the opportunity to determine the environmental condition of the properties.

The agreements clearly required Sisto to deliver to Gencarelli the environmental assessment reports in writing within 60 days after execution of the agreements. As a matter of law, Sisto's failure to satisfy this condition negated any obligation of Gencarelli to perform.

*The Boundary Surveys were not Provided to Gencarelli in a Timely and Satisfactory Manner*

The agreements also required Sisto to provide satisfactory boundary surveys within sixty (60 ) days of the execution of the agreements. However, Sisto failed to provide the

survey for 1500 Mineral Spring Avenue until February 16, 2000, one hundred and six (106) days after the execution of the agreements. *See,* Affidavit of Gencarelli at ¶ 8. The surveys were due to be delivered on or before December 1, 1999. Sisto did forward a survey of the Smith Street property. However, the survey was hand-drawn and unsatisfactory; not only to Gencarelli, but also to Gencarelli's engineer, Mr. David Taglianetti. *See*, Affidavit of Gencarelli at ¶ 7. Sisto never delivered a CAD formatted survey.

As set forth in the agreements, the surveys had to be provided in a manner acceptable to Gencarelli. The request for a CAD formatted survey was a reasonable request, since it originated from Gencarelli's engineer. More fundamentally, the surveys were not provided within the sixty (60) day time frame. Pursuant to Section 1(a) of the lease agreements, Sisto's failure to timely provide the surveys was a "condition precedent to Lessee's performance of *any* obligation" under the agreements.

Due to Sisto's failure to fulfill two of the material conditions precedent, among others not set forth herein, the agreements were not binding and any obligation to perform on Gencarelli's part was discharged, as a matter of law.

*The Addenda Required the Agreements to Be Held in Escrow until the Parties Agreed to Certain Exhibits to be Attached to the Contracts*

Separate from the terms of the agreements, which were not satisfied by Sisto, the parties executed addenda that required the contracts to be "held in escrow until Exhibit A, Exhibit B and Exhibit C are agreed upon by the parties." *See*, Exhibits C and D.

The agreements state that the property to be leased is that property located at its street address and "as more particularly described in Exhibit 'A'". (Exhibits A and B, at p. 1). However, Exhibit A was never agreed upon and remains a blank sheet of paper in the agreements. Additionally, the agreements referred to Exhibit B, the particular description of the retail coffee shop to be built on the property, and Exhibit C, the cross-easement site plan and description. These descriptions were also never agreed to and remained blank sheets in the agreements. The express written language of the parties must prevail. *Elias,* 493 A.2d at 163; *Durapin,* 559 A.2d at 1056.

The exhibits were material conditions to the contract. For example, Exhibit C refers to the cross-easement of the parking lot located at the Smith Street property. It related to Gencarelli's use of a co-tenant's parking lot during certain hours of the day. It was not possible to prepare Exhibit C, since he was never provided an adequate boundary survey of the property. Inasmuch as Exhibit C could not be prepared and Exhibit A was never agreed upon, the agreements were to remain in escrow, according to the express terms of the addenda. Therefore, the agreements did not become legally effective.

*CONCLUSION*

For the reasons set forth above, Gencarelli's motion for summary judgment should be granted and this Court should declare that Gencarelli had no obligation to perform due to Sisto's failure to satisfy material preconditions specified in the contracts.

LOUIS A. GENCARELLI, SR.,

By his Attorneys,

Scott T. Spear #3189
Raymond A. Marcaccio #3569
BLISH & CAVANAGH
30 Exchange Terrace
Providence, RI 02903
Telephone: (401) 831-8900
Facsimile: (401) 751-7542

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September, 2000, I caused a true copy of the within document to be mailed, postage prepaid to Robert D. Wieck, Esq., and Denean M. Russo, Esq., MacAdams & Wieck, Inc., 101 Dyer Street, Suite 400 Providence, RI 02903.

hesseaton.min.sum.dec

HEARING DATE: NOVEMBER 21, 2000

MacADAMS & WIECK INCORPORATED
RECEIVED
NOV 10 2000

STATE OF RHODE ISLAND
PROVIDENCE, SC.

SUPERIOR COURT

| | | |
|---|---|---|
| LOUIS A. GENCARELLI, SR., Plaintiff, v. 1500 MINERAL SPRING ASSOCIATES, LP, et al. Defendants. | : | C.A. No. PC 00-1732 |
| 1800 SMITH STREET ASSOCIATES, LP, et al. Plaintiff, v. LOUIS A. GENCARELLI, SR., Defendant. | : | C.A. No. PC 00-3174 |
| 1500 MINERAL SPRING ASSOCIATES, et al. Plaintiff, v. LOUIS A. GENCARELLI, SR., Defendant. | : | C.A. No. PC 00-3175 |

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS APPEAL FOR FAILURE TO PAY RENT**

## I. *Introduction*

Plaintiff/Appellent, Louis A. Gencarelli, Sr. (hereinafter "Gencarelli") hereby submits this memorandum of law in opposition to the motion to dismiss filed by defendant/appellees, 1500 Mineral Spring Associates LP, by and through its General Partner, Jason's Realty Corp., and 1800 Smith Street Associates, LP, by and through its General Partner, Jason's Realty Corp. (hereinafter collectively referred to as "Sisto").

Gencarelli incorporates and relies upon his memorandum of law previously filed on September 6, 2000, in support of his motion for summary judgment.

## *II. LEGAL ARGUMENT*

### *A. Gencarelli never possessed Sisto's properties and, consequently, Gencarelli has no duty to pay rent to Sisto pending the determination of this appeal.*

Sisto moves to dismiss the appeals of Gencarelli from judgments entered in the Sixth Division District Court on June 15, 2000. In support thereof, Sisto relies upon R.I. Gen. Laws § 34-18.1-18, and contends that Gencarelli was required to pay rent to Sisto, pending the adjudication of the appeals. Having failed to pay such rents, Sisto claims that Gencarelli's appeals must be dismissed.

Sisto's reliance upon the aforesaid statute is misplaced. In pertinent part, the statute reads:

> Whenever an action for the *recovery of real property* covered by this chapter shall be pending on appeal in the superior or supreme court, the defendant or defendants in the action shall pay to the plaintiff or plaintiffs sums of money equal to the rent for the premises, which sums shall be paid at such times and in such amounts as rent would be due and payable were the action then not pending. The acceptance of this money shall not constitute a waiver of the right of the plaintiff or plaintiffs to obtain possession of the premises, nor shall the receipt thereof be deemed to reinstate the defendant or defendants as tenants.

R.I. Gen. Laws § 34-18.1-18 (emphasis added). The statute clearly applies only to actions for *recovery* of real property. The introductory sections of this legislation specifically state that "persons *in possession* of lands or tenements covered by this chapter as tenants by sufferance shall be liable to pay rent for such time as they may *occupy* or detain the same." R.I. Gen. Laws § 34-18.1-3 (emphasis added). In fact, the statutes are applicable only

where there is possession of commercial property by tenants at will, or by sufferance, or tenants by parol. See, generally, R.I. Gen. Laws § 34-18.1-2 through § 34-18.1-5. Each of these terms, "at will," "by sufferance," or "tenants by parol," are words signifying possession. The legislation seeks to protect landlords by requiring tenants to continue to pay rent pending the appeal of an adverse judgment where such tenant maintains possession of the landlord's property.

The requirements of R.I. Gen. Laws § 34-18.1-18 simply do not apply since Gencarelli does not have, and does not claim to have, a right to possess Sisto's properties. See, Exhibit A. In fact, Gencarelli never claimed to have a right to possess Sisto's properties.

As set forth more fully in Gencarelli's memorandum of law in support of his motion for summary judgment, this dispute arises from two *executory* contracts, signed on November 1, 1999 between Gencarelli and Sisto. Addenda to the contracts were executed on November 4, 1999. Each contract contained a 120-day period in which certain preconditions were required to be satisfied. If at the end of the 120 days, all such preconditions were satisfied, Gencarelli would *then* lease two parcels of land from Sisto. If the preconditions were not satisfied within 120 days, then neither party had any obligation to proceed under the agreements, i.e., the executory contracts would not ripen into a landlord/tenant relationship.

Without repeating the arguments set forth in Gencarelli's motion for summary judgment, Sisto had the initial burden to perform certain preconditions within the first 60 days, including the preparation of environmental audits on the properties:

> It shall be a *condition precedent* to the lessee's [Gencarelli's] performance of any obligation lessee may have as lessee hereunder... (b) that lessor obtain at its expense and deliver to lessee and environmental assessment report in writing, which is satisfactory to lessee and lessee's lender, (which satisfaction shall not be unreasonably withheld and/or delayed), from a licensed firm selected by lessor within sixty (60) days after execution of this lease;...

See, Exhibits A and B of Gencarelli's motion for summary judgment. Sisto never provided the environmental reports to Gencarelli.[1]

Sisto also failed to timely provide boundary surveys, pursuant to the clear terms of the agreements. Furthermore, pursuant to the November 4 addenda, the agreements were to remain in escrow until such time as the parties agreed to certain definitions and conditions that were to be set forth as Exhibits A through C in the agreements. These definitions and conditions were never agreed to by the parties. Exhibits A through C were never prepared and never became part of the agreements. Consequently, the contracts were to remain in escrow.

Since Sisto never satisfied the preconditions of the agreements, the relationship between Sisto and Gencarelli never ripened into a landlord/tenancy. Gencarelli never possessed Sisto's property as a tenant. Consequently, the requirements set forth in R.I.

---

[1] In response to discovery in the instant case, Gencarelli has finally received the environmental survey reports from Sisto. One report discloses the existence of environmental hazards that would have immediately resulted in the termination of negotiations between the parties. One of the sites to be leased was the subject of significant activity by the Department of Environmental Management. Approximately 1800 tons of contaminated soil were removed from the site, due to the release of petroleum product. Investigators also identified suspect asbestos containing materials, as well as PCB containing light ballasts and transformer components. Had this information been disclosed, Gencarelli would not have been able to qualify for financing. It is now manifestly clear why Sisto failed to provide the reports to Gencarelli.

Gen. Laws § 34-18.1-11, which relate to the recovery of real property, do not apply in these cases.

B. *The lower court never found in favor of plaintiffs for possession since Gencarelli is not a tenant on Sisto's properties.*

Sisto filed two trespass and ejectment actions in the Sixth Division District Court after Gencarelli notified Sisto that the executory contracts were terminated. The lawsuits were not proper since the agreements never ripened into a commercial tenancy. Gencarelli simply had no contractual obligations, as tenant or otherwise, since Sisto never satisfied each of his preconditions. Furthermore, a trespass and ejectment action was improper since Gencarelli had no actual or implied possession of the properties: As of the 120th day of the execution of the agreements, the relationship between the parties ended.

In response to Sisto's lawsuits, Gencarelli immediately filed a declaratory judgment action in the Superior Court, seeking a declaration by this Court of the rights and obligations of the parties to the executory contracts, pursuant to R.I. Gen. Laws § 9-30-1, *et seq.* That statute grants exclusive jurisdiction to the Superior Court to declare the legal rights, duties and obligations of the parties. Gencarelli also filed a consent stipulation with the lower court, indicating that Gencarelli "does not have and is not entitled to possession of the [properties]."

Defendant then filed a motion to stay the District Court action, pending a determination by the Superior Court of the rights and duties of the parties to the executory contracts. The lower court denied the motion to stay and held that it had the authority to declare the rights and obligations of the parties. Thus, the case was

improperly transformed from a trespass and ejection action into a declaratory judgment action in the district court.[2]

The case proceeded to trial at the time the motion to stay was denied. The focus of the trial was not the wrongful possession of the premises, but rather: (1) whether the preconditions had been satisfied and (2) if not, whether such failure was due to Gencarelli's conduct. Indeed, there was *no testimony from any party or witness relating to the possession of the premises by Gencarelli*, since defendant had no such possession. Every witness testified as to the efforts made by both parties to satisfy the preconditions of the agreement. Sisto's testimony focused on his assertion that Gencarelli implicitly permitted Sisto to satisfy the preconditions beyond the time deadlines contained therein.

The lower court's decision manifests the true nature of the proceeding. It makes clear that the proceeding was not for possession of rented property, but rather related to Gencarelli's alleged failure to act in good faith - thereby causing Sisto to not meet his contractual obligations. Implicit in the lower court's ruling is the determination that no landlord/tenant relationship existed since the preconditions were never met:

> This court found Mr. Sisto to be the more candid witness in terms of the circumstances which followed the execution of the lease herein in question. Moreover the court finds that his agreement like all such agreements assumes both of the parties will act in good faith as to meeting their respective contractual obligations; while the court finds plaintiff acted in this manner, it does not find the same was the case with defendant or his

---

[2] Gencarelli continues to assert that the district court lacked jurisdiction to make any contractual determination, since Gencarelli filed a declaratory judgment action. It is the exclusive jurisdiction of the Superior Court and Family Court to hear declaratory judgment actions. R.I. Gen. Laws § 9-30-1. Whether or not the preconditions to these executory contracts is a decision to be made, in the first instance, by this Court.

> agent. At the very best defendant's agent was lax (sic) in doing the things defendant had agreed to do when he entered the lease agreement. *Huff's actions caused the delay in getting the environmental report. He didn't do what had to be done to get town approval, etc.* For these reasons, plaintiff should and does prevail.

*See*, Exhibit C of Sisto's motion to dismiss (emphasis added). The court did not rule that Gencarelli was in possession of the premises, nor that he was to be ejected from the premises. The damages awarded by the court related to those *flowing from the purported bad faith of Gencarelli and the consequent failure of the contracts to ripen into a landlord/tenant relationship.* The facts that (a) the district court did not render an award for possession and (b) Gencarelli did not occupy the properties during the appeals, distinguish this case from the two Supreme Court decisions referred to in Sisto's memorandum of law. In both of those cases, the district court found for possession in favor of the landlord and the tenants continued to occupy the property, pending the appeals. *See*, *City of Providence v. S & J 351, Inc.*, 693 A.2d 655, 666 (R.I. 1997), and *Arcade Company v. Kent Co., Inc.*, 592 A.2d 135, 135 (R.I. 1992).

The statutory provision relied upon by Sisto only applies when a tenant is found to be in wrongful possession of another's property. Here, there is no question or even claim that Gencarelli possesses Sisto's properties. Consequently, the statutory rent requirement does not apply.

C. *This Court has previously ruled that this case, however denominated, is not a trespass and ejectment action but rather a breach of contract claim. Consequently, the statutory requirements relating to trespass and ejectment cases do not apply.*

Many aspects of this motion to dismiss have already been fully addressed by this Court. In June of this year, Sisto filed a similar motion to dismiss Gencarelli's appeal, contending that Gencarelli failed to post a bond to cover rent and damages, as required by R.I. Gen. Laws § 9-12-12. Gencarelli successfully argued that since he never had possession of the properties, and since a landlord/tenant relationship was never consummated, the lower court proceeding, however denominated, was not one for possession and the requirements of R.I. Gen. Laws § 9-12-12 do not apply.

The Court agreed and found that since (1) Gencarelli did not have possession of the properties and, indeed, filed a joint stipulation to that effect, and (2) since Sisto never satisfied the preconditions of the agreements, the district court "actions were not actions for possessions of commercial or other tenements, and accordingly, R.I. Gen. Laws § 9-12-12 and its bonding requirements do not pertain." See Exhibit B, decision of Silverstein, J., at 4. Similarly, in the instant motion to dismiss, Sisto once again relies upon a statute that applies only wherein "an action for the recovery of real property... pending an appeal in the Superior or Supreme Court." R.I. Gen. Laws § 34-18.1-18. These lawsuits do not seek to recover property, since Gencarelli never had possession.

Gencarelli also filed a motion to remove these cases from priority assignment on the trial calendar. Sisto objected, claiming that the cases were entitled to priority assignment, pursuant to R.I. Gen. Laws § 9-12-11. That statute allows for acceleration

only if the case is for tenements let, or held at will, or by sufferance, including leases of land... R.I. Gen. Laws § 9-12-11. The matter was heard on September 8, before Magistrate Judge Keough. A copy of the transcript is attached hereto as Exhibit C. Once again, the Court focused on the initial requirement set forth in the statute: possession of another's property. Since Gencarelli was not in possession of Sisto's property, and since the preconditions of the leases were never satisfied by Sisto, the cases were not entitled to an accelerated trial. See, Exhibit C, at 15-16.

*III. CONCLUSION*

For each of the reasons set forth above, Sisto's motion to dismiss should be denied.

LOUIS A. GENCARELLI, SR.,

By his Attorneys,

Scott T. Spear #3189
Raymond A. Marcaccio #3569
BLISH & CAVANAGH
30 Exchange Terrace
Providence, RI 02903
Telephone: (401) 831-8900
Facsimile: (401) 751-7542

CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of November, 2000, I caused a true copy of the within memorandum to be mailed, postage prepaid to Robert D. Wieck, Esq., and Denean M. Russo, Esq., MacAdams & Wieck, Inc., 101 Dyer Street, Suite 400 Providence, RI 02903.

**STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS**

**PROVIDENCE, SC.** **SUPERIOR COURT**

**1500 MINERAL SPRING ASSOCIATES, LP,**
**1800 SMITH STREET ASSOCIATES, LP,**
**AND JASON'S REALTY CORP.**

**PLAINTIFF**

**C.A. Nos: 00-1732, 00-3174, 00-3175**

***vs.***

**LOUIS A. GENCARELLI, SR.**

**DEFENDANT**

## DECISION

**INDEGLIA, J.**: This matter is before the Court on Plaintiffs' actions for rent and associated expenses on two leases with lessee Defendant and on Defendant's Complaint for Declaratory Judgment seeking a declaration of rights and obligations of the parties under the leases.[1] Over several days in December 2003, this matter was tried before this Court sitting without a jury. The parties have submitted post trial briefs and made oral arguments in support of their respective positions.

## FACTS AND TRAVEL

This dispute arises from two commercial leases that were executed as of November of 1999, between Plaintiffs 1500 Mineral Spring Associates, LP (hereinafter "MSA" or "Plaintiff"), and 1800 Smith Street Associates, LP (hereinafter "SSA" or



3-26-2004

"Plaintiff"), and Defendant Louis A. Gencarelli Sr. (hereinafter "Gencarelli", "Defendant", or "Lessee"). Bennie Sisto (hereinafter "Sisto", "Plaintiff", or "Lessor") is the President and majority stockholder of JASON'S REALTY CORP., the general partner of both MSA and SSA. At all times relevant hereto, Gencarelli had been President, CEO and Chairman of the Board of Bess Eaton Donut Flour Company.[2]

Negotiations between Sisto and Gencarelli began in 1998 when Sandra Salvadore (hereinafter "Salvadore"), the real estate broker for MSA and SSA, presented the subject properties to Tim Londregan (hereinafter "Londregan") of Londregan Real Estate, who then represented Bess Eaton. At that time, Londregan informed Salvadore that Bess Eaton was interested in both sites but could not act immediately. In February 1999, Salvadore once again contacted Londregan at which time Londregan proceeded to bring the subject properties to Gencarelli's attention. Gencarelli personally visited both sites with Salvadore, Sisto, Jason Sisto (Plaintiff's son) and Londregan.

In June 1999, Salvadore contacted Gencarelli and his attorney, Scott Spear, to discuss the properties, at which time Salvadore was informed that Gencarelli was now ready to proceed. Thereafter, the parties exchanged several draft letters with respect to each of the properties. In July of 1999, Salvadore forwarded site maps of both MSA and SSA to Bess Eaton. Peter Huff (hereinafter "Huff"), who was Bess Eaton's Director/Manager of Construction and Architectural Design at that time, was to review the identified Bess Eaton locations/sites and work with the contractors, engineers and attorneys that were necessary to complete the projects. On July 8, 1999, Huff prepared a

---

[1] The Plaintiffs actions are de novo appeals from the District Court which awarded judgment for Plaintiffs.
[2] It should be noted that in 2002, Defendant Gencarelli did not act as president of Bess Eaton. During 2002, the president of Bess Eaton was George Cioe. After 2002, Gencarelli resumed his position as president of Bess Eaton.

preliminary sketch/layout (not covering the entire parcel) of the proposed Bess Eaton donut shop on MSA and forwarded it to Salvadore and Gencarelli. On July 19, 1999, Huff prepared a preliminary sketch/layout (not covering the entire parcel) of the proposed Bess Eaton donut shop on SSA and forwarded it to Salvadore. From September 7, 1999, through the latter part of 1999, the parties negotiated and exchanged draft leases regarding the subject properties.

On November 1, 1999, Defendant entered into two five-year leases for MSA and SSA.[3] The Defendant intended to build and operate two Bess Eaton facilities on those sites, and both leases contained a number of identical conditions precedent that were to be satisfied by Defendant and by Plaintiff. The last paragraph of paragraph 1(a) in both leases, and paragraph 1(b) and 1(c) of both leases are identical, and provide as follows:

> "a. It shall be a condition precedent to the Lessee's [Gencarelli's] performance of any obligation Lessee may have as Lessee hereunder that: (a) all the permits and approvals be obtained necessary to construct a drive-thru coffee shop and bakery specifically including the drive-thru capability, the signage and exterior menu, except the condition to operate for 24 hours a day, (b) that Lessor obtain at its expense and deliver to Lessee an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's Lender, (which satisfaction shall not be unreasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of this lease; (c) that Lessor provide a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within (60) days after execution of this lease; (d) that all representations and warranties of Lessor herein are and continue to be true and accurate, (e) that Lessee obtain financing to construct the Building in an amount equal to eighty (80%) percent of all construction costs with financing at commercially acceptable terms and rates within one hundred twenty (120) days after execution

[3] The rent provisions in the leases state they are applicable for the "first five-year period, commencing on March 1, 2000."

> of this lease, (f) that Lessee obtain title insurance in a form sufficient to enable Lessee to obtain financing through the grant of a leasehold mortgage to construct and operate the proposed drive-thru coffee and bakery shop.
>
> b. The Minimum Base Rent Commencement Date shall be one hundred twenty (120) days after execution of the lease or upon Lessee opening for business, whichever is sooner. If the Lessee is unable to satisfy the above contingencies in which event this payment obligation shall cease, and this lease shall become null and void.
>
> c. The Additional Rent Commencement Date shall be November 1, 1999 and shall be paid from said date through the duration of the lease. If the Lessee is unable to satisfy the above contingencies within the 120 days after execution of this lease this payment obligation shall cease and this lease becomes null and void."

Additionally, the first sentence of paragraph 1(a) of the 1500 Lease also provides:

> "This lease is executed with the understanding and agreement that Lessor, at Lessor's expense, will demolish and remove all existing structures, buildings and improvements on the Demised Premises so the Lessee may construct buildings, fixtures and improvements on the Demised Premises. Lessee shall reimburse Lessor $7,800 for said costs."

The 1500 lease provided for a minimum base rent of $3,500.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000. The 1800 lease provided for a minimum base rent of $3,000.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000.

On November 4, 1999, two cover letters were delivered to MSA and SSA from Defendant, each stating the following:

> "Upon final review of the Agreement [Leases], I gave consideration to the possibility that I may encounter delays in the process of obtaining permits. In the event that I experience delays, court contests or appeals, I will need

> your agreement to extend the lease commencement date accordingly. The extension would not include the additional rent commencement date."

In response, both MSA and SSA executed their respective cover letter acknowledging that:

> "The content of this letter is acceptable on behalf of [1800 Smith Street Associates, LP or 1500 Mineral Spring Associates, LP as appropriate] and shall be deemed an amendment to the above referenced Land Lease."

Between November 1, 1999 and February 29, 1999, the parties exchanged several letters and corresponded through their respective agents, primarily Huff and Salvadore. The most pertinent of those communications are discussed herein. On December 20, 1999, Salvadore informed Gencarelli that Garafalo had been hired to perform the environmental reports for both Smith Street and Mineral Spring Avenue. Gencarelli acknowledged his acceptance thereof by executing each letter agreement at the bottom after the following language: "The content of this letter is acceptable on behalf of Bess Eaton Coffee & Bake Shop and shall be deemed an amendment to the above referenced Absolute Triple Net Bonded Land Lease." Sisto testified that he believed that Gencarelli's acknowledgement on and acceptance of the December 20, 1999 letter agreements meant that he was not going to enforce the 60 day deadline for delivery of the environmental reports.

During the trial, Salvadore testified that in December 1999 or January 2000, she contacted Huff to inquire as to Gencarelli's commitment on the Mineral Spring Avenue site and Huff responded that they were totally committed and to move forward with whatever needed to be done to get the site ready. Additionally, Sisto testified that in December 1999, he also had a conversation with Huff wherein Huff told him that they

were going forward with the deal and that they did not want to utilize the existing structures on Mineral Spring. Sisto further testified that in reliance on the above-stated conversations with Huff, in January 2000, MSA demolished and removed the existing brick buildings/ structures from the Mineral Spring Avenue property, and re-graded the site for construction.

On February 14, 2000, Salvadore met with two engineers from Garofalo at the Mineral Spring Avenue site, who were performing the Phase I site evaluation. At this time, Garofalo recommended that a Phase II subsurface investigation be performed on Mineral Spring Avenue because it was discovered that a gas station previously located on another piece of property upgrade from the Mineral Spring Avenue site had a leaking underground storage tank. During the trial, Salvadore testified that she telephoned Huff to inform him of the Phase II evaluation being performed and to ask Huff whether he wanted a written copy of the completed Phase I report. According to Salvadore, Huff told her "no" and to just go ahead with the Phase II evaluation. On February 24, 2000, the Phase II evaluation was being conducted. Salvadore testified that while she was at the Smith Street site, she telephoned Huff to inform him that Phase II was being performed on both properties that day and Huff expressed his pleasure with the progress. Salvadore's recollection of her telephone conversations with Huff is consistent with Gencarelli's testimony during trial in which he stated that receiving the written environmental reports on Mineral Spring Avenue and Smith Street within the 60 day time period set forth in the leases was not important to him.

Also, in February of 2000, the parties resumed correspondence relating to the obtaining of the necessary permits and approvals. By correspondence dated February 16,

2000, corporate counsel for Gencarelli/Bess Eaton, Scott Spear, told Salvadore to contact Attorney Ferrucci, who was engaged by Gencarelli to provide legal services with respect to the permitting process, and work directly with him on the permitting aspects of the projects. On February 17, 2000, Salvadore advised Huff, Attorney Spear and Attorney Ferrucci that the North Providence Town Planning Board Director had reserved two spots for the Smith Street and Mineral Spring Avenue proposals on the Planning Board's February 22 meeting Agenda, and that Bess Eaton needed to submit "something" to him. In response, Huff put together informational packages for each site, which were ultimately submitted to the Planning Board at its February 22, 2000 meeting. The sketch contained in the Smith Street package was the same sketch that was previously prepared by Huff on July 19, 1999 during negotiations between the parties. Likewise, the sketch contained in the Mineral Spring Avenue package is the same sketch that was previously prepared by Huff on July 8, 1999, during negotiations.

At the Planning Board's February 22 meeting, Huff made his presentation regarding each of the projects. The Planning Board took no formal action at this time because there was not a quorum present at that meeting. The matters were continued to the next meeting of the Planning Board, to be held on March 13, 2000. During the trial, Gencarelli testified that he was informed that the Planning Board reacted favorably to the projects, even though they could not take action.

Shortly before the end of the 120-day period set forth in the leases, Sisto sent invoices to lessee for each property, reminding Gencarelli of the rent commencement date and charging rent on each lease as of February 29, 2000. On February 29, 2000, Termination Notices were sent from Gencarelli to SSA and MSA that purported to

exercise Gencarelli's right to terminate the 1500 lease and the 1800 lease. Gencarelli bases his right of termination on the fact that all conditions precedent referenced in the leases were not accomplished within the 120 day time frame set forth in the leases.

**PLAINTIFF'S ARGUMENT**

The Plaintiff-lessor contends that the letters exchanged between the parties constituted a modification to each of the leases, evidencing the parties' intent not to be bound by a strict adherence to the 120 day period set forth in paragraph 1 of the leases. Lessor argues that the amendments to the leases clearly demonstrate that time was not of the essence and therefore, the lessee was not justified in terminating the leases because all of the conditions in the leases were not performed within the original 120 day time period. Furthermore, lessor asserts that even if Defendant did not expressly waive all of the time provisions set forth in the leases, Defendant's behavior up until his letter terminating the leases, was indicative of someone who intended to be bound by the leases and was satisfied with the progress being made.

While lessor concedes that he sent a bill for the base rent due 121 days after execution of the leases, lessor asserts that the bill for rent was a separate act that was not dependent upon the 120 day time period set forth in the leases, as these time limits had already been waived by the parties. Lessor maintains that even if the 120 day time period was not expressly waived by the amendments to the leases, lessee's actions manifested an implicit waiver of the 120 day time constraint in the leases. Consequently, the bill sent by lessor with regard to the properties in question was an independent act that did not carry with it any meaning other than to notify the lessee that the due date for the

minimum base rent was upon them. Additionally, lessor posits that he would have been willing to adjust the due date for the minimum base rent had the lessee opted to engage in discussions with the lessor regarding this matter. It is lessor's contention that up until the point that lessee informed lessor that he was terminating the leases, negotiations between the parties were extremely amiable and making additional accommodations had never posed a problem.

Furthermore, lessor argues that lessee should be held responsible for the rent on the lease because he did not fulfill his duty to use good faith, diligence and best efforts to obtain the necessary approval and permits within the 120 day time period. Lessor maintains that the provision allotting the lessee 120 days to secure financing before either party could terminate the lease assumed that the lessee would make reasonable efforts to secure said financing. Thus, even if the 120 day time period had not been waived by the parties, lessor contends that lessee would still be obligated to pay the rent on the leases, as the lessee did not even attempt to fulfill the condition pertaining to the 120 day time constraint.

Finally, lessor maintains that lessee should bear the costs incurred as a result of the demolition of the structures on the Mineral Spring Avenue site. Lessor argues that he reasonably relied on the representations of lessee and Huff that lessee had every intention of going forward with the leases, irrespective of any time frames originally set forth in the leases.

**DEFENDANT'S ARGUMENT**

Conversely, Defendant-lessee argues that when the conditions precedent were not accomplished within the 120 day time period set forth in the leases, the lessee's obligations to pay rent automatically ceased, and both leases became null and void. It is lessee's contention that the 120 day time period allotted in the leases was a strict time limit within which all of the conditions precedent set forth in the leases needed to be performed. Lessee asserts that because he was unable to obtain financing within 120 days following execution of the leases, under the terms of the agreements, his obligations under the leases automatically ceased. While the lessee does not contest that he was obligated to make reasonable efforts to obtain financing within the 120 days, as per the agreements, he maintains that the lessor's failure to perform certain contingencies, namely providing environmental assessments and boundary surveys in a timely manner, prevented him from obtaining financing within 120 days of execution of the leases, the nonoccurrence of which voided the agreements.

Moreover, lessee maintains that the lessor's bill for the base rent on the 121st day after execution of the leases undermines the lessor's position that the 120 day time provision in the leases was waived or modified by the parties. Lessee contends that if the lessor truly believed that the parties were no longer bound by the 120 day time period then lessor would not have sent out a bill for the rent exactly 120 days after execution of the leases, as provided for in § § b and c of the leases. It is lessee's position that the lessor's partial adherence to the aforementioned provisions, subsequent to the passage of the 120 day time period set forth in the leases, is demonstrative of the fact that lessor

intended to be bound by these provisions, regardless of any amendments made to the 60 day time period allotted for environmental assessments and boundary surveys.

Furthermore, it is lessee's contention that he should not be held responsible for the costs incurred due to the demolition of the structures on Mineral Spring Avenue because lessor was aware that under the terms of the lease, lessee's obligations on the leases would only be triggered if all conditions precedent were accomplished within the 120 day time frame set forth in the leases.

## DISCUSSION

The Rhode Island Supreme Court has repeatedly held that contracts which include provisions relating to performance at a fixed time are to be given a reasonable construction by the court, with regard being given to the surrounding circumstances and the parties' manifested intent. Safeway System, Inc. v. Manuel Bros., Inc., 228 A.2d 851, 856 (R.I. 1967); Furlong v. Barnes, 8 R.I. 226 (R.I. 1865). "A contract is not to be construed like a railway time-table." Furlong, 8 R.I. at 229. Additionally, when construing a contract that includes a provision relating to time limits, the burden of proof falls upon the party contending that time is of the essence. Sal's Furniture Co. v. Peterson, 133 A.2d 770, 773 (R.I. 1957).

In the present case, lessee has not demonstrated to this Court that time was of the essence in the lease agreements at issue. Although the leases do give a specific time frame for the completion of certain conditions, there is no explicit language in the leases themselves suggesting that these time frames are material or essential to the agreements. Moreover, the amendments to the leases, in which the lessee himself requested leniency

if he needed additional time to obtain permits and approvals, further suggests that the parties did not view the time element to be strict in nature.

This Court rejects lessee's position that language stating that the leases shall become null and void if the terms of the leases are not satisfied possess equivalent or even stronger meaning than the phrase "time is of the essence" because they signify an automatic nullification of the leases if the conditions do not occur within the 120 day time frame. Most contracts contain language that the contract will become null and void if the parties do not act consistently with the terms of the lease. That in itself however, does not suggest that time is of the essence. "That the parties to a contract intended to make time of the essence may appear by express stipulation therein or it may be found in the nature or purpose of the contract or in the circumstances under which it was made. There must, however, be some evidence from which such intent can be ascertained, and the party contending that time is of the essence of the contract has the burden of proof thereon." Sal's Furniture Co., 133 A.2d at 773.

Moreover, lessee's argument completely ignores the fact that he implicitly waived all time limits in the leases by voluntarily continuing with the contracts long after the 60 day time limit had not been met. "'A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive." Fairbanks, Morse & Co. v. Nelson, 217 F. 218 (9th Cir. 1914). In the case of Welsh v. Dick, 84 A. 769 (Pa. 1912), the court declared: "The right to insist upon time as the essence of a contract may be waived as effectually by implication as by express agreement, and whether there has been an

implied waiver in any case depends upon whether the conduct of the party seeking to invoke the strict provision of the contract had been such as to lead the other party to believe he would not be held to it, but might, notwithstanding it, proceed to perform." Although, lessee attempts to distinguish the 60 day time limit from the 120 day time limit by arguing that the 120 day time limit was more absolute, the facts of this case do not indicate that lessee made any such representations to that effect at any time throughout the parties' transactions.

Furthermore, "it is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring out that happening." Bradford Dyeing Associates, Inc. v. J. Stog Tech GmbH., 765 A.2d 1226, 1237-38 (R.I. 2001)(citing United States v. Croft-Mullins Electric Co., 333 F.2d 772, 775 n. 4 (5th Cir. 1964)) (quoting Gulf, Mobile& Ohio Railroad Co. v. Illinois Central Railroad Co., 128 F. Supp. 311. 324 (N.D. Ala. 1954)). In the present case, lessee made no attempts to secure financing for the properties within 120 days after execution of the leases. This Court rejects lessee's argument that he was prevented from fulfilling this condition due to the lessor's failure to provide environmental assessment reports and boundary surveys in a timely manner. If it truly was lessee's intent to be lenient with regard to the 60 day time constraint while enforcing a strict 120 day time limit, then it was the lessee's responsibility to clarify this when he realized that the lessor was not going to provide the necessary documents which would allow lessee to secure financing within the 120 days initially allotted. Rather than

making lessor aware of the fact that "time was of the essence", a term absent from the lease itself, however, lessee's behavior suggested that the original time constraints in the leases were unimportant. It is clear to this Court, that lessee knew well in advance of the 120th day following execution of the leases, that financing would not be secured in the time allotted in the leases.

In a recent case with facts very similar to the facts before this Court, the Rhode Island Supreme Court affirmed the trial court's finding that where conditions are made part of a contract, it is assumed that the parties to the contract will utilize good faith and due diligence in order to accomplish those conditions. See Ray LaCroix v. David F. Walker, 819 A.2d 1244 (R.I. 2003). This is especially true where the conditions in a contract particularly benefit or shield one party, as it is mutually assumed that the party for whom the condition is intended to protect will be using his best efforts to accomplish those conditions. See Safeway System, Inc., 228 A.2d at 853. In LaCroix, the parties entered into a five-year lease for three units in a building with the express purpose of operating a gym in the space leased. LaCroix, 819 A.2d at 1245. The lease included an express condition precedent which made the terms of the lease contingent upon the lessee's being able to obtain a license to operate a gym in the leased facility. Id. When the lessee and his architect could not reach an agreement regarding the removal of unit partitions, however, the lessee never applied for a license to operate the gym. Id. The Supreme Court declared that it was reasonable for the trial justice to conclude that the lessee breached the contract by failing to take "all necessary steps" to obtain a license, where the term "all necessary steps" meant that lessee was required to "at a minimum, submit a floor plan and apply to Gold's Gym for a license." Id. at 1246-47.

Lessee attempts to distinguish the facts in LaCroix from the facts in this case by arguing that in this case the conditions lessee had to fulfill were contingent upon the lessor's completion of its conditions. This argument does not have merit since the lessee implicitly waived the time limit for completion of the environmental assessments and boundary surveys and continuously acted in a manner that would lead a reasonable person to believe that he was not concerned with when those acts were to be performed. Here, lessee not only gave no indication to lessor that the 120 day time frame was still in effect, lessee also turned down the opportunity to secure financing when it presented itself.[4] Thus, it is apparent to this Court that lessee failed to use his best efforts in order to achieve the conditions within the 120 day time frame he depends on for nullification of the leases.

Additionally, lessee testified at trial that he was displeased when he realized that under the terms of the leases he was obligated to begin paying rent on the properties themselves before he had obtained all of the necessary permits and approvals from the Town of North Providence to build the donut shops. There is little question that Defendant viewed the parties' failure to adhere to the original terms of the agreements as an opportunity to terminate the leases and escape from what he viewed to be two disadvantageous commitments. During Defendant's deposition, Defendant conceded that he did not realize when he entered into the leases that under their terms he would potentially have to begin paying rent on the properties before he had obtained permits for

[4] In January 2000, Salvadore, Gencarelli and his son, Paul Gencarelli, met with a representative of NE Realty Resources, Inc., a financing source, at Bess Eaton in Westerly. NE Realty ultimately proposed financing to Bess Eaton to fund several of its projects, including the Smith Street and Mineral Spring projects, which had been discussed at their meeting. By correspondence to NE Realty dated January 31, 2000, Gencarelli declined the financing proposal stating "we have already secured sufficient financing to complete our development objectives for the next twelve months." This correspondence between

the Bess Eaton facilities. However, Defendant's displeasure with the agreements he made, no matter how disadvantageous, did not absolve him of his duty to act in good faith and to use his best efforts to timely obtain the permits and approvals in order to satisfy the conditions in the leases. See Bradford Dyeing Associates, Inc., 765 A.2d at 1238.

Although lessee had numerous opportunities to inform the lessor of his intent to disengage himself from the leases if all conditions were not accomplished by the 120 day mark, lessee and Huff engaged in several acts that were directly contrary to that intent. As of February 16, 2000, lessee's legal counsel had not yet filed the pertinent applications with the Town of North Providence and it was only due to the initiative of lessor and his real estate agent that the projects were placed on the agenda for the February 22, 2000 meeting for the North Providence Planning Board. That meeting was held only seven days preceding the 120 day deadline, yet none of the actions taken by lessee or those acting on his behalf indicated that there was any intent on the part of lessee to terminate the leases if all the conditions in the leases were not satisfied by the 120 day mark. At no time before, during or after this meeting, did either Huff or Ferrucci approach Sisto and inform Sisto of any urgency in obtaining approval for the permits and applications because the 120 day deadline was approaching. Lessee's complete failure to notify lessor of his intent to act in accordance with the 120 day time frame set forth in the leases when it was clear that the parties were not acting under that assumption for quite some time, served as an implicit waiver of the 120 day deadline. A contract deadline

---

Gencarelli and NE Realty evidences the fact that Gencarelli was not in a rush to secure financing within the 120 day time frame and that he was aware that he would be able to secure financing for these two projects.

may be expressly or impliedly waived by acts, words or conduct inconsistent with the deadline. CBS, Inc. v. Merrick, 716 F.2d 1292, 1295 (9th Cir. 1983)

With respect to the demolition costs incurred by lessor from the work done on the Mineral Spring Avenue site, this Court finds that lessor reasonably relied on Huff's statements in December 1999, that Defendant intended to follow though on the leases and wanted the structures on the Mineral Spring Avenue property taken down. At no time did lessee or Huff inform lessor that lessee did not intend to pay the expenses incurred as a result of this demolition if all conditions precedent were not accomplished within the 120 day time frame. A plaintiff's reliance upon a vague promise can be viewed as reasonable and justified, if the plaintiff had sufficient reason to believe that the defendants' commitment to an oral contract modification had been made. See GBM Acquisitions, Inc. v. Susan Adams d/b/a The Waterfront Cafe, 823 A.2d 1121, 1124 (R.I. 2003)

In the present case, several conversations between the parties supported lessor's objectively reasonable belief that both the 60 day deadline and the 120 day deadline had been mutually waived by the parties. Consequently, lessor had no reason to suspect that lessee was planning to extricate himself from the leases if the 120 day time deadline was not met. Moreover, lessee's assertion that it was lessor's choice to demolish the buildings before the 120 day deadline completely ignores the fact that in order to conduct a comprehensive environmental assessment of the properties as they would be when delivered to lessee, all unwanted structures needed to be removed in advance of the 120 day time frame.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Accordingly, after careful review of all the evidence introduced, the testimony of the witnesses and memoranda submitted by the attorneys, the Court makes the following findings of fact and conclusions of law.

1. On November 1, 1999, each of the Plaintiffs, MSA and SSA, entered into a commercial Absolute Triple Net Bonded Land Lease with Defendant Gencarelli, collectively referred to as the Leases. Both leases are for a five-year period, commencing on March 1, 2000, with the option of renewal.
2. On November 4, 1999, the parties agreed via cover letters, to amend the leases to include an agreement that if lessee encountered delays in the process of obtaining permits, the lease commencement date for the minimum base rent would be extended accordingly. These amendments were made at the request of Defendant Gencaralli.
3. The 1500 Lease provided that Lessor, at Lessor's expense, would demolish all existing structures on the Demised Premises for the Lessee's benefit, and Lessee would reimburse Lessor $7,800 for said costs. See, *supra*, Facts and Travel.
4. Both leases contained specific conditions precedent to any performance obligation of Defendant Gencarelli as Lessee. See, *supra*, Facts and Travel.
5. The 1500 Lease provided for a Minimum Base Rent of $3,500.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000. The 1800 Lease provided for a Minimum Base Rent of $3,000.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000.

6. On February 29, 2000, written notices were sent from Gencarelli to SSA and MSA that purported to exercise Gencarelli's right to terminate the leases. In each of the Termination Notices, Gencarelli asserted that the alleged failure to satisfy the lease contingencies "automatically voids the lease."
7. Prior to receiving the Termination Notices, Sisto had Invoices sent to Gencarelli for both Smith Street and Mineral Spring Avenue to remind Gencarelli of the minimum base rent commencement date under the leases.
8. Defendant Gencarelli, through his actions and the actions of those acting on his behalf, implicitly waived the 60 day time limit for the production of environmental assessments and boundary surveys, and the 120 day time limit for the securing of financing.
9. The phrase "time is of the essence" is not present in the leases and Defendant's behavior suggested that the original time constraints in the leases were flexible.
10. Defendant knew, or should have known well in advance of the 120th day following execution of the leases, that financing would not be secured in the time allotted in the leases.
11. Defendant breached his implied duty to act in good faith, with due diligence, and to use his best efforts to fulfill his conditions within 120 days after execution of the leases.
12. Up until the time that he sent the termination notices, Defendant, and all those acting on his behalf, manifested an intent to carry through on the leases, regardless of any time provisions originally set forth in the leases.

13. Plaintiffs reasonably relied on Defendant's actions in demolishing the structures on the Mineral Spring Avenue property, in accordance with the 1500 Lease.

14. Plaintiffs have tried to mitigate damages by attempting to sell and/or lease the Mineral Spring Avenue property and the Smith Street property. Despite their marketing efforts, however, they have been unsuccessful in consummating a sale or lease thus far.

15. Plaintiffs have satisfied the Court by a preponderance of the evidence that they are entitled to rent due under the two leases and demolition costs associated with the Mineral Spring Avenue property.

Accordingly, the Court finds for the Plaintiffs and orders Defendant to pay the Minimum Base Rent on both leases for the period commencing on March 1, 2000 through the present date, $3,500 per month under the 1500 Lease and $3,000 per month under the 1800 Lease. Defendant is also ordered to pay the Additional Rent (i.e. taxes and insurance costs/expenses) on both leases for the period commencing on November 1, 1999 through the present date. Additionally, Defendant is hereby ordered to pay for the demolition costs associated with the 1500 Lease in the amount of $7,800. Plaintiffs are entitled to recover from Defendant reasonable attorneys' fees and expenses incurred as a result of Defendant's default under the Leases.

Counsel shall prepare an order consistent with this decision.

(2)

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| LOUIS A. GENCARELLI, SR., | : | |
| | : | Bk. No. 04-10682 |
| Debtor. | : | (Chapter 11) |
| | : | |

FILED AUG 26 '04 16:06 USBCRI

**OBJECTION TO DEBTOR'S MOTION TO LIMIT THE ALLOWANCE OF CLAIMS OF 1500 MINERAL SPRING ASSOCIATES, LP AND 1800 SMITH STREET ASSOCIATES, LP**

NOW COME 1800 Smith Street Associates, LP and 1500 Mineral Spring Associates, LP, by and through their General Partner, Jason's Realty Corp. (collectively referred to herein as the "Creditors"), and hereby Object to Debtor Louis A. Gencarelli, Sr.'s Motion to Limit the Allowance of Claims pursuant to 11 U.S.C. §502(b)(6) which was filed on or about August 13, 2004.

A Memorandum in support of the Creditors' Objection is being filed contemporaneously herewith.

1500 MINERAL SPRING ASSOCIATES, LP, and 1800 SMITH STREET ASSOCIATES, LP, by and through their General Partner JASON'S REALTY CORP.

By their Attorneys,

/s/ Denean M. Russo

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: August 26, 2004

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the within Objection was sent, first-class mail, postage prepaid, on this 26th day of August, 2004, to the following:

Allan M. Shine, Esq.
Attorney Diane Finkle
WINOGRAD, SHINE & ZACKS, P.C.
123 Dyer Street
Providence, RI 02903

Joseph Ferrucci, Esq.
Ferrucci Russo P.C.
55 Pine Street
Providence, RI 02903

Leonard J. DePasquale, Esq.
Assistant United States Trustee
10 Dorrance Street
Suite 910
Providence, RI 02903

Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107

Lynn Kappelman, Esq.
Seyfarth Shaw LLP
World Trade Center East Building
Two Seaport Lane, Suite 300
Boston, MA 02210

Joseph V. Cavanagh, Jr., Esq.
Scott Spear, Esq.
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903

Thomas C. Angelone, Esq.
Hodosh, Spinella & Angelone
One Turks Head Place
Providence, RI 02903

Paul Reynolds, Esq.
Reynolds, DeMarco & Boland
170 Westminster Street
Suite 200
Providence, RI 02903

James Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903

Leland Goldberg, Esq.
Douglas Rainville, Esq.
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494

Richard Kremen, Esq.
Piper Rudnick, LLP
6225 Smith Avenue
Baltimore, MD 21209-3600

Thomas O. Bean, Esq.
Nutter McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604

John P. McCoy, Esq.
Carroll, Kelly & Murphy
One Turks Head Place
Suite 400
Providence, RI 02903

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Horton's
874 Sinclair Road
Oakville, Ontario CANADA L6K 1Y1

Robert E. Glass, Esq.
Lang Michener, LLP
BCE Place
181 Bay Street, Ontario CANADA M5I 2T7

Edwin Smith, Esq.
Mary DeNevi, Esq.
Bingham McCutchen, LLP
150 Federal Street
Boston, MA 02110

Edward J. Bertozzi, Esq.
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903

William J. Delaney, Esq.
Tillinghast, Licht, Perkins
Smith & Cohen, LLP
10 Weybosset Street
Providence, RI 02903

Stephen M. Litwin, Esq.
1 Ship Street
Providence, RI 02903

David S. Berman, Esq.
Riemer & Braunstein, LLP
Three Center Plaza
Boston, MA 02108

Charles Soloveitzik, Esq.
2 Elm Street, PO Box 216
Westerly, RI 02891

William Dolan, Esq.
Brian Lamoureux, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, RI 02903

Richard Pascal, Esq.
O'Brien, Shafner, Stuart, Kelly
& Morris
138 Main Street, PO Box 310
Norwich, CT 06360

Jim Petras
Sara Lee Coffee & Tea
935 National Parkway
Suite 93510
Schaumberg, IL 60173

Marc Wallick, Esq.
51 Jefferson Boulevard
Warwick, RI 02888

Peter Furness, Esq.
Brennan, Recupero, Cascione, Scungio
& McAllister, LLP
362 Broadway
Providence, RI 02909

Chad Dale, Esq.
Gadsby & Hannah, LLP
225 Franklin Street
Boston, MA 02110

Richard S. Mittleman, Esq.
Cameron & Mittleman
56 Exchange Terrace
Providence, RI 02903

Theodore Orson, Esq.
55 Dorrance Street, Suite 400
Providence, RI 02903

Michael P. Lynch, Esq.
117 High Street
P.O. Box 761
Westerly, RI 02891

Matthew J. McGowan, Esq.
Salter, McGowan, Sylvia & Leonard
321 South Main Street
Providence, RI 02903

Tony Corleto
Corleto & Associates
107 Mill Plain Road
Danbury, CT 06811

Carl Lisa, Esq.
Lisa & Sousa, Ltd.
5 Benefit Street
Providence, RI 02903

Michelle B. Daugherty

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\BANKRUPTCY PLEADINGS\Objection to Debtor's Motion to Limit Allowance of Claims

082404.doc

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| In re:<br><br>LOUIS A. GENCARELLI, SR.,<br><br>Debtor. | Bk. No. 04-10682<br>(Chapter 11) |

FILED AUG 26 '04 16:05 USBCRI

**MEMORANDUM IN SUPPORT OF OBJECTION TO DEBTOR'S MOTION TO LIMIT THE ALLOWANCE OF CLAIMS OF 1500 MINERAL SPRING ASSOCIATES, LP AND 1800 SMITH STREET ASSOCIATES, LP**

## I. INTRODUCTION

Claimants, 1800 Smith Street Associates, LP ("Smith Street") and 1500 Mineral Spring Associates, LP ("Mineral Spring"), by and through their General Partner, Jason's Realty Corp. (collectively referred to herein as the "Creditors"), hereby submit this Memorandum in support of their Objection to Debtor Louis A. Gencarelli, Sr.'s ("Gencarelli") Motion to Limit the Allowance of Claims pursuant to 11 U.S.C. §502(b)(6) ("Motion") which was filed on or about August 13, 2004.

As explained herein, §502(b)(6) is not applicable to the circumstances of this case in that Gencarelli has, at all times prior to the within Motion, asserted that no landlord/tenant relationship existed between the parties and that he never had possession of the subject premises. Thus, the status of the Creditors is no different than any other general unsecured creditor who had obtained a state court judgment against the debtor for damages resulting from the breach of a contract such as, for example, an unsecured promissory note. Even assuming, *arguendo*, that the §502(b)(6) "cap" is applicable to the Creditors' claims, the bankruptcy petition date (*i.e.*, March 3, 2004) is the operative date for purposes of calculating the Creditors' claims. Thus, as detailed herein, the Creditors' "capped" claims under §502(b)(6) would total as follows:

Mineral Spring = $262,202.82
Smith Street = $205,935.56

Finally, the unique pre-petition circumstances of this matter, and of Gencarelli's likelihood of receiving a significant distribution of surplus funds from his bankruptcy estate, warrant this Court's application of 11 U.S.C. §105 to prevent Gencarelli from using the bankruptcy process to avoid paying the Creditors interest and attorneys' fees to which they are lawfully entitled.

## II. PERTINENT BACKGROUND

The Creditors commenced two separate actions against Gencarelli in the Rhode Island District Court, Sixth Division, on or about March 28, 2000, for trespass, ejectment and the payment of rent, arising out of two long-term (*i.e.*, 20 years) commercial Absolute Triple Net Bonded Land Leases (the "Leases") between the parties dated November 1, 1999. *See* the Rhode Island District Court Complaints attached to Gencarelli's Memorandum in Support of his Motion at Exhibit C. The Leases covered certain real property owned by the Creditors located at 1500 Mineral Spring Avenue, North Providence, and located at 1800 Smith Street, North Providence (collectively, the "Properties"). Gencarelli was the President, CEO and Chairman of the Board of the Bess Eaton Donut & Flour Company, Incorporated ("Bess Eaton"), and desired to build a Bess Eaton donut shop on each of the Properties. In short, the Creditors alleged at all times that Gencarelli breached both of the Leases **and that Gencarelli's purported termination of both of the Leases was ineffective**. Thus, the Creditors sought recovery of the Minimum Base Rent and Additional Rent due and owing from Gencarelli as prescribed by the terms of the Leases, together with reasonable attorneys' fees and expenses.

In response to the actions commenced by the Creditors, Gencarelli filed a Complaint for Declaratory Judgment in the Providence County Superior Court on or about April 5, 2000 (C.A. No. 00-1732), seeking a declaration of the rights and obligations of the parties under the Leases

(the "DJ Action"). A copy of Gencarelli's Complaint for Declaratory Judgment is attached hereto as Exhibit 1.

After a trial conducted on May 23, 2000, the Rhode Island District Court (Pirraglia, J.), rendered a decision in favor of each of the Creditors. Judgments were subsequently entered by the District Court on June 15, 2000. Thereafter, on June 16, 2000, Gencarelli filed his Notices of Appeal from those Judgments to the Providence County Superior Court. By Order entered in the Superior Court on July 25, 2000, Gencarelli's DJ Action (C.A. No. 00-1732) was consolidated with the two appeals from the Judgments of the Rhode Island District Court (C.A. Nos. 00-3174 and 00-3175).

Importantly, Gencarelli consistently took the position that the parties formed a contract to enter into a commercial lease agreement only if certain specified conditions precedent were satisfied. In the Rhode Island District Court actions, Gencarelli strongly disputed that the Leases ever became valid and legally binding on the parties because those conditions were not met. Furthermore, Gencarelli always denied that he had possession or control of the Properties. *See* Gencarelli's Motions to Stay (without exhibits) dated April 6, 2000 attached hereto as Exhibit 2, and the Stipulations of the parties dated April 19, 2000 attached hereto as Exhibit 3. Similarly, in the Superior Court, Gencarelli strongly disputed that the Leases ever became valid and legally binding on the parties. Furthermore, Gencarelli firmly and consistently asserted that he never had possession or a right to the Properties because certain conditions were not satisfied and, as a result, the Leases did not "ripen into a landlord/tenant relationship." *See, e.g.*, Gencarelli's Motion to Consolidate dated June 29, 2000 attached hereto as Exhibit 4, Gencarelli's Memorandum of Law in support of his Motion for Summary Judgment (without exhibits) dated September 6, 2000 attached hereto as Exhibit 5, and Gencarelli's Memorandum of Law in

opposition to the Creditors' Motion to Dismiss Appeal for Failure to Pay Rent (without exhibits) dated November 9, 2000 attached hereto as Exhibit 6.

Over several days in December 2003, the consolidated actions were tried before the Superior Court (Indeglia, J.) sitting without a jury. In addition, pursuant to the trial justice's request, counsel for the Creditors and counsel for Gengarelli each prepared and filed lengthy and detailed Proposed Findings of Fact and Conclusions of Law, and a Post-Trial Memorandum on February 9, 2004. Post-trial oral argument was scheduled for hearing on March 3, 2004 at 2:00 p.m.

On March 3, 2004, prior to the filing of Gencarelli's Voluntary Bankruptcy Petition, Justice Indeglia heard oral arguments from both counsel and took the matters under advisement. Gencarelli's Bankruptcy Petition was filed after the parties had concluded all activity concerning the proceedings in the Superior Court and after the matters were taken under advisement by the trial justice. Thereafter, Justice Indeglia filed his written Decision in favor of the Creditors and against Gencarelli on March 26, 2004.[1] A true copy of the Decision is attached hereto as Exhibit 7.

On April 5, 2004, the Creditors moved for relief from the automatic stay imposed by 11 U.S.C. §362(a) for "cause" under §362(d)(1) to allow the Providence County Superior Court to enter final Judgments in the consolidated state court actions. Pursuant to a Consent Order executed by counsel for the Creditors and bankruptcy counsel for Gencarelli, and entered by this

---

[1] *See, e.g., In re Wilson*, 72 B.R. 956, 958 (Bankr.M.D.Fla. 1987), citing and discussing *In re Anderson*, 62 B.R. 448, 452-53 (Bankr.D.Minn. 1986) ("**Where parties to a proceeding have concluded all activity and the court** makes an oral ruling or **takes the matter under advisement prepetition,** the entry of a decision post-petition by the court is not an action which is stayed under §362(a). This situation is significantly different than if one of the parties tries to enforce the decision after it is entered post-petition, or takes some other type of affirmative action without first seeking relief from §362(a)." (emphasis added)).

Bankruptcy Court on June 15, 2004, relief from the automatic stay was granted. Justice Indeglia of the Superior Court had been advised of the status and entered Judgments in the state court actions on June 24, 2004.

On April 15, 2004, each of the Creditors filed their respective Proof of Claim with this Court. The amount of each claim consisted of two components: (a) the proposed amount of the final Judgment to be entered in the state court action consistent with Justice Indeglia's written Decision dated March 26, 2004; and (b) the estimated amount of the contingent future rent and "additional rent" under the subject lease, plus additional interest, attorneys' fees and expenses that would continue to accrue on the claim from and after March 31, 2004. Thus, Mineral Spring's claim was for: (a) Judgment amount of $314,059.78; and (b) $153,667.80 for future rent and "additional rent," plus all interest (including post-judgment interest), attorneys' fees and expenses that would continue to accrue on Mineral Spring's claim. Likewise, Smith Street's claim was for: (a) Judgment amount of $257,288.02; and (b) $118,969.26 for future rent and "additional rent," plus all interest (including post-judgment interest), attorneys' fees and expenses that would continue to accrue on Smith Street's claim.

## III. ARGUMENT

### A. 11 U.S.C. §502(b)(6) IS NOT APPLICABLE TO THE CREDITOR'S CLAIMS

As clearly evidenced by the documents attached hereto as Exhibits 1 –6, Gencarelli consistently took the position that the parties formed a contract to enter into a commercial lease agreement only if certain specified conditions precedent were satisfied. He firmly and consistently asserted in the state court proceedings that he never had possession or a right to possess the Properties because those specified conditions under the Leases were not satisfied and, as a result, the executed contracts did not "ripen into a landlord/tenant relationship."

Gencarelli's defense was entirely premised on his position that certain conditions precedent to the formation of a lawfully binding lease were not satisfied as prescribed by the Lease terms and, consequently, there was "no valid commercial lease agreement." *See* Exhibit 2.

Now, after the Superior Court has ruled against him and Judgments were entered for specified agreed-upon sums, Gencarelli seeks to utilize the limitation of §502(b)(6) of the Bankruptcy Code by arguing the complete opposite. In connection with the within Motion, Gencarelli presently asserts: that the Leases were valid and binding, and governed by the provisions of the Rhode Island Commercial Landlord and Tenant Act (R.I.G.L. §34-18.1-1 *et seq.*); that he had legal possession of the Properties which was purportedly "surrendered" by him and "repossessed" by the Creditors. Gencarelli should not be permitted to take such a diametrically opposite position to evade the full payment of the Judgments to the Creditors and ultimately put more money into his pocket to the detriment of the Creditors. Gencarelli should be bound by his position uniformly taken in the state court proceedings --- no legally effective Leases and no right to possession. Consequently, the Creditors should be treated no differently than any other general unsecured creditor who had obtained a state court judgment against the debtor for damages resulting from the breach of a contract such as, for example, an unsecured promissory note. In that situation, a creditor would have an unsecured claim for the entire amount of the judgment, inclusive of interest and all fees and charges provided for under the terms of the promissory note. In short, in light of the unique circumstances of this case as aforesaid, Gencarelli should be estopped from altering his position to manipulate the provisions of §502(b)(6) of the Bankruptcy Code for his benefit in order to railroad the Creditors. Thus, Gencarelli's request for the application of the §502(b)(6) "cap" to the Creditors' claims should be rejected by this Court.

B. EVEN ASSUMING, *ARGUENDO*, THAT THE §502(b)(6) "CAP" IS APPLICABLE TO THE CREDITOR'S CLAIMS, THE LIMITATION MUST BE CALCULATED FROM THE BANKRUPTCY PETITION FILING DATE

Section 502(b)(6) provides, in pertinent part, that:

> **Allowance of claims or interests**
>
> * * *
>
> (b) except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that –
>
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds –
>
> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of:
>
> (i) the date of the filing of the petition; and
>
> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>
> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

11 U.S.C. § 502(b)(6).

The purpose of the §502(b)(6) cap is to limit lease termination claims to prevent landlords from receiving a windfall over other general unsecured creditors. The cap was "designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 207-208 (3rd Cir. 2003) (quoting H.R.Rep. No. 95-595, at 353 (1977)). "Although Congress sought to limit the amount of damages that a landlord could recover from a bankrupt debtor, Congress only placed said

limitation on a landlord's claims for post-petition damages, 11 U.S.C. §502(b)(6)(A), while ensuring that said landlord recovers on those damages incurred up to the earlier of lease termination or the petition filing, 11 U.S.C. §502(b)(6)(B)." *In re Smith*, 249 B.R. 328, 334 (Bankr.S.D.Ga. 2000) (quoting *In re Fifth Avenue Jewelers, Inc.*, 203 B.R. 372, 379 (Bankr.W.D.Pa. 1996)).

It is well established that, prior to applying the limitation of §502(b)(6), the total amount of the Creditors' claims must first be determined by reference to the terms of the Leases and the application of pertinent state law. *See, e.g., In re Peters*, 2004 WL 1291125, *2 (Bankr.E.D.Pa. 2004); *In re Smith*, 249 B.R. at 329; *In re Fifth Avenue Jewelers*, 203 B.R. at 376. This total damage calculation has already been determined in the Superior Court proceedings and Judgments were entered in favor of the Creditors on June 24, 2004 (Judgment for Mineral Spring in the amount of **$314,059.78** and Judgment for Smith Street in the amount of **$257,288.02**). *See* the Creditors' Judgment Calculation attached to Gencarelli's Memorandum in Support of the within Motion at Exhibit B. In connection with the entry of those Judgments, Gencarelli **did not dispute** the elements or the accuracy of the Creditors' Judgment Calculation.

Next, the calculation of the "cap" under §502(b)(6) requires the initial determination of which date is earlier: the date the bankruptcy petition was filed or the date the leased premises were "surrendered" by the tenant and accepted or "repossessed" by the landlord. To determine whether a "surrender" and acceptance or "repossession" has occurred in this matter under §502(b)(6)(A)(ii), Rhode Island state law will apply. *See In re Peters*, 2004 WL 1291125 at *5; *In re Smith*, 249 B.R. at 334-336; *In re Fifth Avenue Jewelers*, 203 B.R. at 377-380. However, as demonstrated below, Gencarelli is now precluded from raising those issues as a result of the Superior Court proceedings and the entry of the Judgments.

The Doctrine of Res Judicata

The applicability of the doctrines of collateral estoppel (issue preclusion) or its sister doctrine res judicata (claim preclusion) is a question of law. *See, e.g., Porn v. National Grange Mutual Insurance Co.*, 93 F.3d 31, 33 (1st Cir. 1996). Under the doctrine of res judicata, a prior final judgment on the merits in a civil action involving the same party is conclusive with regard to any claims that were litigated, **or that could have been raised and litigated in that prior action**, and precludes the party from re-litigating those claims in a second action. *Porn,* 93 F.3d at 34; *Apparel Art International, Inc. v. Amertex Enterprises Ltd.*, 48 F.3d 576, 583 (1st Cir. 1995); *Gonzalez v. Banco Central Corp.*, 27 F.3d 751, 755 (1st Cir. 1994); *In re Belmont Realty Corporation*, 11 F.3d 1092, 1097 (1st Cir. 1993); *Aunyx Corporation v. Canon U.S.A., Inc.*, 978 F.2d 3, 6 (1st Cir. 1992), *cert. denied*, 507 U.S. 973, 113 S.Ct. 1416, 122 L.Ed.2d 786 (1993).

The policy underlying res judicata and collateral estoppel is to economize the judicial system's time and lessen the financial burden upon litigants, as well as to ensure that judicial resources are not wasted on multiple and possibly inconsistent resolutions. *See Apparel Art, supra*. As stated by the United States Supreme Court in *Astoria Federal Savings & Loan Assn. v Solomino*, 501 U.S. 104 (1991), there is a sound and obvious principle of judicial policy that:

> a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise. To hold otherwise would, as a general matter, impose unjustifiably upon those who have already shouldered their burdens, and drain the resources of an adjudicatory system with disputes resisting resolution.

*Id.* at 107-108.

As demonstrated herein, the application of the doctrine of res judicata is warranted under the circumstances of this matter.

1. Finality of Judgment

The Restatement (Second) of Judgments (1982) defines the element of finality of judgment as follows:

> The rules of res judicata are applicable only when a final judgment is rendered. However, for purposes of issue preclusion (as distinguished from merger and bar), "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.

*Id.* at §13. A judgment rendered in a case constitutes a final judgment with res judicata effect whether it is a default or summary judgment, or a judgment rendered after trial. *See, e.g., SMA Life Assurance Co. v. Sanchez-Pica*, 960 F.2d 274, 275 (1st Cir. 1992); *Rhode Island Hospital Trust National Bank v. Ohio Casualty Insurance Co.*, 789 F.2d 74, 81 at n. 10 (1st Cir. 1986); *Hazen Research, Inc. v. Omega Minerals, Inc.*, 497 F.2d 151, 154 (5th Cir. 1974).

Now, admittedly, Gencarelli has appealed the Judgments of the Superior Court. However, the preclusive effect of a lower court's judgment cannot be suspended simply by the taking of an appeal that remains undecided. *See* Wright & Miller, Federal Practice and Procedure, *Jurisdiction and Related Matters*, §4433, p. 305. The rule requires only that a judgment is final in the court rendering it and, thus **appellate remedies do not have to be exhausted before a judgment is considered final**. *Old Republic Ins. Co. v. Chuhak & Tecson, P.C.*, 84 F.3d 998, 1000-1001 (7th Cir. 1996) ("the doctrine of collateral estoppel, which requires only a judgment that is final in the court rendering it, and not a judgment that is final after exhaustion of appellate remedies"); *Williams v. Commissioner*, 1 F.3d 502, 504 (7th Cir. 1993) (loser need not exhaust appellate remedies for judgment to be final for preclusion purposes). Similarly, the First Circuit has found that a judgment has a "preclusive effect while appeal is pending." *See Belmont, supra*, at 1096 (citations omitted). Consequently, although Gencarelli

has filed an appeal from each of the Judgments, his appeal does not in any way affect the finality of the Decision of the Superior Court for purposes of this Court's analysis of the applicability of the doctrine of res judicata in this proceeding.

2. Identity of the Parties

Clearly, a party and its privies are bound by or entitled to the benefit of the rules of res judicata and collateral estoppel with respect to determinations made in a case to which they were parties. *See Belmont, supra*, at 1097; *Graff v. Motta*, 748 A.2d 249 (R.I. 2000). In examining the identity of the parties in the within Bankruptcy Court proceeding relating to the Creditors' claims and in the Superior Court proceedings, the parties are identical. Thus, Gencarelli is bound by the rules of preclusion. *See id.*

3. Related factual and legal issues could have been raised

Here, the Superior Court has made factual findings and rendered legal conclusions in favor of the creditors after a trial. Gencarelli deserves no rematch after a defeat he fairly sustained on the factual and legal issues relating to the rights and obligations of the parties under the Leases. Not once during the course of those state court proceedings did Gencarelli raise or assert a "surrender" or "repossession" argument in defense to the Creditors' claim that Gencarelli's purported termination of both Leases was ineffective, and therefore, the Creditors were entitled to the Minimum Base Rent and Additional Rent due and owing from Gencarelli as prescribed by the terms of the Leases. The "surrender" or "repossession" assertions **could have and should have been raised by Gencarelli and adjudicated in the Superior Court.** To the contrary, as explained above, Gencarelli steadfastly took the position that **the Leases never ripened into a landlord/tenant relationship and that he did not have possession of the Properties**. Clearly, the surrender or repossession of real property presupposes that an initial

rightful possession was relinquished or terminated at some point in time. Gencarelli always argued that he had no rights in the Properties under the Leases which could be terminated. Now, despite his prior contentions to contrary and to foster his own interests, Gencarelli is attempting to circumvent the payment of the Judgments by arguing a "surrender" and/or "repossession" under §502(b)(6)(A)(ii). Nevertheless, Gencarelli is barred by the doctrine of res judicata from doing so.[2]

Consequently, the "cap" date for purposes of applying the limitation imposed by §502(b)(6) must be the date the bankruptcy petition was filed, namely March 3, 2004. Utilizing the petition date as the "cap" date, the Creditors are entitled to the following **at a minimum** (*See* the Creditors' Judgment Calculation attached to Gencarelli's Memorandum in Support of the within Motion at Exhibit B):

1500 Mineral Spring:

| Pre-Petition | One Year/Post-Petition |
|---|---|
| (1) $175,000 Base Rent | (1) $42,000 Base Rent |
| (2) $26,938.75 Taxes | (2) $8,972.60 Taxes |
| (3) $1,241.47 Insurance | (3) $250 Insurance |
| (4) $7,800 Demolition Costs | |
| $210,980.22 | $51,222.60 |
| Total: **$262,202.82** | |

[2] Even if this Court determines that Gencarelli is not precluded from raising "surrender" herein, there is absolutely no evidence whatsoever anywhere in the Superior Court record to remotely suggest that the Creditors either expressly or impliedly accepted a "surrender" of the Properties from Gencarelli under Rhode Island law so as to waive their right to rent reserved under the Leases. Instead, the Creditors always asserted that Gencarelli breached both of the Leases and clearly notified Gencarelli that his purported termination of both of the Leases was **ineffective and did not relieve him of his obligations under the Leases**. Contrary to Gencarelli's suggestion, a "surrender" by operation of law requires more than the mere physical transfer of possession by the tenant. There must also be an acceptance on the part of the landlord whereby he gives up his right to the payment of future rent. *See, e.g., Lott v. Chaffee*, 46 R.I. 242 (1924) and *Smith v. Hunt*, 32 R.I. 326 (1911) (where lessee abandoned property held under a written lease, with full knowledge that the lessor had no intention of releasing him from his lease obligations, there was no acceptance of the surrender by the landlord even though landlord resumed possession before the expiration of the lease term). Furthermore, paragraph 6 in the Leases expressly reserves to the Creditors the right to reserved rent upon Gencarelli's default, notwithstanding the Creditors physical repossession of the Properties.

1800 Smith Street:

| Pre-Petition | One Year/Post-Petition |
|---|---|
| (1) $150,000 Base Rent | (1) $36,000 Base Rent |
| (2) $14,741.33 Taxes | (2) $3,505.44 Taxes |
| (3) $1,537.81 Insurance | (3) $150.98 Insurance |
| $166,279.14 | $39,656,42 |

Total: **$205,935.56**

First, with respect to the "Additional Rent" (taxes and insurance) claimed under the Leases, it cannot be disputed that those charges are included within the definition of "rent reserved" post-petition under §502(b)(6)(A) and "unpaid rent" pre-petition under §502(b)(6)(B). *See In re Peters*, 2004 WL 1291125 at *6 (citing *In re McSheridan*, 184 B.R. 91 (9th Cir. BAP 1995); *In re Smith*, 249 B.R. at 336-338 (applying the three-part test set forth in *McSheridan, supra*); *In re Fifth Avenue Jewelers*, 203 B.R. at 381 (applying the three-part test set forth in *McSheridan, supra*). The three-part *McSheridan* test to determine whether an additional charge is included within the cap under §502(b)(6)(A) & (B) is as follows:

> 1. The charge must (a) be designated as 'rent' or 'additional rent' in the lease, or (b) be provided as the tenant's/lessee's obligation in the lease;
> 2. The charge must be related to the value of the property or the lease thereon; and
> 3. The charge must be properly classifiable as rent because it is a fixed, regular or periodic charge.

*Id.*, 184 B.R. at 99-100.

Second, the demolition and removal costs reimbursement of $7,800 expressly provided for in the 1500 Mineral Spring Lease meets all three requirements of the *McSheridan* test. The Mineral Spring Lease states, at page 2, the following pertinent part:

> 1. Construction of Building:
>
> a. This lease is executed with the understanding and agreement that lessor, at lessor's expense, will demolish and remove all

> existing structures, buildings and improvements on the Demised Premises so the Lessee may construct buildings, fixtures, and improvements on the Demised Premises. **Lessee shall reimburse Lessor $7,800 for said costs.** (emphasis added)

Thus, the demolition reimbursement amount of $7,800 was specifically provided as Gencarelli's obligation in the Mineral Spring Lease. It is an express provision that was negotiated and agreed upon by the parties and is, obviously, related to the Mineral Spring Lease. Furthermore, Gencarelli's obligation was definite and for a fixed sum. Consequently, it is allowed to be included in the calculation of the pre-petition "unpaid rent" under §502(b)(6)(B).

In summary, the petition date is the operative date for purposes of applying the "cap" under §502(b)(6). Consequently, this Court must allow, **at a minimum**, the claim of Mineral Spring in the amount of **$262,202.82** and the claim of Smith Street in the amount of **$205,935.56**.

C. EVEN ASSUMING, *ARGUENDO*, THAT THE §502(b)(6) "CAP" IS APPLICABLE TO THE CREDITOR'S CLAIMS, THIS COURT'S EQUITABLE POWER UNDER 11 U.S.C.§105 SHOULD BE APPLIED IN THIS MATTER TO ALLOW THE CREDITORS' CLAIMS FOR PRE-PETITION, PRE-JUDGMENT INTERST AND ATTORNEYS' FEES

Based upon the same reasons previously set forth in Section A above, and for the additional reasons explained herein, the application of the Court's equitable power under 11 U.S.C. §105 should be applied in this matter. 11 U.S.C. §105(a) states:

> (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of any issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

Section 105(a) grants to the bankruptcy courts broad equitable power to regulate the use of the bankruptcy process and the conduct of the parties in bankruptcy court. Under this provision of

the Bankruptcy Code, this Court has the authority, as a matter of equity, "to prevent an abuse of process" by Gencarelli. Permitting Gencarelli to avoid the payment of the Creditors' claims for pre-petition, pre-judgment interest and attorneys' fees in this instance, due to the application of §502(b)(6), would clearly constitute an abuse of the bankruptcy process.

First, as discussed in Section A above, Gencarelli should be estopped from completely altering his prior "no valid Leases" and "no right to possession" arguments in order to rely upon the provisions of §502(b)(6) of the Bankrupcty Code to suit his needs at the detriment of the Creditors.

Second, as discussed in Section B above, Gencarelli is attempting an end-run around the Rhode Island Superior Court by altering his position and raising issues in this forum that could have been and should have been raised in the state court proceedings. Gencarelli's attempt must be precluded.

Finally, and perhaps most importantly is the fact that the intended purpose behind the "cap" of §502(b)(6) will not be served in this matter. As noted above, the purpose of the §502(b)(6) cap is to limit lease termination claims to prevent landlords from receiving a windfall over other general unsecured creditors. The cap was "designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 207-208 (3rd Cir. 2003) (quoting H.R.Rep. No. 95-595, at 353 (1977)). Here, Gencarelli's bankruptcy estate is highly solvent. Thus, as explained below, the aforesaid purpose of the statute will not be served by the application of §502(b)(6) to the unusual circumstances of this case:

(i) whether or not the "cap" is applied to the Creditor's claims, all of Gencarelli's creditors will be paid 100% of their allowed claims, together with interest;

(ii) whether or not the "cap" is applied to the Creditor's claims, Gencarelli's attorneys who litigated with the Creditors in the state court proceedings will be paid 100% of their claim for attorneys' fees (it is patently unfair that the Creditors who were successful in the state court proceedings would have to forego their attorney's fees that were awarded); and

(iii) even if there is no "cap" applied to the Creditor's claims, there will be a surplus of funds remaining in the estate after all creditors are paid, which funds will be distributed to Gencarelli. Consequently, if the Creditors are denied their claimed interest and attorneys' fees, an **additional windfall of surplus funds** will line Gencarelli's pockets even though the Superior Court awarded those funds to the Creditors.

## IV. CONCLUSION

For all of the reasons set forth above, this Court should deny Gencarelli's Motion to apply §502(b)(6) to the Creditors' claims.

1500 MINERAL SPRING ASSOCIATES, LP, and 1800 SMITH STREET ASSOCIATES, LP, by and through their General Partner JASON'S REALTY CORP.

By their Attorneys,

Denean M. Russo

Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams & Wieck Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: August 26, 2004

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the within Memorandum in support of Objection was sent, first-class mail, postage prepaid, on this 26th day of August, 2004, to the following:

Allan M. Shine, Esq.
Attorney Diane Finkle
WINOGRAD, SHINE & ZACKS, P.C.
123 Dyer Street
Providence, RI 02903

Joseph Ferrucci, Esq.
Ferrucci Russo P.C.
55 Pine Street
Providence, RI 02903

Leonard J. DePasquale, Esq.
Assistant United States Trustee
10 Dorrance Street
Suite 910
Providence, RI 02903

Harold B. Murphy, Esq.
D. Ethan Jeffery, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107

Lynn Kappelman, Esq.
Seyfarth Shaw LLP
World Trade Center East Building
Two Seaport Lane, Suite 300
Boston, MA 02210

Joseph V. Cavanagh, Jr., Esq.
Scott Spear, Esq.
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903

Thomas C. Angelone, Esq.
Hodosh, Spinella & Angelone
One Turks Head Place
Providence, RI 02903

Paul Reynolds, Esq.
Reynolds, DeMarco & Boland
170 Westminster Street
Suite 200
Providence, RI 02903

James Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903

Leland Goldberg, Esq.
Douglas Rainville, Esq.
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494

Richard Kremen, Esq.
Piper Rudnick, LLP
6225 Smith Avenue
Baltimore, MD 21209-3600

Thomas O. Bean, Esq.
Nutter McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604

John P. McCoy, Esq.
Carroll, Kelly & Murphy
One Turks Head Place
Suite 400
Providence, RI 02903

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Horton's
874 Sinclair Road
Oakville, Ontario CANADA L6K 1Y1

Robert E. Glass, Esq.
Lang Michener, LLP
BCE Place
181 Bay Street, Ontario CANADA M5I 2T7

Edwin Smith, Esq.
Mary DeNevi, Esq.
Bingham McCutchen, LLP
150 Federal Street
Boston, MA 02110

Edward J. Bertozzi, Esq.
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903

William J. Delaney, Esq.
Tillinghast, Licht, Perkins
Smith & Cohen, LLP
10 Weybosset Street
Providence, RI 02903

Stephen M. Litwin, Esq.
1 Ship Street
Providence, RI 02903

David S. Berman, Esq.
Riemer & Braunstein, LLP
Three Center Plaza
Boston, MA 02108

Charles Soloveitzik, Esq.
2 Elm Street, PO Box 216
Westerly, RI 02891

William Dolan, Esq.
Brian Lamoureux, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, RI 02903

Richard Pascal, Esq.
O'Brien, Shafner, Stuart, Kelly
& Morris
138 Main Street, PO Box 310
Norwich, CT 06360

Jim Petras
Sara Lee Coffee & Tea
935 National Parkway
Suite 93510
Schaumberg, IL 60173

Marc Wallick, Esq.
51 Jefferson Boulevard
Warwick, RI 02888

Peter Furness, Esq.
Brennan, Recupero, Cascione, Scungio
& McAllister, LLP
362 Broadway
Providence, RI 02909

Chad Dale, Esq.
Gadsby & Hannah, LLP
225 Franklin Street
Boston, MA 02110

Richard S. Mittleman, Esq.
Cameron & Mittleman
56 Exchange Terrace
Providence, RI 02903

Theodore Orson, Esq.
55 Dorrance Street, Suite 400
Providence, RI 02903

Michael P. Lynch, Esq.
117 High Street
P.O. Box 761
Westerly, RI 02891

Matthew J. McGowan, Esq.
Salter, McGowan, Sylvia & Leonard
321 South Main Street
Providence, RI 02903

Tony Corleto
Corleto & Associates
107 Mill Plain Road
Danbury, CT 06811

Carl Lisa, Esq.
Lisa & Sousa, Ltd.
5 Benefit Street
Providence, RI 02903

Michelle B. Daugherty

G:\Sisto, Bennie\Gencarelli, Louis A. Sr\BANKRUPTCY PLEADINGS\Memo in Supp of Objection to Debtor's Motion to Limit Allowance of Claims 082404.doc

STATE OF RHODE ISLAND
PROVIDENCE, SC.

SUPERIOR COURT

LOUIS A. GENCARELLI, SR.,
Plaintiff,

v.

C.A. No.

1500 MINERAL SPRING ASSOCIATES, LP,
1800 SMITH STREET ASSOCIATES, LP,
and JASON'S REALTY CORP.,
Defendants.

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Louis A. Gencarelli, Sr., brings this action for a declaratory judgment, pursuant to R.I. Gen. Laws § 9-30-1, *et seq.*, seeking a declaration of the parties' rights and duties under two lease agreements, executed on November 1, 1999.

### The Parties

1. Plaintiff, Louis A. Gencarelli, Sr., resides in the Town of Westerly, State of Rhode Island.

2. Defendant, 1500 Mineral Spring Associates, LP, (hereinafter "Mineral Spring Associates"), upon information and belief is a Rhode Island limited partnership with a principal place of business located at 20 Westminster Street, Providence, Rhode Island.

3. Defendant, 1800 Smith Street Associates, LP (hereinafter "Smith Street Associates"), upon information and belief is a Rhode Island limited partnership with a principal place of business located at 20 Westminster Street, Providence, Rhode Island.

MacADAMS & WIECK INCORPORATED
RECEIVED
APR 6 2000

4. Defendant, Jason's Realty Corporation, upon information and belief is a Rhode Island corporation and serves as the general partner of both Mineral Spring Associates and Smith Street Associates.

COUNT I
(Mineral Spring Associates)

5. As of November 1, 1991, Gencarelli, on the one hand, and Mineral Spring Associates, on the other, entered into an agreement entitled, Absolute Triple Net Bonded Land Lease, a copy of which is annexed hereto as Exhibit A.

6. An addendum to the aforesaid agreement was executed by Gencarelli and Mineral Spring Associates on November 4, 1999, a copy of which is annexed hereto as Exhibit B.

7. Pursuant to the addendum to the lease agreement, heretofore identified as Exhibit B, the lease agreement was to remain in escrow until such time as the parties agreed to the following definitions and conditions to the lease agreement: (1) the "demised premises site plan and description," (2) the "building, structure, sign specifications," and (3) the "cross easement site plan and description."

8. To date, the parties to the lease agreement have not mutually agreed upon the definitions and conditions set forth in the immediately preceding paragraph.

9. As expressly provided for by the addendum to the lease agreement, neither Gencarelli nor Mineral Spring Associates have any contractual duties, obligations, or expectations, since the parties did not agree to the material definitions and conditions set forth above.

10. Pursuant to Section 26(a) of the lease agreement, Mineral Spring Associates was required to conduct an initial environmental audit of the parcel of land to be leased by Gencarelli.

11. Pursuant to Section 1(a) of the lease agreement, Mineral Spring Associates was required to "obtain at its own expense and deliver to Lessee [Gencarelli] an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's lender, (which satisfaction shall not be reasonably withheld and/or delayed), from a licensed firm selected by Leasor within sixty (60) days after execution of the Lease..."

12. Pursuant to Section 1(a) of the lease agreement, the environmental testing and the delivery of the environmental assessment report were conditions precedent to Gencarelli's performance of any obligation under the aforesaid agreement.

13. Upon information and belief, Mineral Spring Associates never conducted the environmental testing required to be done pursuant to the lease agreement.

14. To date, Mineral Spring Associates has not provided Gencarelli with a copy of the environmental assessment report, as required pursuant to the express terms of the lease agreement.

15. Pursuant to Section 1(a) of the lease agreement Mineral Spring Associates was required to provide Gencarelli with "a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within sixty (60) days after execution" of the lease.

16. Defendant Mineral Spring Associates failed to provide a boundary survey of the parcel of land to be leased, within sixty (60) days after the execution of the lease agreement.

17. Pursuant to Section 1(a) of the lease agreement, the obligation of Mineral Spring Associates to provide the aforesaid boundary survey within sixty (60) days after the execution of the agreement was a "condition precedent to Lessee's [Gencarelli] performance of any obligation" under the agreement.

WHEREFORE, Plaintiff prays that this Court:

1. Interpret and construe the terms and conditions of the agreements and make a binding declaration concerning the rights, duties, and obligations of the parties;

2. Make a binding declaration that the aforesaid agreement does not impose any obligations upon either Gencarelli or Mineral Spring Associates since the material definitions and terms of the agreement were never mutually assented to;

3. Make a binding declaration that, in the event the lease agreement is legally binding upon the parties, Gencarelli has no duty to perform any obligation under the aforesaid agreement since Mineral Spring Associates failed to perform the conditions precedent set forth above, including the timely provision of an environmental assessment report and boundary survey;

4. Award such other legal and equitable relief as this Court deems necessary and just.

COUNT II
Smith Street Associates

18. As of November 1, 1999, Gencarelli, on the one hand, and Smith Street Associates, on the other, entered into an agreement entitled, Absolute Triple Net Bonded Land Lease, a copy of which is annexed hereto as Exhibit C.

19. On November 4, 1999, Gencarelli and Smith Street Associates executed an addendum to the agreement, a copy of which is attached hereto as Exhibit D.

20. Pursuant to the addendum to the lease agreement, heretofore identified as Exhibit D, the lease agreement was to remain in escrow until such time as the parties agreed to the following definitions and conditions to the lease agreement: (1) the "demised premises site plan and description," (2) the "building, structure, sign specifications," and (3) the "cross easement site plan and description."

21. To date, the parties to the lease agreement have not mutually agreed upon the definitions and conditions set forth in the immediately preceding paragraph.

22. As expressly provided for by the addendum to the lease agreement, neither Gencarelli nor Smith Street Associates have any contractual duties, obligations, or expectations, since the parties did not agree to the material definitions and conditions set forth above.

23. Pursuant to Section 26(a) of the lease agreement, Smith Street Associates was required to conduct an initial environmental audit of the parcel of land to be leased by Gencarelli.

24. Pursuant to Section 1(a) of the lease agreement, Smith Street Associates was required to "obtain at its own expense and deliver to Lessee [Gencarelli] an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's lender, (which satisfaction shall not be reasonably withheld and/or delayed), from a licensed firm selected by Leasor within sixty (60) days after execution of the Lease..."

25. Pursuant to Section 1(a) of the lease agreement, the environmental testing and the delivery of the environmental assessment report were conditions precedent to Gencarelli's performance of any obligation under the aforesaid agreement.

26. Upon information and belief, Smith Street Associates never conducted the environmental testing required to be done pursuant to the lease agreement.

27. To date, Smith Street Associates has not provided Gencarelli with a copy of the environmental assessment report, as required pursuant to the express terms of the lease agreement.

28. Pursuant to Section 1(a) of the lease agreement Smith Street Associates was required to provide Gencarelli with "a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within sixty (60) days after execution" of the lease.

29. Smith Street Associates failed to provide a boundary survey of the parcel of land to be leased, within sixty (60) days after the execution of the lease agreement.

30. Pursuant to Section 1(a) of the lease agreement, the obligation of Smith Street Associates to provide the aforesaid boundary surveys within sixty (60) days after the execution of the agreement was a "condition precedent to Lessee's performance of any obligation" under the agreement.

WHEREFORE, Plaintiff prays that this Court:

1. Interpret and construe the terms and conditions of the agreements and make a binding declaration concerning the rights, duties, and obligations of the parties;

2. Make a binding declaration that the aforesaid agreement does not impose any obligations upon either Gencarelli or Smith Street Associates since the material definitions and terms of the agreement were never mutually assented to;

3. Make a binding declaration that, in the event the lease agreement is legally binding upon the parties, Gencarelli has no duty to perform any obligation under the aforesaid agreement since Smith Street Associates failed to perform the conditions precedent set forth above, including the timely provision of an environmental assessment report and boundary survey;

4. Award such other legal and equitable relief as this Court deems necessary and just.

LOUIS A. GENCARELLI, SR.,
By his Attorneys,

Scott T. Spear (RM)

Scott T. Spear #3189
Raymond A. Marcaccio #3569
BLISH & CAVANAGH
30 Exchange Terrace
Providence, RI 02903
Telephone: (401) 831-8900
Facsimile: (401) 751-7542

Dated: April 5, 2000

PLAINTIFF DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.

# ABSOLUTE TRIPLE NET BONDED LAND LEASE

THIS INDENTURE, made as of the 1st day of November, 1999 by and between 1500 Mineral Spring Associates, LP with an address of 20 Westminster Street Providence, Rhode Island 02903 (hereinafter referred to as Lessor) and LOUIS A. GENCARELLI, SR., with a mailing address of 79 Tom Harvey Road, Westerly, Rhode Island 02891 (hereinafter referred to as Lessee).

W I T N E S S E T H :

That in consideration of the rents, terms and conditions herein reserved and contained on the part of the Lessee to be paid, performed and observed, Lessor does hereby lease and demise to Lessee that land situated in the Town of North Providence, and the State of Rhode Island, located on 1500 Mineral Spring Avenue, as more particularly described in Exhibit "A", attached hereto and made a part hereof (hereinafter called the "Demised Premises");

TO HAVE AND TO HOLD the same for an initial term of twenty (20) years commencing on the Commencement Date, as hereinafter defined, yielding and paying therefore, Minimum Base Rent and Additional Rent as follows:

## S U M M A R Y O F P A Y M E N T S

Minimum Base Rent: Commencing as of the Base Rent Commencement Date and continuing through the last day of the sixtieth (60th) month, Lessee agrees to pay to Lessor an annual minimum Base Rent of Forty Two Thousand and 00/100 ($42,000.00) Dollars payable in advance in equal successive monthly installments of Three-Thousand and 00/100 ($3,500.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of sixty-first (61st) month and continuing through, the last day of the second five year period, Lessee agrees to pay to Lessor an annual minimum Base Rent of Forty Six Thousand Two Hundred and 00/100 ($46,200.00) Dollars payable in advance in equal successive monthly installments of Three Thousand Three Hundred and 00/100 ($3,850.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of the one hundred twenty-first (121st) month and continuing through the last day of the third five year period. Lessee agrees to pay to Lessor an annual minimum Base Rent of Fifty Thousand Eight Hundred Twenty and 00/100 ($50,820.00) Dollars payable in advance in equal successive monthly installments of Four Thousand Two Hundred Thirty Five and 00/100 ($4,235.00) Dollars each on the first day of every calendar month during said period.

Commencing as of the first day of the one hundred eighty-first (181st) month and continuing through the last day of the fourth five year period. Lessee agrees to pay to Lessor an annual minimum Base Rent of Fifty Five Thousand, Nine Hundred Two and 00/100 ($55,902.00) Dollars payable in advance in equal successive monthly installments of Four Thousand Six Hundred Fifty Eight and 50/100 ($4,658.50) Dollars each on the first day of every calendar month during said period.

For any partial month at the beginning or end of the Term, Lessee shall pay a proportional share of the amount that would be due for a full month. In addition to the Base Rent, Lessee shall pay all Additional Rent and Rental Adjustments provided herein. All payments shall be made to Lessor at Lessor's address or such other place as Lessor may designate in writing, without prior demand and without deduction or offset.

Additional Rent: Commencing as of the Additional Rent Commencement Date, Lessee shall pay, when due, any and all costs and expenses directly attributable to the use, operation, maintenance, and repair of the Premises, including but not limited to, real estate taxes and all other assessments against the land as set forth in Paragraphs 8 and 9, and/or structure(s); personal property taxes; insurance; and all utilities, including but not limited to water, sewer, gas, phone, and electrical. This Additional Rent shall be paid during the full term of the Lease and through all extension periods thereof. Additional Rent payments shall be assessed and paid monthly.

This Lease is made on the following terms and conditions:

1. Construction of Building:

a. This Lease is executed with the understanding and agreement that Lessor, at Lessor's expense, will demolish and remove all existing structures, buildings and improvements on the Demised Premises so the Lessee may construct buildings, fixtures and improvements on the Demised Premises. Lessee shall reimburse Lessor $7,800 for said costs. Lessee shall rough grade the site at its own expense. It is understood and agreed that Lessee will erect on the Demised Premises a free-standing retail coffee shop and bakery building as more particularly described in Exhibit B, attached hereto and made part hereof (hereinafter called the "Building").

Prior to commencement of construction, Lessee shall present to Lessor certificates of insurance evidencing to the reasonable satisfaction of Lessor that Lessee has procured "builder's risk" insurance, so-called pursuant to a prepaid premium insuring Lessor and Lessee and Lessor's lender (when financing is obtained) as an additional insured for construction of the Improvements on the Property in such amounts reasonable for the construction contemplated hereby, and comprehensive public liability insurance insuring Lessor and Lessee as an additional insured against loss from and liability for damages on account of loss or injuries suffered by any person within or upon the Property. Such coverage and protection to be not less than a combined single limit of Two Million Dollars ($2,000,000.00).

In connection with any such construction and continuing thereafter Lessor shall cooperate with and if required join with Lessee in applying for such permits and approvals, including, but not limited to, any zoning changes, variances, whether for use or dimensional or set back requirements, zoning exceptions, curb cuts and sewer, water and other

utility tie-ins or connections, and building permits, as are required for the construction and the operation of a retail coffee shop and bakery with drive-thru capability and 24 hour operation. Any applications for permits (including demolition), approvals or variances shall be at Lessee's sole cost and expense. Lessor shall not be responsible for any portion of such costs, including filing fees, attorney fees or any other costs associated with such applications. The Lessee shall arrange for sufficient financing to pay for any construction which Lessee undertakes on the Demised Premise.

It shall be a condition precedent to the Lessee's performance of any obligation Lessee may have as Lessee hereunder that; (a) all the permits and approvals be obtained necessary to construct a drive-thru coffee shop and bakery specifically including the drive-thru capability, the signage and exterior menu, except the condition to operate for 24 hours a day, (b) that Lessor obtain at its expense and deliver to Lessee an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's Lender, (which satisfaction shall not be unreasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of this lease; (c) that Lessor provide a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within sixty (60) days after execution of this lease; (d) that all representations and warranties of Lessor herein are and continue to be true and accurate, (e) that Lessee obtain financing to construct the Building in an amount equal to eighty (80%) percent of all construction costs with financing at commercially acceptable terms and rates within one hundred twenty (120)days after execution of this lease, (f) that Lessee obtain title insurance in a form sufficient to enable Lessee to obtain financing through the grant of a leasehold mortgage to construct and operate the proposed drive-thru coffee and bakery shop.

b. The Minimum Base Rent Commencement Date shall be one hundred twenty (120) days after execution of the lease or upon Lessee opening for business, whichever is sooner. If the Lessee is unable to satisfy the above contingencies in which event this payment obligation shall cease, and this lease shall become null and void.

c. The Additional Rent Commencement Date shall be November 1,1999 and shall be paid from said date through the duration of the lease. If the Lessee is unable to satisfy the above contingencies within the 120 days after execution of this lease this payment obligation shall cease and this lease becomes null and void.

d. The Commencement Date of this Lease shall be November 1, 1999.

2. Quiet Enjoyment: So long as the Lessee keeps and performs all of his covenants and conditions under this Lease and is not in default, he shall have quiet, undisturbed and continued possession of the Demised Premises free from all claims against Lessor and all persons

claiming under, by or through Lessor.

3. Use and Occupancy: The Demised Premises may be used and occupied by Lessee for a retail store and/or restaurant including, but not limited to the operation of a retail store for the sale of bakery products, with drive thru capability, including, but not limited to, the sale of donuts, muffins and bagels and other pastries or bakery items of any kind, and for the sale of coffee, tea and other non-alcoholic beverages, and to provide tables, chairs and counters for patrons to sit while eating and drinking; or any other lawful purpose which (a) notwithstanding the foregoing provisions of this document, Lessee shall not have the right to use the Demised Premises for any use which directly competes with any business located on property owned by Lessor that is contiguous to or adjacent to the Demised Property, without Lessor's prior written consent, which consent shall not be unreasonably withheld or delayed and; (b) Lessee shall promptly observe and comply with all present and future laws, ordinances, requirements, orders, directives, rules, and regulations of federal, state, and municipal governments and all other government authorities applicable to the Premises with regards to Lessee's use thereof.

Lessee shall not cause any portion of the Demised Premises to be used for any banking purpose, whether commercial banking, retail banking, mortgage banking, insurance brokerage, insurance sales and/or securities brokerage.

Lessor shall not, during the term of this Lease or any renewal thereof, without Lessee's consent in writing conduct any business, lease or cause to be leased, any space which exclusively sells or serves pastry items, and/or donuts and/or muffins and/or bagels, and/or coffee or tea, or which is otherwise in substantial competition with the Lessee on or contiguous to or adjacent to the Demised Premises. Substantial competition shall mean stores with a similar format to Lessee including Dunkin Donuts, Honeydew Donuts, Starbucks, Café LaFrance and the like.

4. Alteration and Improvements: Lessee covenants that at the end of the initial term of twenty (20) years or any Extended Term, Lessee will at no cost to Lessor peaceably deliver up to Lessor or Lessor's heirs, executors, administrators, successors and assigns the Demised Premises. All buildings, erections, improvements, or fixtures, which are placed on the Demised Premises, not including Lessee's personal property and trade fixtures, shall remain as the property of the Lessor. Lessee may at it's own expense remove the façade or features of the building (without placing the structure in jeopardy) to eliminate the appearance of a Bess Eaton store. All alterations to the facade or other features must be replaced, at Lessees sole cost and expense with like kind materials and workmanship.

5. Assignment of Lease: Lessee shall not assign this Lease nor sublet the Demised Premises or any part thereof without the written consent of the Lessor, which consent shall not be unreasonably withheld. Notwithstanding anything to the contrary contained in this Lease, Lessee may assign or sublet the Lease to Bess Eaton Donut Flour Co., Inc. or a member of Lessee's immediate family so long as Louis A. Gencarelli, Sr., guarantees the Lease. As a condition of any

assignment or sub-let, Lessee shall personally guarantee the obligations of any assignee or sub-lessee if Lessor so demands. Except where consented to by Lessor, which consent shall not be unreasonably withheld, any sublease hereunder shall incorporate by reference the obligations of Lessee hereunder.

6. Default: In the event that any Rent, including Additional Rent, shall be in arrears and unpaid for five (5) days or more after receipt of notice from the Lessor that the same is unpaid provided, however, Lessor shall not be required to provide notice more than twice in any twelve month period for any particular monetary payment constituting Base Rent and Additional Rent, or if, after notice from Lessor of a default in the performance of any other covenant or condition herein contained and to be kept by Lessee, Lessee shall not have cured such default within the space of thirty (30) days after the receipt of such notice or if said default cannot be cured within such time, if Lessee shall not have commenced curing such default or shall thereafter fail diligently to proceed with and complete curing the same, or if Lessee shall at any time vacate the Demised Premises and not sublet the Premises as herein provided or make a general assignment for the benefit of his creditors or apply for relief under any bankruptcy or insolvency laws, or if Lessee shall be adjudicated a bankrupt, it shall be lawful for Lessor thereupon, or at any time thereafter, at Lessor's option, and with or without process of law, to exercise all rights and remedies at law or in equity, and to terminate this Lease and to enter upon the Premises and to expel Lessee and those claiming under Lessee without being guilty of any manner including but not limited to trespass, and thenceforth peacefully and quietly hold and enjoy the Premises as if this Lease has not been made; without prejudice, however, to any right to sue for and recover any Rent, Additional Rent, and other sums then and thereafter due under this Lease, or to any claim for damages or right of action or remedy for the preceding breach of covenant, agreement or condition herein contained which Lessor might otherwise have or use, plus reasonable attorneys' fees incurred by Lessor in enforcing its remedies hereunder.

In the event of default, this Lease shall not, except at the option of the Lessor, continue for the benefit of any attaching creditor, assignee for the benefit of creditors, permanent receiver, or trustee in bankruptcy. This Lease is a "shopping center lease", so-called, pursuant to the Bankruptcy Code. Upon default, Lessor's and Lessee's rights, remedies, and benefits under this Lease are not cumulative and shall not be exclusive of any other rights, remedies, and benefits allowed by law or equity.

7. Governmental Orders: Lessee shall comply with all requirements of the municipal or other governmental authorities relating to the operation of the business of Lessee at Demised Premises (with the right, however, to contest by appropriate legal proceedings at his sole cost, expense and risk and requirements which Lessee may regard as unlawful or improper), provided that Lessor is not at risk of forfeiture of the Demised Property.

8. Taxes: From the Additional Rent Commencement Date hereof until termination of the Lease hereunder, Lessee shall pay as Additional

Rent, all real estate and personal property taxes and other assessments whether general or special assessments on the Demised Premises and the improvements thereon. Lessee shall be obligated to pay only those installments of such taxes or assessments which are payable during the term hereof. Except as otherwise specifically stated above, nothing in this Lease shall be construed to require Lessee to pay any franchise, estate, inheritance, succession, capital levy, business tax or transfer tax of Lessor arising out of or connected with this Lease or Lessor's right in said premises, or any income, excess profit, or revenue tax or any other tax or import charged or levied upon the rentals payable by Lessee pursuant to this Lease, except any alternative method of taxing the use and occupancy of Lessee which replaces, substitutes and/or supplements real estate and/or personal property taxes as currently assessed and referred to. Lessee may contest and review by legal proceedings, instituted and conducted by him at his own expense, taxes, assessment, water rates, sewer charges or other charges imposed against the Demised Premises or improvements thereon. Notwithstanding anything to the contrary contained herein, Lessee shall be required to pay any taxes which he is contesting in good faith but not any interest, penalty, charge or assessment arising from Lessor's failure to pay taxes or assessments when due or otherwise arising from Lessor's misfeasance, nonfeasance or malfeasance. Lessee shall indemnify and hold harmless Lessor from and against any cost or expenses associated with any such contest.

Lessee shall furnish to Lessor evidence of the payment of the Taxes and Assessments within ten (10) days following the date upon which payment is due. In the event Lessee does not timely pay such taxes and assessments of any nature, Lessor shall be permitted to pay the same on behalf of Lessee and such payments shall constitute Additional Rent payable to Lessor by Lessee. Upon written demand from Lessor, together with evidence of Lessor's payments of such taxes and assessments, Lessee shall promptly reimburse Lessor or such payment together with interest actually charged.

9. Utilities: Lessee shall pay the cost of all water, sewer, electricity, heating and other utilities including the cost of use and maintenance and/or replacements in connection with the Demised Premises and/or any buildings it constructs on the Demised Premises from the Commencement date hereof and during the term hereof.

10. Mortgages:

a. Subordination: Lessee will, upon request of Lessor, execute such document or documents as may be reasonably required to subordinate its leasehold to any subsequent mortgage made by Lessor on the Demised Premises (after Lessee has completed construction upon the premises - which Lessor and Lessee acknowledge will require bank financing), provided that the mortgagee agrees to recognize the validity of this Lease, and so long as the Lessee is not in default of this Lease and performs its obligations under this Lease, not to disaffirm this Lease, to assume the Lessor's obligation under this Lease, and not to disturb Lessee's possession or use of the Demised Premises in accordance with this Lease, and executes and delivers to Lessee such document or documents as may be reasonably required to

effect and evidence such agreements by the mortgagee. If this Lease remains in full force and effect after the foreclosure of a mortgage upon the Demised Premises, Lessee agrees to recognize the mortgagee or the purchaser in foreclosure as Lessor under this lease and to execute such document or documents as may be reasonably required to evidence such attornment.

b. Leasehold Mortgages: Lessee shall have the right to mortgage his interest in this Lease under a "Leasehold Mortgage" or to make a "Collateral Assignment" of this Lease or of any of Lessee's rights hereunder as security for a loan to Lessee, but any such Mortgage or Assignment shall in all respects and at all times be subject to the provisions of this Lease. Any Leasehold Mortgage or Collateral Assignment by Lessee shall always be subordinate to Lessor's fee interest and to any present or future mortgage by Lessor. Lessee shall not obtain any mortgage and/or financing by Lessee for Lessee's construction, alterations, improvements or for any other purpose that involves a lien or encumbrance of Lessor's interest in the Demised Premises.

11. Condemnation:

a. Eminent domain; Cancellation. If, at any time during the continuance of this Lease, all or any portion of the Demised Premises or the improvement of any building located thereon is taken, appropriated or condemned by reason of eminent domain, the Lessor and Lessee shall divide the proceeds and awards in the condemnation proceedings, abate the rent, and make other adjustments in a just and equitable manner under the circumstances. If the parties cannot agree on a just and equitable decision, annual abatement of rent, or other adjustments within 30 days after the award has been made, the disputed matters shall, by appropriate proceedings, be submitted to a court having jurisdiction of the subject matter for its decision and determination. If legal title to the entire premises is wholly taken by condemnation, the Lease shall be canceled.

b. Apportionment. The deprivation of the Lessee's use of the buildings and improvements shall, together with the remaining term of the Lease, be an item of damage in determining the Lessee's portion of the condemnation award and the value of the land together with the remaining term of the Lease shall be an item of damage in determining Lessors award. It is the general intent of this Section that, upon condemnation, the parties shall share in their awards to the extent that their respective interests are depreciated, damaged, or destroyed by the exercise of the right of eminent domain. If the condemnation is total, the condemnation award shall be allocated so that the then value of the property, as if it were unimproved property, is allocated to the Lessor after giving due consideration to the number of years then remaining on the term of this Lease, and the then value of the building or buildings thereon is allocated between the Lessor and Lessee after giving due consideration to the number of years then remaining on the term of this lease and the condition of the buildings at the time of condemnation.

Notwithstanding anything to the contrary contained herein, Lessee shall be entitled to a separate award from the condemning authority for moving expenses, loss business and good will, and for its trade fixtures and equipment.

12. **Expenses, Improvements and Replacements:** It is the intention of the Lessor and Lessee that the Base Rent and Additional Rent herein specified shall be absolute and triple net, with no costs or services to the Lessor, in each year during the term and any extensions thereof of the Lease. Nothing in this Lease shall be deemed to require the Lessee to pay or discharge any liens or mortgages which are placed on the Demised Premises as a result of Lessor's action or inaction.

13. **Renewal Options & Holdover Tenancy:** Rent during the Renewal Option period shall be negotiated by the Lessor and the Lessee at least one (1) year prior to the expiration of the initial term. If the Lessee holds over after the termination of this Lease (including any renewal or option period), then the tenancy shall be from month-to-month in the absence of any written agreement to the contrary. Either party may terminate such month-to-month tenancy upon thirty (30) days written notice to the other party. Rent and Additional Rent obligations during such holdover period shall continue at a rate one and a half times (1½) the Rent obligation for the last month of the Lease term.

14. **Indemnity and Insurance:** Lessee will indemnify and hold harmless the Lessor from any liability by reason of personal injury or death to any person or persons or loss or damage to property on or about the Demised Premises. Lessee will carry ALL RISK fire, casualty, real estate, personal property, liability, general liability, public liability and loss of rent insurance in an amount reasonably satisfactory to the Lessor. Insurance policy shall be approved by Lessor, which approval shall not be unreasonably withheld or delayed, and name Lessor as additional insured, in the minimum amount of Two Million Dollars ($2,000,000) for injury to or death of any one person, and Two Million Dollars ($2,000,000) for injury to or death of any number of persons arising out of a single occurrence and Five Hundred Thousand ($500,000) Dollars for damage to property and will pay all premiums for said policies promptly when due and otherwise keep said policies in good standing. Lessee will provide Lessor with certificates thereof, will put the same into effect as of the date of Lease Commencement and will maintain all such policies or renewals thereof in effect during the Term and extended Terms of this Lease as well as during any period(s) in which Lessee occupies the Demised Premises.

Notwithstanding the foregoing, the Lessee shall not be required to indemnify or hold the Lessor harmless for any death or injury to any person or damage to any property due to the negligence of the Lessor, its agents, employees or contractors.

15. **Damage or Destruction:** Lessee shall, to the extent obtainable, keep all buildings and improvements placed on the Demised Premises insured for 100% of actual replacement cost against loss or damage by fire and all such other risks and hazards as are insurable under

present and future standard forms of fire and extended coverage insurance policies. In the event of any fire or other casualty insured against by Lessee's policies Lessor shall, at Lessee's request, assign to Lessee all of its rights, title and interest in any insurance proceeds, subject to Lessee's full replacement of the building and improvements. If the building or improvements on the Demised Premises shall be damaged or destroyed by casualty or fire, Lessee elects not to replace the building to original condition, Lessee shall not have the right to request any rights, title and/or interest in any insurance proceeds and Lessee shall have the option to terminate this Lease following such fire or casualty. Rent and additional rent shall abate during any period of untenantability caused by any damage to the buildings and/or improvements on the Demised Premises.

16. Signs: The Lessee shall have the right to place signs on the Demised Premises, including signs on the exterior of the building and on the curb area of the Demised Premises, provided that such signs comply with applicable State and Municipal regulations or are permitted by special use permit or variance.

17. First Refusal Purchase Option: Lessor shall not sell, or grant options with respect to or otherwise dispose of the Demised Premises or any part thereof to any direct or indirect competitor of Bess Eaton Donut Flour Co., Inc. unless Lessor shall first notify Lessee in writing stating the terms and conditions under which Lessor is willing to sell, or grant options with respect to or otherwise dispose of the Demised Premises and giving Lessee the Refusal Purchase Option to purchase said property pursuant to such terms and conditions as set forth in the then existing offer to purchase acceptable to the Lessor. If this first refusal purchase option is not exercised by Lessee within five (5) business days after such notice is received, Lessor may sell, and/or grant said property to another party pursuant to such terms and conditions. Notwithstanding anything to the contrary contained in this Lease, the Lessee's right of first Refusal Purchase Option contained herein does not apply to and is waived by Lessee and thus null and void with respect to transfers, assignments, sales, leases, inheritance, devise, grant, and/or bequests to relatives of the Lessor, his assignees, respective successors, heirs, kindred, and descendents, but Lessee's First Refusal Purchase Option shall thereafter remain in full force and effect. Notice of Lessee's Option shall be contained in all transfer documents.

18. Notice: All notices required to be given under this Lease or as provided by law shall be effective on receipt and shall be addressed to the Lessor or Lessee at the following addresses, until written notice is received that a different address is to be used, and such notices must be sent by certified mail, return receipt requested:

To Lessor: 1500 Mineral Spring Associates, LP<br>c/o SAF Management, LLC.<br>20 Westminster Street<br>Providence, Rhode Island 02903

With a copy to: The Discovery Group, LLC.
c/o Jason A. Sisto
P.O. Box 8801
Boston, Massachusetts 02114

To Lessee: Louis A. Gencarelli, Sr.
79 Tom Harvey Road
Westerly, Rhode Island 02891

With a copy to: Scott T. Spear, Esq.
BLISH & CAVANAGH
30 Exchange Terrace
Providence, RI 02903

19. Captions: The captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease nor the intent of an provision thereof.

20. Binding: The obligation of each party hereto shall be binding upon such party and upon the respective successors and assigns of the parties, as the case may be.

21. Counterparts: This Lease may be executed in any number of counterparts, each of which shall be an original and the counterparts shall constitute but one and the same instrument.

22. Modifications: This Lease may not be modified, altered, terminated or discharged orally, but only by an agreement, in writing, signed by the parties hereto.

23. Brokers: The parties recognize Sandra Salvadore of Metropolitan Commercial Property, Ltd. as the sole agent for the Lessor. The parties acknowledge there are no other brokers involved in this transaction other than Sandra Salvadore of Metropolitan Commercial Property Ltd. and the Lessee shall indemnify and hold the Lessor harmless from and against any and all claim or demand by any broker, or any person who claims to have dealt with the indemnifying party.

24. The submission by Lessee of this document for examination does not constitute an offer and this document shall become effective and binding only upon execution and delivery hereof by both Lessor and Lessee.

25. Lessor hereby represents and warrants to Lessee as follows:

a. Lessor is the owner of the Demised Premises in fee simple absolute.

b. There are no restrictions, encumbrances, covenants, easements, exclusive use provisions in other Lessor's leases or other agreements, laws or other ordinances or regulations which will prevent Lessee from occupying the Premises for the purposes provided herein or otherwise conflict with any provision of this Lease, to the best of its knowledge.

c. Lessor has full right and authority to enter into this Lease

and no joinder or approval of any other person or entity is required with respect to Lessor's right and authority to enter into this Lease.

d. To the best of its knowledge there is no oil or hazardous waste, material or substance on the Demised Premises as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency, and there are no violations of any federal or state law or municipal ordinance, order, or requirements of any governmental body or authority affecting all or any portion of the Demised Premises. Lessor, its successors or assigns agrees to indemnify and hold harmless the Lessee, its successors and assigns from any and all loss, cost, or damage, including attorneys' fees and court costs, which the Lessee, its successors or assigns, may sustain, suffer or incur as a result of any storage, disposal, release, escape, threat of release, presence on or transport to the Demised Premises of any oil or hazardous waste, material or substance as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency prior to the execution of this Lease or which results from the fault, act, omission, negligence or misconduct of Lessor, its agents, employees, and contractors or any predecessor in title.

Lessor will save Lessee harmless, and will exonerate, defend, and indemnify Lessee from and against any and all claims, liabilities or penalties (including attorney fees) asserted by or on behalf of any person, firm, corporation or public authority: (1) On account of or based upon any injury to persons or loss of or damage to property sustained or occurring on the Demised Premises on account or based upon the act, omission, fault, negligence, or misconduct of Lessor, its agents, employees, contractors or invitees to the full extent of any injury or damage not attributable to Lessee; (2) On account of or resulting from the failure of Lessor to perform and discharge any of its covenants and obligations under this Lease; and

Lessee, its successors or assigns agrees to indemnify and hold harmless the Lessor, its successors and assigns from any and all loss, cost, or damage, including attorneys' fees and court costs, which the Lessor, its successors or assigns, may sustain, suffer or incur as a result of any storage, disposal, release, escape, threat of release, presence on or transport to the Demised Premises of any oil or hazardous waste, material or substance as designated in any municipal, state or federal law or by the regulations of any municipal, state or federal governmental agency during the term of this Lease or which results from the fault, act, omission, negligence or misconduct of Lessee, its agents, employees, contractors, invitees, and/or licensees, to the full extent of any injury or damage not attributable to Lessor.

Lessee will save Lessor harmless, and will exonerate, defend, and indemnify Lessor from and against any and all claims,

liabilities or penalties (including attorney fees) asserted by or on behalf of any person, firm, corporation or public authority on account or based upon any injury to persons or loss of or damage to property sustained or occurring on the Demised Premises on account or based upon the act, omission, fault, negligence, or misconduct of Lessee, its agents, employees, contractors or invitees to the full extent of any injury or damage not attributable to Lessor.

26. Environmental Audit:

a. Owner Conducts Initial Audit (Initial Environmental Audit): On or before the delivery date, Lessor shall, at its sole cost and expense, provide tenant a Phase I environmental assessment of the Premises, together with additional reports and testing from an environmental consultant selected by the Lessor.

b. Lessee Conducts Update (Environmental Update): After lessee vacates the premises in accordance with the terms and conditions of this lease, but no later than 30 days after the expiration or sooner termination of this lease, Lessee shall, at its sole cost and expense, provide Landlord with a Phase I environmental assessment of the Premises, together with such additional reports and testing, including a Phase II environmental assessment if reasonably necessary in Landlord's sole discretion using the consultant who initially prepared the initial Environmental Audit or, if that consultant is not available, another licensed environmental consultant reasonably acceptable to Landlord, to determine the environmental status of the premises as of the date of that Environmental Update.

c. Lessee's Further Environmental Obligations: Lessee's obligations under this Section (including, without limitation, its redemption and indemnification obligations) shall be limited to any Hazardous Waste and/or contamination generated, stored, or disposed of by Lessee, it's agents, employees, contractors, invitees, licensees, and/or any other parties during the term or extended term of this lease, contrary to the provisions of this Lease which are revealed by the Environmental Update (or any inspection by the Landlord prior to Lessee's delivery of the Premises to Landlord), but which were not revealed by the Initial Environmental Audit. This clause shall survive the expiration or sooner termination of the Lease."

27. Lessor and Lessee agree that upon the request of the other, they will execute a memorandum of lease or short form lease for recording purposes which shall contain a Summary of the lease terms and right of first Refusal Purchase Option contained herein.

28. The Lessee shall not allow a lien and/or claim of any kind to be filed, including but not limited to liens and/or claims to be filed against the Lessor's interest in the Demised Premises, except for leasehold mortgages necessary to finance construction during the

continuance of this Lease. If such lien and/or claim is filed, the Lessee shall cause the Demised Premises to be released from the lien and/or claim within 60 days after the Lessor is given written notice that a claim has been filed, or within 60 days after the Lessor is given written notice of the claim and transmits written notice of its receipt to the Lessee, whichever 60-day period expires earlier. The Lessee will cause such release either by paying to the court the amount necessary to relieve and release the Demised Premises from the lien, or in any other manner which, as a matter of law, will result, within the 60-day period, in releasing the Lessor and its title from the claim.

29. **Force majeure:** If the Lessor or Lessee is delayed, hindered, or prevented from performing any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive government laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war, or other reason beyond its control, then performance of the act shall be excused for the period of the delay. In the event of a delay, the Commencement Date of the Rent payment obligations and Additional Rent payment obligations shall not be so extended. In that event, the period for the performance of the act shall be extended for a period equivalent to the period of the delay, provided that such extension shall not extend the term of this Lease.

30. Estoppel - Certificates: Either party shall, without charge, at any time and from time to time hereafter, within ten days after the others' written request of the other, certify by instrument duly executed and acknowledged to any mortgagee or purchaser or proposed mortgagee or proposed purchaser, or any other person, firm, or corporation specified in the request as to:

a. Whether this Lease has been supplemented or amended, and, if so, the substance and manner of the supplement or amendment;

b. The validity and force and effect of this Lease, in accordance with its tenor as then constituted;

c. The existence of any default thereunder;

d. The existence of all offsets, counterclaims, or defenses thereto on the part of the other party;

e. The commencement and expiration dates of the term of this Lease; and

f. All other matters that may reasonably be so requested.

Any such certificate may be relied upon by the party who requested it and any other person, firm, or corporation to whom it may be exhibited or delivered, and the contents of the certificate shall be binding on the party executing it.

31. **Waivers:** The failure of either party hereto to insist in any one or more instances upon the strict and literal performance of any of the agreements, terms, or conditions of this Agreement and Lease,

shall not be construed as a waiver for the future of such term, condition, or agreement.

32. **Covenants Running with Land; Binding Effect:** All covenants, conditions, and obligations contained herein or implied by law are covenants running with the land and shall attach and bind and inure to the benefit of the Lessor and Lessee and their respective heirs, legal representatives, successors, and assigns, except as otherwise provided herein. All covenants, conditions, and obligations contained herein or implied by law shall expire at the date of termination of this lease, except as otherwise provided herein.

33. Upon signing of this document, Lessor and Lessee acknowledge their willful, full, complete and total acceptance of the terms and conditions herein. Lessor and Lessee acknowledge that this agreement is a full, complete and total integration of the parties intent and that all previous warranties, guarantees, representations, (both oral and written), memorandums, letters, including but not limited to facsimiles and electronic mail, are null and void for the all purposes, including, but not limited to parol evidence. Lessor and Lessee acknowledge this agreement, exhibits, appendixes and all other contents attached to herein are a willful, final and complete binding commitment and representation between the Lessor and Lessee.

IN WITNESS WHEREOF, Lessor and Lessee have caused these presents and a duplicate of the same tenor to be executed on the day and year above written.

Witness:

[signature]

Lessor:

[signature]

1500 Mineral Spring Associates, LP

Witness:

[signature]

Lessee:

[signature]

Louis A. Gencarelli, Sr.

STATE OF Rhode Island
COUNTY OF Providence

In November, on the 10th day of 1999, before me personally appeared Jason Sisto, in his capacity as Vice President of Jason's Rec. Co. ______________ to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him so executed to be his free act and deed and the free act and deed of said entity.

Notary Public

My Commission Expires: 3/20/02

STATE OF RI
COUNTY OF Washington

In Westerly, on the 5th day of November, before me personally appeared Louis A. Gencarelli, Sr., to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him so executed to be his free act and deed and the free act and deed of said entity.

Notary Public

My Commission Expires: 2-13-02

EXHIBIT A
"Demised Premises Site Plan and Description"

EXHIBIT B

"Building, Structure, Sign Specifications"

EXHIBIT C

"Cross Easement Site Plan and Description"

Bess Eaton.
Coffee & Bake Shop

November 4, 1999

Mr. Bennie Sisto
1500 Mineral Spring Associates, LP
c/o SAF Management, LLC
20 Westminster Street
Providence, RI 02903

Reference: 1500 Mineral Spring Avenue, North Providence, Rhode Island

Dear Mr. Sisto:

I am pleased to enclose an original executed Absolute Triple Net Bonded Land Lease for property at 1500 Mineral Spring Avenue, North Providence, Rhode Island.

This Land Lease is being provided to you with the understanding that it will be held in escrow until Exhibit A, Exhibit B and Exhibit C are agreed upon by the parties. Obviously, I cannot agree to lease property that has not yet been defined

Additionally, upon final review of the Agreement, I gave consideration to the possibility that I may encounter delays in the process of obtaining operating permits. In the event that I experience delays, court contests or appeals, I will need your agreement to extend the lease commencement date accordingly. The extension would not include the additional rent commencement date.

If the contents of this letter are acceptable to you, would you please acknowledge your acceptance by executing the enclosed copy of this letter where indicated and returning the same to me.

Yours truly,

Louis A. Gencarelli, Sr.

*The content of this letter is acceptable on behalf of 1500 Mineral Spring Associates, LP and shall be deemed an amendment to the above referenced Land Lease.*

*1500 Mineral Spring Associates, LP*

*By:* Jason A. Sisto

Enclosure (1)

79 TOM HARVEY ROAD
WESTERLY RI 02891

(3)

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **In Re:** | : | |
| | : | |
| **Louis A. Gencarelli, Sr.** | : | **Chapter 11** |
| | : | **Case No. 04-10682** |
| **Debtor** | : | |
| | | |
| **Bess Eaton Donut Flour Company Incorporated** | : | |
| **d/b/a Bess Eaton Coffee and Bake Shop** | : | **B.K. NO.: 04-10630** |
| **d/b/a Bess Eaton Coffee Shop** | : | **Chapter 11** |
| **Debtor** | : | |

**DEBTOR LOUIS A. GENCARELLI, SR.'S MOTION FOR EXPEDITED HEARING UPON HIS MOTION TO LIMIT THE ALLOWANCE OF CLAIMS FILED BY CLAIMANTS, 1500 MINERAL SPRING ASSOCIATES, L.P. AND 1800 SMITH STREET ASSOCIATES, L.P.**

NOW COMES Debtor Louis A. Gencarelli, Sr. ("Debtor"), by and through counsel, and hereby moves this Court for an order expediting the hearing upon the Debtor's pending motion to limit the allowance of claims filed by Claimants 1500 Mineral Spring Associates, L.P. and 1800 Smith Street Associates, L.P. (collectively hereinafter as the "Landlords").

Specifically, the Debtor moves this Court for an order expediting the hearing upon the above-referenced motion, and, further, that the same be scheduled or assigned for hearing on an expedited or emergency basis not that the objection period relative to the subject motion has expired.

Respectfully Submitted:
LOUIS A. GENCARELLI, SR.

By his attorneys,

FERRUCCI RUSSO, P.C.
Joseph P. Ferrucci, Esq.
R.I. Bar No.: 4231
55 Pine Street, 4th Floor
Providence, RI 02903
Tel: (401) 455-1000
Fax: (401) 455-7778
Dated: 8/30/04

**CERTIFICATION**

I hereby certify that on the ~~30th~~ 31st day of August, 2004, I forwarded a true copy of the foregoing by regular mail, postage prepaid to the parties set forth on the attached list.

Brenda R. Vucci

**Please take notice:** That within ten (10) days after service (twenty (20) days for U.S. Government Officers and Agencies thereof), any party against whom a "Pleading" is filed, or any other party to the action who objects to the relief sought therein, shall serve and file an Objection to that Pleading. If no Objection is filed to a Pleading within the time prescribed herein, the Pleading will be deemed unopposed and will be granted, unless (1) the requested relief is prohibited by law; or (2) the requested relief is against public policy; or (3) in the opinion of the Court, the interests of justice requires *sua sponte* denial of the unopposed Motion.

**In re: LOUIS A. GENCARELLI, SR.**
**BK NO.: 04-10682**

**Service List**

Allan M. Shine, Esq.
Winograd Shine & Zacks
123 Dyer Street
Providence, RI 02903
(counsel to Bess Eaton)

Diane Finkle, Esq.
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903
(Counsel to Bess Eaton)

Harold B. Murphy, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors Committee)

Charles Bennett, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors Committee)

Scott Spear, Esq.
Blish & Cavanagh
30 Exchange Terrace
Providence, RI 02903
(Special Counsel to Bess Eaton)

William J. Delaney, Esq.
Tillinghast Licht Perkins Smith & Cohen LLP
10 Weybosset Street, Suite 1000
Providence, RI 02903
(Counsel to RDW Group)

Leonard De Pasquale, Esq.
United States Trustee
Suite 910
10 Dorrance Street
Providence, RI 02903

Douglas Rainville
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(CFO, COO of Bess Eaton)

Thomas O. Bean, Esq.
Nutter McClennan & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(Counsel to Perkins Paper Co.)

Richard Kremen, Esq.
Piper Rudnick, LLP
6225 Smith Avenue
Baltimore, MD 21209-3600
(Counsel to Sara Lee)

Leland Goldberg
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(Interim CEO Bess Eaton)

William M. Dolan, III, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, RI 02903
(Counsel to Washington Trust Co.)

Brian J. Lamoureux, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, RI 02903
(Counsel to The Washington Trust Co.)

Richard S. Mittleman, Esq.
Cameron & Mittleman, LLP
56 Exchange Terrace
Providence, RI 02903
(Counsel to First Union Trade Bank)

Edward J. Bertozzi, Jr., Esq.
Edwards & Angell, LLP
2800 Financial Plaza
Providence, RI 02903
(Counsel to Tim Hortons (New England), Inc.)

Edwin Smith, Esq.
Mary DeNevi, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
(Counsel to Tim Horton (New England), Inc.)

James R. Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903
(Counsel to UPS Capital Business Credit f/k/a First International Bank d/b/a First International Capital)

Richard Nadeau, Jr., Esq.
Nadeau & Simmons, P.C.
56 Pine Street
Providence, RI 02903
(Counsel to UPS Capital Business Credit f/k/a First International Bank d/b/a First International Capital)

Max Wistow, Esq.
Wistow & Barylick
61 Weybosset Street
Providence, RI 02903
(Counsel to George Cioe)

Theodore Orson, Esq.
55 Dorrance Street
Providence, RI 02903
(Counsel to George Cioe)

David S. Berman, Esq.
Riemer & Braunstein LLP
Three Center Plaza
Boston, MA 02108
(Counsel to Eastern Bank)

John P. McCoy, Esq.
Carroll, Kelly & Murphy
One Turks Head , Suite 400
Providence, RI 02903
(Counsel to Narragansett Electric and New England Gas)

Alfred Lane, Esq.
Executive Vice President
Development and General Counsel
Tim Hortons
874 Sinclair Road
Oakville,Ontario CANADA L6K 2Y1
(Counsel to Tim Hortons)

Robert E. Glass, Esq.
Lang Michener, LLP
BCE Place
181 Bay Street, Suite 2500
Toronto, Ontario CANADA M5J 2T7

Charles Soloveitzik, Esq.
Two Elm Street, P.O. Box 414
Westerly, RI 02891
(Counsel to H. Douglas Randall III and Lorraine Randall)

Robert D. Wieck, Esq.
McAdams & Wieck
101 Dyer Street
Providence, RI 02903
(counsel to 1500 Mineral Spring Associates, et al)

Michael P. Lynch, Esq.
117 High Street,
P.O. Box 761
Westerly, RI 02891
(Counsel to Angelo A. Gencarelli, III and Frances G. Kirchon)

William A. Nardone, Esq.
Orsinger & Nardone
53 High Street
Westerly, RI 02891
(Counsel to Chelsea Groton Savings Bank)

Mark A. McSally, Esq.
Kelly, Kelleher, Reilly & Simpson
28 Caswell Street
Narragansett, RI 02882
(Counsel to Narragansett Pier Assoc.)

Cheryl Asquino, Esq.
Narragansett Bay Commission
One Service Road
Providence, RI 02903

Richard L. Gemma, Esq.
MacAdams & Wieck Incorporated
101 Dyer Street, 4th Floor
Providence, RI 02903
(Counsel to Sovereign Bank, Network Capital Alliance Division)

Patrick McBride, Esq.
Moss Codilis, L.L.P.
P.O. Box 1469
Scottsbluff, NE 69363-1469
(Counsel to Aurora Loan Service, Inc.)

C. George Kanabis, Esq.
Kanabis & Houlse
320 State Street
P.O. Box 2022
New London, CT 06320
(Counsel to Christ Matsas & Despina Matsas)

Benjamin M. Scungio, Esq.
Brennan, Recupero, Cascione, Scungio & McAllister, LLP
362 Broadway
Providence, RI 02909
(Counsel to Randolph Savings Bank)

Linda T. Taverni, Esq.
Deily, Mooney & Glastetter, LLP
8 Thurlow Terrace
Albany, NY 12203-1006
(Counsel to ChrylerDaimler Services North America LLC, successor by merger to Mercedes Benz Credit Corporation)

Mark B. Morse, Esq.
420 Angell Street
Providence, RI 02903
(Counsel to Salem Town Center, LLC)

David H. Sholes, Esq.
1375 Warwick Avenue
Warwick, RI 02888
(Counsel to Michael Caito)

**In re: BESS EATON DONUT FLOUR COMPANY INCORPORATED**
**d/b/a BESS EATON COFFEE AND BAKE SHOP**
**d/b/a BESS EATON COFFEE SHOP**
**BK NO.: 04-10630**

**SERVICE LIST**

Allan M. Shine, Esq.
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903
(Counsel to Bess Eaton

Diane Finkle, Esq.
Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903
(Counsel to Debtor)

Harold B. Murphy, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors' Committee)

D. Ethan Jeffrey, Esq.
Hanify & King
One Beacon Street
Boston, MA 02108-3107
(Counsel to Creditors' Committee)

Scott Spear, Esq.
Blish & Cavanagh
30 Exchange Terrace
Providence, RI 02903
(Special Counsel to Bess Eaton)

James Simmons, Esq.
Nadeau & Simmons
56 Pine Street
Providence, RI 02903
(Counsel to U.P.S. Capital Corp.)

Leonard De Pasquale
United States Trustee
10 Dorrance Street, Suite 910
Providence, RI 029903

Douglas Rainville
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(CFO, COO Bess Eaton)

Joseph P. Ferrucci, Esq.
Ferrucci Russo, P.C.
55 Pine Street, 4th Floor
Providence, RI 02903
(Counsel to Louis A. Gencarelli, Sr.)

Richard Kremen, Esq.
Piper Rudnick, LLP
6225 Smith Avenue
Baltimore, MD 21209-3600
(Counsel to Sarah Lee)

Thomas O. Bean, Esq.
Nutter McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
(Counsel to Perkins Paper)

Louis A. Gencarelli, Sr.
2 Kidds Way
Watch Hill, RI 02891

Leland Goldberg
Nachman, Hays, Brownstein
200 Highland Avenue, 3rd Floor
Needham, MA 02494
(Interim CEO Bess Eaton)

John P. McCoy, Esq.
Carroll, Kelly & Murphy
One Turks Head Place, Suite 400
Providence, RI 02903
(Counsel to Narragansett Electric)

Alfred Lane, Esq., Exec. Vice Pres.
Development and General Counsel
Tim Hortons
874 Sinclair Road
Oakville, Ontario CANADA L6K 2Y1
(Counsel to Tim Hortons)

William Dolan, Esq.
Brian Lamoureux, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, RI 02903

Robert E. Glass, Esq.
Lang Michener LLP
BCE Place
181 Bay Street, Suite 2500
Toronto, Ontario CANADA M5J 2T7
(Counsel to Tim Hortons)

Jim Petras
Sara Lee Coffee & Tea
935 National Parkway, Ste. 93510
Schaumberg, IL 60173
(Chairman, Creditors Committee)

Edwin Smith, Esq.
Mary DeNevi, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
(Counsel to Tim Hortons)

Max Wistow, Esq.
Wistow & Barylick
61 Weybosset Street
Providence, RI 02903

Theodore Orson, Esq.
55 Dorrance Street, Suite 400
Providence, RI 02903

Edward J. Bertozzi, Esq.
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903
(Counsel to Tim Hortons)

William J. Delaney, Esq.
Tillinghast, Licht, Perkins, Smith & Cohen, LLP
10 Weybosset Street
Providence, RI 02903
(Counsel to RDW Group)

David S. Berman, Esq.
Riemer & Braunstein, LLP
Three Center Plaza
Boston, MA 02108
(Counsel to Eastern Bank)

Patricia Antonelli, Esq.
180 South Main Street
Providence, RI 02903
(Counsel to Copper Beech Properties & Moogie LLC)

William A. Nardone, Esq.
Orsinger & Nardone
53 High Street
Westerly, RI 02891
(Counsel to Chelsea Groton Savings Bank)

Mark A. McSally, Esq.
Kelly, Kelleher, Reilly & Simpson
28 Caswell Street
Narragansett, RI 02882
(Counsel to Narragansett Pier Assoc.)

Mark B. Morse, Esq.
420 Angell Street
Providence, RI 02903
(counsel to SalemTown Center, LLC)

Richard S. Mittleman, Esq.
Cameron & Mittleman
56 Exchange Terrace
Providence, RI 02903

Michael P. Lynch, Esq.
117 High Street
P.O. Box 761
Westerly, RI 02891

Tony Corleto
Corleto & Associates
107 Mill Plain Road
Danbury, CT 06811

Richard Pascal
O'Brien, Shafner, Stuart, Kelly & Morris
138 Main Street
P.O. Box 310
Norwich, CT 06360

Robert D. Wieck, Esq.
MacAdams & Wieck
101 Dyer Street
Providence, RI 02903

David H. Sholes, Esq.
1375 Warwick Avenue
Warwick, RI 02888
(Counsel to Michael Caito)

Carl Lisa, Esq.
Lisa & Sousa, Ltd.
5 Benefit Street
Providence, RI 02903

Matthew J. McGowan, Esq.
Salter, McGowan, Sylvia & Leonard
321 South Main Street
Providence, RI 02903

Cheryl Asquino, Esq.
Narragansett Bay Commission
One Service Road
Providence, RI 02905

Richard L. Gemma, Esq.
MacAdams & Wieck Incorporated
101 Dyer Street, 4th Floor
Providence, RI 02903
(Counsel to Sovereign Bank, Network Capital Alliance Division)

Benjamin M. Scungio, Esq.
Brennan, Recupero, Cascione, Scungio & McAllister, LLP
362 Broadway
Providence, RI 02909
(Counsel to Randolph Savings Bank)

C. George Kanabis, Esq.
Kanabis & Houle
320 State Street
P.O. Box 2022
New London, CT 06320
(Counsel to Christ Matsas & Despina Matsas)

Lynda L. Laing, Esq.
222 Richmond Street, Suite 208
Providence, RI 02903
(Counsel to Volvo North America LLC)

45

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
- - - - - - - - - - - - - - - - - - -x

In Re: :

LOUIS A. GENCARELLI, SR. : BK No. 04-10682
Debtor Chapter 11

- - - - - - - - - - - - - - - - - - -x

**ORDER**

The above-entitled Chapter 11 bankruptcy proceeding having come before this Court on September 22, 2004, upon debtor Louis A. Gencarelli, Sr.'s ("Gencarelli") motion to limit allowance of claims filed by claimants 1500 Mineral Spring Associates, LP and 1800 Smith Street Associates, LP (collectively hereinafter referred to as the "Claimants"), pursuant to 11 U.S.C. § 502(b)(6), and the Claimants' objections thereto, and after considering the papers and pleadings in this matter, and those pleadings filed in other related proceedings more commonly known, and captioned, as *1500 Mineral Spring Associates, LP v. Louis A. Gencarelli, Sr.*, R.I. Super Ct. (C.A. No. PC 00-3175); *1800 Smith Street Associates, LP v. Louis A. Gencarelli, Sr.*, R.I. Super Ct. (C.A. No. PC 00-3174), *1500 Mineral Spring Associates, LP v. Louis A. Gencarelli, Sr.*, R.I. Dist. Ct. (C.A. No. 00-3376); and *1800 Smith Street Associates, LP v. Louis A. Gencarelli, Sr.*, R.I. Dist. Ct. (C.A. No. 00-3375), as well as the arguments of counsel, in open court, it is

BK No. 04-10682

**ORDERED, ADJUDGED & DECREED**

1. Gencarelli's motion to limit the allowance of claims filed by claimants is *GRANTED*, and the Claimants' objections thereto are *OVERRULED*;

2. The arguments advanced by Gencarelli, by and through counsel, both in his papers in support of Gencarelli's motion to limit allowance of claims filed by Claimants, and at oral argument are adopted and incorporated herein by reference in granting Gencarelli's motion to limit the allowance of claims. A true and accurate copy of the Court's Bench Decision and Order is appended hereto.

3. In adopting and accepting the position asserted by Gencarelli in his papers in support of Gencarelli's motion to limit allowance of claims filed by Claimants, and at oral argument thereon, the Court makes the following findings of fact and/or conclusions of law:

   a. 11 U.S.C. § 502(b)(6) is applicable to the instant proceedings, and in particular, with respect to limiting the Claimants' claims as asserted herein;

   b. In November, 1999, the Claimants owned undeveloped real property located in North Providence, Rhode

Island, at 1500 Mineral Spring Avenue and 1800 Smith Street (collectively the "Properties");

c. On November 1, 1999, the Claimants leased the Properties to Gencarelli for the purported development of Bess Eaton locations;

d. The lease relative to the 1500 Mineral Spring Avenue property (the "1500 Lease") provided for a minimum base rent of $3,500.00 per month, commencing on March 1, 2000;

e. The lease relative to the 1800 Smith Street property (the "1800 Lease") provided for a minimum base rent of $3,000.00 per month, commencing on March 1, 2000;

f. The 1500 Lease and 1800 Lease, respectively, also provided for additional rent defined therein as taxes and insurance costs/expenses;

g. The 1500 Lease and 1800 Lease, respectively, constituted Absolute Triple Net Bonded Land Leases by and between Gencarelli and the Claimants, dated November 1, 1999, and therefore, constitute a "lease," or "leases," as the case may be, as that

term(s) in contained, and set forth, in 11 U.S.C. § 502(b)(6);

h. On February 29, 2000, Gencarelli served written notice upon the Claimants purporting to exercise Gencarelli"s right to terminate the 1500 Lease and 1800 Lease;

i. On March 28, 2000, the Claimants commenced two (2) separate actions against Gencarelli in the Sixth Division District Court (the "District Court actions") seeking damages and possession of the Properties, pursuant to the Rhode Island Commercial Landlord and Tenant Act;

j. On April 19, 2000, Gencarelli and the Claimants executed a stipulation in the District Court actions wherein the parties acknowledged and assented to the fact that Gencarelli was not in possession of the Properties, nor was he entitled to possession of the same;

k. On April 19, 2004, the Claimants repossessed the Properties described in the 1500 Lease and 1800 Lease, pursuant to, and as defined in 11 U.S.C. § 502(b)(6);

l. On June 13, 2000, the District Court entered judgment in favor of the Claimants in the District Court actions;

m. The judgment entered in favor of the Claimants, and against Gencarelli, in the District Court actions, which was with respect to damages only, was appealed to the Providence County Superior Court by Gencarelli;

n. At no time did Gencarelli contest, nor otherwise appeal, the Claimants' claims for possession of the Properties, and, further, at no time did Gencarelli pay any rent to the Claimants during the pendency of the appeal to the Superior Court;

o. On or about March 3, 2004, Gencarelli filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Rhode Island;

p. Thereafter, on March 26, 2004, the Superior Court issued a decision in connection with the Superior Court appeal;

q. In its March 26 decision the Superior Court judicially determined that the parties had entered

into leases, *to wit*, the 1500 Lease and the 1800 Lease, and, further, that the leases were legally valid, binding and enforceable leases by and between the parties;

r. 11 U.S.C. 502(b)(6) applies in the instant proceedings and the so-called "cap" described and defined therein limits recovery by the Claimants in connection with their claims against Gencarelli in this matter;

s. In light of the clear and unambiguous language of 11 U.S.C. § 502(b)(6), this Court will not substitute its judgment for that of the plain reading and intent of that particular statutory provision;

t. Notwithstanding the Claimants' arguments to the contrary, the Court declines to invoke the equitable provisions of 11 U.S.C. § 105 in the instant proceedings insofar as 11 U.S.C. § 502(b)(6) controls or governs the same;

u. The operative date to calculate the Claimants' limited or "capped" claim to damage(s) recovery is April 19, 2000, the date of the parties'

stipulation to possession in the District Court actions;

v. The claims of the Claimants herein are limited or "capped" as follows:

i. The claim of 1500 Mineral Spring Associates, LP is limited to $54,071.26, as follows:

i. $3,923.93 for back rent, taxes, and insurance for the period of March 1, 2000, through March 31, 2000;

ii. $2,485.16 for back rent, taxes, and insurance for the period of April 1, 2000, through April 19, 2000;

iii. $47,662.17, which is the amount reserved by the 1500 Lease, without acceleration, for one year pursuant to 11 U.S.C. 502 § (b)(6); and

ii. The claim of 1800 Smith Street Associates, LP is limited to $45,461.01 as follows:

BK No. 04-10682

i. $3,283.28 for back rent, taxes, and insurance for the period of March 1, 2000, through March 31, 2000;

ii. $2,079.41 for back rent, taxes, and insurance for the period April 1, 2000, through April 19, 2000;

iii. $40,098.32, which is the amount reserved by the 1800 Lease, without acceleration, for one year pursuant to 11 U.S.C. § 502(b)(6).

Entered as an Order of this Court this 22nd day of November, 2004.

Arthur N. Votolato
U.S. Bankruptcy Judge

Judgment#:1:04-bk-10682-265-141 Entered on Docket: 11/22/04

**STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS**

**PROVIDENCE, SC.** **SUPERIOR COURT**

6

**1500 MINERAL SPRING ASSOCIATES, LP,**
**1800 SMITH STREET ASSOCIATES, LP,**
**AND JASON'S REALTY CORP.**

**PLAINTIFF**

**C.A. Nos: 00-1732, 00-3174, 00-3175**

*vs.*

**LOUIS A. GENCARELLI, SR.**

**DEFENDANT**

## DECISION

INDEGLIA, J.: This matter is before the Court on Plaintiffs' actions for rent and associated expenses on two leases with lessee Defendant and on Defendant's Complaint for Declaratory Judgment seeking a declaration of rights and obligations of the parties under the leases.[1] Over several days in December 2003, this matter was tried before this Court sitting without a jury. The parties have submitted post trial briefs and made oral arguments in support of their respective positions.

## FACTS AND TRAVEL

This dispute arises from two commercial leases that were executed as of November of 1999, between Plaintiffs 1500 Mineral Spring Associates, LP (hereinafter "MSA" or "Plaintiff"), and 1800 Smith Street Associates, LP (hereinafter "SSA" or

"Plaintiff"), and Defendant Louis A. Gencarelli Sr. (hereinafter "Gencarelli", "Defendant", or "Lessee"). Bennie Sisto (hereinafter "Sisto", "Plaintiff", or "Lessor") is the President and majority stockholder of JASON'S REALTY CORP., the general partner of both MSA and SSA. At all times relevant hereto, Gencarelli had been President, CEO and Chairman of the Board of Bess Eaton Donut Flour Company.[2]

Negotiations between Sisto and Gencarelli began in 1998 when Sandra Salvadore (hereinafter "Salvadore"), the real estate broker for MSA and SSA, presented the subject properties to Tim Londregan (hereinafter "Londregan") of Londregan Real Estate, who then represented Bess Eaton. At that time, Londregan informed Salvadore that Bess Eaton was interested in both sites but could not act immediately. In February 1999, Salvadore once again contacted Londregan at which time Londregan proceeded to bring the subject properties to Gencarelli's attention. Gencarelli personally visited both sites with Salvadore, Sisto, Jason Sisto (Plaintiff's son) and Londregan.

In June 1999, Salvadore contacted Gencarelli and his attorney, Scott Spear, to discuss the properties, at which time Salvadore was informed that Gencarelli was now ready to proceed. Thereafter, the parties exchanged several draft letters with respect to each of the properties. In July of 1999, Salvadore forwarded site maps of both MSA and SSA to Bess Eaton. Peter Huff (hereinafter "Huff"), who was Bess Eaton's Director/Manager of Construction and Architectural Design at that time, was to review the identified Bess Eaton locations/sites and work with the contractors, engineers and attorneys that were necessary to complete the projects. On July 8, 1999, Huff prepared a

---

[1] The Plaintiffs actions are de novo appeals from the District Court which awarded judgment for Plaintiffs.
[2] It should be noted that in 2002, Defendant Gencarelli did not act as president of Bess Eaton. During 2002, the president of Bess Eaton was George Cioe. After 2002, Gencarelli resumed his position as president of Bess Eaton.

preliminary sketch/layout (not covering the entire parcel) of the proposed Bess Eaton donut shop on MSA and forwarded it to Salvadore and Gencarelli. On July 19, 1999, Huff prepared a preliminary sketch/layout (not covering the entire parcel) of the proposed Bess Eaton donut shop on SSA and forwarded it to Salvadore. From September 7, 1999, through the latter part of 1999, the parties negotiated and exchanged draft leases regarding the subject properties.

On November 1, 1999, Defendant entered into two five-year leases for MSA and SSA.[3] The Defendant intended to build and operate two Bess Eaton facilities on those sites, and both leases contained a number of identical conditions precedent that were to be satisfied by Defendant and by Plaintiff. The last paragraph of paragraph 1(a) in both leases, and paragraph 1(b) and 1(c) of both leases are identical, and provide as follows:

> "a. It shall be a condition precedent to the Lessee's [Gencarelli's] performance of any obligation Lessee may have as Lessee hereunder that: (a) all the permits and approvals be obtained necessary to construct a drive-thru coffee shop and bakery specifically including the drive-thru capability, the signage and exterior menu, except the condition to operate for 24 hours a day, (b) that Lessor obtain at its expense and deliver to Lessee an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's Lender, (which satisfaction shall not be unreasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of this lease; (c) that Lessor provide a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within (60) days after execution of this lease; (d) that all representations and warranties of Lessor herein are and continue to be true and accurate, (e) that Lessee obtain financing to construct the Building in an amount equal to eighty (80%) percent of all construction costs with financing at commercially acceptable terms and rates within one hundred twenty (120) days after execution

[3] The rent provisions in the leases state they are applicable for the "first five-year period, commencing on March 1, 2000."

> of this lease, (f) that Lessee obtain title insurance in a form sufficient to enable Lessee to obtain financing through the grant of a leasehold mortgage to construct and operate the proposed drive-thru coffee and bakery shop.
>
> b. The Minimum Base Rent Commencement Date shall be one hundred twenty (120) days after execution of the lease or upon Lessee opening for business, whichever is sooner. If the Lessee is unable to satisfy the above contingencies in which event this payment obligation shall cease, and this lease shall become null and void.
>
> c. The Additional Rent Commencement Date shall be November 1, 1999 and shall be paid from said date through the duration of the lease. If the Lessee is unable to satisfy the above contingencies within the 120 days after execution of this lease this payment obligation shall cease and this lease becomes null and void."

Additionally, the first sentence of paragraph 1(a) of the 1500 Lease also provides:

> "This lease is executed with the understanding and agreement that Lessor, at Lessor's expense, will demolish and remove all existing structures, buildings and improvements on the Demised Premises so the Lessee may construct buildings, fixtures and improvements on the Demised Premises. Lessee shall reimburse Lessor $7,800 for said costs."

The 1500 lease provided for a minimum base rent of $3,500.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000. The 1800 lease provided for a minimum base rent of $3,000.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000.

On November 4, 1999, two cover letters were delivered to MSA and SSA from Defendant, each stating the following:

> "Upon final review of the Agreement [Leases], I gave consideration to the possibility that I may encounter delays in the process of obtaining permits. In the event that I experience delays, court contests or appeals, I will need

> your agreement to extend the lease commencement date accordingly. The extension would not include the additional rent commencement date."

In response, both MSA and SSA executed their respective cover letter acknowledging that:

> "The content of this letter is acceptable on behalf of [1800 Smith Street Associates, LP or 1500 Mineral Spring Associates, LP as appropriate] and shall be deemed an amendment to the above referenced Land Lease."

Between November 1, 1999 and February 29, 1999, the parties exchanged several letters and corresponded through their respective agents, primarily Huff and Salvadore. The most pertinent of those communications are discussed herein. On December 20, 1999, Salvadore informed Gencarelli that Garafalo had been hired to perform the environmental reports for both Smith Street and Mineral Spring Avenue. Gencarelli acknowledged his acceptance thereof by executing each letter agreement at the bottom after the following language: "The content of this letter is acceptable on behalf of Bess Eaton Coffee & Bake Shop and shall be deemed an amendment to the above referenced Absolute Triple Net Bonded Land Lease." Sisto testified that he believed that Gencarelli's acknowledgement on and acceptance of the December 20, 1999 letter agreements meant that he was not going to enforce the 60 day deadline for delivery of the environmental reports.

During the trial, Salvadore testified that in December 1999 or January 2000, she contacted Huff to inquire as to Gencarelli's commitment on the Mineral Spring Avenue site and Huff responded that they were totally committed and to move forward with whatever needed to be done to get the site ready. Additionally, Sisto testified that in December 1999, he also had a conversation with Huff wherein Huff told him that they

were going forward with the deal and that they did not want to utilize the existing structures on Mineral Spring. Sisto further testified that in reliance on the above-stated conversations with Huff, in January 2000, MSA demolished and removed the existing brick buildings/ structures from the Mineral Spring Avenue property, and re-graded the site for construction.

On February 14, 2000, Salvadore met with two engineers from Garofalo at the Mineral Spring Avenue site, who were performing the Phase I site evaluation. At this time, Garofalo recommended that a Phase II subsurface investigation be performed on Mineral Spring Avenue because it was discovered that a gas station previously located on another piece of property upgrade from the Mineral Spring Avenue site had a leaking underground storage tank. During the trial, Salvadore testified that she telephoned Huff to inform him of the Phase II evaluation being performed and to ask Huff whether he wanted a written copy of the completed Phase I report. According to Salvadore, Huff told her "no" and to just go ahead with the Phase II evaluation. On February 24, 2000, the Phase II evaluation was being conducted. Salvadore testified that while she was at the Smith Street site, she telephoned Huff to inform him that Phase II was being performed on both properties that day and Huff expressed his pleasure with the progress. Salvadore's recollection of her telephone conversations with Huff is consistent with Gencarelli's testimony during trial in which he stated that receiving the written environmental reports on Mineral Spring Avenue and Smith Street within the 60 day time period set forth in the leases was not important to him.

Also, in February of 2000, the parties resumed correspondence relating to the obtaining of the necessary permits and approvals. By correspondence dated February 16,

2000, corporate counsel for Gencarelli/Bess Eaton, Scott Spear, told Salvadore to contact Attorney Ferrucci, who was engaged by Gencarelli to provide legal services with respect to the permitting process, and work directly with him on the permitting aspects of the projects. On February 17, 2000, Salvadore advised Huff, Attorney Spear and Attorney Ferrucci that the North Providence Town Planning Board Director had reserved two spots for the Smith Street and Mineral Spring Avenue proposals on the Planning Board's February 22 meeting Agenda, and that Bess Eaton needed to submit "something" to him. In response, Huff put together informational packages for each site, which were ultimately submitted to the Planning Board at its February 22, 2000 meeting. The sketch contained in the Smith Street package was the same sketch that was previously prepared by Huff on July 19, 1999 during negotiations between the parties. Likewise, the sketch contained in the Mineral Spring Avenue package is the same sketch that was previously prepared by Huff on July 8, 1999, during negotiations.

At the Planning Board's February 22 meeting, Huff made his presentation regarding each of the projects. The Planning Board took no formal action at this time because there was not a quorum present at that meeting. The matters were continued to the next meeting of the Planning Board, to be held on March 13, 2000. During the trial, Gencarelli testified that he was informed that the Planning Board reacted favorably to the projects, even though they could not take action.

Shortly before the end of the 120-day period set forth in the leases, Sisto sent invoices to lessee for each property, reminding Gencarelli of the rent commencement date and charging rent on each lease as of February 29, 2000. On February 29, 2000, Termination Notices were sent from Gencarelli to SSA and MSA that purported to

exercise Gencarelli's right to terminate the 1500 lease and the 1800 lease. Gencarelli bases his right of termination on the fact that all conditions precedent referenced in the leases were not accomplished within the 120 day time frame set forth in the leases.

**PLAINTIFF'S ARGUMENT**

The Plaintiff-lessor contends that the letters exchanged between the parties constituted a modification to each of the leases, evidencing the parties' intent not to be bound by a strict adherence to the 120 day period set forth in paragraph 1 of the leases. Lessor argues that the amendments to the leases clearly demonstrate that time was not of the essence and therefore, the lessee was not justified in terminating the leases because all of the conditions in the leases were not performed within the original 120 day time period. Furthermore, lessor asserts that even if Defendant did not expressly waive all of the time provisions set forth in the leases, Defendant's behavior up until his letter terminating the leases, was indicative of someone who intended to be bound by the leases and was satisfied with the progress being made.

While lessor concedes that he sent a bill for the base rent due 121 days after execution of the leases, lessor asserts that the bill for rent was a separate act that was not dependent upon the 120 day time period set forth in the leases, as these time limits had already been waived by the parties. Lessor maintains that even if the 120 day time period was not expressly waived by the amendments to the leases, lessee's actions manifested an implicit waiver of the 120 day time constraint in the leases. Consequently, the bill sent by lessor with regard to the properties in question was an independent act that did not carry with it any meaning other than to notify the lessee that the due date for the

minimum base rent was upon them. Additionally, lessor posits that he would have been willing to adjust the due date for the minimum base rent had the lessee opted to engage in discussions with the lessor regarding this matter. It is lessor's contention that up until the point that lessee informed lessor that he was terminating the leases, negotiations between the parties were extremely amiable and making additional accommodations had never posed a problem.

Furthermore, lessor argues that lessee should be held responsible for the rent on the lease because he did not fulfill his duty to use good faith, diligence and best efforts to obtain the necessary approval and permits within the 120 day time period. Lessor maintains that the provision allotting the lessee 120 days to secure financing before either party could terminate the lease assumed that the lessee would make reasonable efforts to secure said financing. Thus, even if the 120 day time period had not been waived by the parties, lessor contends that lessee would still be obligated to pay the rent on the leases, as the lessee did not even attempt to fulfill the condition pertaining to the 120 day time constraint.

Finally, lessor maintains that lessee should bear the costs incurred as a result of the demolition of the structures on the Mineral Spring Avenue site. Lessor argues that he reasonably relied on the representations of lessee and Huff that lessee had every intention of going forward with the leases, irrespective of any time frames originally set forth in the leases.

**DEFENDANT'S ARGUMENT**

Conversely, Defendant-lessee argues that when the conditions precedent were not accomplished within the 120 day time period set forth in the leases, the lessee's obligations to pay rent automatically ceased, and both leases became null and void. It is lessee's contention that the 120 day time period allotted in the leases was a strict time limit within which all of the conditions precedent set forth in the leases needed to be performed. Lessee asserts that because he was unable to obtain financing within 120 days following execution of the leases, under the terms of the agreements, his obligations under the leases automatically ceased. While the lessee does not contest that he was obligated to make reasonable efforts to obtain financing within the 120 days, as per the agreements, he maintains that the lessor's failure to perform certain contingencies, namely providing environmental assessments and boundary surveys in a timely manner, prevented him from obtaining financing within 120 days of execution of the leases, the nonoccurrence of which voided the agreements.

Moreover, lessee maintains that the lessor's bill for the base rent on the 121st day after execution of the leases undermines the lessor's position that the 120 day time provision in the leases was waived or modified by the parties. Lessee contends that if the lessor truly believed that the parties were no longer bound by the 120 day time period then lessor would not have sent out a bill for the rent exactly 120 days after execution of the leases, as provided for in § § b and c of the leases. It is lessee's position that the lessor's partial adherence to the aforementioned provisions, subsequent to the passage of the 120 day time period set forth in the leases, is demonstrative of the fact that lessor

intended to be bound by these provisions, regardless of any amendments made to the 60 day time period allotted for environmental assessments and boundary surveys.

Furthermore, it is lessee's contention that he should not be held responsible for the costs incurred due to the demolition of the structures on Mineral Spring Avenue because lessor was aware that under the terms of the lease, lessee's obligations on the leases would only be triggered if all conditions precedent were accomplished within the 120 day time frame set forth in the leases.

## DISCUSSION

The Rhode Island Supreme Court has repeatedly held that contracts which include provisions relating to performance at a fixed time are to be given a reasonable construction by the court, with regard being given to the surrounding circumstances and the parties' manifested intent. Safeway System, Inc. v. Manuel Bros., Inc., 228 A.2d 851, 856 (R.I. 1967); Furlong v. Barnes, 8 R.I. 226 (R.I. 1865). "A contract is not to be construed like a railway time-table." Furlong, 8 R.I. at 229. Additionally, when construing a contract that includes a provision relating to time limits, the burden of proof falls upon the party contending that time is of the essence. Sal's Furniture Co. v. Peterson, 133 A.2d 770, 773 (R.I. 1957).

In the present case, lessee has not demonstrated to this Court that time was of the essence in the lease agreements at issue. Although the leases do give a specific time frame for the completion of certain conditions, there is no explicit language in the leases themselves suggesting that these time frames are material or essential to the agreements. Moreover, the amendments to the leases, in which the lessee himself requested leniency

if he needed additional time to obtain permits and approvals, further suggests that the parties did not view the time element to be strict in nature.

This Court rejects lessee's position that language stating that the leases shall become null and void if the terms of the leases are not satisfied possess equivalent or even stronger meaning than the phrase "time is of the essence" because they signify an automatic nullification of the leases if the conditions do not occur within the 120 day time frame. Most contracts contain language that the contract will become null and void if the parties do not act consistently with the terms of the lease. That in itself however, does not suggest that time is of the essence. "That the parties to a contract intended to make time of the essence may appear by express stipulation therein or it may be found in the nature or purpose of the contract or in the circumstances under which it was made. There must, however, be some evidence from which such intent can be ascertained, and the party contending that time is of the essence of the contract has the burden of proof thereon." Sal's Furniture Co., 133 A.2d at 773.

Moreover, lessee's argument completely ignores the fact that he implicitly waived all time limits in the leases by voluntarily continuing with the contracts long after the 60 day time limit had not been met. "'A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive." Fairbanks, Morse & Co. v. Nelson, 217 F. 218 (9th Cir. 1914). In the case of Welsh v. Dick, 84 A. 769 (Pa. 1912), the court declared: "The right to insist upon time as the essence of a contract may be waived as effectually by implication as by express agreement, and whether there has been an

implied waiver in any case depends upon whether the conduct of the party seeking to invoke the strict provision of the contract had been such as to lead the other party to believe he would not be held to it, but might, notwithstanding it, proceed to perform." Although, lessee attempts to distinguish the 60 day time limit from the 120 day time limit by arguing that the 120 day time limit was more absolute, the facts of this case do not indicate that lessee made any such representations to that effect at any time throughout the parties' transactions.

Furthermore, "it is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring out that happening." Bradford Dyeing Associates, Inc. v. J. Stog Tech GmbH., 765 A.2d 1226, 1237-38 (R.I. 2001)(citing United States v. Croft-Mullins Electric Co., 333 F.2d 772, 775 n. 4 (5th Cir. 1964)) (quoting Gulf, Mobile& Ohio Railroad Co. v. Illinois Central Railroad Co., 128 F. Supp. 311. 324 (N.D. Ala. 1954)). In the present case, lessee made no attempts to secure financing for the properties within 120 days after execution of the leases. This Court rejects lessee's argument that he was prevented from fulfilling this condition due to the lessor's failure to provide environmental assessment reports and boundary surveys in a timely manner. If it truly was lessee's intent to be lenient with regard to the 60 day time constraint while enforcing a strict 120 day time limit, then it was the lessee's responsibility to clarify this when he realized that the lessor was not going to provide the necessary documents which would allow lessee to secure financing within the 120 days initially allotted. Rather than

making lessor aware of the fact that "time was of the essence", a term absent from the lease itself, however, lessee's behavior suggested that the original time constraints in the leases were unimportant. It is clear to this Court, that lessee knew well in advance of the 120th day following execution of the leases, that financing would not be secured in the time allotted in the leases.

In a recent case with facts very similar to the facts before this Court, the Rhode Island Supreme Court affirmed the trial court's finding that where conditions are made part of a contract, it is assumed that the parties to the contract will utilize good faith and due diligence in order to accomplish those conditions. See Ray LaCroix v. David F. Walker, 819 A.2d 1244 (R.I. 2003). This is especially true where the conditions in a contract particularly benefit or shield one party, as it is mutually assumed that the party for whom the condition is intended to protect will be using his best efforts to accomplish those conditions. See Safeway System, Inc., 228 A.2d at 853. In LaCroix, the parties entered into a five-year lease for three units in a building with the express purpose of operating a gym in the space leased. LaCroix, 819 A.2d at 1245. The lease included an express condition precedent which made the terms of the lease contingent upon the lessee's being able to obtain a license to operate a gym in the leased facility. Id. When the lessee and his architect could not reach an agreement regarding the removal of unit partitions, however, the lessee never applied for a license to operate the gym. Id. The Supreme Court declared that it was reasonable for the trial justice to conclude that the lessee breached the contract by failing to take "all necessary steps" to obtain a license, where the term "all necessary steps" meant that lessee was required to "at a minimum, submit a floor plan and apply to Gold's Gym for a license." Id. at 1246-47.

Lessee attempts to distinguish the facts in LaCroix from the facts in this case by arguing that in this case the conditions lessee had to fulfill were contingent upon the lessor's completion of its conditions. This argument does not have merit since the lessee implicitly waived the time limit for completion of the environmental assessments and boundary surveys and continuously acted in a manner that would lead a reasonable person to believe that he was not concerned with when those acts were to be performed. Here, lessee not only gave no indication to lessor that the 120 day time frame was still in effect, lessee also turned down the opportunity to secure financing when it presented itself.[4] Thus, it is apparent to this Court that lessee failed to use his best efforts in order to achieve the conditions within the 120 day time frame he depends on for nullification of the leases.

Additionally, lessee testified at trial that he was displeased when he realized that under the terms of the leases he was obligated to begin paying rent on the properties themselves before he had obtained all of the necessary permits and approvals from the Town of North Providence to build the donut shops. There is little question that Defendant viewed the parties' failure to adhere to the original terms of the agreements as an opportunity to terminate the leases and escape from what he viewed to be two disadvantageous commitments. During Defendant's deposition, Defendant conceded that he did not realize when he entered into the leases that under their terms he would potentially have to begin paying rent on the properties before he had obtained permits for

[4] In January 2000, Salvadore, Gencarelli and his son, Paul Gencarelli, met with a representative of NE Realty Resources, Inc., a financing source, at Bess Eaton in Westerly. NE Realty ultimately proposed financing to Bess Eaton to fund several of its projects, including the Smith Street and Mineral Spring projects, which had been discussed at their meeting. By correspondence to NE Realty dated January 31, 2000, Gencarelli declined the financing proposal stating "we have already secured sufficient financing to complete our development objectives for the next twelve months." This correspondence between

the Bess Eaton facilities. However, Defendant's displeasure with the agreements he made, no matter how disadvantageous, did not absolve him of his duty to act in good faith and to use his best efforts to timely obtain the permits and approvals in order to satisfy the conditions in the leases. See Bradford Dyeing Associates, Inc., 765 A.2d at 1238.

Although lessee had numerous opportunities to inform the lessor of his intent to disengage himself from the leases if all conditions were not accomplished by the 120 day mark, lessee and Huff engaged in several acts that were directly contrary to that intent. As of February 16, 2000, lessee's legal counsel had not yet filed the pertinent applications with the Town of North Providence and it was only due to the initiative of lessor and his real estate agent that the projects were placed on the agenda for the February 22, 2000 meeting for the North Providence Planning Board. That meeting was held only seven days preceding the 120 day deadline, yet none of the actions taken by lessee or those acting on his behalf indicated that there was any intent on the part of lessee to terminate the leases if all the conditions in the leases were not satisfied by the 120 day mark. At no time before, during or after this meeting, did either Huff or Ferrucci approach Sisto and inform Sisto of any urgency in obtaining approval for the permits and applications because the 120 day deadline was approaching. Lessee's complete failure to notify lessor of his intent to act in accordance with the 120 day time frame set forth in the leases when it was clear that the parties were not acting under that assumption for quite some time, served as an implicit waiver of the 120 day deadline. A contract deadline

---

Gencarelli and NE Realty evidences the fact that Gencarelli was not in a rush to secure financing within the 120 day time frame and that he was aware that he would be able to secure financing for these two projects.

may be expressly or impliedly waived by acts, words or conduct inconsistent with the deadline. CBS, Inc. v. Merrick, 716 F.2d 1292, 1295 (9th Cir. 1983)

With respect to the demolition costs incurred by lessor from the work done on the Mineral Spring Avenue site, this Court finds that lessor reasonably relied on Huff's statements in December 1999, that Defendant intended to follow though on the leases and wanted the structures on the Mineral Spring Avenue property taken down. At no time did lessee or Huff inform lessor that lessee did not intend to pay the expenses incurred as a result of this demolition if all conditions precedent were not accomplished within the 120 day time frame. A plaintiff's reliance upon a vague promise can be viewed as reasonable and justified, if the plaintiff had sufficient reason to believe that the defendants' commitment to an oral contract modification had been made. See GBM Acquisitions, Inc. v. Susan Adams d/b/a The Waterfront Cafe, 823 A.2d 1121, 1124 (R.I. 2003)

In the present case, several conversations between the parties supported lessor's objectively reasonable belief that both the 60 day deadline and the 120 day deadline had been mutually waived by the parties. Consequently, lessor had no reason to suspect that lessee was planning to extricate himself from the leases if the 120 day time deadline was not met. Moreover, lessee's assertion that it was lessor's choice to demolish the buildings before the 120 day deadline completely ignores the fact that in order to conduct a comprehensive environmental assessment of the properties as they would be when delivered to lessee, all unwanted structures needed to be removed in advance of the 120 day time frame.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Accordingly, after careful review of all the evidence introduced, the testimony of the witnesses and memoranda submitted by the attorneys, the Court makes the following findings of fact and conclusions of law.

1. On November 1, 1999, each of the Plaintiffs, MSA and SSA, entered into a commercial Absolute Triple Net Bonded Land Lease with Defendant Gencarelli, collectively referred to as the Leases. Both leases are for a five-year period, commencing on March 1, 2000, with the option of renewal.
2. On November 4, 1999, the parties agreed via cover letters, to amend the leases to include an agreement that if lessee encountered delays in the process of obtaining permits, the lease commencement date for the minimum base rent would be extended accordingly. These amendments were made at the request of Defendant Gencaralli.
3. The 1500 Lease provided that Lessor, at Lessor's expense, would demolish all existing structures on the Demised Premises for the Lessee's benefit, and Lessee would reimburse Lessor $7,800 for said costs. <u>See</u>, *supra*, Facts and Travel.
4. Both leases contained specific conditions precedent to any performance obligation of Defendant Gencarelli as Lessee. <u>See</u>, *supra*, Facts and Travel.
5. The 1500 Lease provided for a Minimum Base Rent of $3,500.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000. The 1800 Lease provided for a Minimum Base Rent of $3,000.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000.

6. On February 29, 2000, written notices were sent from Gencarelli to SSA and MSA that purported to exercise Gencarelli's right to terminate the leases. In each of the Termination Notices, Gencarelli asserted that the alleged failure to satisfy the lease contingencies "automatically voids the lease."

7. Prior to receiving the Termination Notices, Sisto had Invoices sent to Gencarelli for both Smith Street and Mineral Spring Avenue to remind Gencarelli of the minimum base rent commencement date under the leases.

8. Defendant Gencarelli, through his actions and the actions of those acting on his behalf, implicitly waived the 60 day time limit for the production of environmental assessments and boundary surveys, and the 120 day time limit for the securing of financing.

9. The phrase "time is of the essence" is not present in the leases and Defendant's behavior suggested that the original time constraints in the leases were flexible.

10. Defendant knew, or should have known well in advance of the 120th day following execution of the leases, that financing would not be secured in the time allotted in the leases.

11. Defendant breached his implied duty to act in good faith, with due diligence, and to use his best efforts to fulfill his conditions within 120 days after execution of the leases.

12. Up until the time that he sent the termination notices, Defendant, and all those acting on his behalf, manifested an intent to carry through on the leases, regardless of any time provisions originally set forth in the leases.

13. Plaintiffs reasonably relied on Defendant's actions in demolishing the structures on the Mineral Spring Avenue property, in accordance with the 1500 Lease.

14. Plaintiffs have tried to mitigate damages by attempting to sell and/or lease the Mineral Spring Avenue property and the Smith Street property. Despite their marketing efforts, however, they have been unsuccessful in consummating a sale or lease thus far.

15. Plaintiffs have satisfied the Court by a preponderance of the evidence that they are entitled to rent due under the two leases and demolition costs associated with the Mineral Spring Avenue property.

Accordingly, the Court finds for the Plaintiffs and orders Defendant to pay the Minimum Base Rent on both leases for the period commencing on March 1, 2000 through the present date, $3,500 per month under the 1500 Lease and $3,000 per month under the 1800 Lease. Defendant is also ordered to pay the Additional Rent (i.e. taxes and insurance costs/expenses) on both leases for the period commencing on November 1, 1999 through the present date. Additionally, Defendant is hereby ordered to pay for the demolition costs associated with the 1500 Lease in the amount of $7,800. Plaintiffs are entitled to recover from Defendant reasonable attorneys' fees and expenses incurred as a result of Defendant's default under the Leases.

Counsel shall prepare an order consistent with this decision.